**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE TERM SHEET BETWEEN THE DEBTORS, MARLEY SPOON, AND MISFITS MARKETS PURSUANT TO BANKRUPTCY RULE 9019, (II) AUTHORIZING THE DEBTORS TO REJECT CERTAIN AGREEMENTS, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that, on **July 29, 2026, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard, the above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned counsel, shall move the *Debtors' Motion for Entry of an Order (I) Approving The Term Sheet Between the Debtors, Marley*

---

[1]  The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

*Spoon, and Misfits Market Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Reject Certain Agreements, and (III) Granting Related Relief* (the "Motion") before the Honorable Mark E. Hall, United States Bankruptcy Judge, in Courtroom 3E of the United States Bankruptcy Court for the District of New Jersey, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Newark, NJ 07102 (the "Court"), for entry of an order (the "Order"), substantially in the form submitted herewith.

PLEASE TAKE FURTHER NOTICE that, in support of the relief requested in the Motion, the Debtors shall rely on the accompanying Motion, which sets forth the relevant legal and factual bases upon which the relief requested should be granted.  A proposed Order granting the relief requested in the Motion is also submitted herewith.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the relief requested in the Motion shall:  (i) be in writing, (ii) state with particularity the basis of the objection; and (iii) be filed with the Clerk of the Bankruptcy Court electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the *General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002* (the "General Order") and the *Commentary Supplementing Administrative Procedures* dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary, and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest, on CD-ROM in Portable Document Format (PDF), and shall be served in accordance with the General Order and the Supplemental Commentary, so as to be received no later than seven (7) days before the hearing date set forth above.

PLEASE TAKE FURTHER NOTICE that copies of all documents filed in these

chapter 11 cases may be obtained free of charge by visiting the website of Kroll Restructuring

Administration LLC at https://restructuring.ra.kroll.com/Freshrealm.  You may also obtain copies

of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance

with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE** that unless responses are timely and properly filed

and served, the Motion shall be decided on the papers in accordance with D.N.J. LBR 9013-3(d),

and the relief requested may be granted without further notice or hearing.

Dated: June 30, 2026

*/s/ Ryan T. Jareck*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:    msirota@coleschotz.com
          wusatine@coleschotz.com
          rjareck@coleschotz.com
          dharris@coleschotz.com
          mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al*.,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE TERM SHEET BETWEEN THE DEBTORS, MARLEY SPOON, AND MISFITS MARKETS PURSUANT TO BANKRUPTCY RULE 9019, (II) AUTHORIZING THE DEBTORS TO REJECT CERTAIN AGREEMENTS, AND (III) GRANTING RELATED RELIEF**

TO THE HONORABLE MARK E. HALL,
UNITED STATES BANKRUPTCY JUDGE:

---

1   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

The above-captioned debtors (collectively, the "Debtors") state as follows in support of this motion (the "Motion"):[2]

**Relief Requested**

1.      The Debtors respectfully submit this Motion for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (i) approving the settlement pursuant to the Term Sheet, a copy of which is attached hereto as **Exhibit B** (the "Term Sheet"); (ii) authorizing the rejection of executory contracts by and between the Debtors and MMM Consumer Brands Inc. ("Marley Spoon"), including that certain (a) Production Fulfillment Agreement dated February 9, 2024, (b) Technology License Agreement, and (c) any other agreements by and between the Debtors and Marley Spoon (collectively, the "MS Contracts"), effective as of the Service Transfer Date; and (iii) granting related relief.  In support of the Motion, the Debtors respectfully represent as follows:

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.).  The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent

---

2   A description of the Debtors and their business, as well as the facts and circumstances supporting this Motion and giving rise to the Debtors' chapter 11 cases, is set forth in greater detail in the *Declaration of Brian Fleming, Chief Financial Officer of the Debtors and Senior Director of Alvarez & Marsal North America, LLC in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein.  Capitalized terms used but not defined in this Motion have the meaning ascribed to them in the First Day Declaration, elsewhere in this Motion, the TSA (defined below), the TSA Amendment (defined below), or the Term Sheet (as defined below).

of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105, 365, and 1107 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9019-3 of the Local Rules of the United States Bankruptcy Court for the District of New Jersey (the "Local Rules").

**Background**

**A.      General Case Background**

5.      The Debtors were founded in 2013 and became an independent company in 2021 to create fresh meal destinations that cater to busy and healthier consumer lifestyles.  In January 2024, the Debtors acquired the U.S. operational assets of Marley Spoon, a global subscription-based meal kit provider.

6.      On April 27, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (these "Chapter 11 Cases").  On April 29, 2026, this Court entered an order directing the procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) [Docket No. 42]. The Debtors are operating their business and managing their assets as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On May 14, 2026, the U.S. Trustee appointed an official committee of unsecured creditors [Docket No. 118] (the "Committee").  As of the date hereof, no request for the appointment of a trustee or examiner has been made.

3

8.      As described in the First Day Declaration, the Debtors filed these Chapter 11 Cases to pursue a settlement and sale transaction with Blue Apron and Misfits Market (the "Blue Apron/Misfits Transaction"), along with an expeditious, value-maximizing sale process of the Debtors' remaining non-Blue Apron assets for the benefit of all stakeholders.

9.      To effectuate this strategy, on April 27, 2026, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Between the Debtors and Blue Apron Pursuant to Bankruptcy Rule 9019, (II) Approving the Sale of Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (III) Authorizing the Debtors to Enter Into and Perform Their Obligations Under an Asset Purchase Agreement, (IV) Authorizing the Debtors to Enter Into a Transition Services Agreement with Blue Apron, (V) Approving the Procedures Authorizing the Debtors to Assume and Assign Executory Contracts and Unexpired Leases, (VI) Authorizing the Debtors to Reject Certain Agreements, and (VII) Granting Related Relief* [Docket No. 21] to approve the Blue Apron/Misfits Transaction which the Court granted on June 2, 2026 [Docket No. 209] (the "Approval Order").

10.     As part of the Approval Order, the Court approved the (i) Transition Services Agreement (the "TSA") under which the Debtors provide operational, production, and administrative services to facilitate the orderly transition of the Blue Apron production and fulfillment business to Misfits Market, Inc. ("Misfits Market") and (ii) the asset purchase agreement between the Debtors and Misfits Market (the "Misfits APA"). On June 4, 2026, the effective date of the TSA occurred and the sale under the Misfits APA closed. *See* Docket No. 217.

11.     As described in the First Day Declaration, the Debtors operate out of three (3) locations, including their principal place of business located in Linden, New Jersey (the "Linden

4

Facility"). Pursuant to the terms of the Misfits APA and related TSA, the Debtors sold to Misfits Market substantially all their operational assets at the Linden Facility, including certain equipment and inventory. A significant part of the Marley Spoon business is also serviced out of the Linden Facility. As a result of the Misfits APA and the TSA, Misfits Market acquired the equipment and inventory used to service the Marley Spoon business.

12.    Following the execution of the TSA, the Debtors were in negotiations with Misfits Market and Marley Spoon to include as part of the services under the TSA, services related to the Marley Spoon business. The parties were unable to reach a final agreement prior to the hearing on approval of the Blue Apron/Misfits Transaction and therefore agreed to enter into an amendment to the TSA providing for the temporary provision of services by the Debtors to Misfits Market for the benefit of Marley Spoon through June 30, 2026 to allow more time for the parties to negotiate final terms (the "TSA Amendment").[3]

13.    The TSA Amendment provides among other things that:

- beginning on the effective date of the TSA and continuing through June 30, 2026, FreshRealm, Inc. ("FreshRealm") shall cause to be provided to Misfits Market the Marley Spoon Services for the benefit of Marley Spoon;

- absent the execution of a definitive term sheet, FreshRealm shall have no further obligation after June 30, 2026 to continue to provide the Marley Spoon Services;

- all revenues generated or attributable to the Marley Spoon Services owed by Marley Spoon, shall be the sole property of Misfits Market and Marley Spoon would be required to remit such payments directly to Misfits Market; and

- neither Marley Spoon nor the Debtors could assert any claims against the other party during the temporary service period, and that all such claims and defenses are preserved;

---

[3]    The TSA Amendment is attached at **Exhibit A** to the *Notice of First Amendment to Transition Services Agreement* [Docket No. 203] and was approved under the Approval Order.

5

14.     On June 30, 2026, the Debtors, Misfits Market, and Marley Spoon entered into a term sheet, a copy of which is attached hereto as **Exhibit B** (the "Term Sheet") which extends the Marley Spoon Services through the end of the TSA period and resolves certain claims between the parties.  A summary of the key provisions of the Term Sheet are set forth below:[4]

| Provision of the Term Sheet | Description |
|---|---|
| **Transaction Overview** | During the Transition Period, (a) FreshRealm shall provide the Marley Spoon Services to Misfits Market for the benefit of Marley Spoon; and (b) Misfits Market shall use commercially reasonable efforts to direct and manage the performance of the Marley Spoon Services consistent with its express obligations under the TSA, including without limitation Section 2.14 therein. For clarity, the Marley Spoon Services will remain subject to Misfits' operational authority as set forth under the TSA. |
| **Amendment to Marley Spoon PFA** | During the Transition Period, Marley Spoon will operate under modified payment and credit terms, including daily invoicing and weekly payments directly to Misfits Market. <br><br> Marley Spoon will neither (i) (a) accrue or (b) setoff or credit any post-petition FreshRealm Misship Payments under section 6(c) of the Marley Spoon PFA against any other amount owed to Marley Spoon by FreshRealm or against any amount payable to Misfits Market and (ii) waives and releases the Debtors and the Debtors' estates from any claims on account of FreshRealm Misship Payments under section 6(c) of the Marley Spoon PFA which have or would have accrued from and after the commencement of the TSA. <br><br> Marley Spoon shall neither (i) (a) accrue or (b) setoff or credit any post-petition Service Level Credits (as defined and set forth in the Service Level Agreement attached as Schedule 5(d) to the Marley Spoon PFA) against any other amount owed to Marley Spoon by FreshRealm or against any amount payable to Misfits Market and (ii) waives and releases the Debtors' estates from any claims on account of SLA Credits which have or would have accrued from and after the commencement of the TSA. <br><br> During the TSA Period, Marley Spoon waives the right under section 9(b) of the Marley Spoon PFA to withhold, offset, recoup or debit any amounts it owes to FreshRealm or Misfits Market, under the Marley Spoon PFA, the TSA, this Term Sheet or any other Marley Spoon Agreement, against |

---

[4]   In the event of any inconsistency between this summary and the Term Sheet, the terms of the Term Sheet shall control

| Provision of the Term Sheet | Description |
|---|---|
| | any other amount owed to Marley Spoon by FreshRealm under the Marley Spoon PFA or any other Marley Spoon Agreement.<br><br>FreshRealm (i) shall invoice Marley Spoon in the ordinary course of business pursuant to the Marley Spoon PFA as modified by this Term Sheet and the TSA and (ii) shall not accrue any offsets, surcharges, credits, or reconciliation amounts under the Marley Spoon PFA during the TSA Period. |
| **Releases** | Schedule B to the Term Sheet contains a list of potential claims against or obligations of Marley Spoon with respect to the period prior to the execution of the Term Sheet (including all reconciliations, surcharges, costs, expenses and otherwise) and unless set forth on Schedule B, all obligations and liabilities of Marley Spoon with respect to such period (whether known or unknown as of the date hereof) are waived and of no further force or effect upon the Effective Date.<br><br>Other than those matters set forth on Schedule B, FreshRealm waives and releases any and all claims, damages, causes of action, actions, demands, suits, rights, costs and expenses (including attorneys' fees), known or unknown, choate or inchoate, of whatever kind or nature, whether direct, indirect, derivative, vicarious or subrogated in nature, against Marley Spoon or its affiliate BistroMD LLC, which FreshRealm, had or could have had as with respect to the period prior to execution of the Term Sheet.<br><br>Marley Spoon waives and releases any and all claims, damages, causes of action, actions, demands, suits, rights, costs and expenses (including attorneys' fees), known or unknown, choate or inchoate, of whatever kind or nature, whether direct, indirect, derivative, vicarious or subrogated in nature, against the Debtors or the Debtors' estates, which Marley Spoon, had or could have had as with respect to the period prior to execution of the Term Sheet. |
| **Preserved Marley Spoon Claims** | Nothing in the Term Sheet shall be deemed to waive or release FreshRealm from any claims or obligations arising from or with respect to any product recalls, food safety incidents, regulatory claims or consumer claims which accrue following the commencement of the Transition Period (the "Preserved Claims"), *provided however,* that Marley Spoon's recovery on account of the Preserved Claims shall be solely and exclusively limited to any available insurance proceeds up to the available limits of any applicable insurance policies; *provided further,* that for the avoidance of doubt no liability on account of such Preserved Claims will be deemed to impute or extend to Misfits. To the extent that the Preserved Claims are not satisfied by available insurance proceeds, if any, Marley Spoon hereby waives any claim against the Debtors or their estates, and agrees that it will not assert any claim against the debtors, their estates, or seek in any manner |

7

| Provision of the Term Sheet | Description |
| --- | --- |
| | to receive distribution of money or property of or from the Debtors, their estates, or any of their successors-in-interest.<br><br>The Debtors will agree to maintain any applicable insurance policies related to the Preserved Claims until the Service Transfer Date. To the extent there are any Preserved Claims asserted and Marley Spoon requests the Debtors to submit an insurance claim on account of such asserted Preserved Claim, the Debtors will use commercially reasonable efforts to submit the insurance claim to the applicable insurance providers (the "Insurance Claims"). Marley Spoon shall be solely responsible and obligated to pay for any deductible or self-insured retention requirement amounts in connection with the submission of any Insurance Claims and shall pre-fund any such amounts to the Debtors prior to the submission of any such Insurance Claim by the Debtors. |
| **Rejection of the Marley Spoon Agreements** | The Marley Spoon PFA will remain in effect in accordance with its terms as modified herein and by the TSA through the duration of the Transition Period. Thereafter, on the Service Transfer Date (as defined in the TSA), the MS Contracts shall be rejected pursuant to section 365 of the Bankruptcy Code. Except as expressly preserved herein, any and all claims, including rejection damage claims, assertable by Marley Spoon with respect to FreshRealm's rejection of the MS Contracts shall be waived and forever released against the Debtors' estates. |
| **Final Reconciliation** | Within 30 days after the Service Transfer Date, FreshRealm shall deliver to Marley Spoon and Misfits a final reconciliation statement, with reasonable supporting documentation, identifying all amounts claimed by FreshRealm or the Debtors' estates to be owed by Marley Spoon or Misfits for any Marley Spoon Services provided during the Transition Period. Any amount not included in such final reconciliation statement shall be deemed waived by FreshRealm and forever barred. Any amount not invoiced by Misfits to Marley Spoon within 15 days after receipt of such final reconciliation statement from FreshRealm shall also be deemed waived by Misfits and forever barred; provided that the foregoing waiver by Misfits shall not be deemed to waive or limit  any other rights, claims, defenses, indemnities, or remedies of Misfits other than with respect to routine payment obligations for services provided to Marley Spoon during the Transition Period.  Each of Marley Spoon and Misfits shall have 60 days following the Service Transfer Date to dispute in good faith any item in the final reconciliation statement, provided that Marley Spoon and Misfits shall each timely pay all undisputed amounts and any disputed amount shall not be payable unless and until finally resolved by agreement of the parties or by the Bankruptcy Court. |

**Basis for Relief Requested**

## I.    The Term Sheet Should Be Approved

15.    Bankruptcy Rule 9019(a) provides that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019. In addition, section 105(a) of the Bankruptcy Code allows a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]". 11 U.S.C. § 105(a). Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). As the Third Circuit has emphasized, consensual resolutions are generally favored in bankruptcy "as they minimize litigation and expedite the administration of the bankruptcy estate." *In re Petersburg Regency LLC*, 540 B.R. 508, 535 (Bankr. D.N.J. 2015) (*quoting Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)).

16.    The decision to approve a settlement is committed to the sound discretion of the bankruptcy court. *In re Martin*, 91 F.3d at 393; *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. 330, 381 (Bankr. D.N.J. 2020) (citing cases); *In re Petersburg Regency LLC*, 540 B.R. at 535. In evaluating whether to approve a settlement, the bankruptcy court must determine whether it is "fair, reasonable, and in the best interests of the estate." *In re S B Bldg. Assocs. Ltd. P'ship*, 621 B.R. at 381 (quoting *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 92 (Bankr. D. Del. 2005)).

17.    The Third Circuit has prescribed a four-factor balancing test for bankruptcy courts to consider when determining whether to approve a settlement: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of

the creditors." *In re Martin*, 91 F.3d at 393; *Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006); *Mangano v. Warriner (In re ID Liquidation One, LLC)*, 555 F. App'x 202, 205 (3d Cir. 2014).  In applying these four *Martin* factors, a bankruptcy court "need not probe the merits of all claims or conduct a 'mini-trial' before approving the settlement; rather, avoiding litigating the issues is one of the main advantages of settlement."  *In re Immune Pharm. Inc.*, 635 B.R. 118, 122 (Bankr. D.N.J. 2021) (quoting *Stanziale v. U.S. Risk Ins. Grp., Inc. (In re NovaPro Holdings, LLC)*, 815 F. App'x 655, 658 (3d Cir. 2020) (citing collecting cases)).  Rather, courts need only "canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness."  *In re Roper & Twardowsky, LLC*, 559 B.R. 375, 394 (Bankr. D.N.J. 2016); *In re Jasmine, Ltd.*, 258 B.R. 119, 123 (D.N.J. 1999) (citation omitted); *accord In re G-1 Holdings Inc.*, 420 B.R. 216, 256 (Bankr. D.N.J. 2009).

18.     Moreover, a bankruptcy court generally should not substitute its judgment for the trustee or debtor in possession's business judgment.  *See, e.g., In re Roper & Twardowsky, LLC*, 559 B.R. at 394 (citing cases); *In re Immune Pharm. Inc.*, 635 B.R. at 122 ("[U]nder normal circumstances, the court should defer to the trustee's judgment so long as there is a legitimate business justification." (citing *In re ID Liquidation One, LLC*, 555 F. App'x 202, 207 (3d Cir. 2014)).  As demonstrated below, the standard under Bankruptcy Rule 9019 and related case law is easily met here.

19.     The first factor—the probability of success in litigation—weighs in favor of approval of the Term Sheet.  Each of the Debtors and Marley Spoon may assert colorable claims against the other under the Marley Spoon PFA for among other things, breach of contract, true-ups, credits, reconciliations, and performance. However, those assertions turn on disputed facts that cannot be resolved without extensive factual development through discovery, a judicial

10

interpretation of a complex and integrated commercial arrangement, and ultimately, a trial. Simply put, the Debtors cannot predict with certainty that a court would resolve those issues in the Debtors' favor. In addition, the Debtors evaluated potential claims against Marley Spoon under section 553 of the Bankruptcy Code related to a prepetition setoff and determined that based on the defenses to such claims, it would be difficult for the Debtors to succeed on such claims.

20.     The second factor also supports approval of the Term Sheet. Even if the Debtors prevailed on the merits of one or more claims, Marley Spoon could invoke its contractual recoupment and setoff rights under the Marley Spoon PFA to withhold amounts otherwise payable and apply them against disputed obligations, including the assertion of FreshRealm Misship Payments and SLA Credits.  The Debtors, therefore, likely would need to litigate not only their entitlement to payment, but also issues impacting the actual realization of payment, with no assurance that a court would restrict Marley Spoon's contractual remedies in a manner that permits collection.

21.     The third *Martin* factor also weighs in favor of approving the Term Sheet.  Any litigation with Marley Spoon would impose substantial expense, inconvenience, and delay on the Debtors.  Litigation would further burden the Debtors' estates with ongoing professional fees.

22.     In determining whether the fourth *Martin* factor is satisfied, courts evaluate whether the settlement is in the best interests of the estate and its creditors as a whole.  *See, e.g.*, *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 97 (Bankr. D. Del. 2005) (noting that objections of single creditor constituency "cannot be permitted to predominate over the best interests of the estate as a whole"); *In re Capmark Financial Group, Inc.*, 438 B.R. at 520 (approving settlement over objections of unsecured creditors' committee and an ad hoc group noting that, although "it is certainly true that the settlement affects the Debtors' unsecured

creditors, there is no requirement that those creditors be actively involved in the settlement negotiations").

23.     Here, the fourth *Martin* factor weighs in favor of approval because the Term Sheet serves the paramount interests of creditors by delivering immediate, defined value to the estates and eliminating material risks and costs that litigation would impose on creditor recoveries.  In particular, the Term Sheet provides for mutual releases including, Marley Spoon's waiver of potential post-petition administrative claims and other claims, thereby avoiding costly disputes over claims.

24.     Finally, the Term Sheet is balanced and negotiated at arm's length among sophisticated parties, including FreshRealm, Misfits Market, and Marley Spoon, and reflects reasonable compromises. Based on the foregoing, the Court should approve the Term Sheet as being a valid exercise of the Debtors' business judgment.

## II.     Rejection of the MS Contracts is Appropriate

25.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may . . . reject any executory contract . . . of the debtor."  The decision to assume or reject an executory contract is a matter within the "business judgment" of the debtor.  *See Nat'l Labor Relations Bd. V. Bildisco & Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test." (citation omitted)); *see also Glenstone Lodge, Inc. v. Buckhead Am. Corp. (In re Buckhead Am. Corp.)*, 180 B.R. 83, 88 (Bankr. D. Del. 1995). Application of the business judgment standard requires a court to approve a debtor's business decision unless the decision is the product of bad faith, whim, or caprice.  *See, e.g., In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511–12 (Bankr. D. Del. 2003).  Further, "[t]his provision allows a

trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5ᵗʰ Cir. 1996) (citation omitted).

26.    Rejection of a contract is appropriate where such rejection would benefit the estate. *See Sharon Steel*, 872 F.2d at 39–40. Upon finding that a debtor has exercised its sound business judgment in determining that rejection of certain contracts is in the best interests of its creditors and all parties in interest, a court should approve the rejection under section 365(a). *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) (stating that the bankruptcy court will generally approve a debtor's choice to assume or reject an executory contract under the deferential "business judgment rule"); *In re Nickels Midway Pier, LLC*, 332 B.R. 262, 271 (Bankr. D.N.J. 2005), *aff'd in part, rev'd in part and remanded*, 341 B.R. 486 (D.N.J. 2006), *aff'd*, 255 F. App'x 633 (3d Cir. 2007) (stating that a bankruptcy court should defer to a debtor's decision to reject a contract unless it is so unreasonable that the decision could only be based on bad faith or whim); *In re Cent. Jersey Airport Servs.*, 282 B.R. at 183 (stating that to satisfy the "business judgment test" for rejecting executory contracts, the debtor must establish that the rejection will benefit the estate); *In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

27.    Pursuant to the terms of the TSA Amendment, the MS Contracts are being preserved for the benefit of providing the Marley Spoon Services which allow for continuity of the Marley Spoon business, and revenues to accrue to Misfits Market, which maintains ownership and operational control of assets needed to service the Marley Spoon business. Upon the conclusion of the TSA Period, Misfits Market and Marley Spoon will collectively determine

13

whether to continue on with a direct relationship, and the MS Contracts will no longer serve any beneficial purpose for the Debtors' estates. Thus, the Term Sheet provides for the rejection of the MS Contracts at the conclusion of the TSA Period.

28.     Further the Term Sheet provides for the waiver of any rejection damages claims against the Debtors. Such waiver further preserves and maximizes the value of the Debtors' estates. Based on the foregoing, rejection of the MS Contracts falls well within the Debtors' business judgment and serves the best interests of the estates.

## Reservation of Rights

29.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection

14

or seek avoidance of all such liens; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

### No Prior Request

30.     No prior request for the relief sought in this Motion has been made to this Court or any other court.

### Notice

31.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the District of New Jersey; (b) the Committee; (c) Birch Grove Investments LLC; (d) FaraNord (US) IV Pte Ltd; (e) the DIP Agent; (f) Marley Spoon; (g) the United States Attorney's Office for the District of New Jersey; (h) Misfits Market; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Left Intentionally Blank]*

**WHEREFORE**, the Debtors request that the Court enter the Order, in substantially the form submitted herewith, granting the relief requested herein and such other relief as is just and proper under the circumstances.

Dated: June 30, 2026

/s/ *Ryan T. Jareck*
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            rjareck@coleschotz.com
            dharris@coleschotz.com
            mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

16

**Exhibit A**

**Proposed Order**

4131-2365-0154.1

| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**COLE SCHOTZ P.C.**<br>Michael D. Sirota<br>Warren A. Usatine<br>Ryan T. Jareck<br>Daniel J. Harris<br>Matteo Percontino<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>rjareck@coleschotz.com<br>dharris@coleschotz.com<br>mpercontino@coleschotz.com<br><br>*Counsel to the Debtors and Debtors-in-Possession* | |
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING THE TERM SHEET BETWEEN THE DEBTORS, MARLEY SPOON, AND MISFITS MARKETS PURSUANT TO BANKRUPTCY RULE 9019, (II) AUTHORIZING THE DEBTORS TO REJECT CERTAIN AGREEMENTS, AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through seven (7) is

**ORDERED**.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

4131-2365-0154.1

(Page | 3)

| | |
|---|---|
| Debtors: | FRESHREALM, INC., *et al*. |
| Case No. | 26-14656 (MEH) |
| Caption of Order: | Order (I) Approving The Term Sheet Between the Debtors, Marley Spoon, and Misfits Market Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Reject Certain Agreements, and (III) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Approving The Term Sheet Between the Debtors, Marley Spoon, and Misfits Market Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Reject Certain Agreements, and (III) Granting Related Relief* (the "Motion"),[2] of the above-captioned debtors (collectively, the "Debtors"), for entry of an order (this "Order") (i) approving the settlement pursuant to the Term Sheet, a copy of which is attached hereto as **Exhibit B** (the "Term Sheet"); (ii) authorizing the rejection of executory contracts by and between the Debtors and MMM Consumer Brands Inc. ("Marley Spoon"), including that certain (a) Production Fulfillment Agreement dated February 9, 2024, (b) Technology License Agreement, and (c) any other agreements by and between the Debtors and Marley Spoon (collectively, the "MS Contracts"), effective as of the Service Transfer Date; and (iii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter an order consistent with Article III of the United States Constitution; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or Term Sheet, as applicable.

(Page | 4)

| | |
|---|---|
| Debtors: | FRESHREALM, INC., *et al.* |
| Case No. | 26-14656 (MEH) |
| Caption of Order: | Order (I) Approving The Term Sheet Between the Debtors, Marley Spoon, and Misfits Market Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Reject Certain Agreements, and (III) Granting Related Relief |

and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing, establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.      Findings and Conclusions. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      Final Order. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Time is of the essence in consummating the settlement referenced herein, and there is no just reason for delay in the implementation of this Order.

C.      Best Interests and Business Justification. The relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion.  The settlement embodied in the Term Sheet is fair, equitable, and reasonable.  When considered in light of the best possible recovery and the attendant risks, the settlement falls well within the range of reasonableness.

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** as set forth herein.

(Page | 5)

| Debtors: | FRESHREALM, INC., *et al.* |
| Case No. | 26-14656 (MEH) |
| Caption of Order: | Order (I) Approving The Term Sheet Between the Debtors, Marley Spoon, and Misfits Market Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Reject Certain Agreements, and (III) Granting Related Relief |

2.      Any objections to the entry of this Order, to the extent not withdrawn or settled, are overruled.

3.      The settlement embodied in the Term Sheet is hereby approved pursuant to Bankruptcy Rule 9019(a).  The terms and conditions of the Term Sheet are incorporated into this Order as if fully set forth herein.

4.      The Debtors are authorized, but not directed, to take all actions necessary to immediately continue and fully implement the terms of the Term Sheet, and are authorized to enter into, perform, execute and deliver all documents, and take all actions, necessary to immediately continue and fully implement the settlement in accordance with the terms, conditions, and agreements set forth in the Term Sheet.

5.      The releases set forth in Term Sheet are expressly approved and incorporated herein by reference.

6.      Pursuant to section 365 of the Bankruptcy Code, the MS Contracts are terminated and rejected effective as of the Service Transfer Date or earlier termination of the TSA.

7.      The terms and provisions of this Order and any actions taken pursuant hereto shall survive entry of an order which may be entered: (a) confirming any chapter 11 plan in any of these Chapter 11 Cases; (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (c) dismissing the Chapter 11 Cases; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases. The terms and provisions of this Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in these Chapter 11 Cases, or following dismissal of these Chapter 11 Cases.

(Page | 6)

| Debtors: | FRESHREALM, INC., *et al*. |
| Case No. | 26-14656 (MEH) |
| Caption of Order: | Order (I) Approving The Term Sheet Between the Debtors, Marley Spoon, and Misfits Market Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Reject Certain Agreements, and (III) Granting Related Relief |

8.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (f) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; or (h) a waiver of the obligation of any party in interest to file a proof of claim.

9.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

(Page | 7)

| | |
|---|---|
| Debtors: | FRESHREALM, INC., *et al*. |
| Case No. | 26-14656 (MEH) |
| Caption of Order: | Order (I) Approving The Term Sheet Between the Debtors, Marley Spoon, and Misfits Market Pursuant to Bankruptcy Rule 9019, (II) Authorizing the Debtors to Reject Certain Agreements, and (III) Granting Related Relief |

11. The terms and conditions of this Order shall be effective and enforceable immediately upon entry hereof.

12. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **EXHIBIT B**

**Term Sheet**

*Execution Version*

### FreshRealm Term Sheet

June 30, 2026

THIS TERM SHEET SETS FORTH THE TERMS OF FRESHREALM, INC.'S PROVISION OF TRANSITION SERVICES TO MISFITS MARKET, INC. FOR THE BENEFIT OF MMM CONSUMER BRANDS INC. ("MARLEY SPOON") AND MUTUAL RELEASE OF CLAIMS (THE "TERM SHEET").

THIS TERM SHEET CONTAINS A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE TRANSACTIONS AND SETTLEMENT DESCRIBED HEREIN. THE TERM SHEET SHALL BE APPROVED THROUGH A MOTION TO BE FILED AND APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.**

| Transaction Overview | FreshRealm, Inc. ("FreshRealm") has entered into that certain: |
|---|---|
| | • Transition Services Agreement dated April 27, 2026 ("Original TSA"), by and among FreshRealm, Misfits Market, Inc. ("Misfits") and, solely for the purposes of Sections 2.4, 3.2(e) and 3.6 of the TSA, Blue Apron LLC [D.I. 21, Ex. D], as amended by a First Amendment, dated as of June 2, 2026, executed by FreshRealm and Misfits and, solely for purposes of Sections 3.7 and 5.1 of the TSA and Sections 6, 7, 8 and 9 of the First Amendment, Marley Spoon (the "First Amendment," and together with the Original TSA, the "TSA"); and |
| | • Asset Purchase Agreement dated April 27, 2026 ("APA"), by and among FreshRealm and Misfits for the sale of certain working capital assets (the "Acquired Assets") to, and the assumption of certain liabilities by, Misfits [D.I. 21, Ex. C]. |
| | During the Transition Period,[1] (a) FreshRealm shall provide the services, functions, and responsibilities described in the attached Schedule A (collectively, the "Marley Spoon Services") to Misfits for the benefit of Marley Spoon; and (b) Misfits shall use commercially reasonable efforts to direct and manage the performance of the Marley Spoon Services consistent with its express obligations under the TSA, including without limitation Section 2.14 therein. For clarity, the Marley Spoon Services will remain subject to Misfits' operational authority as set forth under the TSA. |

---

[1] All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the TSA.

| | |
|---|---|
| | The Marley Spoon Services shall include, without limitation and in addition to the services described in Schedule A, all services, functions, and responsibilities as requested, necessary, or reasonably appropriate for FreshRealm to perform, on behalf of and as directed by Misfits, all operational, production, procurement, manufacturing, storage, packaging, labeling, fulfillment, logistics, quality, food-safety, regulatory, administrative, and related obligations owed to Marley Spoon pursuant to that certain Production and Fulfillment Agreement dated February 9, 2024 (the "Marley Spoon PFA"), in accordance with, and subject to, the standards, specifications, service levels, and all other performance obligations set forth in the Marley Spoon PFA, all of which are hereby incorporated into Schedule A by reference and shall be deemed to continue as FreshRealm's ongoing obligations under this Schedule A notwithstanding any rejection, expiration, termination, or other cessation of the Marley Spoon PFA (whether in FreshRealm's Chapter 11 case or otherwise), and provided that for the avoidance of doubt that the foregoing shall not be deemed to create or impose any payment or other obligations on, Marley Spoon that are otherwise no longer applicable due to any rejection, expiration, termination, or other cessation of the Marley Spoon PFA (whether in FreshRealm's Chapter 11 case or otherwise). <br><br> The Marley Spoon Services shall further include, without limitation and in addition to the services described in Schedule A, all services, functions, and responsibilities as requested, necessary, or reasonably appropriate for FreshRealm to support and facilitate, on behalf of and as directed by Misfits, the orderly transition of Marley Spoon's U.S.-based customers nationwide, including for its bistroMD, Martha & Marley Spoon, and Dinnerly brands (the "Marley Spoon Business"), to Misfits or to such facilities, service providers, and/or designees as identified by Misfits if the transition of long-term services to Misfits has been approved by Marley Spoon. |
| Services During Transition Period | Marley Spoon agrees to keep its normal business operations with FreshRealm under the current operating terms, except as set forth below, through and including the Transition Period. <br><br> Consistent with the TSA, during the Transition Period, FreshRealm shall provide the same service levels to Misfits for the benefit of Marley Spoon, consistent with historical practices. <br><br> Marley Spoon acknowledges that, pursuant to the TSA, Misfits shall have operational control over the TSA estate and has its own transition plan, which may include reductions in workforce and migration of operations. <br><br> It is agreed that Marley Spoon may transition its bistroMD business to a new service provider during the Transition Period. |

2

71306/0001-53129973v6

| | |
|---|---|
| Effective Date | Unless otherwise agreed to by the parties, this Term Sheet shall become effective (the "Effective Date") upon the first date on which the Bankruptcy Court enters an order approving the Term Sheet, which order is final, non-appealable and unstayed. |
| APA | On the Closing Date (as defined in the APA) FreshRealm sold to Misfits the Acquired Assets, including certain working capital from the Marley Spoon Business. |
| Amendment to Marley Spoon PFA | During the Transition Period:<br><br>• Modified Payments Terms under the Agreements. Notwithstanding section 9(a) of the Marley Spoon PFA, between the date of execution of this Term Sheet and the Service Transfer Date (as defined in the TSA), invoices will be issued on a daily basis. During such period, Marley Spoon shall make weekly payments each Thursday of amounts owed pursuant to invoices received by Marley Spoon as of the immediately preceding Sunday. Payments shall be made by Marley Spoon directly to Misfits (consistent with the First Amendment). If Marley Spoon fails to timely pay any undisputed amount payable to Misfits Market during the Transition Period and such failure continues for two (2) business days after written notice thereof from Misfits Market, Marley Spoon shall thereafter be deemed solely and directly responsible for the payment of all Pass-Through Costs (as defined in the TSA) attributable to the Marley Spoon business owed to FreshRealm from and after the date of such default (for the avoidance of doubt, excluding any such costs which have been properly paid by Marley Spoon to Misfits), and Marley Spoon will release and indemnify Misfits Market from and against any and all such Pass-Through Costs.<br>• FreshRealm Misship Payment. Upon the commencement of the Marley Transition Period (as defined in the TSA), Marley Spoon (i) shall neither (a) accrue or (b) setoff or credit any post-petition FreshRealm Misship Payments under section 6(c) of the Marley Spoon PFA against any other amount owed to Marley Spoon by FreshRealm or against any amount payable to Misfits and (ii) waives and releases the Debtors and the Debtors' estates from any claims on account of FreshRealm Misship Payments under section 6(c) of the Marley Spoon PFA which have or would have accrued from and after the commencement of the Marley Transition Period. For the avoidance of doubt, Marley Spoon shall not assert any administrative expense claims against the Debtors' estates related to any post-petition FreshRealm Misship Payments under section 6(c) of the Marley Spoon PFA. |

3

| | |
|---|---|
| | ● SLA Credits. Upon the commencement of the Marley Transition Period (as defined in the TSA), Marley Spoon shall neither (i) (a) accrue or (b) setoff or credit any post-petition Service Level Credits (as defined and set forth in the Service Level Agreement attached as Schedule 5(d) to the Marley Spoon PFA) against any other amount owed to Marley Spoon by FreshRealm or against any amount payable to Misfits and (ii) waives and releases the Debtors' estates from any claims on account of SLA Credits which have or would have accrued from and after the commencement of the Marley Transition Period. For the avoidance of doubt, Marley Spoon shall not assert any administrative expense claims against the Debtors' estates related to any post-petition SLA Credits.<br><br>● Setoff and Recoupment. During the period from the date of the commencement of the Marley Transition Period and the Service Transfer Date, Marley Spoon waives the right under section 9(b) of the Marley Spoon PFA to withhold, offset, recoup or debit any amounts it owes to FreshRealm or Misfits, under the Marley Spoon PFA, the TSA, this Term Sheet or any other Marley Spoon Agreement, against any other amount owed to Marley Spoon by FreshRealm under the Marley Spoon PFA or any other Marley Spoon Agreement.<br><br>● FreshRealm Credits/Offsets. Upon the commencement of the Marley Transition Period (as defined in the TSA), FreshRealm (i) shall invoice Marley Spoon in the ordinary course of business pursuant to the Marley Spoon PFA as modified by this Term Sheet and the TSA and (ii) shall not accrue any offsets, surcharges, credits, or reconciliation amounts under the Marley Spoon PFA during the TSA Period. |
| Releases | FreshRealm agrees that Schedule B to this Term Sheet contains a list of potential claims against or obligations of Marley Spoon with respect to the period prior to the execution of this Term Sheet (including all reconciliations, surcharges, costs, expenses and otherwise) and agrees that unless set forth on Schedule B, all such obligations and liabilities of Marley Spoon with respect to such period (whether known or unknown as of the date hereof) are hereby waived and of no further force or effect upon the Effective Date.<br><br>Upon the Effective Date, other than those matters set forth on Schedule B, FreshRealm waives and releases any and all claims, damages, causes of action, actions, demands, suits, rights, costs and expenses (including attorneys' fees), known or unknown, choate or inchoate, of whatever kind or nature, whether direct, indirect, derivative, vicarious or subrogated in nature, against Marley Spoon or its affiliate BistroMD LLC, which FreshRealm, had or could have had as with respect to the period prior to execution of this Term Sheet.  The foregoing waivers and releases are expressly accepted by and binding on the Chapter 7 trustee if FreshRealm's Chapter 11 case is converted. |

4

| | |
|---|---|
| | Upon the Effective Date, Marley Spoon waives and releases any and all claims, damages, causes of action, actions, demands, suits, rights, costs and expenses (including attorneys' fees), known or unknown, choate or inchoate, of whatever kind or nature, whether direct, indirect, derivative, vicarious or subrogated in nature, against the Debtors or the Debtors' estates, which Marley Spoon, had or could have had as with respect to the period prior to execution of this Term Sheet. |
| Preserved Marley Spoon Claims | Notwithstanding anything in this Term Sheet, nothing in the Term Sheet shall be deemed to waive or release FreshRealm from any claims or obligations arising from or with respect to any product recalls, food safety incidents, regulatory claims or consumer claims which accrue following the commencement of the Transition Period (the "Preserved Claims"), *provided however,* that Marley Spoon's recovery on account of the Preserved Claims shall be solely and exclusively limited to any available insurance proceeds up to the available limits of any applicable insurance policies; *provided further,* that for the avoidance of doubt no liability on account of such Preserved Claims will be deemed to impute or extend to Misfits. To the extent that the Preserved Claims are not satisfied by available insurance proceeds, if any, Marley Spoon hereby waives any claim against the Debtors or their estates, and agrees that it will not assert any claim against the debtors, their estates, or seek in any manner to receive distribution of money or property of or from the Debtors, their estates, or any of their successors-in-interest.

The Debtors will agree to maintain any applicable insurance policies related to the Preserved Claims until the Service Transfer Date. To the extent there are any Preserved Claims asserted and Marley Spoon requests the Debtors to submit an insurance claim on account of such asserted Preserved Claim, the Debtors will use commercially reasonable efforts to submit the insurance claim to the applicable insurance providers (the "Insurance Claims"). Marley Spoon shall be solely responsible and obligated to pay for any deductible or self-insured retention requirement amounts in connection with the submission of any Insurance Claims and shall pre-fund any such amounts to the Debtors prior to the submission of any such Insurance Claim by the Debtors. |
| Reporting | FreshRealm shall provide Marley Spoon with the same set of reporting as Misfits under the TSA, including daily production reports, weekly inventory reports, weekly staffing reports, weekly financial summary reports, monthly P&L, to the extent such reporting relates to Marley Spoon's business. |

5

71306/0001-53129973v6

| | |
|---|---|
| Rejection of the Marley Spoon Agreements | The Marley Spoon PFA will remain in effect in accordance with its terms as modified herein and by the TSA through the duration of the Transition Period. Thereafter, on the Service Transfer Date (as defined in the TSA), the Marley Spoon PFA and any and all remaining executory contracts by and between FreshRealm and Marley Spoon (collectively, the "Marley Spoon Agreements") shall be rejected pursuant to section 365 of the Bankruptcy Code. Except as expressly preserved herein, any and all claims, including rejection damage claims, assertable by Marley Spoon with respect to FreshRealm's rejection of the Marley Spoon Agreements shall be waived and forever released against the Debtors' estates. |
| Leases | Nothing in this Term Sheet modifies the terms or waives the obligations of Marley Spoon under any assignment agreements by and among the Debtors and Marley Spoon related to any leases of non-residential real property; *provided, however*, that the parties acknowledge that Misfits currently intends to enter into a direct lease with the landlord of FreshRealm's Tracy, CA facility with a commencement date between July 1st and September 1st. Any direct lease between Misfits and such landlord will remain subject to (a) Misfits and the landlord agreeing to mutually acceptable terms and executing definitive lease documentation, and (b) the effectiveness of FreshRealm's rejection of the existing lease pursuant to Section 365 of the Bankruptcy Code. However, nothing herein shall obligate Misfits to enter into any such lease or modify Article 5 of the TSA. |
| Final Reconciliation | Within 30 days after the Service Transfer Date, FreshRealm shall deliver to Marley Spoon and Misfits a final reconciliation statement, with reasonable supporting documentation, identifying all amounts claimed by FreshRealm or the Debtors' estates to be owed by Marley Spoon or Misfits for any Marley Spoon Services provided during the Transition Period. Any amount not included in such final reconciliation statement shall be deemed waived by FreshRealm and forever barred. Any amount not invoiced by Misfits to Marley Spoon within 15 days after receipt of such final reconciliation statement from FreshRealm shall also be deemed waived by Misfits and forever barred; provided that the foregoing waiver by Misfits shall not be deemed to waive or limit  any other rights, claims, defenses, indemnities, or remedies of Misfits other than with respect to routine payment obligations for services provided to Marley Spoon during the Transition Period.  Each of Marley Spoon and Misfits shall have 60 days following the Service Transfer Date to dispute in good faith any item in the final reconciliation statement, provided that Marley Spoon and Misfits shall each timely pay all undisputed amounts and any disputed amount shall not be payable unless and until finally resolved by agreement of the parties or by the Bankruptcy Court. |

71306/0001-53129973v6

| Confidentiality | This Term Sheet and the fact that discussions are taking place between the parties are confidential, must be treated as such, and must not be discussed with any other party, except with each party's employees, advisors, consultants, and directors who need to know such information in order to evaluate, negotiate, and consummate the transactions contemplated hereby, with the expectation that all such individuals will keep such information strictly confidential. |
|---|---|

**[SIGNATURE PAGES FOLLOW]**

71306/0001-53129973v6

IN WITNESS WHEREOF, the parties hereto have executed this Term Sheet as of the date first written above.

**FRESHREALM, INC.**

By: _____

Name: John Hanson
Title: CFO

Jun 30, 2026

**MISFITS MARKET, INC.**

By: _____
Name:
Title:

**MMM CONSUMER BRANDS, INC. (D/B/A MARLEY SPOON)**

By: _____
Name:
Title:

[Signature Page to Term Sheet]

IN WITNESS WHEREOF, the parties hereto have executed this Term Sheet as of the date first written above.

**FRESHREALM, INC.**

By: _____
Name: John Hanson
Title: CFO

**MISFITS MARKET, INC.**

By: *Abhi Ramesh*
    Abhi Ramesh (Jun 30, 2026 15:25:52 EDT)
Name:  Abhi Ramesh
Title:  CEO

**MMM CONSUMER BRANDS, INC. (D/B/A MARLEY SPOON)**

By: _____
Name:
Title:

[Signature Page to Term Sheet]

IN WITNESS WHEREOF, the parties hereto have executed this Term Sheet as of the date first written above.

**FRESHREALM, INC.**

By: _____
Name:
Title:

**MISFITS MARKET, INC.**

By: _____
Name:
Title:

**MMM CONSUMER BRANDS, INC. (D/B/A MARLEY SPOON)**

By: *Michael Hester*  _____
Name: Michael Hester
Title: CEO

**Schedule A**

71306/0001-53129973v6

**Marley Spoon Service Schedule**

During the Marley Transition Period, FreshRealm shall provide the services, functions, and responsibilities described in this Schedule E (collectively, the "Marley Spoon Services"). The Marley Spoon Services shall include, without limitation and in addition to the services described in the table below, all services, functions, and responsibilities as requested, necessary, or reasonably appropriate for FreshRealm to perform, on behalf of and as directed by Misfits, all operational, production, procurement, manufacturing, storage, packaging, labeling, fulfillment, logistics, quality, food-safety, regulatory, administrative, and related obligations owed by FreshRealm to MMM Consumer Brands, Inc. (d/b/a Marley Spoon) under that certain Production and Fulfillment Agreement, dated as of February 9, 2024, between MMM Consumer Brands, Inc. and FreshRealm, Inc. (as amended, the "MS PFA") (the "Downstream Customer", and such agreement, as the same may be amended from time to time, the "Downstream Agreement"), in each case in accordance with, and subject to, the standards, specifications, service levels, and all other performance obligations set forth in the Downstream Agreement, all of which are hereby incorporated into this Schedule E by reference and shall be deemed to continue as FreshRealm's ongoing obligations under this Schedule E during the Marley Transition Period.

The table set forth below is provided by way of illustration of certain of the known Marley Spoon Services and is not intended to be exhaustive or fully inclusive of the Marley Spoon Services to be provided hereunder. The categories, headings, rows, bullet points, groupings, and other drafting conventions used in the table are for convenience of reference only and shall not be construed to limit, define, or restrict the scope of the Marley Spoon Services or Misfits's rights under this Agreement, including Misfits discretion under Section 7.2 of this Agreement to terminate all or any portion of the Marley Spoon Services, in whole or in part, as it determines consistent with the terms of Section 7.2 of this Agreement.

| CATEGORY | SERVICES |
|---|---|
| Marketing, Communications and Technical Development | <ul><li>Packaging design, research and development, supplier qualification and testing, packaging science, packaging chemistry, packaging specifications</li><li>Interface with co-manufacturers and ingredients suppliers regarding products, specifications</li></ul> |

SCHEDULE A

| CATEGORY | SERVICES |
|---|---|
| Operations/Facilities | • Operate all aspects of food processing facilities manufacturing food products for human consumption at locations in Linden, NJ and Tracy, CA<br>• Facilities operation, management of Site Directors, production, facilities warehouse, facilities quality assurance; shift operations, production supervision, sundry, maintenance planning, fill net weight operations<br>• Environmental Health and Safety and Sustainability management activities, compliance initiatives, improvement projects, reporting to Misfits in accordance with the Agreement and as otherwise reasonably requested by Misfits<br>• Food Safety and Quality: Technical services, quality assurance, facilities qualification and audits<br>• Engineering: Project engineering, automation and controls |
| Human Resources | • Support organization and supervision providing services relating to employees as absence partners, employee benefits, compensation, human resources, payroll interface, payroll, information services security, talent, recruiting processes<br>• Human Resources information services and business systems<br>• Employee benefits programs selection, management and administration, interface with benefits brokers and service providers, provide employees with benefits information and process management<br>• Provide services supporting recruiting, talent selection, acquisition and retention, compensation<br>• Provide leadership and management of operations, facility, corporate and local human resources professionals and teams, labor relations, policies and procedures, compliance with local labor and employment laws and practices<br>• Employee training, organizational effectiveness assessment and improvement programs<br>• Execute all HR-related functions in connection with the closure of the Tracy, CA and Linden, NJ facilities, including workforce reduction planning, employee offboarding, final pay processing, administration of accrued paid time off, termination of benefits coverage, COBRA administration, and coordination with benefits providers, brokers, and payroll service providers<br>• Prepare and deliver all required notices to employees in connection with the closure of the Tracy, CA and Linden, NJ facilities, including notices required under the Worker Adjustment and Retraining Notification Act (29 U.S.C. §§ 2101– |

SCHEDULE A

| CATEGORY | SERVICES |
|---|---|
|  | 2109), the New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act (N.J. Stat. Ann. §§ 34:21-1 et seq.), the California Worker Adjustment and Retraining Notification Act (Cal. Lab. Code §§ 1400 et seq.), and any other applicable federal, state, or local plant-closing, mass-layoff, or employee-notification Laws<br><br>• Plan, manage, and deliver internal and external communications regarding the closure of the Tracy, CA and Linden, NJ facilities, including employee-facing announcements, manager talking points, responses to employee inquiries, and coordination with Misfits on messaging to vendors, third-party service providers, and Governmental Authorities<br><br>• Payment of, and compliance with, all Mandatory Severance Obligations (as defined in Section 2.3 of the Agreement), including calculation, administration, processing, and payment of all severance, termination, and similar amounts owed to Service Providers, with such payments to be funded pursuant to the Agreement. |

SCHEDULE A

| CATEGORY | SERVICES |
|---|---|
| Finance | All Accounting/Finance functions associated with the Business including the following:<br><br>• Accounts Payable: Process vendor invoices; travel expense reports and vendor payments for the Business consistent with past practice.<br>• Prepare monthly revenue and expense allocations necessary to support generation of Profit and Loss statements by product line.<br>• Manage monthly financial statement close.<br>• Prepare all required financial transactions to support accounting for inventory (production, adjustments and shipments), 3rd party co-pack operations and freight and warehousing costs.<br>• Oversee maintenance of subsidiary records required to prepare consolidated Profit and Loss Statement and Balance Sheet.<br>• Prepare monthly, quarterly and year-to-date Profit and Loss Statement, Balance Sheet and Cash Flow for the Business.<br>• Maintain necessary master files to support accounting and financial record- keeping.<br>• Reconcile Balance Sheet accounts for Business operations.<br>• Treasury: Cash management, wire transfers, manage banking relationships and accounts<br>• Risk Management: selection and administration of company's insurance policies, claims management<br>• Corporate Controller: payroll, accounting; manage facilities payroll coordination and analysis<br>• Tax Compliance: Manage the company's tax compliance and other tax matters, including payment and filing of tax returns.<br>• Customer Finance, customer business interface, revenue management<br>• Commercial Finance<br>• Information Technology systems management, facilities IT analysis<br>• Financial planning and analysis<br>• Operations Finance management and reporting, accounting, manage logistics, warehouse and capital expenditures, facilities finance, supply chain finance, facilities cost accounting, raw product financial analysis, facilities accounting |

SCHEDULE A

| CATEGORY | SERVICES |
|---|---|
| Logistics, Planning & Customer Supply Chain | Logistics and Warehouse Operations: FreshRealm shall perform under FreshRealm's existing contractual relationships with 3rd party warehouses and transportation carriers during the term of this Agreement<br><br>• Inventory control: Coordinate Inventory Control; reconcile third party distribution center records<br>• Transportation – Truckload Procurement, Intermodal, Rail, Domestic Rail, Export Coordination<br>• Scheduling arrangements for shipment of finished goods via truck, rail or intermodal carrier from US Port to distribution warehouse<br>• Scheduling arrangements for shipment of finished goods via truck, rail or intermodal carrier from U.S. co-packers to Distribution Centers<br>• Scheduling arrangements for shipment of finished goods via truck, rail or intermodal carrier from Distribution Centers to other Distribution Centers<br>• Scheduling arrangements for shipment of finished goods via truck, rail or intermodal carrier from Distribution Centers to Customers (utilizing FreshRealm employees and 3rd party transportation providers) |

SCHEDULE A

| CATEGORY | SERVICES |
|---|---|
| | • Customs clearance<br>  · Warehouse Operations<br>  · Business Process<br>  · Business Systems<br>  · Freight Payment: Manage payment processes, claims through third party transportation provider.<br>• Storage service<br>• Senior management oversight of warehousing<br>• Warehouse Management<br>• In-and-Out pallet handling<br><br>   Procurement<br><br>• Materials Management: MRO, Purchasing<br>• Commodities purchasing and management: packaging, ingredients<br>• Purchasing analysis<br>• Indirect sourcing of facility services and professional services<br><br>   Customer Service: coordination, projects and processes<br><br>• Responsible for all aspects of customer order management from receipt of purchase orders to billing<br>• Manages day-to-day customer relationships, with escalation of material issues to Misfits's attention<br>• Validates claims and disposition for returns, OS&Ds, and other non-trade related deductions.<br><br>Supply chain, centers of excellence<br><br>• Data and systems<br>• Supply chain analytics & "BI"<br>• Business interface, Customer and Price Master, Material Master, Data Sync, BI Specialist<br>• Co-Manufacturing management, co-management operations<br>• Supply Chain strategies, Procurement Operations, Planning integration, Supply Chain "PMO"<br>• Labeling |

SCHEDULE A

| CATEGORY | SERVICES |
|---|---|
| | • Supply chain planning, inventory management and deployment, inventory management for fruit and meal enhancer business units<br>• Supply planning, "MPS" management, Co-Manufacturing planning<br>• Customer supply chain management<br><br>Business Systems/Information Technology<br><br>• Support all aspects of information technology services, hardware and software, asset management, systems security, user service support, software implementation and maintenance<br>• Provide specialized services in IT security, including incident response, prompt notification to Misfits of any security incident, and handover of security configurations, credentials, and related documentation to Misfits or its designee as reasonably necessary to support the Marley Spoon Services |
| Food Safety and Quality | • Monitor and manage food safety and quality programs to assure compliance with legal and regulatory requirements and FreshRealm policies.<br>• Perform traceability, product holds, withdrawals, and recalls, and other product handling in accordance with applicable Law, the Downstream Agreements, and Misfits's direction. |
| Misfits Transition Support — IT, Data, & Records Migration | • Export and deliver to Misfits in commercially reasonable electronic formats all ERP, WMS, OMS, master data, historical transaction data, and vendor and customer data used in the Business; provide reasonable migration assistance, test support, and cutover coordination in accordance with Misfits's timeline<br>• Deliver to Misfits copies of all books, records, master data files, vendor files, customer files, and operating procedures relevant for the ongoing conduct of the Business |

SCHEDULE 1

71306/0001-53296886v2

| CATEGORY | SERVICES |
|---|---|
| Misfits Transition Support — Regulatory & Permit Transfer | • USDA Registration Transfer: assistance in transferring food facility registrations, product registrations, and permits held in FreshRealm's name to Misfits or its designee if and as directed by Misfits.<br>• State & Local License Transfers: support in transferring operating licenses and health department permits held in FreshRealm's name to Misfits or its designee if and as directed by Misfits. |
| Misfits Transition Support — Litigation & Regulatory Handover | • Provide Misfits with a complete written inventory and status of all pending, threatened, or reasonably anticipated litigation, regulatory proceeding, investigations, enforcement actions, customer claims, employee claims, and food quality or safety incidents related to the Business, together with copies of all underlying documentation, within fifteen days following the Effective Date and updated monthly thereafter. For clarity, the foregoing will not be deemed to create or reflect the assumption by Misfits of any responsibility or liability for any such matters unless expressly assumed by Misfits pursuant to the terms of the Agreement. |
| Misfits Transition Support — Vendor Transitions | • Timely support Marley Spoon in the transition of any products produced, manufactured, or co-manufactured by FreshRealm on Marley Spoon's behalf to alternative third-party supplier(s) reasonably acceptable to Marley Spoon to ensure continued product availability after the transition period.<br>• Support Misfits with the transition of FreshRealm's existing vendor, supplier, and service provider relationships supporting the Business to Misfits or its designee, including if and as requested by Misfits, providing a complete list of such vendors and copies of all underlying contracts and related documentation, facilitating introductions and direct communications with such vendors, and using commercially reasonable efforts to assign any such contracts to Misfits or its designee and obtain any required consents. |
| Misfits Transition Support — Other Support | • Provide such other additional support, cooperation, information, and assistance as Misfits may reasonably request from time to time in connection with any other transition processes, activities, or requirements not expressly enumerated in this Schedule E that arise during the Marley Transition Period. |

SCHEDULE A

## **Schedule B**

- Any claims, rights, or amounts owed in connection with all open accounts receivables with respect to services provided from June 4, 2026 through the date of this Term Sheet.

71306/0001-53129973v6