**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al*.,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF (A) REVISED JOINT CHAPTER 11 PLAN
OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES, (B) REVISED
DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
FRESHREALM, INC. AND ITS DEBTOR AFFILIATES, AND (C) REVISED
PROPOSED ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF
THE DISCLOSURE STATEMENT; (II) APPROVING (A) THE SOLICITATION
PROCEDURES; (B) THE FORMS OF BALLOTS AND NOTICES IN CONNECTION
THEREWITH; AND (C) CERTAIN DATES WITH RESPECT THERETO; AND (III)
GRANTING RELATED RELIEF**

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

**PLEASE TAKE NOTICE** that on July 27, 2026, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures, (B) the Forms of Ballots and Notices in Connection Therewith, and (C) Certain Dates with Respect Thereto; and (III) Granting Related Relief* [Docket No. 353] (the "Disclosure Statement Motion"): (a) seeking entry of an order authorizing the Debtors to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. 351] (the "Plan"); (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. 352] (the "Disclosure Statement"); (c) approving the solicitation materials and documents to be included in the solicitation packages; and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE** that, on **August 13, 2026 at 10:00 a.m.**, the Court will hold the Combined Hearing, at which the Court will consider the Disclosure Statement Motion, the Plan, and the Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a revised Disclosure Statement, attached hereto as **Exhibit A-1**.  Attached hereto as **Exhibit A-2** is a redline of the Disclosure Statement marked against the form originally filed at Docket No. 352.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a revised Plan, attached hereto as **Exhibit B-1**.  Attached hereto as **Exhibit B-2** is a redline of the Plan marked against the form originally filed at Docket No. 351.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a revised proposed *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures, (B) the Forms of Ballots and Notices in Connection Therewith, and (C) Certain Dates with Respect Thereto; and (III) Granting Related Relief* and exhibits thereto, attached hereto as **Exhibit C-1**.  Attached hereto as **Exhibit C-2** is a redline of the Order marked against the form originally filed at Docket No. 353.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Plan, Disclosure Statement, Disclosure Statement Order and all documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Kroll Restructuring Administration LLC at https://restructuring.ra.kroll.com/Freshrealm/. You may also obtain copies of any pleadings by visiting the Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors reserve all rights as set forth in the Disclosure Statement Order, Disclosure Statement and Plan, and applicable law, including the right to further amend, supplement, or modify the Disclosure Statement, Plan and Disclosure Statement Order in accordance therewith.

2

Dated: August 12, 2026

*/s/ Ryan T. Jareck*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            rjareck@coleschotz.com
            dharris@coleschotz.com
            mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A-1

**Revised Disclosure Statement**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FRESHREALM, INC., *et al.*,[1] | ) | Case No. 26-14656 (MEH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Ryan T. Jareck, Esq.
Daniel J. Harris, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:     (201) 489-3000
Facsimile:     (201) 489-1536
Email:          msirota@coleschotz.com
                    wusatine@coleschotz.com
                    rjareck@coleschotz.com
                    dharris@coleschotz.com
                    mpercontino@coleschotz.com

*Counsel for the Debtors
and Debtors in Possession*

Dated: July 27, 2026

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY

**NOTED.   THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.   WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.   THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.**

**MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE.   THE DEBTORS RECOMMEND THAT INTERESTED PARTIES CONSULT THEIR OWN LEGAL COUNSEL.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS, LIQUIDATING TRUSTEE, THE PLAN ADMINISTRATOR, OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS**

OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING <u>ARTICLE IX</u>, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION. ........................................................................................................................1

II.     PRELIMINARY STATEMENT. ................................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
THE PLAN. ................................................................................................................................4
    A.     What is chapter 11?....................................................................................................4
    B.     Why are the Debtors sending me this Disclosure Statement?....................................4
    C.     Am I entitled to vote on the Plan?............................................................................4
    D.     What will I receive from the Debtors if the Plan is consummated?..........................6
    E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
         Claim, or a Priority Tax Claim?................................................................................8
         1.     Administrative Claims. .................................................................................8
         2.     DIP Claims. ..................................................................................................9
         3.     Priority Tax Claims.......................................................................................9
         4.     Professional Fee Claims................................................................................9
    F.     What happens to my recovery if the Plan is not confirmed or does not go effective? ...................11
    G.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
         Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
         "Consummation"?....................................................................................................11
    H.     What is the Blue Apron/Misfits Transaction?........................................................11
    I.      What are the sources of Cash and other consideration required to fund the Plan?..........................12
    J.      Is there potential litigation related to the Plan?......................................................12
    K.     Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............12
    L.      What is the deadline to vote on the Plan? ...............................................................13
    M.    How do I vote for or against the Plan?....................................................................13
    N.     Why is the Bankruptcy Court holding a Confirmation Hearing?............................13
    O.     When is the Confirmation Hearing set to occur? ...................................................14
    P.      What is the purpose of the Confirmation Hearing?.................................................14
    Q.     What is the effect of the Plan on the Debtors' ongoing business? ..........................14
    R.     Whom do I contact if I have additional questions with respect to this Disclosure
         Statement or the Plan?.............................................................................................15
    S.      Who Supports the Plan?...........................................................................................15
    T.      Could subsequent events potentially affect recoveries under the Plan?..................15
    U.     Do the Debtors recommend voting in favor of the Plan?........................................15

IV.    SUMMARY OF THE PLAN. ...................................................................................................16
    A.     Classification and Treatment of Claims and Interests.............................................16
         1.     Classification of Claims and Interests........................................................16
         2.     Special Provision Governing Unimpaired Claims. .....................................16
         3.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
             Code................................................................................................................17
         4.     Subordinated Claims....................................................................................17
          5.     Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes..............17
         6.     Intercompany Interests.................................................................................17
          7.     Controversy Concerning Impairment. .........................................................17
         8.     Insurance......................................................................................................18
    B.     Means for Implementation of the Plan.....................................................................18
         1.     Sources of Consideration for Plan Distributions.........................................18
         2.     Vesting of Assets. .......................................................................................19
         3.     Wind-Down Debtors....................................................................................19

4. Plan Administrator. ...................................................................................19
5. Liquidating Trust. ....................................................................................22
6. Corporate Existence Post-Effective Date. ...............................................26
7. Statutory Committee and Cessation of Fee and Expense Payment. ..................................27
8. Cancellation of Securities and Agreements. ............................................27
9. Corporate Action. ....................................................................................27
10. Effectuating Documents; Further Transactions. ......................................28
11. Section 1146 Exemption. .........................................................................28
12. Causes of Action. .....................................................................................29
13. Books and Records. ..................................................................................29
14. Insurance Claims: Business Interruption Insurance Claims, D&O Claims........................29
and Others. ...............................................................................................29
15. Section 1145 Exemption. .........................................................................30
C. Treatment of Executory Contracts and Unexpired Leases. ...............................................30
1. Assumption and Rejection of Executory Contracts and Unexpired Leases. ......................30
2. Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......................31
3. Insurance Policies. ...................................................................................31
4. Preexisting Obligations to the Debtors Under Executory Contracts and
Unexpired Leases........................................................................................32
5. Modifications, Amendments, Supplements, Restatements, or Other Agreements............32
6. Reservation of Rights. ..............................................................................33
7. Nonoccurrence of Effective Date..............................................................33
D. Settlement, Release, Injunction, and Related Provisions. .................................................33
1. Settlement, Compromise, and Release of Claims and Interests. .......................................33
2. Release of Liens. ......................................................................................33
3. Releases by the Debtors.............................................................................34
4. Releases by Holders of Claims and Interests. ..........................................35
5. Exculpation..............................................................................................37
6. Injunction.................................................................................................37
7. Protection Against Discriminatory Treatment. ........................................38
8. Document Retention. ................................................................................38
9. Reimbursement or Contribution. ..............................................................39
E. Conditions Precedent to Confirmation and the Effective Date. ........................................39
1. Conditions Precedent to the Effective Date. ............................................39
2. Waiver of Conditions................................................................................40
3. Effect of Failure of Conditions. ...............................................................40
4. Substantial Consummation. ......................................................................40

V.      THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW. ..................................41
        A.      Formation and Growth of FreshRealm..................................................41
        B.      Key Relationships. ...............................................................41
        C.      Board of Directors. ..............................................................42

VI.     THE COMPANY'S PREPETITION CAPITAL STRUCTURE. ..................................42

VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES. ...............................43
        A.      Food Safety Recalls and Operational Disruption. ...............................43
        B.      Insurance Coverage for Listeria-Related Claims ...............................44
        C.      Blue Apron Dispute. ...........................................................44
        D.      Advisor Engagements ..........................................................45
        E.      Prepetition Negotiations With Lenders. .......................................45

VIII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
        CASES. .................................................................................46
        A.      First Day Relief. ............................................................46
        B.      Appointment of Official Committee of Unsecured Creditors .....................46
        C.      Second Day Relief. ...........................................................46
        D.      The Debtors' Professionals' Retention Applications. ..........................47
        E.      Approval of Debtor in Possession Financing. ..................................47
        F.      Schedules and Statements. ....................................................48
        G.      Bar Date Motion. .............................................................48
        H.      Blue Apron/Misfits Market Transaction ........................................48
        I.      Bidding Procedures and Marketing Process......................................49
        J.      Litigation Matters............................................................49
        K.      Committee Investigation and Pending Challenges................................49

IX.     CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING...........................50
        A.      Risks Related to the Confirmation and Consummation of the Plan................50
                1.      Parties in Interest May Object to the Plan's Classification of Claims and
                        Interests............................................................50
                2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur...51
                3.      The Debtors May Fail to Satisfy Vote Requirements. ..................51
                4.      The Debtors May Not Be Able to Secure Confirmation of the Plan.......51
                5.      Nonconsensual Confirmation. ........................................52
                6.      The Debtors Could Lose Exclusivity..................................52
                7.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the
                        Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed. ...52
                8.      The Debtors May Object to the Amount or Classification of a Claim or Interest...52
                9.      Risk of Non-Occurrence of the Effective Date. ......................53
                10.     Contingencies May Affect Votes of Impaired Classes to Accept or Reject the
                        Plan. ..............................................................53
                11.     The Plan's Release, Injunction, and Exculpation Provisions May Not Be
                        Approved. ..........................................................53
                12.     The Total Amount of Allowed Administrative Claims and/or General Unsecured
                        Claims May Be Higher Than Anticipated by the Debtors. ..............53
                13.     The Committee's Pending Challenges May or May Not Be Resolved Prior to
                        Confirmation .......................................................53
                14.     Certain Tax Implications of the Plan. ..............................54
        B.      Disclosure Statement Disclaimer. .............................................54
                1.      The Financial Information Contained in this Disclosure Statement Has Not Been
                        Audited. ...........................................................54
                2.      Information Contained in this Disclosure Statement is for Soliciting Votes. ...54
                3.      This Disclosure Statement Was Not Approved by the United States Securities
                        and Exchange Commission.............................................54

iii

4.     No Legal or Tax Advice Is Provided to You by this Disclosure Statement........................54

5.     This Disclosure Statement May Contain Forward Looking Statements. ..........................55

6.     No Admissions Made. ......................................................................................................55

7.     Failure to Identify Litigation Claims or Projected Objections. ........................................55

8.     No Waiver of Right to Object Claims or Interests............................................................55

9.     Information Was Provided by the Debtors and Was Relied Upon by the Debtors'
Advisors. .........................................................................................................................55

10.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. ..................56

11.    No Representations Outside this Disclosure Statement Are Authorized. ..........................56

**X.    SOLICITATION AND VOTING PROCEDURES. ....................................................................56**

A.    Holders of Claims Entitled to Vote on the Plan. ..............................................................56

B.    Voting Record Date. .......................................................................................................57

C.    Voting on the Plan...........................................................................................................57

D.    Ballots Not Counted. ......................................................................................................57

**XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. ........................58**

A.    Confirmation Hearing. ....................................................................................................58

B.    Confirmation Standards. .................................................................................................58

1.     Requirements of Section 1129(a) of the Bankruptcy Code.............................................58

2.     Best Interests of Creditors—Liquidation Analysis. ........................................................59

3.     Feasibility. ......................................................................................................................60

4.     Valuation ........................................................................................................................60

C.    Acceptance by Impaired Classes.....................................................................................61

D.    Confirmation Without Acceptance by All Impaired Classes. ...........................................61

1.     No Unfair Discrimination. ...............................................................................................61

2.     Fair and Equitable Test. ...................................................................................................62

**XII.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ...............62**

A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors .....................63

B.    Character of Gain or Loss ...............................................................................................64

C.    Market Discount..............................................................................................................65

D.    Accrued Interest. ............................................................................................................65

E.    Limitation on Use of Capital Losses ...............................................................................65

F.    Information Reporting and Backup Withholding..............................................................66

G.    U.S. Federal Income Tax Treatment of the Liquidating Trust..........................................66

1.     Liquidating Trust ............................................................................................................66

2.     Reporting. .......................................................................................................................68

3.     Valuation. .......................................................................................................................68

4.     Tax Returns......................................................................................................................69

5.     Attribution of Income. ....................................................................................................69

6.     Tax Identification Numbers. ............................................................................................69

7.     Annual Statements. .........................................................................................................70

8.     Notices. ...........................................................................................................................70

9.     Expedited Determination .................................................................................................70

10.    Withholding. ...................................................................................................................70

**XIII.    RECOMMENDATION. ....................................................................................................................70**

iv

## EXHIBITS

**EXHIBIT A**     Chapter 11 Plan

**EXHIBIT B**     Liquidation Analysis

## I.    INTRODUCTION.

FreshRealm, Inc. and its affiliated debtors, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time, the "Plan").[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors will seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims and Interests entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Kroll Restructuring Administration LLC, the Debtors' notice and claims agent (the "Claims and Noticing Agent"), no later than **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**.  The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## II.    PRELIMINARY STATEMENT.

The Debtors and their non-Debtor affiliates (collectively, "FreshRealm" or the "Company") are a food development, manufacturing, and fulfillment company founded in 2013 and spun off as independent companies in 2021.  The Debtors have built a sophisticated food development, manufacturing, and fulfillment platform, with physical and overhead infrastructure purpose-built for the full spectrum of fresh and better-for-you food, capable of accommodating growth of innovative food businesses through a segment-agnostic business strategy.

The Company's business activity is conducted through multiple channels, including direct-to-consumer, grocery, performance, and a growing portfolio of lifestyle and medically-focused customers.  The Company's largest customers are Blue Apron, LLC ("Blue Apron") and MMM Consumer Brands, Inc. ("Marley Spoon").

The Debtors' growth trajectory accelerated significantly with the June 2023 acquisition of the production and fulfillment operations of Blue Apron, pursuant to which the Debtors entered into a 10-year production and fulfillment agreement (the "PFA") with Blue Apron that made the Debtors the exclusive supplier of Blue Apron's meal kits.  On January 30, 2024, the Debtors acquired the U.S. operational assets of Marley Spoon, integrating them into the Debtors' U.S.-based network.  However, beginning in late-March 2025, the Debtors experienced multiple food

---

[2]  Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan or the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures; (B) the Forms of Ballots and Notices in Connection Therewith; and (C) Certain Dates With Respect Thereto; and (III) Granting Related Relief* (the "Disclosure Statement Motion"), as applicable.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

safety incidents driven by the receipt of contaminated material from suppliers, leading to several recalls that were extremely disruptive to the Debtors' business and eroded the Debtors' liquidity.

Commencing in April 2025 and leading up to the commencement of these Chapter 11 Cases, Blue Apron asserted that the Debtors breached certain obligations under the PFA based on, among other things, food quality and safety failures associated with the recalls, sent the Debtors a notice of termination of the PFA in December 2025, and sought to replace the Debtors as the exclusive provider of Blue Apron's meal kits. The Debtors also lost their Walmart customer as a result of the recalls. Facing these challenges, the Debtors executed on a transformation plan that included SG&A organizational changes, facilities consolidation and plant closures, and material optimization strategies. Ultimately, the Debtors were unable to raise sufficient capital outside of chapter 11 to fund operations.

Recognizing the need to act, the Debtors' board of directors (the "Board"), consisting of independent directors, Jill Frizzley and Charlie Piper, in conjunction with the Debtors' advisors, determined that the Debtors' most value-maximizing path forward was through a chapter 11 filing. The Debtors engaged with their key creditor constituencies, including FaraNord (US) III Pte Ltd, as collateral agent and administrative agent for certain lenders (the "2L Lender"), BGC Lender Rep LLC, as collateral agent and administrative agent for certain lenders (the "1L Lender," and together with the 2L Lender, the "Prepetition Lenders"), and Blue Apron on a holistic restructuring solution. The DIP Lenders provided $3 million in protective advances as bridge financing and agreed to provide a debtor-in-possession term loan facility of $15 million in post-petition new money loans (the "DIP Facility") to support the ultimate resolution of the Debtors' Chapter 11 Cases.

In addition, subject to Bankruptcy Court approval, the Debtors and Blue Apron entered into a settlement agreement and mutual release (the "Settlement Agreement") whereby Blue Apron agreed to provide approximately $47 million in cash consideration (a portion paid on the Effective Date and a portion paid in installments over a subsequent 15-month period), waivers of certain claims in excess of $8 million, and other financial accommodations from Blue Apron of approximately $7 to $10 million to terminate the PFA and related agreements, and transition Blue Apron's exclusive fulfillment business to Misfits Market, Inc. ("Misfits Market"). The Settlement Agreement further provided for a cash payment of $500,000 to the Debtors to be held by the Debtors solely for the purposes of funding a liquidation trust or equivalent structure pursuant to a plan filed by the Debtors (the "Trust Payment"). As part of the settlement, the Debtors also entered into a transition services agreement (the "TSA") with Misfits Market for the provision of transition services through August 31, 2026, and an asset purchase agreement (the "APA" and together with the Settlement Agreement and TSA, the "Blue Apron/Misfits Transaction") with Misfits Market for the sale of certain working capital, inventory, and equipment, plus assumed liabilities.

On April 27, 2026 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). On the Petition Date, the Debtors also filed a motion to approve the Settlement Agreement, TSA, and APA (the "Sale and Settlement Motion"). On June 2, 2026, the Bankruptcy Court entered an order approving the Sale and Settlement Motion [Docket No. 209], and June 4, 2026, the Debtors closed on the sale under the APA and the Settlement Agreement and TSA went effective [Docket No. 217].

The Debtors intend to conclude these Chapter 11 Cases efficiently through (i) an orderly wind-down process of the Debtors and their estates and (ii) the Debtors' pursuit of a plan of liquidation, which shall provide for the orderly liquidation of the Debtors' estates, include customary terms and conditions, provide for the funding of the costs of a wind-down subject to a specified wind-down budget, and be confirmed by the Bankruptcy Court.

In parallel with the Blue Apron/Misfits Market Transaction, the Debtors pursued a process to maximize value for those of the Debtors' assets that are not related to the Blue Apron/Misfits Transaction, including certain of the Debtors' inventory, accounts receivable, contracts, leases, intellectual property rights, and other residual assets. That process did not result in an actionable bid for such assets and therefore the Debtors pursued various other actions to maximize value, including but not limited to, liquidation sales, sales pursuant to de minimis asset procedures, and sales in the ordinary course of business.

Following the consummation of the Blue Apron/Misfits Transaction and other miscellaneous sale transactions, the Debtors propose to liquidate any remaining assets and pursue any retained causes of action pursuant to the Plan.  The Debtors believe that the Plan maximizes the value of recoveries to all stakeholders and generally distributes all property of the Debtors' estates that is or becomes available for distribution according to the priorities established by the Bankruptcy Code and applicable law.  The Plan provides the ability of the Debtors to satisfy administrative and priority claims in full.

The primary objective of the Plan is to maximize value for all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, the Plan:

- Provides for the vesting of certain assets in the Wind-Down Debtors or a Liquidating Trust, as applicable, for the purpose of distribution to Holders of Claims;

- designates a Plan Administrator to wind down the Debtors' affairs and administer the Plan in an efficient manner, and establishes a Liquidating Trust for the benefit of Holders of Allowed General Unsecured Claims; and

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative would materially reduce recoveries to Holders of Claims.  Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that the Claims and Noticing Agent actually receives such ballots by **September 15, 2026, at**

3

**5:00 p.m.** prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

A.    *What is chapter 11?*

Chapter 11 is the principal business chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

The Plan provides for the efficient distribution of distributable cash (including the proceeds of the Sale Transactions, to Holders of Allowed Claims and Allowed Interests and the orderly Wind-Down and dissolution of the Debtors' Estates. This Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.    *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant

4

to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan.  As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth in the Plan.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

D.      *What will I receive from the Debtors if the Plan is consummated?*

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Plan Administrator:  (i) payment in full in Cash of such Holder's Allowed Secured Tax Claim; or (ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period. |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtors or Wind-Down Debtors:  (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; (iii) Reinstatement of such Holder's Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. |

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Administrative, Allowed Priority Tax Claim, or Allowed Other Claims, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| 4 | First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed First Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Claim shall receive its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Article II of the Plan; *provided, however*, that in no event shall any Holder of a First Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |
| 5 | Second Lien Claims | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Second Lien Claim shall receive its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Articles II and III of the Plan; provided, however, that in no event shall any Holder of Second Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |
| 6 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Liquidating Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed General Unsecured Claim, each Holder thereof will receive its pro rata share of the Liquidating Trust Interests. |
| 7 | Intercompany Claims | Each Allowed Intercompany Claim, to the extent not assumed pursuant to the terms of any Sale Order, shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released; or (d) otherwise addressed at the option of the Debtors or Wind-Down Debtors without any distribution on account of such Intercompany Claims. |
| 8 | Intercompany Interests | Allowed Intercompany Interests, to the extent not assumed pursuant to the terms of any Sale Order, shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise addressed at the option of the Wind-Down Debtors or Debtors without any distribution on account of such Intercompany Interests. |
| 9 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished, and will be of no further force or effect. Holders of Interests shall receive no recovery or distribution on account of their Interests. |
| 10 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be cancelled, released, and extinguished, and will be of no further force or effect. Holders of Section 510(b) Claims shall not receive recovery or distribution on account of such Claims. |

7

E.       *What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims, Intercompany Interests, and Interests set forth in Article III of the Plan.

1.       <u>Administrative Claims</u>.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, the DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which (i) an order Allowing such Administrative Claim becomes a Final Order, or (ii) the Plan Administrator, on the one hand, and the Holder of the Administrative Claim, on the other hand, agree to the Allowed amount of such claim, or as soon as reasonably practicable thereafter; or (3) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claim.

**Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down Debtors, or their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Wind-Down Debtors or any notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.**

2.      DIP Claims.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable or alternative treatment, on or before the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) has consented to receive and shall receive, (i) Cash in an amount necessary to pay the reasonable and documented fees, expenses, and disbursements of the Lender Professionals, to the extent any amount remains outstanding, (ii) Cash in an amount necessary to pay the reasonable and documented fees, expenses, and disbursements of the Lender Professionals, to the extent any amount remains outstanding, and (iii) the Distributable Value under the Distributable Waterfall, until such Allowed DIP Claim is indefeasibly paid in full, but at all times subject to the Distributable Waterfall.  For the avoidance of doubt, any distribution made pursuant to verse (ii) above shall be made directly to the applicable Lender Professional and not to the Holder of an Allowed DIP Claim.

3.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code

4.      Professional Fee Claims.

(a)      Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Wind-Down Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account, when such Professional Fee Claims are Allowed or awarded by entry of an order of the Bankruptcy Court.

(b)      Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, and in consultation with the DIP Lenders, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any

9

way.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors.

The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to each such Professional by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account or the Wind-Down Debtor Account, as applicable, as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute part of the Wind-Down Debtor Assets without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      Professional Fee Amount.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than 5 days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Wind-Down Debtors shall use Cash on hand or from the Wind-Down Debtor Account to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)      Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtors.  If the Debtors or the Wind-Down Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or the Wind-Down Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate,

and the Wind-Down Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything in this Plan, nothing alters the terms of the *Order Authorizing the Debtors to (A) Retain Alvarez & Marsal North America, LLC to Provide Certain Executive Officers and Certain Additional Personnel, and (B) Designate Certain Executive Officers, and (II) Granting Related Relief* [Docket No. 255] (the "A&M Order") and the requirement to seek approval of the Completion Fee (as defined in the A&M Order) as set forth in the A&M Order.

F.    *What happens to my recovery if the Plan is not confirmed or does not go effective?*

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code, and in the alternative, the Chapter 11 Cases may be dismissed.  Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes.  *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).  Either alternative will bring additional risks and uncertainties.

G.    *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?*

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective."  Distributions to Holders of Allowed Claims and Allowed Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article IV.E of this Disclosure Statement, entitled "*Conditions Precedent to Confirmation and the Effective Date*," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" means the occurrence of the Effective Date.

H.    *What is the Blue Apron/Misfits Transaction?*

The sale and settlement transaction approved by the Bankruptcy Court pursuant to the Sale and Settlement Order which provides, among other things for: (i) the settlement with Blue Apron pursuant to the Settlement Agreement, whereby Blue Apron agreed to provide approximately $47 million in cash consideration, the Trust Payment, waivers of certain claims in excess of $8 million, and other financial accommodations from Blue Apron of approximately $7 to $10 million; (ii) the Transition Services Agreement with Misfits Market for the provision of transition services through August 31, 2026; and (iii) the Asset Purchase Agreement with Misfits Market for the sale of certain

11

working capital plus assumed liabilities to enable Misfits Market to assume fulfillment services for Blue Apron.

     I.     *What are the sources of Cash and other consideration required to fund the Plan?*

The Debtors shall fund or make distributions under the Plan with: (i) the proceeds from the Settlement Agreement with Blue Apron; (ii) the proceeds from sales or liquidations of remaining assets not sold pursuant to the Blue Apron/Misfits Transaction; (iii) the Debtors' Cash on hand; (iv) proceeds from the Wind Down, including the Wind-Down Debtor Assets; and (v) proceeds from the Liquidating Trust Assets.

     J.     *Is there potential litigation related to the Plan?*

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article IX.A.4 of this Disclosure Statement, entitled "*The Debtors May Not Be Able to Secure Confirmation of the Plan.*"

     K.     *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall chapter 11 efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize the assets distributable by the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Releasing Parties are each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (i) each Related Party of each Entity in clause (a) through this clause (g), for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided, however,* that each Entity in the foregoing clause (f) or (g) that (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is

not withdrawn or otherwise resolved before the Confirmation Order is entered shall not be a Releasing Party.

The Released Parties are each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) each Releasing Party; (g) each current and former Affiliate of each Entity in clause (a) through the following clause (f); each Related Party of each Entity in clause (a) through this clause (g), each in their capacity as such; (h) the current members of the Board or Boards of the Debtors, Jill Frizzley and Charlie Piper; and (i) the Released Officers; *provided, however,* that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered. For the avoidance of doubt and notwithstanding anything herein to the contrary, no former director (in their capacity as such) or non-Releasing Party shall be a Released Party under the Plan.

The Exculpated Parties are: (a) each of the Debtors; (b) the Independent Directors; (c) the Committee and its members; and (d) with respect to the Debtors and the Committee, each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors, as applicable, that served in such capacity between the Petition Date and Effective Date.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.D of this Disclosure Statement, entitled "*Settlement, Release, Injunction, and Related Provisions.*"

L.      *What is the deadline to vote on the Plan?*

**The Voting Deadline is September 15, 2026, at 5:00 p.m., prevailing Eastern Time**.

M.      *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in Article X of this Disclosure Statement and please refer to the Disclosure Statement Order and Instructions for Completing the Ballot found at the end of each applicable Class Ballot for additional requirements with respect to voting to accept or reject the Plan. **BALLOTS SENT BY EMAIL OR FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

N.      *Why is the Bankruptcy Court holding a Confirmation Hearing?*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

O.      *When is the Confirmation Hearing set to occur?*

The Bankruptcy Court has scheduled the Confirmation Hearing for **September 24, 2026, at 10:00 a.m. prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Confirmation Hearing is being held on the same day as the hearing to approve the adequacy of this Disclosure Statement on a final basis.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objecting to the Plan and the date and time of the Confirmation Hearing, in a nationally recognized publication to provide notification to those persons who may not receive notice by mail.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**, pursuant to the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

P.      *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

Q.      *What is the effect of the Plan on the Debtors' ongoing business?*

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan and the Liquidating Trustee will administer the

Liquidating Trust Assets.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

      R.     *Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kroll Restructuring Administration LLC:

      *By regular mail, hand delivery or overnight mail at:*

      FreshRealm, Ballot Processing Center
      c/o Kroll Restructuring Administration LLC
      850 Third Avenue, Suite 412
      Brooklyn, NY 11232

      *By electronic mail at:*

      FreshRealmInfo@ra.kroll.com
      Please reference "FreshRealm, Inc. – Solicitation Inquiry" in the subject line.

      *By telephone at:*

      (888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims and Noticing Agent at https://restructuring.ra.kroll.com/FreshRealm (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

      S.     *Who Supports the Plan?*

The Plan, which remains subject to further negotiation, is supported by the Debtors, the DIP Lenders, the First Lien Lenders, and the Second Lien Lenders.  The Debtors are engaged in negotiations with, among other parties, the Committee regarding the terms of the Plan.  As of the date hereof, the Plan remains subject to further negotiation and finalization.

      T.     *Could subsequent events potentially affect recoveries under the Plan?*

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is confirmed and the Effective Date is reached.  Any number of subsequent events may interfere with Plan recoveries.

      U.     *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe

the Plan is in the best interests of all Holders of Claims and Interests, and that other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  As noted above, at this time, the Committee does not support the Plan.

## IV.   SUMMARY OF THE PLAN.

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Wind-Down Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Classification and Treatment of Claims and Interests.*

1.    Classification of Claims and Interests.

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or an Interest to be classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.    Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Wind-Down Debtors', the Plan Administrator's, or the Liquidating Trustee's rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

3.  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B herein.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X herein to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

4.  Subordinated Claims.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee (as applicable) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

5.  Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  To the extent a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, such Class shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.  Intercompany Interests

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are being received by Holders of such Intercompany Interests solely to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Wind-Down Debtors to the Holders of certain Allowed Claims and otherwise for uses as are contemplated by the Plan, in each case, in accordance with the terms of the applicable Sale Order.

7.  Controversy Concerning Impairment.

17

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date

8. Insurance.

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

If a Claim may be covered by an Insurance Policy that has a self insured retention (an "SIR") or deductible (a "Deductible"), the Allowed amount of such Claim that is within the applicable SIR or Deductible shall constitute an Allowed General Unsecured Claim against the applicable Debtor's Estate. Such SIR or Deductible shall be considered satisfied pursuant to this Plan through allowance of such General Unsecured Claim solely in the amount of the applicable SIR or Deductible; provided, however, that nothing herein obligates the Liquidating Trust to otherwise satisfy any SIR or Deductible under any Insurance Policy. Any recovery on account of a Claim, that may be payable, in full or in part, pursuant to the terms and conditions of one of the Debtors' Insurance Policies in excess of the SIR or Deductible shall be payable pursuant to the terms and conditions of the applicable Insurance Policy, if any.  Nothing in this Plan shall (1) be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an Insurance Policy, (2) alter or modify the terms and conditions of any Insurance Policy, or (3) be a determination that any Insurance Policy is an Executory Contract or is capable of assumption or rejection. In no event shall the Debtors or the Liquidating Trust be required to pay any amounts within an SIR or Deductible, including defense costs, other than though the allowance of a General Unsecured Claim up to the amount of the applicable SIR or Deductible.

B. *Means for Implementation of the Plan.*

1. Sources of Consideration for Plan Distributions.

Distributions on account of the DIP Claims, First Lien Claims, and Second Lien Claims shall be funded by the Debtors and the Wind-Down Debtors, as applicable, consistent with the Plan, provided, however, to the extent any of the preceding Claims are satisfied in whole or in part from the Blue Apron Deferred Payments, such Claims shall be funded by Blue Apron or Wonder Group, Inc, or an affiliate thereof.  The applicable Purchaser shall be responsible for payment of all Allowed Claims that constitute Assumed Liabilities under any Purchase Agreement. Administrative Claims, Priority Tax Claims and Secured Tax Claims, Other Secured Claims, and Other Priority Claims which were not assumed by any Purchaser, shall be funded by the Debtors with Cash on hand or through the Administrative Claims Reserve Amount under the Wind-Down Budget, on the Effective Date or shortly thereafter consistent with the Plan.  The Liquidating Trustee shall fund distributions to all other Holders of Allowed General Unsecured Claims under the Plan with the Liquidating Trust Assets, in each case in a manner consistent with the Plan.

18

2.      <u>Vesting of Assets</u>.

On the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, (i) the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests except as otherwise expressly provided in the Plan; and (ii) the Plan Administration Assets shall vest in the Wind-Down Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests except for those concerning the DIP Claims, the First Lien Claims, and the Second Lien Claims, or as otherwise expressly provided in the Plan.

3.      <u>Wind-Down Debtors.</u>

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors solely for the purposes of (i) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, and liquidating all Wind-Down Debtor Assets, (ii) performing any remaining obligations under the TSA; (iii) enforcing and prosecuting Claims, interests, rights, and privileges under the Wind-Down Debtor Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the First Lien Lenders and Second Lien Lenders to outweigh the costs associated therewith; (iv) resolving any Disputed non-General Unsecured Claims, (v) paying or otherwise satisfying Allowed non-General Unsecured Claims, (vi) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtor are entitled and file any tax returns or other filings as are required in connection therewith), (vii) complying with its continuing obligations under the Asset Purchase Agreements, if any, (viii) otherwise administering the Plan in an efficacious manner, and (ix) undertaking any restructuring transactions as are necessary or advisable in connection with the foregoing. The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (xi) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter.

On the Effective Date, the Wind-Down Debtor Assets shall vest in the Wind-Down Debtors for the primary purpose of administering the Wind-Down Debtors' Estates, which may include liquidating the Wind-Down Debtor Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business, other than performance under the TSA. In consultation with the DIP Agent, the First Lien Agent and the Second Lien Agent, the Wind-Down Debtors will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Debtor Assets, make timely distributions pursuant to the Plan and Confirmation Order, and not unduly prolong its duration. The Wind-Down Debtor Assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. The Wind-Down Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

4.      <u>Plan Administrator</u>.

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor, with the consent of the Required DIP Lenders, as the sole director and the sole officer of such Wind-Down Debtor and shall succeed to the powers of such Debtor's directors and officers. The Plan Administrator shall be the sole representative of, and shall act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all Governance Documents are deemed amended by the Plan to permit and authorize the same).

The Debtors shall include, in the Plan Supplement, the information set forth in Sections 1129(a)(4) and (5) of the Bankruptcy Code and the identity of the Person or Entity that the Debtors have selected as the Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(a)     The Plan Administrator Agreement.

Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date, which shall be subject to the consent of the DIP Agent, the First Lien Agent and the Second Lien Agent, are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan.

(b)     Rights, Powers, and Duties of the Debtors and Plan Administrator.

On and after the Effective Date, the Plan Administrator will act for the Post-Effective Date Debtors in the same capacity as applicable to a board of managers or directors, or to officers, subject to the provisions of the Plan. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Wind-Down Debtors. Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all corporate actions consistent with the Plan, the Confirmation Order, any Asset Purchase Agreements, all other applicable orders of the Bankruptcy Court, and the Plan Administrator Agreement, in each case, that are necessary and/or desirable to effectuate the terms of the Plan on behalf of the Wind-Down Debtors and use its reasonable best efforts to assist with or effectuate the transition of the Debtors' business, wind down, dissolution, or liquidation of the Wind-Down Debtors. In taking such actions, the Plan Administrator may control and exercise authority over any Assets, vested in the Wind-Down Debtors pursuant to the Plan, over the acquisition, management, and disposition thereof and over the management and conduct of the affairs of the Wind-Down Debtors. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Wind-Down Debtors pursuant to the Plan and the Plan Administrator Agreement, shall include, among others, (a) making distributions to Holders of

20

Allowed Claims and Interests as provided for in the Plan (except for Allowed General Unsecured Claims), (b) administering, reconciling and resolving (i) Administrative Claims, Secured Claims, and Priority Tax Claims, and (ii) upon one (1) business days' notice to the Liquidating Trustee, DIP Claims, First Lien Claims, Second Lien Claims, and Other Priority Claims, (c) filing tax returns and paying taxes, (d) commencing and pursuing the Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets and managing and administering any proceeds thereof, (e) paying certain Quarterly Fees, (f) defending the Debtors in any pending or future litigation, (g) selling, abandoning, or otherwise fully administering the Estates, (h) in consultation with the Liquidating Trustee, closing the Chapter 11 Cases, (i) dissolving the Wind-Down Debtors, and (j) performing other duties and functions that are consistent with the implementation of the Plan.

For the avoidance of doubt, the Plan Administrator shall administer the Wind-Down Debtors and the Plan in accordance with the Wind-Down Budget and shall have the authority to authorize, make, or cause to be made payments in accordance with the Wind-Down Budget. The Plan Administrator shall use commercially reasonable efforts to adhere to (or outperform) the Wind-Down Budget; provided that the Plan Administrator shall have the authority to reallocate funding between line items within the Wind-Down Budget without further order of the Court, but in all cases in consultation with the DIP Agent, the First Lien Agent, and the Second Lien Agent.

In pursuing any Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, under the Plan, the Plan Administrator shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, may be brought under Section 546 of the Bankruptcy Code.

The Plan Administrator shall have the right, in consultation with the First Lien Agent and Second Lien Agent, to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator and in accordance with the Wind-Down Budget. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

The Plan Administrator and all professionals retained by the Plan Administrator shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each Wind-Down Debtor. The Plan Administrator may rely upon written information previously generated by the Debtors.

(c)     Compensation of the Plan Administrator.

The Plan Administrator shall be compensated pursuant to the terms of the Plan Administrator Agreement; *provided that* the Plan Administrator shall be permitted to use the

21

Wind-Down Amount, which has been allocated and approved pursuant to the Approved Budget, to pay the Plan Administrator's fees and expenses as set forth in the Plan Administrator Agreement.

(d)    Insurance for the Plan Administrator.

The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Amount all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Wind-Down Debtors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator after the termination of the Plan Administrator Agreement. The Plan Administrator may also obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.

(e)    Transition Services.

On the Effective Date, the Plan Administrator shall serve as an appointed agent of the designated operator or as the operator of the Debtors in accordance with the Plan for the purposes of fulfilling any obligations under the TSA.

(f)    Termination of the Plan Administrator's Responsibilities and Obligations.

Upon the conclusion of the Plan Administrator's obligations under the post-Effective Date Wind Down in accordance with the Plan and Plan Administrator Agreement, the Plan Administrator shall remit any remaining balance of the Wind-Down Account Amount to the DIP Lenders or Prepetition Secured Parties, as applicable, for distribution pursuant to the terms of the Plan.

5.    Liquidating Trust.

(a)    Establishment of the Liquidating Trust

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement, which will be Filed with the Bankruptcy Court as part of the Plan Supplement. Upon establishment of the Liquidating Trust, title to the Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of the Debtors or any managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors.

The Liquidating Trust Interests to be distributed to Liquidating Trust Beneficiaries under the Plan shall not constitute "securities" under applicable securities laws and shall represent only the right to receive distributions from the Liquidating Trust in accordance with the Liquidating

22

Trust Agreement. The Liquidating Trust Interests shall be non-transferable, except as required by law or as provided in the Liquidating Trust Agreement.

(b)      Transfer of the Liquidating Trust Assets

Pursuant to section 1141 of the Bankruptcy Code, all property transferred to the Liquidating Trust shall be made free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as may be otherwise provided for in the Plan. Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust. For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof.

(c)      Liquidating Trust Agreement

On the Effective Date, the Debtors shall execute the Liquidating Trust Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Liquidating Trust Agreement made by the Debtors, subject to the reasonable consent of the First Lien Agent and the Second Lien Agent, will be ratified. The Liquidating Trust Agreement will contain provisions permitting the amendment or modification of the Liquidating Trust Agreement necessary to implement the provisions of the Plan

(d)      Purpose of the Liquidating Trust

The Liquidating Trust shall be established for, among other purposes, the purpose of (a) receiving and holding the Liquidating Trust Assets; (b) administering, disputing, objecting to, compromising, or otherwise resolving all Claims and Interests other than (i) DIP Claims, (ii) First Lien Claims, (iii) Second Lien Claims, (iv) Administrative Claims, (v) Secured Claims, (vi) Priority Tax Claims; and (vii) Prepetition Deficiency Claims; (c) making distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement; (d) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries; and (e) commencing and pursuing the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, if any, and managing and administering any proceeds thereof with no objective to continue or engage in the conduct of a trade or business in accordance with Treas. Reg. § 301.7701-4(d).

The Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

(e)      The Liquidating Trustee

23

Upon the occurrence of the Effective Date, the Liquidating Trustee shall be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement. The Liquidating Trustee, subject to the terms and conditions of the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable. The Liquidating Trustee shall owe fiduciary duties solely to the Liquidating Trust Beneficiaries and shall act in the best interests of such Liquidating Trust Beneficiaries in connection with the foregoing and the administration, monetization or distribution of any Liquidating Trust Assets.

In pursuing any Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, the Liquidating Trustee shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets may be brought under Section 546 of the Bankruptcy Code.

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement. The Liquidating Trustee (and any professionals retained by the Liquidating Trustee) shall not be required to File a fee application to receive compensation.

The Liquidating Trustee shall have the right, and subject to any consent or consultation rights as set forth in the Liquidating Trust Agreement, and without Bankruptcy Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement

(f)     U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust

The Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize

24

the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than 5 years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the 6 month period prior to the fifth anniversary (or within the 6 month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan

(g)    Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust"

25

treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

6.      Corporate Existence Post-Effective Date.

(a)      Directors and Officers.

Immediately following the occurrence of the Effective Date, (i) the respective boards of directors or managers, as applicable, and the current officers, of each of the Debtors, shall be terminated without cause and such members of the boards of directors or managers, as applicable, and the current officers of the Debtors shall be deemed to have resigned; and (ii) the Plan Administrator shall: (1) be appointed as the sole member of the board of directors or board of managers, as applicable, and the sole officer; (2) succeed as the sole Holder of Interests in each Wind-Down Debtor; (3) have the rights and powers of a debtor in possession under Section 1107 of the Bankruptcy Code; (4) be a "representative of the estate" pursuant to Section 1123(b)(3) of the Bankruptcy Code; (5) be vested with the rights, powers, and benefits afforded to a "trustee" under Sections 704 and 1106 of the Bankruptcy Code; and (6) have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval.

(b)      Organizational Governance Documents

Immediately following the occurrence of the Effective Date, the Wind-Down Debtors shall continue to exist in accordance with the laws of their respective states of formation and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with the Plan. The Wind-Down Debtors shall exist for the limited purposes of fully administering the Estates. Promptly after performing all duties and functions that are consistent with the implementation of the Plan, the Confirmation Order, and the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all actions to wind down, dissolve, or liquidate the Wind-Down Debtors without the necessity for any other or further actions to be taken by or on behalf of such dissolving Wind-Down Debtors or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

26

The certificate and articles of incorporation and bylaws of each Wind-Down Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under Section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Wind-Down Debtors to matters authorized under the Plan.

7.      Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation and objections thereto.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (y) applications for payment of any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court; and (z) responding to objections to its applications for payment of fees and expenses rendered prior to the Effective Date.

8.      Cancellation of Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except (i) such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan and (ii) any indemnification obligations set forth in Article V.E of the Plan) shall be cancelled solely as to the Debtors and their Affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Debtor affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds (but not including any surety bonds issued on behalf of any of the Debtors), indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, (a) no executory contract or unexpired lease that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code shall be terminated or cancelled on the Effective Date, and (b) no Prepetition Loan Document shall be cancelled to the extent such document evidences indebtedness and/or grants a Prepetition Secured Party a security interest in the Debtors' or Wind-Down Debtors' property.

9.      Corporate Action.

Upon the Effective Date, by virtue of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator or the Liquidating

Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, Wind-Down Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

10.     Effectuating Documents; Further Transactions.

On and after the Effective Date the Plan Administrator and the Agents may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Confirmation Order, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

11.     Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtor or to any other Person or from any of the Wind-Down Debtors to the Liquidating Trust or any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtors; (2) any Sale Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  No provision of the Plan or of the Confirmation Order shall be construed to broaden the tax exemption under section 1146(a) beyond what the statute allows.

12.     Causes of Action.

Except as otherwise provided in Article IX of the Plan or in any contract, instrument, release, or agreement entered into in connection with the Plan or the Sale (including the Asset Purchase Agreement), in accordance with section 1123(b) of the Bankruptcy Code, (a)(i) all Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets are preserved and transferred to the Liquidating Trust on the Effective Date and (ii) all Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets are preserved and transferred to the Wind-Down Debtors on the Effective Date, and (b) all Causes of Action constituting Acquired Assets are preserved and transferred to the applicable purchaser (to the extent not previously transferred).

13.     Books and Records.

On the Effective Date, each of the Liquidating Trust and Plan Administrator shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with any Asset Purchase Agreement and that relate to the operation and business of the Liquidating Trust or Wind-Down Debtors; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee or Plan Administrator, determines, in accordance with the Liquidating Trust Agreement or Plan Administrator Agreement, that retention of same is no longer necessary or beneficial.

14.     Insurance Claims: Business Interruption Insurance Claims, D&O Claims and Others.

Nothing in the Plan or Confirmation Order shall affect, impair or diminish in any form the Business Interruption Insurance Claims or any rights thereto.  Similarly, any rights and Claims under any applicable Business Interruption Insurance Policies shall not be affected, impaired or diminished by operation of the Plan or Confirmation Order.  For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Business Interruption Insurance Policies of the Debtors.

To the extent any D&O Claims are designated as Liquidating Trust Retained Causes of Action or Wind-Debtor Retained Causes of Action, nothing in the Plan, including the releases provided under Article VIII of the Plan, shall have the effect of prohibiting the initiation or continuation of an action by the Plan Administrator up to and through the entry of a judgment or settlement against any D&O Party, provided, however, that the entry of a judgment or settlement on account of any such D&O Claim shall be for the sole purpose of (and expressly limited to) seeking and obtaining a recovery from the amount of proceeds, if any, actually received under any available and applicable Insurance Policies of the Debtors (including, for the avoidance of doubt, any defense costs, professional fees, indemnification or other disbursements payable from insurance). For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Insurance Policies of the Debtors.

The Wind-Down Debtors, the Plan Administrator, and the Liquidating Trust (if applicable) shall use commercially reasonable efforts to cooperate with the DIP Agent and the First Lien Agent in providing information and documents and in pursuing proceeds under the Insurance Collateral

to the extent practicable. The extent and specifics of such cooperation shall be governed by the Liquidating Trust Agreement and Plan Administrator Agreement, as applicable, which shall be included in the Plan Supplement.

### 15.    Section 1145 Exemption.

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Interests pursuant to the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local Law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Interests issued pursuant to the Plan are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

### C.    *Treatment of Executory Contracts and Unexpired Leases.*

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is:  (1) the TSA; (2) the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) an Insurance Policy; (5) an Asset Purchase Agreement; or (6) to be assumed by the Debtors and assigned to any Purchaser in connection with any Sale Transactions and pursuant to any Sale Transactions Documentation or the TSA.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Orders to assume and assign Executory Contracts and Unexpired Leases to the Purchasers pursuant to the Asset Purchase Agreements.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any Final Order, including the Confirmation Order, which has not been assigned to a Purchaser pursuant to the applicable Asset Purchase Agreement or the applicable Sale Order, shall revest in and be fully enforceable by the Wind-Down Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

For the avoidance of doubt, Article V of the Plan relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of any Sale Order.

2.       <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date (the "<u>Rejection Damages Claims Bar Date</u>"). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, the Liquidating Trust (if any), the Purchasers, or their respective property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Wind-Down Debtors and the Holder of such Claim.

3.       <u>Insurance Policies</u>.

Except as otherwise provided in the Plan, nothing in the Plan, the Confirmation Order, the Plan Administrator Agreement, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder, or the terms and conditions thereof, or diminishes or impairs the enforceability of the Insurance Policies. In addition, on and after the Effective Date and subject to the terms and conditions of the D&O Liability Insurance Policies, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies in effect or purchased as of the Effective Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies. Notwithstanding anything herein to the contrary, the Debtors or Wind-Down Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Wind-Down Debtors deem necessary, including by purchasing any tail coverage or tail policies.

Upon the Effective Date, each of the Insurance Policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors (or a Wind-Down Debtor identified as first named insured or counterparty thereto) effective as of the Effective Date, pursuant to sections 105, 365 and 1123 of the Bankruptcy Code,  and coverage for defense and

31

indemnity under any D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any such policies, subject to the terms and conditions of such D&O Liability Insurance Policies; *provided* that any indemnification obligations of the Debtors or Wind-Down Debtors, as applicable, will only continue as to former officers, directors, individual managers, members, partners, supervisors, agents, or employees to the extent such former officers, directors, individual managers, members, partners, supervisors, agents, or employees that are a Released Party.  For the avoidance of doubt, this section shall not apply to any obligations as to any equity owner of any of the Debtors in its capacity as such, but this section shall only apply to any representatives or appointees of such equity owner if they are the Debtors' current or former officers, directors, individual managers, members, partners, supervisors, agents, or employees, in each case in their capacities as such.

The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.F of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court: (i) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, (ii) claims where an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII.F of the Plan to proceed with its claim; and (iii) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Policies, and take other actions relating thereto (including effectuating a setoff), in each case in accordance with the terms of the Insurance Policies and/or applicable non-bankruptcy law.  Nothing in Article VIII.F of the Plan or any corresponding paragraph of the Confirmation Order requires, precludes and/or prohibits Insurers to or from administering, handling, defending, settling and/or paying claims covered by any Insurance Policies in accordance with and subject to the terms and conditions of such Insurance Policies and/or applicable non-bankruptcy law.

### 4. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

### 5. Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided for in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits,

rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6.      Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Rejected Executory Contracts and Unexpired Leases, or any other exhibit, schedule or annex, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Wind-Down Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

7.      Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

D.      *Settlement, Release, Injunction, and Related Provisions.*

1.      Settlement, Compromise, and Release of Claims and Interests.

To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, and in consideration of the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith release, compromise, and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI hereof, all distributions, if any, made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

2.      Release of Liens.

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order or any contract, instrument, release, or other agreement or document created pursuant to**

33

**the Plan or the Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan, and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien and/or security interest, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**If any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

3.      <u>Releases by the Debtors.</u>

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that**

is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Article VIII.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.      Releases by Holders of Claims and Interests.

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively,

absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Article VIII.D of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and

36

compromise of the Claims released by the releases provided in Article VIII.D of the Plan; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided Article VIII.D of the Plan.

5.      Exculpation.

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and solely to the extent such acts or omissions occurred between the Petition Date and the Effective Date, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, any other Definitive Document, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transactions, any other Definitive Document, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the Sale and Settlement Order, the pursuit of the Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.      Injunction.

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  To the fullest extent permissible under applicable law, except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims against or Interests in the Debtors and/or Wind-Down Debtors or Causes of Action, in each case that have been released or are subject to exculpation pursuant to the Plan, shall be precluded and are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties (including the Debtors and Wind-Down Debtors) or the Released Parties, and any successors, assigns or representatives of such Persons or Entities:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with

37

**respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation, of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

7.      Protection Against Discriminatory Treatment.

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

8.      Document Retention.

38

On and after the Effective Date, the Wind-Down Debtors, the Debtors, the Plan Administrator, or Liquidating Trustee, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by each, subject to the applicable provisions of the Plan Administrator Agreement or Liquidating Trust Agreement.

9.      Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

E.      *Conditions Precedent to Confirmation and the Effective Date.*

1.      Conditions Precedent to the Effective Date.

It shall be a condition precedent to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to Article IX of the Plan:

a.  The Sale Transactions shall have been implemented and/or consummated, as applicable, in all material respects;

b.  the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance acceptable to the Required DIP Lenders;

c.  the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and acceptable to the Required DIP Lenders and such order shall have become a Final Order;

d.  the DIP Facility shall be in full force and effect, and there shall be no defaults under the DIP Facility Documents continuing unless waived by the Required DIP Lenders in accordance with the terms and conditions of the DIP Documents;

e.   the Plan Supplement, Plan, and all schedules, documents, supplements, and exhibits thereto, as applicable, shall be acceptable to the Required DIP Lenders and have become Filed;

f.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

g.  the Debtors shall have established the Administrative Claims Reserve;

h.  all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date into the Professional Fee Escrow Account pending approval of such fees and expenses by the Bankruptcy Court;

i.  The Debtors have funded the Wind-Down Debtor Account Amount in Cash;

j.  The Liquidating Trust shall have been established and funded with the Liquidating Trust Assets;

k.  no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan; and

l.  the following documents shall be in full force and effect, and shall not have been terminated prior to the Effective Date: (a) any Sale Orders; (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Plan; and (c) all other material customary documents delivered in connection with transactions of this type.

2.  <u>Waiver of Conditions</u>.

The conditions to Consummation set forth in Article IX of the Plan may be waived by the Debtors, subject to the consent of the Required DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

3.  <u>Effect of Failure of Conditions</u>.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.  Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of (a) the DIP Orders, including without limitation, any releases provided therein, or (b) the Sale Transaction(s) under the Asset Purchase Agreements or the revocation of the Debtors' authority under the Sale Orders to consummate such Sale Transaction(s).

4.  <u>Substantial Consummation</u>.

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

40

## V.      THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.

A.      *Formation and Growth of FreshRealm.*

FreshRealm was founded in 2013 and ultimately spun off as independent companies in 2021.  The Company has established a sophisticated food development, manufacturing, and fulfillment business.  The Debtors' physical and overhead infrastructure are purpose-built for the full spectrum of fresh and better-for-you food, capable of accommodating growth of innovative food businesses through a segment-agnostic business strategy.  Rather than every individual innovative food business constructing its own single-use infrastructure, the Debtors built a shared services platform that allows fixed costs, expertise, and capacity to be leveraged across multiple customers and many channels simultaneously.

FreshRealm, Inc. ("FRI") is the Debtors' main operating entity.  FRI is the direct sole shareholder of the other Debtors (other than FreshRealm Holdings, Inc.).  FreshRealm Holdings, Inc. is the parent entity.  The Debtors' principal assets and place of business are located in Linden, New Jersey.  The Debtors' Linden facility (the "Linden Facility") consists of a 495,000 square foot manufacturing facility built in 2017.  The Debtors employ approximately 700 employees at the Linden Facility.  In total, the Debtors employ approximately 1,017 individuals across the United States.  The Debtors maintain additional operating facilities mainly in Lancaster, Texas and Tracy, California.

B.      *Key Relationships.*

*Relationship with Blue Apron.*  On June 9, 2023, the Debtors acquired the production and fulfillment operations of Blue Apron, including Blue Apron's leasehold interests at the Linden Facility, furnishings and equipment, certain transferred contracts, and intellectual property.  In connection with the acquisition, the Debtors and Blue Apron entered into the PFA with an initial term of 10 years, under which the Debtors agreed to serve as the exclusive supplier of Blue Apron's meal kits.  Blue Apron was subsequently acquired by virtual food hall chain Wonder Group, Inc. in September 2023.  As of the Petition Date, the Debtors fulfilled approximately 60,000 boxes of meal kits and prepared meals per week to Blue Apron customers.  Blue Apron sales account for approximately 70% of the Debtors' total revenue.

*Relationship with Marley Spoon.*  On January 30, 2024, the Debtors acquired the U.S. operational assets of Marley Spoon, a global subscription-based meal kit provider.  The Debtors acquired all of Marley Spoon's U.S.-based operational and supply chain infrastructure, integrating them into its U.S.-based network.  After the closing, the Debtors fulfilled all orders for Marley Spoon's U.S.-based customers nationwide, including for its bistroMD, Martha & Marley Spoon, and Dinnerly brands.

*UFC Ignite Joint Venture.*  On January 9, 2026, the Debtors announced UFC Ignite, a first-of-its-kind, sports-affiliated meal plan created in collaboration with UFC, the world's premier mixed martial arts organization.  The UFC Ignite Program delivers chef-designed, performance-driven meals directly to consumers' doorsteps, offering nearly 200 total meals with a rotating weekly menu featuring more than 60 selections.

C.     *Board of Directors.*

FRI which is the direct sole shareholder of the other Debtors (other than FreshRealm Holdings, Inc.), maintains a two-member Board consisting of Jill Frizzley and Charlie Piper.  Ms. Frizzley was appointed to the Board on October 16, 2025 and Mr. Piper was appointed to the Board on November 6, 2025.  Both directors were previously unaffiliated with the Debtors and their key stakeholders.

## VI.     THE COMPANY'S PREPETITION CAPITAL STRUCTURE.

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $168 million in outstanding secured funded debt obligations.

| *Funded Debt* | *Approximate Outstanding  Principal Amount (in USD)* |
|---|---|
| **2L Financing Agreement** | **~$117 million** |
| **1L Financing Agreement** | **~$51 million** |
| **Total Funded Debt Obligations** | **~$168 million** |

A.     *1L Financing Transaction*

FRI, as borrower, is a party to that certain Financing Agreement dated March 11, 2025, as amended by that certain Waiver and Amendment No. 1 to Financing Agreement dated October 16, 2025, as further amended by that Certain Amendment No. 2 to Financing Agreement dated December 4, 2025 (the "1L Financing Agreement"), by and among FRI, as borrower, the lenders thereto, and BGC Lender Rep LLC, as administrative agent and collateral agent (the "1L Agent"), which initially provided for a $75,000,000 loan facility consisting of a $45,000,000 initial term loan that was funded at closing and up to $30,000,000 in delayed draw term loans.  The obligations under the 1L Financing Agreement are guaranteed by IHEC LLC and FreshRealm HR, LLC (collectively, the "1L Guarantors") pursuant to a Pledge and Security Agreement dated March 11, 2025, and secured by first-priority liens on substantially all assets of the Debtors and 1L Guarantors, other than the 2L Priority Collateral.

B.     *2L Financing.*

FRI is a party to that certain Financing Agreement dated October 16, 2025, as amended by that certain Amendment No. 1 to Financing Agreement dated December 4, 2025 (the "2L Financing Agreement"), by and among FRI, as borrower and the 2L Lender, pursuant to which the 2L Lender agreed to make available to the Debtors a credit facility of up to $50,000,000 consisting of a term loan in the principal amount of $20,000,000 and delayed draw term loans in an aggregate principal amount not to exceed $30,000,000 (the "Initial 2L Credit Facility").  The Initial 2L Credit Facility was fully drawn as of the Petition Date. On December 4, 2025, FRI entered into Amendment No. 1, whereby the 2L Lender provided incremental delayed draw term loans of up

42

to \$70,000,000, of which \$60,000,000 was drawn as of the Petition Date.  FRI's obligations under the 2L Financing Agreement are guaranteed by FreshRealm Holdings, Inc., FreshRealm HR, LLC, and IHEC LLC (collectively, the "2L Guarantors").

As security for FRI's and the 2L Guarantors' obligations under the 2L Financing Agreement, and pursuant to an Amended and Restated Intercreditor Agreement dated December 4, 2025 (the "Intercreditor Agreement"), FRI and the 2L Guarantors granted to the 2L Lender a second-priority lien and security interest in all of their respective assets, other than with respect to certain collateral including all accounts, rights to payment, receivables, inventory, and all proceeds and products of the foregoing (the "2L Priority Collateral"), in which case the 2L Lender has a first priority lien on such 2L Priority Collateral and the 1L Lender has a second lien on such 2L Priority Collateral.

## VII.    EVENTS LEADING TO THESE CHAPTER 11 CASES.

### A.    *Food Safety Recalls and Operational Disruption.*

Subsequent to closing the 1L Financing Transaction in March 2025, the Debtors experienced five separate withdrawal, voluntary recall, or recall incidents associated with Listeria monocytogenes, all of which stemmed from the Debtors' receipt of contaminated material from suppliers.  On March 19, 2025, the United States Department of Agriculture began collecting samples from the Debtors' Indianapolis, Indiana facility involved in the production of meal products, and provided a series of presumptive positive test results in late March 2025.  In April 2025, a presumptive positive environmental swab was identified at the Montezuma, Georgia facility.  In May 2025, the Debtors' customer Walmart withdrew all products produced at that facility as a precautionary measure.  On June 17, 2025, following discussions with customers and regulators, the Debtors initiated a voluntary recall of specific Chicken Fettuccine Alfredo SKUs sold under the Marketside and Home Chef brands. The Debtors also experienced three other instances of receiving contaminated ingredients in 2025 in linguine, cauliflower, and spinach products.  The Debtors took immediate action to address the recalls. Notwithstanding such efforts, each recall event described above caused certain disruptions and delays in production and fulfillment operations, and caused customer attrition, in turn, depleting the Debtors' liquidity.

The Debtors exercised their remaining option to sell \$10 million of Series B preferred shares to Gamstar (US) IX Pte Ltd in July 2025, which was funded in August 2025. Subsequently, in October 2025, the Debtors and the Prepetition Lenders reached an agreement for a comprehensive recapitalization of the business and the implementation of a comprehensive turnaround plan to achieve profitability. More specifically, the Debtors raised \$110 million in additional capital through the 2L Financing Agreement, predicated upon a right-sizing of the Debtors' cost structure to the then-existing revenue base. The turnaround plan also emphasized reductions in facility-level fixed costs, tighter SG&A controls, and operational discipline in labor, freight, and overhead.

While the Debtors were implementing the turnaround plan, Walmart informed the Debtors that it would cease its customer relationship in January 2026. Walmart previously had been a growing customer that comprised more than 20% of the Debtors' revenue. Because the Walmart business represented approximately 80% of the San Clemente, California and Indianapolis, Indiana

production volume, and because those facilities already were unprofitable and underutilized, the Debtors made the decision to close those two facilities and transition any remaining volume to other facilities in the network to reduce costs. Those facilities wound down at the end of January 2026.

    B.    *Insurance Coverage for Listeria-Related Claims*

The Debtors have historically procured insurance policies from multiple insurers to protect themselves from a myriad of risks, including claims arising from losses arising from the actual or alleged damage, injury, or impairment to its consumable products. These insurance policies include, among other insurance purchased by the Debtors, product recall insurance policies and commercial general liability insurance policies. These insurance policies are listed in Schedule A. These insurance policies are general intangibles and collateral under the First Lien Collateral Agreement.

The Debtors have prepared preliminary claims for their listeria-related losses incurred in 2025 and 2026. The claims for their listeria-related losses are potentially covered under two separate periods of product recall insurance: (1) the first period of insurance is from June 10, 2024 to June 9, 2025; and (2) the second period of insurance is from June 10, 2025 to February 1, 2026. In each period, the Debtors purchased primary and excess product recall policies that, combined, provide a total of $20 million in aggregate limits, subject to various self-insured retentions and sub-limits. Prior to the Petition Date, the Debtors and their representatives began communication with their product recall insurers regarding their claims for insurance coverage. The Debtors' product recall insurers have reserved their rights, identified certain potential defenses or limitations to their coverage obligations for the Debtor's listeria-related losses and, to date, have not made any payments under these insurance policies. The Debtors continue to pursue their rights under these policies.

The Debtors also tendered certain of their listeria-related losses to their general liability insurer, Federal Insurance Company ("Federal"). Federal issued primary and excess commercial general liability insurance policies to the Debtors for the period June 10, 2024 to June 9, 2025 and June 10, 2025 to February 1, 2026. Federal's commercial general liability insurance policies for each of these periods provide a $2 million aggregate limit at the primary layer and a $10 million aggregate limit at the excess layer. Federal has denied coverage for the Debtors' listeria-related losses based on a "biological agents" exclusion in the commercial general liability insurance policies. The Debtors continue to pursue their rights under these policies.

The Plan does not resolve the insurance coverage matters under any insurance policies purchased by the Debtors with respect to the listeria-related claims (the "Business-Interruption Insurance Claims"). The Debtors are actively working with their insurers to resolve these disputes.

    C.    *Blue Apron Dispute.*

Commencing in April 2025 and leading up to the commencement of these Chapter 11 Cases, Blue Apron asserted that the Debtors breached certain obligations under the PFA based on, among other things, food quality and safety failures associated with the recalls. In December 2025, Blue Apron sent the Debtors a notice of termination of the PFA and sought to replace the Debtors

as the exclusive provider of Blue Apron's meal kits (the "Termination Notice"). The Termination Notice was predicated on: (i) alleged material breaches previously identified in a prior letter from Blue Apron dated April 9, 2025, and (ii) additional alleged material breaches identified in the Termination Notice attributable to, among other things, food safety and quality issues associated with the recalls and attendant operational issues.

In response, the Debtors contended that the Termination Notice failed to comply with the PFA's notice and cure requirements with respect to the newly alleged material breaches under the PFA. The Debtors asserted (a) the alleged conduct did not constitute a "material breach" of the PFA, (b) the Debtors undertook sufficient actions to cure the alleged breaches previously identified, and (c) Blue Apron failed to strictly comply with the PFA's notice provisions. The Debtors and Blue Apron thereafter engaged in settlement discussions to resolve the outstanding issues, including Blue Apron's asserted termination of the PFA. While those discussions were ongoing, the Debtors and Blue Apron entered into a series of tolling agreements to expressly reserve all rights, claims and defenses, including, but not limited to, the validity of the Termination Notice, with the most recent of such tolling periods set to expire on May 4, 2026. Notwithstanding the tolling arrangement, the ongoing disputes with Blue Apron concerning the PFA negatively affected financial support to and investment in the Debtors' business.

While attempting to negotiate a mutually beneficial resolution with Blue Apron, the Debtors simultaneously sought to raise additional capital to fund the business through the balance of the transformation to forecasted positive cash flow in the third quarter of 2026. Through January and February 2026, the Debtors met with at least 15 working capital lenders and multiple parties to seek to monetize the Debtors' insurance claims. None of those efforts ultimately were successful. With diminishing liquidity despite a materially improved business and operations, the Debtors focused their efforts on contingency planning.

D. *Advisor Engagements*

On October 16, 2025, the Debtors engaged A&M to provide Chief Financial Officer and Chief Transformational Officer services and implement operational and financial performance improvements. The engagement was expanded to add Chief Operating Officer services on December 16, 2025. On February 21, 2026, the Debtors engaged Rothschild & Co. to facilitate contingency planning and investment banking services for the sale of the Debtors. On March 10, 2026, the Debtors engaged Cole Schotz P.C. to support their restructuring efforts, including assisting the Debtors in contingency planning, exploring restructuring options and, ultimately, Chapter 11 planning and execution.

E. *Prepetition Negotiations With Lenders.*

Debtors and their advisors were in near-constant communication with the Prepetition Lenders and their advisors during the months and weeks preceding the bankruptcy filing. In January 2026, the Debtors determined, with the assistance of their advisors, that additional liquidity would be necessary to sustain the Debtors' operations. The Debtors and their advisors explored various mechanisms to generate additional liquidity and had extensive discussions with many of the Debtors' key stakeholders, including the Prepetition Lenders and Blue Apron, on strategic alternatives to alleviate pressure on the Debtors' business. Those discussions revealed

45

that proceeding through an out-of-court restructuring would not be viable, and that the Debtors needed to pursue an in-court restructuring through a chapter 11 filing.

## VIII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A. *First Day Relief.*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Debtors' Chapter 11 Cases following the commencement of the Chapter 11 Cases. A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Bryan Fleming, Chief Financial Officer of the Debtors and Senior Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20] (the "First Day Declaration").

The First Day Motions were heard and approved on an interim or final (as applicable) basis, and all First Day Motions and orders for interim and final relief granted in the Chapter 11 Cases can be viewed free of charge at https://restructuring.ra.kroll.com/FreshRealm.

### B. *Appointment of Official Committee of Unsecured Creditors*

On May 14, 2026, the U.S. Trustee Filed a *Notice of Appointment of Committee of Unsecured Creditors*, notifying parties in interest that the U.S. Trustee had appointed an official committee of unsecured creditors (the "Committee") in these Chapter 11 Cases. The Committee is currently comprised of: (a) Federal Express Corporation, (b) Bristlecone Incorporated, (c) Lasership Inc., dba OnTrac Final Mile, (d) Elberta Logistics International Solutions, LLC, (e) Public Service and Gas Company, (f) RR Donnelley, and (g) Pelton Shepherd Industries Inc. The Committee's proposed counsel is Fox Rothschild LLP.

A meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on June 4, 2026.

### C. *Second Day Relief.*

The Debtors also filed several other motions to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following hearings held on May 21, 2026 and June 2, 2026, the Bankruptcy Court entered orders granting the following relief:

(i) **The Bidding Procedures Order** approving *inter alia,* proposed marketing, auction, and procedures for the sale of assets unrelated to the Blue Apron/Misfits Transaction, and establishing certain dates and deadlines related thereto [Docket No. 160].

(ii) **Administrative Fee Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 159];

(iii) ***De Minimis Asset and Abandonment Procedures Order*** approving procedures for the sale or abandonment of de minimis assets [Docket No. 157];

(iv) ***The Contract Rejection Order*** approving procedures to reject executory contracts and unexpired leases as of the Petition Date [Docket No. 162]; and

(v) ***The Blue Apron/Misfits Sale and Settlement Order*** approving the (i) settlement agreement with Blue Apron, (ii) entry into the TSA with Misfits Market, and (iii) the entry into the asset purchase agreement with Misfits Market [Docket No. 209].

D. *The Debtors' Professionals' Retention Applications.*

To further facilitate the Debtors restructuring efforts and ease administrative burdens, the Debtors filed applications to retain professionals postpetition pursuant to sections 327, 328, 105, and 363 of the Bankruptcy Code, including:

(i) ***Cole Schotz P.C. as Counsel for the Debtors and Debtors in Possession*** [Docket No. 174] (approved at Docket No. 231);

(ii) ***Alvarez & Marsal North America, LLC to Provide Executive Officers and Additional Personnel*** [Docket No. 175];

(iii) ***Rothschild & Co as Investment Banker to the Debtors and Debtors in Possession*** [Docket No. 173];

(iv) ***Kroll Restructuring Administration LLC as Claims and Noticing Agent and Administrative Advisor for the Debtors and Debtors in Possession*** [Docket Nos. 6 and 59] (approved at Docket Nos. 44 and 144);

E. *Approval of Debtor in Possession Financing.*

On April 27, 2026, the Debtors Filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 17] (the "DIP Motion") and on June 2, 2026, the Bankruptcy Court entered a final order approving the DIP Motion [Docket No. 210] (the "DIP Order").  Pursuant to the DIP Motion and DIP Order and to provide the Debtors with the liquidity to commence a smooth landing into these Chapter 11 Cases, the Prepetition Lenders agreed to provide the DIP Facility and continued access to prepetition Cash Collateral.  The DIP Order authorized the Debtors to receive senior secured postpetition financing on a superpriority basis in the form of a senior secured, super priority multiple draw term loan facility in an aggregate principal amount of $18 million in new money loans ($3 million consisting of a prepetition protective advance), plus a roll-up of $38 million of pre-petition Term Loans, and to continue using the Prepetition Lenders' cash collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases.

The DIP Facility and access to Cash Collateral provided the Debtors with the necessary liquidity to consummate the Blue Apron/Misfits Transaction, to fund their business operations and administrative expenses during these Chapter 11 Cases, and to fund a wind-down of any remaining estate assets and liabilities in accordance with an agreed wind-down budget. The DIP Facility contains case milestones to ensure that the Chapter 11 Cases proceed efficiently, allowing the Debtors to realize their operational objectives while avoiding a prolonged stay in chapter 11 and promptly close on the transactions described herein.

The DIP Facility was the culmination of extensive, arm's-length negotiations between the Debtors and the DIP Lenders, and provided the Debtors with crucial liquidity at the outset of these Chapter 11 Cases, allowing the Debtors and their advisors to focus on consummating the Blue Apron/Misfits Transaction and exiting chapter 11 expeditiously.

F.      *Schedules and Statements.*

The Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs on June 1, 2026.

G.      *Bar Date Motion.*

On May 28, 2026, the Debtors filed the *Debtors' Motion For Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 178] (the "Bar Date Motion"). On June 18, 2026, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 256] (the "Bar Date Order"), which established procedures and deadlines for filing Proofs of Claim against the Debtors and approval of the form and manner of the bar date notice (the "Bar Date Notice"). Pursuant to the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is **July 27, 2026, at 11:59 p.m. Eastern Time** and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is **October 26, 2026, at 11:59 p.m. Eastern Time**. On May 26, 2026, the Bar Date Notice was published in *The New York Times* (national edition).

H.      *Blue Apron/Misfits Market Transaction*

On the Petition Date, the Debtors Filed the motion to approve the Blue Apron/Misfits Transaction, which as described above and in the First Day Declaration, was a key component to a successful transition into these Chapter 11 Cases and ultimately the Debtors' efforts to perform their restructuring efforts. The Blue Apron/Misfits Transaction, *inter alia,* (i) provides approximately $47 million in cash consideration, (ii) the Trust Payment, (iii) provided the Debtors with much needed liquidity, including net zero payment terms and an immediate payment of approximately $5.1 million in contractual "end of life payments", (iv) provides for Blue Apron to address substantial remediation costs at the end of the lease term for the Debtors' Linden, NJ facility, and (v) provides for waivers of administrative claims against the Estates. The Bankruptcy

Court approved the Blue Apron/Misfits Transaction on June 2, 2026 and the Settlement Agreement, TSA, and APA went effective and closed on June 4, 2026.

I.      *Bidding Procedures and Marketing Process.*

As described above, the Debtors conducted a marketing process for all or substantially all of their assets not sold pursuant to the Blue Apron/Misfits Transaction.  The marketing process was an extensive and far reaching. The Debtors and their advisors sought strategic and financial investors to effectuate a value maximizing transaction.  Rothschild, with the assistance of the Debtors, identified numerous parties, including strategic and financial partners, as potential bidders for such assets.  Despite the Debtors' substantial efforts, no person or entity submitted a qualifying bid by June 10, 2026 (the bid deadline). Thus, on June 11, 2026, the Debtors filed a *Notice of Cancellation of Auction* [Docket No. 240].

J.      *Litigation Matters.*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

K.      *Committee Investigation and Pending Challenges.*

Pursuant to the Final DIP Order, the Committee was granted a period (the "Challenge Period") to investigate and, if appropriate, commence challenges (each, a "Challenge") to the stipulations in the Final DIP Order regarding the validity, extent, perfection, and priority of the Prepetition Liens and the Prepetition Obligations. As of the date hereof, the Challenge Period remains open as to both the First Lien Secured Parties for certain limited purposes and the Second Lien Agent and Second Lien Secured Parties (also known as FaraNord (US) III Pte Ltd (including its affected affiliates, the "FaraNord Parties")).

The Committee has conducted an extensive investigation and has identified the following potential claims and Challenges:

(a) Fraudulent Transfer Claims. The Committee has identified potential constructive (and actual) fraudulent transfer claims against the FaraNord Parties.

(b) Lien Challenges. The Committee has identified potential bases to challenge the validity, extent, and priority of the Prepetition Secured Parties' liens as to certain categories of assets, including commercial tort claims, certificated goods, Chapter 5 avoidance actions, and a foreign patent.

(c) Equitable Subordination. The Committee is investigating the potential equitable subordination of the FaraNord Parties' debt claims.

(d) Recharacterization. The Committee is investigating the potential recharacterization of the FaraNord Parties' equity and debt claims.

The Committee and BGC Lender Rep LLC and Birch Grove Investments LLC (collectively, "BGC") (on behalf of the First Lien Secured Parties) have agreed in principle regarding a potential settlement of the Committee's Challenges as to the First Lien Secured Parties (the "Potential First Lien Settlement"). As of the date hereof, the Potential First Lien Settlement has not been approved by the Bankruptcy Court and is not yet effective. The Potential First Lien Settlement is subject to documentation and the terms of a Plan being acceptable to the First Lien Secured Parties in all respects. The material terms of the Potential First Lien Settlement, if approved, would resolve the Committee's lien challenges – as to the First Lien Secured Parties – and include mutual releases between the Committee, the Debtors, BGC and the First Lien Secured Parties. The Potential First Lien Settlement, if approved, would expressly preserve the Committee's claims against the FaraNord Parties in full.

The Committee's Challenge against the FaraNord Parties remains pending and has not been resolved. If successful, the Committee's Challenges against the FaraNord Parties could result in a material increase in the assets available for distribution to holders of General Unsecured Claims. The FaraNord Parties dispute the Committee's claims.

Holders of Claims and Interests should be aware that the Plan's release and injunction provisions (Article VIII) would, if confirmed as currently drafted, release the FaraNord Parties and the First Lien Secured Parties from all Claims and Causes of Action, including the Committee's pending Challenges. Without resolution, the Committee anticipates objecting to the scope of these release provisions as they apply to the FaraNord Parties and the First Lien Secured Parties.

## IX.   CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.

Holders of Claims and Interests entitled to vote should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.   *Risks Related to the Confirmation and Consummation of the Plan.*

1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or

Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or met, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind-down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a

distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

5.     Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.     The Debtors Could Lose Exclusivity.

In addition, at the outset of these Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors obtained the exclusive right to propose the Plan upon filing their petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

7.     These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals.  Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes.  *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).

8.     The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an

objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9. Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10. Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11. The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Released Parties. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

12. The Total Amount of Allowed Administrative Claims and/or General Unsecured Claims May Be Higher Than Anticipated by the Debtors.

With respect to Holders of Allowed Administrative Claims and/or General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.

13. The Committee's Pending Challenges May or May Not Be Resolved Prior to Confirmation

The Committee has identified potential claims and Challenges against the First Lien Secured Parties and the FaraNord Parties, as described in Section VIII.K of this Disclosure Statement. The Committee is separately negotiating a settlement with the First Lien Secured Parties (described above) that is being documented. The Committee is also negotiating with the FaraNord Parties. There can be no assurance that these negotiations will result in a settlement, or that any settlement will be approved by the Bankruptcy Court. If the Committee's Challenges are not resolved prior to Confirmation, the Plan's release provisions could extinguish the Committee's Challenges, which the Committee believes are potentially the largest source of recovery available

to holders of General Unsecured Claims. The treatment of Class 6 General Unsecured Claims may be materially affected by the resolution (or non-resolution) of the Committee's Challenges, including whether the Potential First Lien Settlement is approved and whether any recovery is obtained from the FaraNord Parties. Holders of Claims should carefully consider these uncertainties before voting on the Plan.

14. Certain Tax Implications of the Plan.

Holders of Allowed Claims should carefully review <u>Article XII</u> of this Disclosure Statement, entitled "*Material United States Federal Income Tax Consequences*," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtors, Liquidating Trust, and Holders of Claims.

B. *Disclosure Statement Disclaimer.*

1. The Financial Information Contained in this Disclosure Statement Has Not Been Audited.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2. Information Contained in this Disclosure Statement is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3. This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4. No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

**This Disclosure Statement does not constitute legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.

54

This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.      This Disclosure Statement May Contain Forward Looking Statements.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

6.      No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

7.      Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors, Wind-Down Debtors, Liquidating Trustee, or the Plan Administrator, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

8.      No Waiver of Right to Object Claims or Interests.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

55

10.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.     No Representations Outside this Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## X.     SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

A.      *Holders of Claims Entitled to Vote on the Plan.*

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

56

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 3, 7, 8, 9, or 10.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.      *Voting Record Date.*

**The Voting Record Date is August 6, 2026**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.      *Voting on the Plan.*

**The Voting Deadline is September 15, 2026, at 5:00 p.m., prevailing Eastern Time**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Claims and Noticing Agent on or before the Voting Deadline:

D.      *Ballots Not Counted.*

**No ballot will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT**
>
> **AT (888) 454-0938  (U.S./CANADA, TOLL FREE) OR +1 (646) 452-8302 (INTERNATIONAL) OR EMAIL FRESHREALMINFO@RA.KROLL.COM AND**

**REFERENCE "IN RE FRESHREALM – SOLICITATION INQUIRY" IN THE
SUBJECT LINE.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR
OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER
WILL <u>NOT</u> BE COUNTED.**

## XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

### A.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The Bankruptcy Court has scheduled the Confirmation Hearing for September 24, 2026 at 10:00 a.m., prevailing Eastern Time.**  The Confirmation Hearing may be adjourned from time to time by the Debtors or Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of New Jersey; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties no later than the Confirmation Objection Deadline. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court**.

### B.    *Confirmation Standards.*

#### 1.    <u>Requirements of Section 1129(a) of the Bankruptcy Code</u>.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1)  the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for

58

plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

2.      <u>Best Interests of Creditors—Liquidation Analysis</u>.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **<u>Exhibit B</u>** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide the same or a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

A substantial part of the Debtors' business and assets have been liquidated pursuant to the Blue Apron/Misfits Transaction with the balance to be liquidated through further de minimis asset, liquidation, or ordinary course transactions. The Plan effects a wind down of the Debtors' remaining assets not otherwise sold or liquidated to date. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses. Therefore, the appointment of a chapter 7 trustee would

potentially delay distributions to creditors and reduce the present value of any recovery for Holders. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.

The conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

### 3. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### 4. Valuation

As described above, the Debtors simultaneously conducted the Blue Apron/Misfits Transaction and engaged in marketing process for the rest of their business assets pursuant to the Bidding Procedures Order. The Debtors believe that this process provided the best method of valuing their enterprise, as it allows the market to speak as to that value. The Debtors' marketing and sale process was a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions. Based on the marketing process, this Disclosure Statement does not include a valuation analysis (which the Debtors at this time do not anticipate filing). *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI)

60

(Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

### C.    *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

### D.    *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided,* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts

consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.  Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.   MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder").  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who

hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein.  Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.      *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors*

The Sale Transactions and the liquidation of any remaining assets of the Debtors are generally expected to be treated as one or more taxable sales of assets and/or equity interests of the Debtors, with the Debtors recognizing gain or loss equal to the difference between the value

of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor  remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.

The Debtors expect to realize significant COD Income as a result of the consummation of the Plan. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan.

B.    *Character of Gain or Loss*

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

C.   *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID"), its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

D.   *Accrued Interest.*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

E.   *Limitation on Use of Capital Losses*

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for

married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains.  A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years.  For corporate Holders, capital losses recognized may only be used to offset capital gains recognized.  A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

F.  *Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

G.  *U.S. Federal Income Tax Treatment of the Liquidating Trust*

1.  <u>Liquidating Trust</u>

It is intended that any Liquidating Trust will qualify as a "liquidating trust" under Treasury Regulation section 301.7701-4(d).  Accordingly, it is intended that any Liquidating Trust will be

treated as a grantor trust for U.S. federal income tax purposes, and that the beneficiaries will be treated as grantors of such trust.

In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, sets forth the general criteria for obtaining an advance ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Consistent with the requirements of Revenue Procedure 94-45, the Liquidating Trust agreement will require all relevant parties to treat the transfer of the Liquidating Trust Assets for U.S. federal income tax purposes as (i) a transfer of the Liquidating Trust Assets directly to the beneficiaries in satisfaction of the Claims against the Debtors (to the extent of the value of the beneficiaries' respective interests in the applicable Liquidating Trust Assets) followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust (to the extent of the value of the beneficiaries' respective interests in the applicable Liquidating Trust Assets), provided, however, that the Liquidating Trust Assets will be subject to any post-Effective Date liabilities or obligations incurred by the Liquidating Trust relating to the pursuit of Liquidating Trust Assets.

Accordingly, the beneficiaries should be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets.  The foregoing treatment should also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As a grantor trust, the Liquidating Trust agreement will require all items of income, gain, loss, deduction and credit to be included in the income of the beneficiaries, and reported on such beneficiaries' U.S. federal income tax returns as if such items had been recognized directly by the beneficiaries in the proportions in which they own beneficial interests in the Liquidating Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the trustee of any Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee of any Liquidating Trust), the  trustee of any Liquidating Trust may (i) timely elect to treat any portion or all of the Liquidating Trust or any Liquidating Trust Assets as a "disputed ownership fund" within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes (the "Disputed Ownership Fund") and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Disputed Ownership Fund will be subject to tax annually on a separate entity basis on any net income earned with respect to any Liquidating Trust Assets held in any such Disputed Ownership Fund, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

No ruling is currently being requested from the IRS concerning the tax status of the Liquidating Trust as a liquidating trust.  As such, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a liquidating trust.  If the IRS were to successfully challenge the liquidating trust classification, the U.S. federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).  Certain U.S. federal income tax consequences of the Liquidating Trust or portions thereof

relating to Disputed Claims and being treated as a Disputed Ownership Fund are also discussed below.

2.    Reporting.

Any Liquidating Trust shall comply with all tax reporting requirements, including, without limitation, filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and, in connection therewith, the Liquidating Trustee may require the beneficiaries to provide certain tax information as a condition to receipt of distributions. The trustee of any Liquidating Trust shall also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such beneficiary will be required to report such items on its U.S. federal income tax return; provided, however, that any reporting under this section is subject to the  discretion of the trustee of any Liquidating Trust to elect to treat the Liquidating Trust or any Liquidating Trust Assets (in whole or in part) as a Disputed Ownership Fund, which election may alter the requirement in accordance with federal tax laws and regulations.

All taxable income and loss of the Liquidating Trust will be allocated among, and treated as directly earned and incurred by, the beneficiaries with respect to such beneficiary's interest in the assets of the Liquidating Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims.  The character of any income or gain and the character and ability to use any loss or loss will depend on the particular situation of the beneficiary.

The U.S. federal income tax obligations of a beneficiary with respect to its beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any Cash or other proceeds, subject to any portion(s) of the Liquidating Trust allocable to Disputed Claims. Thus, a beneficiary may incur U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the U.S. Holder.

In general, other than in respect of amounts retained on account of Disputed Claims, a distribution of Cash by the Liquidating Trust will not be separately taxable to a beneficiary of the Liquidating Trust, since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and will be taxed at the time the Cash was earned or received by the Liquidating Trust).  Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

3.    Valuation.

After the Effective Date, the Liquidating Trustee shall (i) determine the fair market value of the Liquidating Trust Assets as of the Effective Date, based on the Liquidating Trustee's good faith determination (in conjunction with guidance provided by trust professionals if any); and (ii) establish appropriate means to apprise the beneficiaries of such valuation; provided, however, that no such valuation will be required if the trustee of any Liquidating Trust  elects to treat the Liquidating Trust or the Liquidating Trust Assets (in whole or in part) as a Disputed Ownership Fund. The valuation, if established pursuant to the terms of the Liquidating Trust agreement, shall

be used consistently by all Parties (including, without limitation, the Debtors, the Liquidating Trust, the trustee of any Liquidating Trust, and the beneficiaries) for all U.S. federal income tax purposes.

4.      <u>Tax Returns.</u>

In accordance with the provisions of section 6012(b)(3) of the Tax Code (and any comparable provision of state or local tax law), the trustee of any Liquidating Trust shall cause to be prepared, at the cost and expense of the Liquidating Trust, the income tax returns (federal, state and local) that the Debtors are required to file (to the extent such returns have not already been filed by the Effective Date). The trustee of any Liquidating Trust shall also cause to be prepared, at the cost and expense of the Liquidating Trust, the income tax returns (federal, and if applicable, state and local) required to be filed on behalf of the Liquidating Trust, and such returns filed on behalf of the Liquidating Trust shall be consistent with the treatment of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) (other than with respect to any election by the trustee of any Liquidating Trust to treat the Liquidating Trust or any of the Liquidating Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund), and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. The trustee of any Liquidating Trust shall timely file each such tax return with the appropriate taxing authority and shall pay out of the assets of the Liquidating Trust all taxes due with respect to the period covered by each such tax return.

5.      <u>Attribution of Income.</u>

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the trustee of any Liquidating Trust of a private letter ruling if the trustee of such Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee of such Liquidating Trust), taxable income, gain, loss or deduction in respect of the Liquidating Trust Assets shall be attributed to the beneficiaries in proportion to their beneficial interests in the Liquidating Trust Assets. Notwithstanding anything in the Plan or Disclosure Statement, the timing of distributions shall comply with the requirements of Revenue Procedure 94-45, as determined by the Liquidating Trustee in its reasonable discretion.

6.      <u>Tax Identification Numbers.</u>

The trustee of any Liquidating Trust may require any beneficiary to furnish to the trustee of such Liquidating Trust its employer or taxpayer identification number as assigned by the IRS (e.g., via signed W-9 or for any non-U.S. Beneficiary a W-8) or otherwise certify in writing to the satisfaction of the trustee of such Liquidating Trust that distributions from the Liquidating Trust to the beneficiary are exempt from backup withholding. The trustee of any Liquidating Trust may condition any distribution to any beneficiary upon receipt of such identification number or exemption certification. If after reasonable inquiry and reasonable time constraints for responding (in each case, as determined by the trustee of any Liquidating Trust in its sole discretion), any beneficiary fails to provide such identification number, then distributions to such beneficiary shall

become undeliverable property to be made available for distribution to the remaining beneficiaries, in accordance with the terms of the Plan and the Liquidating Trust agreement.

### 7.   Annual Statements.

The trustee of any Liquidating Trust  shall annually (for tax years in which distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit, and all such beneficiaries shall report such items on their federal income tax returns; provided, however, that any such reporting obligation under this subsection is subject to the discretion trustee of such Liquidating Trust to elect to treat the Liquidating Trust or any of the Liquidating Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund, which may impact the requirement of such annual statements pursuant to federal tax regulations and applicable laws.

### 8.   Notices.

The trustee of any Liquidating Trust shall distribute such notices to the beneficiaries as the trustee of such Liquidating Trust determines are necessary or desirable.

### 9.   Expedited Determination

The trustee of any Liquidating Trust may request an expedited determination of taxes of the Debtors or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

### 10.   Withholding.

The trustee of any Liquidating Trust will comply with all applicable governmental withholding requirements.

## XIII.  RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: July 27, 2026                          FRESHREALM, INC., on behalf of itself and
                                              all other Debtors


                                              */s/ John Hanson*
                                              _____
                                              John Hanson
                                              Chief Financial Officer

## <u>EXHIBIT A</u>

**Chapter 11 Plan**

[Filed Separately]

## EXHIBIT B

**Liquidation Analysis**

(To Be Filed)

B-1

**<u>Exhibit A-2</u>**

**Redline of Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FRESHREALM, INC., *et al.*,[1] | ) | Case No. 26-14656 (MEH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
## FRESHREALM, INC. AND ITS DEBTOR AFFILIATES

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Ryan T. Jareck, Esq.
Daniel J. Harris, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:    (201) 489-3000
Facsimile:    (201) 489-1536
Email:        msirota@coleschotz.com
              wusatine@coleschotz.com
              rjareck@coleschotz.com
              dharris@coleschotz.com
              mpercontino@coleschotz.com

*Counsel for the Debtors*
*and Debtors in Possession*

Dated: July 27, 2026

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES.   NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT  EXCEPT  WHERE  OTHERWISE  SPECIFICALLY

NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF UNITED STATES SECURITIES LAWS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.

MAKING INVESTMENT DECISIONS BASED ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN IS THEREFORE HIGHLY SPECULATIVE. THE DEBTORS RECOMMEND THAT INTERESTED PARTIES CONSULT THEIR OWN LEGAL COUNSEL.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS, LIQUIDATING TRUSTEE, THE PLAN ADMINISTRATOR, OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS

OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS PRECEDENT TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS AND THE WIND-DOWN DEBTORS' FUTURE PERFORMANCE.   THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION. ..................................................................................................................1

II.     PRELIMINARY STATEMENT. ..........................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN. ............................................................................................................................4
        A.      What is chapter 11? ...................................................................................................4
        B.      Why are the Debtors sending me this Disclosure Statement? ...................................4
        C.      Am I entitled to vote on the Plan? ............................................................................4
        D.      What will I receive from the Debtors if the Plan is consummated? ...........................6
        E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
                Claim, or a Priority Tax Claim? ................................................................................8
                1.      Administrative Claims. ..................................................................................8
                2.      DIP Claims. ....................................................................................................9
                3.      Priority Tax Claims. .......................................................................................9
                4.      Professional Fee Claims. ...............................................................................9
        F.      What happens to my recovery if the Plan is not confirmed or does not go effective? ....................11
        G.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation"? ....................................................................................................11
        H.      What is the Blue Apron/Misfits Transaction? ........................................................11
        I.      What are the sources of Cash and other consideration required to fund the Plan? ..........12
        J.      Is there potential litigation related to the Plan? .....................................................12
        K.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............12
        L.      What is the deadline to vote on the Plan? ...............................................................13
        M.      How do I vote for or against the Plan? ....................................................................13
        N.      Why is the Bankruptcy Court holding a Confirmation Hearing? ............................13
        O.      When is the Confirmation Hearing set to occur? ....................................................14
        P.      What is the purpose of the Confirmation Hearing? .................................................14
        Q.      What is the effect of the Plan on the Debtors' ongoing business? ...........................14
        R.      Whom do I contact if I have additional questions with respect to this Disclosure
                Statement or the Plan? ........................................................................................1415
        S.      Who Supports the Plan? ..........................................................................................15
        T.      Could subsequent events potentially affect recoveries under the Plan? .................15
        U.      Do the Debtors recommend voting in favor of the Plan? ........................................15

IV.     SUMMARY OF THE PLAN. .........................................................................................1516
        A.      Classification and Treatment of Claims and Interests .............................................16
                1.      Classification of Claims and Interests. ........................................................16
                2.      Special Provision Governing Unimpaired Claims. ......................................16
                3.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
                        Code. .......................................................................................................1617
                4.      Subordinated Claims. ...................................................................................17
                5.      Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes. ..............17
                6.      Intercompany Interests. ...............................................................................17
                7.      Controversy Concerning Impairment. .........................................................17
                8.      Insurance. ...............................................................................................1718
        B.      Means for Implementation of the Plan. ...................................................................18
                1.      Sources of Consideration for Plan Distributions. .......................................18
                2.      Vesting of Assets. ...................................................................................1819
                3.      Wind-Down Debtors. ...................................................................................19

71306/0001-53374288v10

4.      Plan Administrator. ................................................................................19

5.      Liquidating Trust. ..................................................................................22

6.      Corporate Existence Post-Effective Date. ............................................26

7.      Statutory Committee and Cessation of Fee and Expense Payment. ......27

8.      Cancellation of Securities and Agreements. .........................................27

9.      Corporate Action. ..................................................................................27

10.     Effectuating Documents; Further Transactions. ...................................28

11.     Section 1146 Exemption. .......................................................................28

12.     Causes of Action. ...............................................................................2829

13.     Books and Records. ...............................................................................29

14.     Insurance Claims: Business Interruption Insurance Claims, D&O Claims .......................29
        and Others. ............................................................................................29

15.     Section 1145 Exemption. ....................................................................2930

C.      Treatment of Executory Contracts and Unexpired Leases. ...............................30

1.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ....................30

2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. ...................3031

3.      Insurance Policies. ................................................................................31

4.      Preexisting Obligations to the Debtors Under Executory Contracts and
        Unexpired Leases. .................................................................................32

5.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ............32

6.      Reservation of Rights. ...........................................................................33

7.      Nonoccurrence of Effective Date. .........................................................33

D.      Settlement, Release, Injunction, and Related Provisions. ..................................33

1.      Settlement, Compromise, and Release of Claims and Interests. ...........33

2.      Release of Liens. ....................................................................................33

3.      Releases by the Debtors. ........................................................................34

4.      Releases by Holders of Claims and Interests. ........................................35

5.      Exculpation. ...........................................................................................37

6.      Injunction. ..............................................................................................37

7.      Protection Against Discriminatory Treatment. ......................................38

8.      Document Retention. ..............................................................................38

9.      Reimbursement or Contribution. ...........................................................39

E.      Conditions Precedent to Confirmation and the Effective Date. .........................39

1.      Conditions Precedent to the Effective Date. ..........................................39

2.      Waiver of Conditions. ............................................................................40

3.      Effect of Failure of Conditions. .............................................................40

4.      Substantial Consummation. ...................................................................40

ii

71306/0001-53374288v10

V.   THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.............................4041
    A.   Formation and Growth of FreshRealm. ....................................................4041
    B.   Key Relationships. .............................................................................41
    C.   Board of Directors.............................................................................4142

VI.   THE COMPANY'S PREPETITION CAPITAL STRUCTURE. ........................................42

VII.   EVENTS LEADING TO THESE CHAPTER 11 CASES. ...............................................43
    A.   Food Safety Recalls and Operational Disruption.......................................43
    B.   Insurance Coverage for Listeria-Related Claims .......................................4344
    C.   Blue Apron Dispute. ..........................................................................44
    D.   Advisor Engagements .........................................................................45
    E.   Prepetition Negotiations With Lenders....................................................45

VIII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
    CASES. ...............................................................................................46
    A.   First Day Relief. ...............................................................................46
    B.   Appointment of Official Committee of Unsecured Creditors.........................46
    C.   Second Day Relief. ............................................................................46
    D.   The Debtors' Professionals' Retention Applications....................................47
    E.   Approval of Debtor in Possession Financing.............................................47
    F.   Schedules and Statements. ...................................................................48
    G.   Bar Date Motion................................................................................48
    H.   Blue Apron/Misfits Market Transaction ..................................................48
    I.   Bidding Procedures and Marketing Process. .............................................4849
    J.   Litigation Matters..............................................................................49
    K.   Committee Investigation and Pending Challenges. .....................................49

IX.   CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING. ....................................4950
    A.   Risks Related to the Confirmation and Consummation of the Plan. ...............4950
        1.   Parties in Interest May Object to the Plan's Classification of Claims and
            Interests..............................................................................4950
        2.   The Conditions Precedent to the Effective Date of the Plan May Not Occur. .............5051
        3.   The Debtors May Fail to Satisfy Vote Requirements...................................5051
        4.   The Debtors May Not Be Able to Secure Confirmation of the Plan. .........................5051
        5.   Nonconsensual Confirmation. ...................................................5152
        6.   The Debtors Could Lose Exclusivity..........................................5152
        7.   These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the
            Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed. ..........5152
        8.   The Debtors May Object to the Amount or Classification of a Claim or Interest........5152
        9.   Risk of Non-Occurrence of the Effective Date...........................5253
        10.   Contingencies May Affect Votes of Impaired Classes to Accept or Reject the
            Plan. ..................................................................................5253
        11.   The Plan's Release, Injunction, and Exculpation Provisions May Not Be
            Approved. ..........................................................................5253
        12.   The Total Amount of Allowed Administrative Claims and/or General Unsecured
            Claims May Be Higher Than Anticipated by the Debtors..........................5253
        13.   The Committee's Pending Challenges May or May Not Be Resolved Prior to
            Confirmation......................................................................53
        14.   Certain Tax Implications of the Plan. ........................................5254
    B.   Disclosure Statement Disclaimer. ........................................................5254
        1.   The Financial Information Contained in this Disclosure Statement Has Not Been
            Audited. .............................................................................5254
        2.   Information Contained in this Disclosure Statement is for Soliciting Votes................5354
        3.   This Disclosure Statement Was Not Approved by the United States Securities
            and Exchange Commission......................................................5354

71306/0001-53374288v10

4.      No Legal or Tax Advice Is Provided to You by this Disclosure Statement. ................. 5354

5.      This Disclosure Statement May Contain Forward Looking Statements. ...................... 5355

6.      No Admissions Made. ................................................................................................. 5355

7.      Failure to Identify Litigation Claims or Projected Objections. .................................. 5455

8.      No Waiver of Right to Object Claims or Interests. .................................................... 5455

9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors. ...................................................................................................................... 5455

10.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. ............. 5456

11.     No Representations Outside this Disclosure Statement Are Authorized ...................... 5456

X.      SOLICITATION AND VOTING PROCEDURES. ............................................................ 5556

        A.      Holders of Claims Entitled to Vote on the Plan. ....................................................... 5556

        B.      Voting Record Date. ................................................................................................. 5557

        C.      Voting on the Plan .................................................................................................... 5557

        D.      Ballots Not Counted. ................................................................................................ 5657

XI.     STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN. ............... 5658

        A.      Confirmation Hearing. .............................................................................................. 5658

        B.      Confirmation Standards. ........................................................................................... 5758

                1.      Requirements of Section 1129(a) of the Bankruptcy Code. ............................. 5758

                2.      Best Interests of Creditors—Liquidation Analysis .......................................... 5759

                3.      Feasibility. ...................................................................................................... 5860

                4.      Valuation. ........................................................................................................ 5960

        C.      Acceptance by Impaired Classes .............................................................................. 5961

        D.      Confirmation Without Acceptance by All Impaired Classes. ..................................... 5961

                1.      No Unfair Discrimination. ............................................................................... 6061

                2.      Fair and Equitable Test. .................................................................................. 6062

XII.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ........... 6062

        A.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors .............. 6263

        B.      Character of Gain or Loss ......................................................................................... 6264

        C.      Market Discount ........................................................................................................ 6365

        D.      Accrued Interest. ...................................................................................................... 6365

        E.      Limitation on Use of Capital Losses ......................................................................... 6465

        F.      Information Reporting and Backup Withholding ........................................................ 6466

        G.      U.S. Federal Income Tax Treatment of the Liquidating Trust .................................... 6566

                1.      Liquidating Trust ............................................................................................ 6566

                2.      Reporting. ....................................................................................................... 6668

                3.      Valuation. ........................................................................................................ 6768

                4.      Tax Returns ..................................................................................................... 6769

                5.      Attribution of Income. ..................................................................................... 6869

                6.      Tax Identification Numbers ............................................................................. 6869

                7.      Annual Statements. .......................................................................................... 6870

                8.      Notices. ........................................................................................................... 6870

                9.      Expedited Determination ................................................................................. 6870

                10.     Withholding. .................................................................................................... 6970

XIII.   RECOMMENDATION. ...................................................................................................... 6970

iv

71306/0001-53374288v10

## EXHIBITS

**EXHIBIT A**     Chapter 11 Plan

**EXHIBIT B**     Liquidation Analysis

71306/0001-53374288v10

## I.    INTRODUCTION.

FreshRealm, Inc. and its affiliated debtors, as debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* (as may be amended, modified, or supplemented from time to time, the "Plan").[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtors will seek the Bankruptcy Court's approval of the Plan and strongly urge all Holders of Claims and Interests entitled to vote to accept the Plan by returning their ballots, so as to be **actually received** by Kroll Restructuring Administration LLC, the Debtors' notice and claims agent (the "Claims and Noticing Agent"), no later than **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**.  The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## II.    PRELIMINARY STATEMENT.

The Debtors and their non-Debtor affiliates (collectively, "FreshRealm" or the "Company") are a food development, manufacturing, and fulfillment company founded in 2013 and spun off as independent companies in 2021.  The Debtors have built a sophisticated food development, manufacturing, and fulfillment platform, with physical and overhead infrastructure purpose-built for the full spectrum of fresh and better-for-you food, capable of accommodating growth of innovative food businesses through a segment-agnostic business strategy.

The Company's business activity is conducted through multiple channels, including direct-to-consumer, grocery, performance, and a growing portfolio of lifestyle and medically-focused customers.  The Company's largest customers are Blue Apron, LLC ("Blue Apron") and MMM Consumer Brands, Inc. ("Marley Spoon").

The Debtors' growth trajectory accelerated significantly with the June 2023 acquisition of the production and fulfillment operations of Blue Apron, pursuant to which the Debtors entered into a 10-year production and fulfillment agreement (the "PFA") with Blue Apron that made the Debtors the exclusive supplier of Blue Apron's meal kits.  On January 30, 2024, the Debtors acquired the U.S. operational assets of Marley Spoon, integrating them into the Debtors' U.S.-based network.  However, beginning in late-March 2025, the Debtors experienced multiple food

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan or the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures; (B) the Forms of Ballots and Notices in Connection Therewith; and (C) Certain Dates With Respect Thereto; and (III) Granting Related Relief* (the "Disclosure Statement Motion"), as applicable.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

safety incidents driven by the receipt of contaminated material from suppliers, leading to several recalls that were extremely disruptive to the Debtors' business and eroded the Debtors' liquidity.

Commencing in April 2025 and leading up to the commencement of these Chapter 11 Cases, Blue Apron asserted that the Debtors breached certain obligations under the PFA based on, among other things, food quality and safety failures associated with the recalls, sent the Debtors a notice of termination of the PFA in December 2025, and sought to replace the Debtors as the exclusive provider of Blue Apron's meal kits. The Debtors also lost their Walmart customer as a result of the recalls. Facing these challenges, the Debtors executed on a transformation plan that included SG&A organizational changes, facilities consolidation and plant closures, and material optimization strategies. Ultimately, the Debtors were unable to raise sufficient capital outside of chapter 11 to fund operations.

Recognizing the need to act, the Debtors' board of directors (the "Board"), consisting of independent directors, Jill Frizzley and Charlie Piper, in conjunction with the Debtors' advisors, determined that the Debtors' most value-maximizing path forward was through a chapter 11 filing. The Debtors engaged with their key creditor constituencies, including FaraNord (US) III Pte Ltd, as collateral agent and administrative agent for certain lenders (the "2L Lender"), BGC Lender Rep LLC, as collateral agent and administrative agent for certain lenders (the "1L Lender," and together with the 2L Lender, the "Prepetition Lenders"), and Blue Apron on a holistic restructuring solution. The DIP Lenders provided $3 million in protective advances as bridge financing and agreed to provide a debtor-in-possession term loan facility of $15 million in post-petition new money loans (the "DIP Facility") to support the ultimate resolution of the Debtors' Chapter 11 Cases.

In addition, subject to Bankruptcy Court approval, the Debtors and Blue Apron entered into a settlement agreement and mutual release (the "Settlement Agreement") whereby Blue Apron agreed to provide approximately $47 million in cash consideration (a portion paid on the Effective Date and a portion paid in installments over a subsequent 15-month period), waivers of certain claims in excess of $8 million, and other financial accommodations from Blue Apron of approximately $7 to $10 million to terminate the PFA and related agreements, and transition Blue Apron's exclusive fulfillment business to Misfits Market, Inc. ("Misfits Market"). The Settlement Agreement further provided for a cash payment of $500,000 to the Debtors to be held by the Debtors solely for the purposes of funding a liquidation trust or equivalent structure pursuant to a plan filed by the Debtors (the "Trust Payment"). As part of the settlement, the Debtors also entered into a transition services agreement (the "TSA") with Misfits Market for the provision of transition services through August 31, 2026, and an asset purchase agreement (the "APA" and together with the Settlement Agreement and TSA, the "Blue Apron/Misfits Transaction") with Misfits Market for the sale of certain working capital, inventory, and equipment, plus assumed liabilities.

On April 27, 2026 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). On the Petition Date, the Debtors also filed a motion to approve the Settlement Agreement, TSA, and APA (the "Sale and Settlement Motion"). On June 2, 2026, the Bankruptcy Court entered an order approving the Sale and Settlement Motion [Docket No. 209], and June 4, 2026, the Debtors closed on the sale under the APA and the Settlement Agreement and TSA went effective [Docket No. 217].

2

The Debtors intend to conclude these Chapter 11 Cases efficiently through (i) an orderly wind-down process of the Debtors and their estates and (ii) the Debtors' pursuit of a plan of liquidation, which shall provide for the orderly liquidation of the Debtors' estates, include customary terms and conditions, provide for the funding of the costs of a wind-down subject to a specified wind-down budget, and be confirmed by the Bankruptcy Court.

In parallel with the Blue Apron/Misfits Market Transaction, the Debtors pursued a process to maximize value for those of the Debtors' assets that are not related to the Blue Apron/Misfits Transaction, including certain of the Debtors' inventory, accounts receivable, contracts, leases, intellectual property rights, and other residual assets. That process did not result in an actionable bid for such assets and therefore the Debtors pursued various other actions to maximize value, including but not limited to, liquidation sales, sales pursuant to de minimis asset procedures, and sales in the ordinary course of business.

Following the consummation of the Blue Apron/Misfits Transaction and other miscellaneous sale transactions, the Debtors propose to liquidate any remaining assets and pursue any retained causes of action pursuant to the Plan. The Debtors believe that the Plan maximizes the value of recoveries to all stakeholders and generally distributes all property of the Debtors' estates that is or becomes available for distribution according to the priorities established by the Bankruptcy Code and applicable law. The Plan provides the ability of the Debtors to satisfy administrative and priority claims in full.

The primary objective of the Plan is to maximize value for all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, the Plan:

- Provides for the vesting of certain assets in the Wind-Down Debtors or a Liquidating Trust, as applicable, for the purpose of distribution to Holders of Claims;

- designates a Plan Administrator to wind down the Debtors' affairs and administer the Plan in an efficient manner, and establishes a Liquidating Trust for the benefit of Holders of Allowed General Unsecured Claims; and

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative would materially reduce recoveries to Holders of Claims. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that the Claims and Noticing Agent actually receives such ballots by **September 15, 2026, at**

71306/0001-53374288v10

**5:00 p.m.** prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN.

A.      *What is chapter 11?*

Chapter 11 is the principal business chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.      *Why are the Debtors sending me this Disclosure Statement?*

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

The Plan provides for the efficient distribution of distributable cash (including the proceeds of the Sale Transactions, to Holders of Allowed Claims and Allowed Interests and the orderly Wind-Down and dissolution of the Debtors' Estates.  This Disclosure Statement is being submitted to provide information about the transactions contemplated under the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

C.      *Am I entitled to vote on the Plan?*

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant

4

71306/0001-53374288v10

to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims) are classified into Classes for all purposes, including voting, Confirmation, and distributions. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The table above summarizes the classification and voting rights of all classified Claims and Interests against each Debtor (as applicable) under the Plan. As set forth in more detail in the Plan, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III of the Plan.

5

D. *What will I receive from the Debtors if the Plan is consummated?*

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Plan Administrator: (i) payment in full in Cash of such Holder's Allowed Secured Tax Claim; or (ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period. |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtors or Wind-Down Debtors: (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; (iii) Reinstatement of such Holder's Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. |

6

| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest |
|---|---|---|
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Administrative, Allowed Priority Tax Claim, or Allowed Other Claims, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| 4 | First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed First Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Claim shall receive its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Article II of the Plan; *provided, however,* that in no event shall any Holder of a First Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |
| 5 | Second Lien Claims | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Second Lien Claim shall receive its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Articles II and III of the Plan; provided, however, that in no event shall any Holder of Second Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |
| 6 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Liquidating Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed General Unsecured Claim, each Holder thereof will receive its pro rata share of the Liquidating Trust Interests. |
| 7 | Intercompany Claims | Each Allowed Intercompany Claim, to the extent not assumed pursuant to the terms of any Sale Order, shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released; or (d) otherwise addressed at the option of the Debtors or Wind-Down Debtors without any distribution on account of such Intercompany Claims. |
| 8 | Intercompany Interests | Allowed Intercompany Interests, to the extent not assumed pursuant to the terms of any Sale Order, shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise addressed at the option of the Wind-Down Debtors or Debtors without any distribution on account of such Intercompany Interests. |
| 9 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished, and will be of no further force or effect. Holders of Interests shall receive no recovery or distribution on account of their Interests. |
| 10 | Section 510(b) Claims | On the Effective Date, all Section 510(b) Claims shall be cancelled, released, and extinguished, and will be of no further force or effect. Holders of Section 510(b) Claims shall not receive recovery or distribution on account of such Claims. |

7

71306/0001-53374288v10

E.      *What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Claim, or a Priority Tax Claim?*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims, Intercompany Interests, and Interests set forth in Article III of the Plan.

1.      Administrative Claims.

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, the DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which (i) an order Allowing such Administrative Claim becomes a Final Order, or (ii) the Plan Administrator, on the one hand, and the Holder of the Administrative Claim, on the other hand, agree to the Allowed amount of such claim, or as soon as reasonably practicable thereafter; or (3) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claim.

**Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down Debtors, or their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Wind-Down Debtors or any notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.**

8

2.      DIP Claims.

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable or alternative treatment, on or before the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) has consented to receive and shall receive, (i) Cash in an amount necessary to pay the reasonable and documented fees, expenses, and disbursements of the Lender Professionals, to the extent any amount remains outstanding, (ii) Cash in an amount necessary to pay the reasonable and documented fees, expenses, and disbursements of the Lender Professionals, to the extent any amount remains outstanding, and (iii) the Distributable Value under the Distributable Waterfall, until such Allowed DIP Claim is indefeasibly paid in full, but at all times subject to the Distributable Waterfall.  For the avoidance of doubt, any distribution made pursuant to verse (ii) above shall be made directly to the applicable Lender Professional and not to the Holder of an Allowed DIP Claim.

3.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code

4.      Professional Fee Claims.

(a)     Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Wind-Down Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account, when such Professional Fee Claims are Allowed or awarded by entry of an order of the Bankruptcy Court.

(b)     Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, and in consultation with the DIP Lenders, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any

9

71306/0001-53374288v10

way.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors.

The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to each such Professional by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account or the Wind-Down Debtor Account, as applicable, as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute part of the Wind-Down Debtor Assets without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      Professional Fee Amount.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than 5 days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Wind-Down Debtors shall use Cash on hand or from the Wind-Down Debtor Account to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)      Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtors.  If the Debtors or the Wind-Down Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or the Wind-Down Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate,

10

and the Wind-Down Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything in this Plan, nothing alters the terms of the *Order Authorizing the Debtors to (A) Retain Alvarez & Marsal North America, LLC to Provide Certain Executive Officers and Certain Additional Personnel, and (B) Designate Certain Executive Officers, and (II) Granting Related Relief* [Docket No. 255] (the "A&M Order") and the requirement to seek approval of the Completion Fee (as defined in the A&M Order) as set forth in the A&M Order.

F.      *What happens to my recovery if the Plan is not confirmed or does not go effective?*

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code, and in the alternative, the Chapter 11 Cases may be dismissed. Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c). Either alternative will bring additional risks and uncertainties.

G.      *If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?*

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims and Allowed Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article IV.E of this Disclosure Statement, entitled "*Conditions Precedent to Confirmation and the Effective Date*," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" means the occurrence of the Effective Date.

H.      *What is the Blue Apron/Misfits Transaction?*

The sale and settlement transaction approved by the Bankruptcy Court pursuant to the Sale and Settlement Order which provides, among other things for: (i) the settlement with Blue Apron pursuant to the Settlement Agreement, whereby Blue Apron agreed to provide approximately $47 million in cash consideration, the Trust Payment, waivers of certain claims in excess of $8 million, and other financial accommodations from Blue Apron of approximately $7 to $10 million; (ii) the Transition Services Agreement with Misfits Market for the provision of transition services through August 31, 2026; and (iii) the Asset Purchase Agreement with Misfits Market for the sale of certain

11

working capital plus assumed liabilities to enable Misfits Market to assume fulfillment services for Blue Apron.

I. *What are the sources of Cash and other consideration required to fund the Plan?*

The Debtors shall fund or make distributions under the Plan with: (i) the proceeds from the Settlement Agreement with Blue Apron; (ii) the proceeds from sales or liquidations of remaining assets not sold pursuant to the Blue Apron/Misfits Transaction; (iii) the Debtors' Cash on hand; (iv) proceeds from the Wind Down, including the Wind-Down Debtor Assets; and (v) proceeds from the Liquidating Trust Assets.

J. *Is there potential litigation related to the Plan?*

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.A.4 of this Disclosure Statement, entitled "*The Debtors May Not Be Able to Secure Confirmation of the Plan.*"

K. *Will there be releases and exculpation granted to parties in interest as part of the Plan?*

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall chapter 11 efforts and were an essential element of the negotiations between the Debtors and their key constituencies in obtaining their support for the Plan.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize the assets distributable by the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Releasing Parties are each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (i) each Related Party of each Entity in clause (a) through this clause (g), for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided, however,* that each Entity in the foregoing clause (f) or (g) that (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is

12

71306/0001-53374288v10

not withdrawn or otherwise resolved before the Confirmation Order is entered shall not be a Releasing Party.

The Released Parties are each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) each Releasing Party; (g) each current and former Affiliate of each Entity in clause (a) through the following clause (f); each Related Party of each Entity in clause (a) through this clause (g), each in their capacity as such; (h) the current members of the Board or Boards of the Debtors, Jill Frizzley and Charlie Piper; and (i) the Released Officers; *provided, however,* that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered. For the avoidance of doubt and notwithstanding anything herein to the contrary, no former director (in their capacity as such) or non-Releasing Party shall be a Released Party under the Plan.

The Exculpated Parties are: (a) each of the Debtors; (b) the Independent Directors; (c) the Committee and its members; and (d) with respect to the Debtors and the Committee, each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors, as applicable, that served in such capacity between the Petition Date and Effective Date.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.D of this Disclosure Statement, entitled "*Settlement, Release, Injunction, and Related Provisions.*"

L.     *What is the deadline to vote on the Plan?*

**The Voting Deadline is September 15, 2026, at 5:00 p.m., prevailing Eastern Time**.

M.     *How do I vote for or against the Plan?*

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must submit your ballot in accordance with the instructions provided in Article X of this Disclosure Statement and please refer to the Disclosure Statement Order and Instructions for Completing the Ballot found at the end of each applicable Class Ballot for additional requirements with respect to voting to accept or reject the Plan. **BALLOTS SENT BY EMAIL OR FACSIMILE TRANSMISSION ARE NOT PERMITTED AND WILL NOT BE COUNTED.**

N.     *Why is the Bankruptcy Court holding a Confirmation Hearing?*

13

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

O.      *When is the Confirmation Hearing set to occur?*

The Bankruptcy Court has scheduled the Confirmation Hearing for **September 24, 2026, at 10:00 a.m. prevailing Eastern Time**.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Confirmation Hearing is being held on the same day as the hearing to approve the adequacy of this Disclosure Statement on a final basis.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objecting to the Plan and the date and time of the Confirmation Hearing, in a nationally recognized publication to provide notification to those persons who may not receive notice by mail.

The deadline by which all objections to the Plan must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties is **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**, pursuant to the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

P.      *What is the purpose of the Confirmation Hearing?*

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

Q.      *What is the effect of the Plan on the Debtors' ongoing business?*

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the wind down of the Wind-Down Debtors in accordance with the terms of the Plan and the Liquidating Trustee will administer the

71306/0001-53374288v10

Liquidating Trust Assets.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

      R.    *Whom do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?*

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kroll Restructuring Administration LLC:

*By regular mail, hand delivery or overnight mail at:*

FreshRealm, Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

*By electronic mail at:*

FreshRealmInfo@ra.kroll.com
Please reference "FreshRealm, Inc. – Solicitation Inquiry" in the subject line.

*By telephone at:*

(888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Chapter 11 Cases are available upon written request to the Debtors' Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Claims and Noticing Agent at https://restructuring.ra.kroll.com/FreshRealm (free of charge) or the Bankruptcy Court's website at https://www.njb.uscourts.gov (for a fee).

      S.    *Who Supports the Plan?*

The Plan, which remains subject to further negotiation, is supported by the Debtors, the DIP Lenders, the First Lien Lenders, and the Second Lien Lenders.  The Debtors are engaged in negotiations with, among other parties, the Committee regarding the terms of the Plan.  As of the date hereof, the Plan remains subject to further negotiation and finalization.

      T.    *Could subsequent events potentially affect recoveries under the Plan?*

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is confirmed and the Effective Date is reached.  Any number of subsequent events may interfere with Plan recoveries.

      U.    *Do the Debtors recommend voting in favor of the Plan?*

Yes.  The Debtors believe the Plan provides for a greater distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe

15

71306/0001-53374288v10

the Plan is in the best interests of all Holders of Claims and Interests, and that other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  As noted above, at this time, the Committee does not support the Plan.

## IV.    SUMMARY OF THE PLAN.

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein.  The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan controls the actual treatment of Claims against, and Interests in, the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Debtors, the Debtors' Estates, the Wind-Down Debtors, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    *Classification and Treatment of Claims and Interests.*

1.    Classification of Claims and Interests.

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or an Interest to be classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

2.    Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Wind-Down Debtors', the Plan Administrator's, or the Liquidating Trustee's rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

16

71306/0001-53374288v10

3.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B herein.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X herein to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

4.    Subordinated Claims.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee (as applicable) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

5.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  To the extent a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, such Class shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

6.    Intercompany Interests

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are being received by Holders of such Intercompany Interests solely to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Wind-Down Debtors to the Holders of certain Allowed Claims and otherwise for uses as are contemplated by the Plan, in each case, in accordance with the terms of the applicable Sale Order.

7.    Controversy Concerning Impairment.

17

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date

8.      Insurance.

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

If a Claim may be covered by an Insurance Policy that has a self insured retention (an "SIR") or deductible (a "Deductible"), the Allowed amount of such Claim that is within the applicable SIR or Deductible shall constitute an Allowed General Unsecured Claim against the applicable Debtor's Estate. Such SIR or Deductible shall be considered satisfied pursuant to this Plan through allowance of such General Unsecured Claim solely in the amount of the applicable SIR or Deductible; provided, however, that nothing herein obligates the Liquidating Trust to otherwise satisfy any SIR or Deductible under any Insurance Policy. Any recovery on account of a Claim, that may be payable, in full or in part, pursuant to the terms and conditions of one of the Debtors' Insurance Policies in excess of the SIR or Deductible shall be payable pursuant to the terms and conditions of the applicable Insurance Policy, if any.  Nothing in this Plan shall (1) be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an Insurance Policy, (2) alter or modify the terms and conditions of any Insurance Policy, or (3) be a determination that any Insurance Policy is an Executory Contract or is capable of assumption or rejection. In no event shall the Debtors or the Liquidating Trust be required to pay any amounts within an SIR or Deductible, including defense costs, other than though the allowance of a General Unsecured Claim up to the amount of the applicable SIR or Deductible.

B.      *Means for Implementation of the Plan.*

1.      Sources of Consideration for Plan Distributions.

Distributions on account of the DIP Claims, First Lien Claims, and Second Lien Claims shall be funded by the Debtors and the Wind-Down Debtors, as applicable, consistent with the Plan, provided, however, to the extent any of the preceding Claims are satisfied in whole or in part from the Blue Apron Deferred Payments, such Claims shall be funded by Blue Apron or Wonder Group, Inc, or an affiliate thereof.  The applicable Purchaser shall be responsible for payment of all Allowed Claims that constitute Assumed Liabilities under any Purchase Agreement. Administrative Claims, Priority Tax Claims and Secured Tax Claims, Other Secured Claims, and Other Priority Claims which were not assumed by any Purchaser, shall be funded by the Debtors with Cash on hand or through the Administrative Claims Reserve Amount under the Wind-Down Budget, on the Effective Date or shortly thereafter consistent with the Plan.  The Liquidating Trustee shall fund distributions to all other Holders of Allowed General Unsecured Claims under the Plan with the Liquidating Trust Assets, in each case in a manner consistent with the Plan.

18

2.      Vesting of Assets.

On the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, (i) the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests except as otherwise expressly provided in the Plan; and (ii) the Plan Administration Assets shall vest in the Wind-Down Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests except for those concerning the DIP Claims, the First Lien Claims, and the Second Lien Claims, or as otherwise expressly provided in the Plan.

3.      Wind-Down Debtors.

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors solely for the purposes of (i) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, and liquidating all Wind-Down Debtor Assets, (ii) performing any remaining obligations under the TSA; (iii) enforcing and prosecuting Claims, interests, rights, and privileges under the Wind-Down Debtor Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the First Lien Lenders and Second Lien Lenders to outweigh the costs associated therewith; (iv) resolving any Disputed non-General Unsecured Claims, (v) paying or otherwise satisfying Allowed non-General Unsecured Claims, (vi) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtor are entitled and file any tax returns or other filings as are required in connection therewith), (vii) complying with its continuing obligations under the Asset Purchase Agreements, if any, (viii) otherwise administering the Plan in an efficacious manner, and (ix) undertaking any restructuring transactions as are necessary or advisable in connection with the foregoing.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (xi) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter.

On the Effective Date, the Wind-Down Debtor Assets shall vest in the Wind-Down Debtors for the primary purpose of administering the Wind-Down Debtors' Estates, which may include liquidating the Wind-Down Debtor Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business, other than performance under the TSA.  In consultation with the DIP Agent, the First Lien Agent and the Second Lien Agent, the Wind-Down Debtors will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Debtor Assets, make timely distributions pursuant to the Plan and Confirmation Order, and not unduly prolong its duration.  The Wind-Down Debtor Assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan.  The Wind-Down Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

4.      Plan Administrator.

71306/0001-53374288v10

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor, with the consent of the Required DIP Lenders, as the sole director and the sole officer of such Wind-Down Debtor and shall succeed to the powers of such Debtor's directors and officers.  The Plan Administrator shall be the sole representative of, and shall act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all Governance Documents are deemed amended by the Plan to permit and authorize the same).

The Debtors shall include, in the Plan Supplement, the information set forth in Sections 1129(a)(4) and (5) of the Bankruptcy Code and the identity of the Person or Entity that the Debtors have selected as the Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

(a)   The Plan Administrator Agreement.

Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date, which shall be subject to the consent of the DIP Agent, the First Lien Agent and the Second Lien Agent, are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan.

(b)   Rights, Powers, and Duties of the Debtors and Plan Administrator.

On and after the Effective Date, the Plan Administrator will act for the Post-Effective Date Debtors in the same capacity as applicable to a board of managers or directors, or to officers, subject to the provisions of the Plan. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Wind-Down Debtors. Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all corporate actions consistent with the Plan, the Confirmation Order, any Asset Purchase Agreements, all other applicable orders of the Bankruptcy Court, and the Plan Administrator Agreement, in each case, that are necessary and/or desirable to effectuate the terms of the Plan on behalf of the Wind-Down Debtors and use its reasonable best efforts to assist with or effectuate the transition of the Debtors' business, wind down, dissolution, or liquidation of the Wind-Down Debtors. In taking such actions, the Plan Administrator may control and exercise authority over any Assets, vested in the Wind-Down Debtors pursuant to the Plan, over the acquisition, management, and disposition thereof and over the management and conduct of the affairs of the Wind-Down Debtors. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Wind-Down Debtors pursuant to the Plan and the Plan Administrator Agreement, shall include, among others, (a) making distributions to Holders of

20

Allowed Claims and Interests as provided for in the Plan (except for Allowed General Unsecured Claims), (b) administering, reconciling and resolving (i) Administrative Claims, Secured Claims, and Priority Tax Claims, and (ii) upon one (1) business days' notice to the Liquidating Trustee, DIP Claims, First Lien Claims, Second Lien Claims, and Other Priority Claims, (c) filing tax returns and paying taxes, (d) commencing and pursuing the Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets and managing and administering any proceeds thereof, (e) paying certain Quarterly Fees, (f) defending the Debtors in any pending or future litigation, (g) selling, abandoning, or otherwise fully administering the Estates, (h) in consultation with the Liquidating Trustee, closing the Chapter 11 Cases, (i) dissolving the Wind-Down Debtors, and (j) performing other duties and functions that are consistent with the implementation of the Plan.

For the avoidance of doubt, the Plan Administrator shall administer the Wind-Down Debtors and the Plan in accordance with the Wind-Down Budget and shall have the authority to authorize, make, or cause to be made payments in accordance with the Wind-Down Budget.  The Plan Administrator shall use commercially reasonable efforts to adhere to (or outperform) the Wind-Down Budget; provided that the Plan Administrator shall have the authority to reallocate funding between line items within the Wind-Down Budget without further order of the Court, but in all cases in consultation with the DIP Agent, the First Lien Agent, and the Second Lien Agent.

In pursuing any Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, under the Plan, the Plan Administrator shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, may be brought under Section 546 of the Bankruptcy Code.

The Plan Administrator shall have the right, in consultation with the First Lien Agent and Second Lien Agent, to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator and in accordance with the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

The Plan Administrator and all professionals retained by the Plan Administrator shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each Wind-Down Debtor.  The Plan Administrator may rely upon written information previously generated by the Debtors.

(c)      Compensation of the Plan Administrator.

The Plan Administrator shall be compensated pursuant to the terms of the Plan Administrator Agreement; *provided that* the Plan Administrator shall be permitted to use the

71306/0001-53374288v10

Wind-Down Amount, which has been allocated and approved pursuant to the Approved Budget, to pay the Plan Administrator's fees and expenses as set forth in the Plan Administrator Agreement.

(d)     Insurance for the Plan Administrator.

The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Amount all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Wind-Down Debtors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator after the termination of the Plan Administrator Agreement. The Plan Administrator may also obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.

(e)     Transition Services.

On the Effective Date, the Plan Administrator shall serve as an appointed agent of the designated operator or as the operator of the Debtors in accordance with the Plan for the purposes of fulfilling any obligations under the TSA.

(f)     Termination of the Plan Administrator's Responsibilities and Obligations.

Upon the conclusion of the Plan Administrator's obligations under the post-Effective Date Wind Down in accordance with the Plan and Plan Administrator Agreement, the Plan Administrator shall remit any remaining balance of the Wind-Down Account Amount to the DIP Lenders or Prepetition Secured Parties, as applicable, for distribution pursuant to the terms of the Plan.

5.     <u>Liquidating Trust.</u>

(a)     Establishment of the Liquidating Trust

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement, which will be Filed with the Bankruptcy Court as part of the Plan Supplement. Upon establishment of the Liquidating Trust, title to the Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of the Debtors or any managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors.

The Liquidating Trust Interests to be distributed to Liquidating Trust Beneficiaries under the Plan shall not constitute "securities" under applicable securities laws and shall represent only the right to receive distributions from the Liquidating Trust in accordance with the Liquidating

22

71306/0001-53374288v10

Trust Agreement. The Liquidating Trust Interests shall be non-transferable, except as required by law or as provided in the Liquidating Trust Agreement.

(b)    Transfer of the Liquidating Trust Assets

Pursuant to section 1141 of the Bankruptcy Code, all property transferred to the Liquidating Trust shall be made free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as may be otherwise provided for in the Plan. Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust. For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof.

(c)    Liquidating Trust Agreement

On the Effective Date, the Debtors shall execute the Liquidating Trust Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Liquidating Trust Agreement made by the Debtors, subject to the reasonable consent of the First Lien Agent and the Second Lien Agent, will be ratified. The Liquidating Trust Agreement will contain provisions permitting the amendment or modification of the Liquidating Trust Agreement necessary to implement the provisions of the Plan

(d)    Purpose of the Liquidating Trust

The Liquidating Trust shall be established for, among other purposes, the purpose of (a) receiving and holding the Liquidating Trust Assets; (b) administering, disputing, objecting to, compromising, or otherwise resolving all Claims and Interests other than (i) DIP Claims, (ii) First Lien Claims, (iii) Second Lien Claims, (iv) Administrative Claims, (v) Secured Claims, (vi) Priority Tax Claims; and (vii) Prepetition Deficiency Claims; (c) making distributions to the Liquidating Trust Beneficiaries in accordance with the Plan and the Liquidating Trust Agreement; (d) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries; and (e) commencing and pursuing the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, if any, and managing and administering any proceeds thereof with no objective to continue or engage in the conduct of a trade or business in accordance with Treas. Reg. § 301.7701-4(d).

The Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

(e)    The Liquidating Trustee

71306/0001-53374288v10

Upon the occurrence of the Effective Date, the Liquidating Trustee shall be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement. The Liquidating Trustee, subject to the terms and conditions of the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable. The Liquidating Trustee shall owe fiduciary duties solely to the Liquidating Trust Beneficiaries and shall act in the best interests of such Liquidating Trust Beneficiaries in connection with the foregoing and the administration, monetization or distribution of any Liquidating Trust Assets.

In pursuing any Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, the Liquidating Trustee shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets may be brought under Section 546 of the Bankruptcy Code.

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement. The Liquidating Trustee (and any professionals retained by the Liquidating Trustee) shall not be required to File a fee application to receive compensation.

The Liquidating Trustee shall have the right, and subject to any consent or consultation rights as set forth in the Liquidating Trust Agreement, and without Bankruptcy Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement

(f)      U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust

The Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly.  For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust.  If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize

24

71306/0001-53374288v10

the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than 5 years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the 6 month period prior to the fifth anniversary (or within the 6 month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan

(g)     Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust"

25

71306/0001-53374288v10

treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

6.      Corporate Existence Post-Effective Date.

(a)      Directors and Officers.

Immediately following the occurrence of the Effective Date, (i) the respective boards of directors or managers, as applicable, and the current officers, of each of the Debtors, shall be terminated without cause and such members of the boards of directors or managers, as applicable, and the current officers of the Debtors shall be deemed to have resigned; and (ii) the Plan Administrator shall: (1) be appointed as the sole member of the board of directors or board of managers, as applicable, and the sole officer; (2) succeed as the sole Holder of Interests in each Wind-Down Debtor; (3) have the rights and powers of a debtor in possession under Section 1107 of the Bankruptcy Code; (4) be a "representative of the estate" pursuant to Section 1123(b)(3) of the Bankruptcy Code; (5) be vested with the rights, powers, and benefits afforded to a "trustee" under Sections 704 and 1106 of the Bankruptcy Code; and (6) have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval.

(b)      Organizational Governance Documents

Immediately following the occurrence of the Effective Date, the Wind-Down Debtors shall continue to exist in accordance with the laws of their respective states of formation and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with the Plan. The Wind-Down Debtors shall exist for the limited purposes of fully administering the Estates. Promptly after performing all duties and functions that are consistent with the implementation of the Plan, the Confirmation Order, and the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all actions to wind down, dissolve, or liquidate the Wind-Down Debtors without the necessity for any other or further actions to be taken by or on behalf of such dissolving Wind-Down Debtors or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

26

71306/0001-53374288v10

The certificate and articles of incorporation and bylaws of each Wind-Down Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under Section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Wind-Down Debtors to matters authorized under the Plan.

7.      Statutory Committee and Cessation of Fee and Expense Payment.

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation and objections thereto.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (y) applications for payment of any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court; and (z) responding to objections to its applications for payment of fees and expenses rendered prior to the Effective Date.

8.      Cancellation of Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except (i) such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan and (ii) any indemnification obligations set forth in Article V.E of the Plan) shall be cancelled solely as to the Debtors and their Affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Debtor affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds (but not including any surety bonds issued on behalf of any of the Debtors), indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, (a) no executory contract or unexpired lease that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code shall be terminated or cancelled on the Effective Date, and (b) no Prepetition Loan Document shall be cancelled to the extent such document evidences indebtedness and/or grants a Prepetition Secured Party a security interest in the Debtors' or Wind-Down Debtors' property.

9.      Corporate Action.

Upon the Effective Date, by virtue of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator or the Liquidating

27

Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, Wind-Down Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

### 10.     Effectuating Documents; Further Transactions.

On and after the Effective Date the Plan Administrator and the Agents may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Confirmation Order, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

### 11.     Section 1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtor or to any other Person or from any of the Wind-Down Debtors to the Liquidating Trust or any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtors; (2) any Sale Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  No provision of the Plan or of the Confirmation Order shall be construed to broaden the tax exemption under section 1146(a) beyond what the statute allows.

28

71306/0001-53374288v10

12.    Causes of Action.

Except as otherwise provided in Article IX of the Plan or in any contract, instrument, release, or agreement entered into in connection with the Plan or the Sale (including the Asset Purchase Agreement), in accordance with section 1123(b) of the Bankruptcy Code, (a)(i) all Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets are preserved and transferred to the Liquidating Trust on the Effective Date and (ii) all Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets are preserved and transferred to the Wind-Down Debtors on the Effective Date, and (b) all Causes of Action constituting Acquired Assets are preserved and transferred to the applicable purchaser (to the extent not previously transferred).

13.    Books and Records.

On the Effective Date, each of the Liquidating Trust and Plan Administrator shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with any Asset Purchase Agreement and that relate to the operation and business of the Liquidating Trust or Wind-Down Debtors; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee or Plan Administrator, determines, in accordance with the Liquidating Trust Agreement or Plan Administrator Agreement, that retention of same is no longer necessary or beneficial.

14.    Insurance Claims: Business Interruption Insurance Claims, D&O Claims and Others.

Nothing in the Plan or Confirmation Order shall affect, impair or diminish in any form the Business Interruption Insurance Claims or any rights thereto.  Similarly, any rights and Claims under any applicable Business Interruption Insurance Policies shall not be affected, impaired or diminished by operation of the Plan or Confirmation Order.  For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Business Interruption Insurance Policies of the Debtors.

To the extent any D&O Claims are designated as Liquidating Trust Retained Causes of Action or Wind-Debtor Retained Causes of Action, nothing in the Plan, including the releases provided under Article VIII of the Plan, shall have the effect of prohibiting the initiation or continuation of an action by the Plan Administrator up to and through the entry of a judgment or settlement against any D&O Party, provided, however, that the entry of a judgment or settlement on account of any such D&O Claim shall be for the sole purpose of (and expressly limited to) seeking and obtaining a recovery from the amount of proceeds, if any, actually received under any available and applicable Insurance Policies of the Debtors (including, for the avoidance of doubt, any defense costs, professional fees, indemnification or other disbursements payable from insurance). For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Insurance Policies of the Debtors.

The Wind-Down Debtors, the Plan Administrator, and the Liquidating Trust (if applicable) shall use commercially reasonable efforts to cooperate with the DIP Agent and the First Lien Agent in providing information and documents and in pursuing proceeds under the Insurance Collateral

29

71306/0001 53374288v10

to the extent practicable. The extent and specifics of such cooperation shall be governed by the Liquidating Trust Agreement and Plan Administrator Agreement, as applicable, which shall be included in the Plan Supplement.

### 15. Section 1145 Exemption.

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Interests pursuant to the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local Law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Interests issued pursuant to the Plan are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

### C. *Treatment of Executory Contracts and Unexpired Leases.*

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is:  (1) the TSA; (2) the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) an Insurance Policy; (5) an Asset Purchase Agreement; or (6) to be assumed by the Debtors and assigned to any Purchaser in connection with any Sale Transactions and pursuant to any Sale Transactions Documentation or the TSA.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Orders to assume and assign Executory Contracts and Unexpired Leases to the Purchasers pursuant to the Asset Purchase Agreements.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any Final Order, including the Confirmation Order, which has not been assigned to a Purchaser pursuant to the applicable Asset Purchase Agreement or the applicable Sale Order, shall revest in and be fully enforceable by the Wind-Down Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

30

For the avoidance of doubt, Article V of the Plan relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of any Sale Order.

2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date (the "Rejection Damages Claims Bar Date"). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, the Liquidating Trust (if any), the Purchasers, or their respective property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Wind-Down Debtors and the Holder of such Claim.

3.      Insurance Policies.

Except as otherwise provided in the Plan, nothing in the Plan, the Confirmation Order, the Plan Administrator Agreement, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder, or the terms and conditions thereof, or diminishes or impairs the enforceability of the Insurance Policies. In addition, on and after the Effective Date and subject to the terms and conditions of the D&O Liability Insurance Policies, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies in effect or purchased as of the Effective Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies. Notwithstanding anything herein to the contrary, the Debtors or Wind-Down Debtors, as applicable, shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors or Wind-Down Debtors deem necessary, including by purchasing any tail coverage or tail policies.

Upon the Effective Date, each of the Insurance Policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors (or a Wind-Down Debtor identified as first named insured or counterparty thereto) effective as of the Effective Date, pursuant to sections 105, 365 and 1123 of the Bankruptcy Code,  and coverage for defense and

31

71306/0001-53374288v10

indemnity under any D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any such policies, subject to the terms and conditions of such D&O Liability Insurance Policies; *provided* that any indemnification obligations of the Debtors or Wind-Down Debtors, as applicable, will only continue as to former officers, directors, individual managers, members, partners, supervisors, agents, or employees to the extent such former officers, directors, individual managers, members, partners, supervisors, agents, or employees that are a Released Party.  For the avoidance of doubt, this section shall not apply to any obligations as to any equity owner of any of the Debtors in its capacity as such, but this section shall only apply to any representatives or appointees of such equity owner if they are the Debtors' current or former officers, directors, individual managers, members, partners, supervisors, agents, or employees, in each case in their capacities as such.

The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.F of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court: (i) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, (ii) claims where an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII.F of the Plan to proceed with its claim; and (iii) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Policies, and take other actions relating thereto (including effectuating a setoff), in each case in accordance with the terms of the Insurance Policies and/or applicable non-bankruptcy law.  Nothing in Article VIII.F of the Plan or any corresponding paragraph of the Confirmation Order requires, precludes and/or prohibits Insurers to or from administering, handling, defending, settling and/or paying claims covered by any Insurance Policies in accordance with and subject to the terms and conditions of such Insurance Policies and/or applicable non-bankruptcy law.

4.     Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

5.     Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided for in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits,

71306/0001-53374288v10

rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

6. Reservation of Rights.

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Rejected Executory Contracts and Unexpired Leases, or any other exhibit, schedule or annex, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Wind-Down Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

7. Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

D. *Settlement, Release, Injunction, and Related Provisions.*

1. Settlement, Compromise, and Release of Claims and Interests.

To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, and in consideration of the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith release, compromise, and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI hereof, all distributions, if any, made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

2. Release of Liens.

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order or any contract, instrument, release, or other agreement or document created pursuant to**

33

the Plan or the Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan, and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien and/or security interest, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

If any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

3.      Releases by the Debtors.

Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that

34

is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Article VIII.C of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

4.   Releases by Holders of Claims and Interests.

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively,

35

71306/0001 53374288v10

**absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Article VIII.D of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and**

71306/0001-53374288v10

compromise of the Claims released by the releases provided in Article VIII.D of the Plan; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided Article VIII.D of the Plan.

5.      Exculpation.

Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and solely to the extent such acts or omissions occurred between the Petition Date and the Effective Date, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, any other Definitive Document, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transactions, any other Definitive Document, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the Sale and Settlement Order, the pursuit of the Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6.      Injunction.

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  To the fullest extent permissible under applicable law, except as otherwise specifically provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims against or Interests in the Debtors and/or Wind-Down Debtors or Causes of Action, in each case that have been released or are subject to exculpation pursuant to the Plan, shall be precluded and are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties (including the Debtors and Wind-Down Debtors) or the Released Parties, and any successors, assigns or representatives of such Persons or Entities:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with

37

respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation, of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

7.     Protection Against Discriminatory Treatment.

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

8.     Document Retention.

38

On and after the Effective Date, the Wind-Down Debtors, the Debtors, the Plan Administrator, or Liquidating Trustee, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by each, subject to the applicable provisions of the Plan Administrator Agreement or Liquidating Trust Agreement.

9.      Reimbursement or Contribution.

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

E.      *Conditions Precedent to Confirmation and the Effective Date.*

1.      Conditions Precedent to the Effective Date.

It shall be a condition precedent to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to Article IX of the Plan:

a.  The Sale Transactions shall have been implemented and/or consummated, as applicable, in all material respects;

b.  the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance acceptable to the Required DIP Lenders;

c.  the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and acceptable to the Required DIP Lenders and such order shall have become a Final Order;

d.  the DIP Facility shall be in full force and effect, and there shall be no defaults under the DIP Facility Documents continuing unless waived by the Required DIP Lenders in accordance with the terms and conditions of the DIP Documents;

e.   the Plan Supplement, Plan, and all schedules, documents, supplements, and exhibits thereto, as applicable, shall be acceptable to the Required DIP Lenders and have become Filed;

f.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

g.  the Debtors shall have established the Administrative Claims Reserve;

39

71306/0001-53374288v10

h.  all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date into the Professional Fee Escrow Account pending approval of such fees and expenses by the Bankruptcy Court;

i.  The Debtors have funded the Wind-Down Debtor Account Amount in Cash;

j.  The Liquidating Trust shall have been established and funded with the Liquidating Trust Assets;

k.  no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan; and

l.  the following documents shall be in full force and effect, and shall not have been terminated prior to the Effective Date: (a) any Sale Orders; (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Plan; and (c) all other material customary documents delivered in connection with transactions of this type.

2.    Waiver of Conditions.

The conditions to Consummation set forth in Article IX of the Plan may be waived by the Debtors, subject to the consent of the Required DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

3.    Effect of Failure of Conditions.

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.  Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of (a) the DIP Orders, including without limitation, any releases provided therein, or (b) the Sale Transaction(s) under the Asset Purchase Agreements or the revocation of the Debtors' authority under the Sale Orders to consummate such Sale Transaction(s).

4.    Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

<div align="center">40</div>

## V.    THE COMPANY'S CORPORATE HISTORY AND BUSINESS OVERVIEW.

A.    *Formation and Growth of FreshRealm.*

FreshRealm was founded in 2013 and ultimately spun off as independent companies in 2021.   The Company has established a sophisticated food development, manufacturing, and fulfillment business.  The Debtors' physical and overhead infrastructure are purpose-built for the full spectrum of fresh and better-for-you food, capable of accommodating growth of innovative food businesses through a segment-agnostic business strategy.   Rather than every individual innovative food business constructing its own single-use infrastructure, the Debtors built a shared services platform that allows fixed costs, expertise, and capacity to be leveraged across multiple customers and many channels simultaneously.

FreshRealm, Inc. ("FRI") is the Debtors' main operating entity.  FRI is the direct sole shareholder of the other Debtors (other than FreshRealm Holdings, Inc.).  FreshRealm Holdings, Inc. is the parent entity.  The Debtors' principal assets and place of business are located in Linden, New Jersey.  The Debtors' Linden facility (the "Linden Facility") consists of a 495,000 square foot manufacturing facility built in 2017.  The Debtors employ approximately 700 employees at the Linden Facility.   In total, the Debtors employ approximately 1,017 individuals across the United States.  The Debtors maintain additional operating facilities mainly in Lancaster, Texas and Tracy, California.

B.    *Key Relationships.*

*Relationship with Blue Apron.*  On June 9, 2023, the Debtors acquired the production and fulfillment operations of Blue Apron, including Blue Apron's leasehold interests at the Linden Facility, furnishings and equipment, certain transferred contracts, and intellectual property.  In connection with the acquisition, the Debtors and Blue Apron entered into the PFA with an initial term of 10 years, under which the Debtors agreed to serve as the exclusive supplier of Blue Apron's meal kits.  Blue Apron was subsequently acquired by virtual food hall chain Wonder Group, Inc. in September 2023.  As of the Petition Date, the Debtors fulfilled approximately 60,000 boxes of meal kits and prepared meals per week to Blue Apron customers.  Blue Apron sales account for approximately 70% of the Debtors' total revenue.

*Relationship with Marley Spoon.*  On January 30, 2024, the Debtors acquired the U.S. operational assets of Marley Spoon, a global subscription-based meal kit provider.  The Debtors acquired all of Marley Spoon's U.S.-based operational and supply chain infrastructure, integrating them into its U.S.-based network.  After the closing, the Debtors fulfilled all orders for Marley Spoon's U.S.-based customers nationwide, including for its bistroMD, Martha & Marley Spoon, and Dinnerly brands.

*UFC Ignite Joint Venture.*  On January 9, 2026, the Debtors announced UFC Ignite, a first-of-its-kind, sports-affiliated meal plan created in collaboration with UFC, the world's premier mixed martial arts organization.  The UFC Ignite Program delivers chef-designed, performance-driven meals directly to consumers' doorsteps, offering nearly 200 total meals with a rotating weekly menu featuring more than 60 selections.

71306/0001-53374288v10

C.    *Board of Directors.*

FRI which is the direct sole shareholder of the other Debtors (other than FreshRealm Holdings, Inc.), maintains a two-member Board consisting of Jill Frizzley and Charlie Piper. Ms. Frizzley was appointed to the Board on October 16, 2025 and Mr. Piper was appointed to the Board on November 6, 2025. Both directors were previously unaffiliated with the Debtors and their key stakeholders.

## VI.    THE COMPANY'S PREPETITION CAPITAL STRUCTURE.

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $168 million in outstanding secured funded debt obligations.

| *Funded Debt* | *Approximate Outstanding Principal Amount (in USD)* |
|---|---|
| **2L Financing Agreement** | **~$117 million** |
| **1L Financing Agreement** | **~$51 million** |
| **Total Funded Debt Obligations** | **~$168 million** |

A.    *1L Financing Transaction*

FRI, as borrower, is a party to that certain Financing Agreement dated March 11, 2025, as amended by that certain Waiver and Amendment No. 1 to Financing Agreement dated October 16, 2025, as further amended by that Certain Amendment No. 2 to Financing Agreement dated December 4, 2025 (the "1L Financing Agreement"), by and among FRI, as borrower, the lenders thereto, and BGC Lender Rep LLC, as administrative agent and collateral agent (the "1L Agent"), which initially provided for a $75,000,000 loan facility consisting of a $45,000,000 initial term loan that was funded at closing and up to $30,000,000 in delayed draw term loans. The obligations under the 1L Financing Agreement are guaranteed by IHEC LLC and FreshRealm HR, LLC (collectively, the "1L Guarantors") pursuant to a Pledge and Security Agreement dated March 11, 2025, and secured by first-priority liens on substantially all assets of the Debtors and 1L Guarantors, other than the 2L Priority Collateral.

B.    *2L Financing.*

FRI is a party to that certain Financing Agreement dated October 16, 2025, as amended by that certain Amendment No. 1 to Financing Agreement dated December 4, 2025 (the "2L Financing Agreement"), by and among FRI, as borrower and the 2L Lender, pursuant to which the 2L Lender agreed to make available to the Debtors a credit facility of up to $50,000,000 consisting of a term loan in the principal amount of $20,000,000 and delayed draw term loans in an aggregate principal amount not to exceed $30,000,000 (the "Initial 2L Credit Facility"). The Initial 2L Credit Facility was fully drawn as of the Petition Date. On December 4, 2025, FRI entered into Amendment No. 1, whereby the 2L Lender provided incremental delayed draw term loans of up

42

71306/0001-53374288v10

to $70,000,000, of which $60,000,000 was drawn as of the Petition Date. FRI's obligations under the 2L Financing Agreement are guaranteed by FreshRealm Holdings, Inc., FreshRealm HR, LLC, and IHEC LLC (collectively, the "2L Guarantors").

As security for FRI's and the 2L Guarantors' obligations under the 2L Financing Agreement, and pursuant to an Amended and Restated Intercreditor Agreement dated December 4, 2025 (the "Intercreditor Agreement"), FRI and the 2L Guarantors granted to the 2L Lender a second-priority lien and security interest in all of their respective assets, other than with respect to certain collateral including all accounts, rights to payment, receivables, inventory, and all proceeds and products of the foregoing (the "2L Priority Collateral"), in which case the 2L Lender has a first priority lien on such 2L Priority Collateral and the 1L Lender has a second lien on such 2L Priority Collateral.

## VII.   EVENTS LEADING TO THESE CHAPTER 11 CASES.

### A.   *Food Safety Recalls and Operational Disruption.*

Subsequent to closing the 1L Financing Transaction in March 2025, the Debtors experienced five separate withdrawal, voluntary recall, or recall incidents associated with Listeria monocytogenes, all of which stemmed from the Debtors' receipt of contaminated material from suppliers. On March 19, 2025, the United States Department of Agriculture began collecting samples from the Debtors' Indianapolis, Indiana facility involved in the production of meal products, and provided a series of presumptive positive test results in late March 2025. In April 2025, a presumptive positive environmental swab was identified at the Montezuma, Georgia facility. In May 2025, the Debtors' customer Walmart withdrew all products produced at that facility as a precautionary measure. On June 17, 2025, following discussions with customers and regulators, the Debtors initiated a voluntary recall of specific Chicken Fettuccine Alfredo SKUs sold under the Marketside and Home Chef brands. The Debtors also experienced three other instances of receiving contaminated ingredients in 2025 in linguine, cauliflower, and spinach products. The Debtors took immediate action to address the recalls. Notwithstanding such efforts, each recall event described above caused certain disruptions and delays in production and fulfillment operations, and caused customer attrition, in turn, depleting the Debtors' liquidity.

The Debtors exercised their remaining option to sell $10 million of Series B preferred shares to Gamstar (US) IX Pte Ltd in July 2025, which was funded in August 2025. Subsequently, in October 2025, the Debtors and the Prepetition Lenders reached an agreement for a comprehensive recapitalization of the business and the implementation of a comprehensive turnaround plan to achieve profitability. More specifically, the Debtors raised $110 million in additional capital through the 2L Financing Agreement, predicated upon a right-sizing of the Debtors' cost structure to the then-existing revenue base. The turnaround plan also emphasized reductions in facility-level fixed costs, tighter SG&A controls, and operational discipline in labor, freight, and overhead.

While the Debtors were implementing the turnaround plan, Walmart informed the Debtors that it would cease its customer relationship in January 2026. Walmart previously had been a growing customer that comprised more than 20% of the Debtors' revenue. Because the Walmart business represented approximately 80% of the San Clemente, California and Indianapolis, Indiana

43

71306/0001-53374288v10

production volume, and because those facilities already were unprofitable and underutilized, the Debtors made the decision to close those two facilities and transition any remaining volume to other facilities in the network to reduce costs. Those facilities wound down at the end of January 2026.

B.      *Insurance Coverage for Listeria-Related Claims*

The Debtors have historically procured insurance policies from multiple insurers to protect themselves from a myriad of risks, including claims arising from losses arising from the actual or alleged damage, injury, or impairment to its consumable products. These insurance policies include, among other insurance purchased by the Debtors, product recall insurance policies and commercial general liability insurance policies. These insurance policies are listed in Schedule A. These insurance policies are general intangibles and collateral under the First Lien Collateral Agreement.

The Debtors have prepared preliminary claims for their listeria-related losses incurred in 2025 and 2026. The claims for their listeria-related losses are potentially covered under two separate periods of product recall insurance: (1) the first period of insurance is from June 10, 2024 to June 9, 2025; and (2) the second period of insurance is from June 10, 2025 to February 1, 2026. In each period, the Debtors purchased primary and excess product recall policies that, combined, provide a total of $20 million in aggregate limits, subject to various self-insured retentions and sub-limits. Prior to the Petition Date, the Debtors and their representatives began communication with their product recall insurers regarding their claims for insurance coverage. The Debtors' product recall insurers have reserved their rights, identified certain potential defenses or limitations to their coverage obligations for the Debtor's listeria-related losses and, to date, have not made any payments under these insurance policies. The Debtors continue to pursue their rights under these policies.

The Debtors also tendered certain of their listeria-related losses to their general liability insurer, Federal Insurance Company ("Federal"). Federal issued primary and excess commercial general liability insurance policies to the Debtors for the period June 10, 2024 to June 9, 2025 and June 10, 2025 to February 1, 2026. Federal's commercial general liability insurance policies for each of these periods provide a $2 million aggregate limit at the primary layer and a $10 million aggregate limit at the excess layer. Federal has denied coverage for the Debtors' listeria-related losses based on a "biological agents" exclusion in the commercial general liability insurance policies. The Debtors continue to pursue their rights under these policies.

The Plan does not resolve the insurance coverage matters under any insurance policies purchased by the Debtors with respect to the listeria-related claims (the "Business-Interruption Insurance Claims"). The Debtors are actively working with their insurers to resolve these disputes.

C.      *Blue Apron Dispute.*

Commencing in April 2025 and leading up to the commencement of these Chapter 11 Cases, Blue Apron asserted that the Debtors breached certain obligations under the PFA based on, among other things, food quality and safety failures associated with the recalls. In December 2025, Blue Apron sent the Debtors a notice of termination of the PFA and sought to replace the Debtors

44

71306/0001-53374288v10

as the exclusive provider of Blue Apron's meal kits (the "Termination Notice"). The Termination Notice was predicated on: (i) alleged material breaches previously identified in a prior letter from Blue Apron dated April 9, 2025, and (ii) additional alleged material breaches identified in the Termination Notice attributable to, among other things, food safety and quality issues associated with the recalls and attendant operational issues.

In response, the Debtors contended that the Termination Notice failed to comply with the PFA's notice and cure requirements with respect to the newly alleged material breaches under the PFA. The Debtors asserted (a) the alleged conduct did not constitute a "material breach" of the PFA, (b) the Debtors undertook sufficient actions to cure the alleged breaches previously identified, and (c) Blue Apron failed to strictly comply with the PFA's notice provisions. The Debtors and Blue Apron thereafter engaged in settlement discussions to resolve the outstanding issues, including Blue Apron's asserted termination of the PFA. While those discussions were ongoing, the Debtors and Blue Apron entered into a series of tolling agreements to expressly reserve all rights, claims and defenses, including, but not limited to, the validity of the Termination Notice, with the most recent of such tolling periods set to expire on May 4, 2026. Notwithstanding the tolling arrangement, the ongoing disputes with Blue Apron concerning the PFA negatively affected financial support to and investment in the Debtors' business.

While attempting to negotiate a mutually beneficial resolution with Blue Apron, the Debtors simultaneously sought to raise additional capital to fund the business through the balance of the transformation to forecasted positive cash flow in the third quarter of 2026. Through January and February 2026, the Debtors met with at least 15 working capital lenders and multiple parties to seek to monetize the Debtors' insurance claims. None of those efforts ultimately were successful. With diminishing liquidity despite a materially improved business and operations, the Debtors focused their efforts on contingency planning.

D.    *Advisor Engagements*

On October 16, 2025, the Debtors engaged A&M to provide Chief Financial Officer and Chief Transformational Officer services and implement operational and financial performance improvements. The engagement was expanded to add Chief Operating Officer services on December 16, 2025. On February 21, 2026, the Debtors engaged Rothschild & Co. to facilitate contingency planning and investment banking services for the sale of the Debtors. On March 10, 2026, the Debtors engaged Cole Schotz P.C. to support their restructuring efforts, including assisting the Debtors in contingency planning, exploring restructuring options and, ultimately, Chapter 11 planning and execution.

E.    *Prepetition Negotiations With Lenders.*

Debtors and their advisors were in near-constant communication with the Prepetition Lenders and their advisors during the months and weeks preceding the bankruptcy filing. In January 2026, the Debtors determined, with the assistance of their advisors, that additional liquidity would be necessary to sustain the Debtors' operations. The Debtors and their advisors explored various mechanisms to generate additional liquidity and had extensive discussions with many of the Debtors' key stakeholders, including the Prepetition Lenders and Blue Apron, on strategic alternatives to alleviate pressure on the Debtors' business. Those discussions revealed

45

that proceeding through an out-of-court restructuring would not be viable, and that the Debtors needed to pursue an in-court restructuring through a chapter 11 filing.

## VIII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A.   *First Day Relief.*

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Debtors' Chapter 11 Cases following the commencement of the Chapter 11 Cases.  A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Bryan Fleming, Chief Financial Officer of the Debtors and Senior Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 20] (the "First Day Declaration").

The First Day Motions were heard and approved on an interim or final (as applicable) basis, and all First Day Motions and orders for interim and final relief granted in the Chapter 11 Cases can be viewed free of charge at https://restructuring.ra.kroll.com/FreshRealm.

### B.   *Appointment of Official Committee of Unsecured Creditors*

On May 14, 2026, the U.S. Trustee Filed a *Notice of Appointment of Committee of Unsecured Creditors*, notifying parties in interest that the U.S. Trustee had appointed an official committee of unsecured creditors (the "Committee") in these Chapter 11 Cases.  The Committee is currently comprised of: (a) Federal Express Corporation, (b) Bristlecone Incorporated, (c) Lasership Inc., dba OnTrac Final Mile, (d) Elberta Logistics International Solutions, LLC, (e) Public Service and Gas Company, (f) RR Donnelley, and (g) Pelton Shepherd Industries Inc. The Committee's proposed counsel is Fox Rothschild LLP.

A meeting of creditors pursuant to section 341 of the Bankruptcy Code was held on June 4, 2026.

### C.   *Second Day Relief.*

The Debtors also filed several other motions to facilitate the Debtors' restructuring efforts and ease administrative burdens.  Following hearings held on May 21, 2026 and June 2, 2026, the Bankruptcy Court entered orders granting the following relief:

(i)   **The Bidding Procedures Order** approving *inter alia,* proposed marketing, auction, and procedures for the sale of assets unrelated to the Blue Apron/Misfits Transaction, and establishing certain dates and deadlines related thereto [Docket No. 160].

(ii)   **Administrative Fee Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 159];

46

(iii) ***De Minimis Asset and Abandonment Procedures Order*** approving procedures for the sale or abandonment of de minimis assets [Docket No. 157];

(iv) ***The Contract Rejection Order*** approving procedures to reject executory contracts and unexpired leases as of the Petition Date [Docket No. 162]; and

(v) ***The Blue Apron/Misfits Sale and Settlement Order*** approving the (i) settlement agreement with Blue Apron, (ii) entry into the TSA with Misfits Market, and (iii) the entry into the asset purchase agreement with Misfits Market [Docket No. 209].

    D.    *The Debtors' Professionals' Retention Applications.*

To further facilitate the Debtors restructuring efforts and ease administrative burdens, the Debtors filed applications to retain professionals postpetition pursuant to sections 327, 328, 105, and 363 of the Bankruptcy Code, including:

(i) ***Cole Schotz P.C. as Counsel for the Debtors and Debtors in Possession*** [Docket No. 174] (approved at Docket No. 231);

(ii) ***Alvarez & Marsal North America, LLC to Provide Executive Officers and Additional Personnel*** [Docket No. 175];

(iii) ***Rothschild & Co as Investment Banker to the Debtors and Debtors in Possession*** [Docket No. 173];

(iv) ***Kroll Restructuring Administration LLC as Claims and Noticing Agent and Administrative Advisor for the Debtors and Debtors in Possession*** [Docket Nos. 6 and 59] (approved at Docket Nos. 44 and 144);

    E.    *Approval of Debtor in Possession Financing.*

On April 27, 2026, the Debtors Filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 17] (the "DIP Motion") and on June 2, 2026, the Bankruptcy Court entered a final order approving the DIP Motion [Docket No. 210] (the "DIP Order").  Pursuant to the DIP Motion and DIP Order and to provide the Debtors with the liquidity to commence a smooth landing into these Chapter 11 Cases, the Prepetition Lenders agreed to provide the DIP Facility and continued access to prepetition Cash Collateral.  The DIP Order authorized the Debtors to receive senior secured postpetition financing on a superpriority basis in the form of a senior secured, super priority multiple draw term loan facility in an aggregate principal amount of $18 million in new money loans ($3 million consisting of a prepetition protective advance), plus a roll-up of $38 million of pre-petition Term Loans, and to continue using the Prepetition Lenders' cash collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases.

71306/0001-53374288v10

The DIP Facility and access to Cash Collateral provided the Debtors with the necessary liquidity to consummate the Blue Apron/Misfits Transaction, to fund their business operations and administrative expenses during these Chapter 11 Cases, and to fund a wind-down of any remaining estate assets and liabilities in accordance with an agreed wind-down budget.  The DIP Facility contains case milestones to ensure that the Chapter 11 Cases proceed efficiently, allowing the Debtors to realize their operational objectives while avoiding a prolonged stay in chapter 11 and promptly close on the transactions described herein.

The DIP Facility was the culmination of extensive, arm's-length negotiations between the Debtors and the DIP Lenders, and provided the Debtors with crucial liquidity at the outset of these Chapter 11 Cases, allowing the Debtors and their advisors to focus on consummating the Blue Apron/Misfits Transaction and exiting chapter 11 expeditiously.

F.      *Schedules and Statements.*

The Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs on June 1, 2026.

G.      *Bar Date Motion.*

On May 28, 2026, the Debtors filed the *Debtors' Motion For Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 178] (the "Bar Date Motion").  On June 18, 2026, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion [Docket No. 256] (the "Bar Date Order"), which established procedures and deadlines for filing Proofs of Claim against the Debtors and approval of the form and manner of the bar date notice (the "Bar Date Notice").  Pursuant to the Bar Date Notice, the last date for certain persons and entities to file Proofs of Claim in these Chapter 11 Cases is **July 27, 2026, at 11:59 p.m. Eastern Time** and the last date for governmental units to file Proofs of Claim in the Debtors' Chapter 11 Cases is **October 26, 2026, at 11:59 p.m. Eastern Time**.  On May 26, 2026, the Bar Date Notice was published in *The New York Times* (national edition).

H.      *Blue Apron/Misfits Market Transaction*

On the Petition Date, the Debtors Filed the motion to approve the Blue Apron/Misfits Transaction, which as described above and in the First Day Declaration, was a key component to a successful transition into these Chapter 11 Cases and ultimately the Debtors' efforts to perform their restructuring efforts.   The Blue Apron/Misfits Transaction, *inter alia,* (i) provides approximately $47 million in cash consideration, (ii) the Trust Payment, (iii) provided the Debtors with much needed liquidity, including net zero payment terms and an immediate payment of approximately $5.1 million in contractual "end of life payments", (iiiiv) provides for Blue Apron to address substantial remediation costs at the end of the lease term for the Debtors' Linden, NJ facility, and (ivv) provides for waivers of administrative claims against the Estates.  The

48

71306/0001-53374288v10

Bankruptcy Court approved the Blue Apron/Misfits Transaction on June 2, 2026 and the Settlement Agreement, TSA, and APA went effective and closed on June 4, 2026.

I.      *Bidding Procedures and Marketing Process.*

As described above, the Debtors conducted a marketing process for all or substantially all of their assets not sold pursuant to the Blue Apron/Misfits Transaction.  The marketing process was an extensive and far reaching. The Debtors and their advisors sought strategic and financial investors to effectuate a value maximizing transaction.  Rothschild, with the assistance of the Debtors, identified numerous parties, including strategic and financial partners, as potential bidders for such assets.  Despite the Debtors' substantial efforts, no person or entity submitted a qualifying bid by June 10, 2026 (the bid deadline). Thus, on June 11, 2026, the Debtors filed a *Notice of Cancellation of Auction* [Docket No. 240].

J.      *Litigation Matters.*

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

K.      *Committee Investigation and Pending Challenges.*

Pursuant to the Final DIP Order, the Committee was granted a period (the "Challenge Period") to investigate and, if appropriate, commence challenges (each, a "Challenge") to the stipulations in the Final DIP Order regarding the validity, extent, perfection, and priority of the Prepetition Liens and the Prepetition Obligations. As of the date hereof, the Challenge Period remains open as to both the First Lien Secured Parties for certain limited purposes and the Second Lien Agent and Second Lien Secured Parties (also known as FaraNord (US) III Pte Ltd (including its affected affiliates, the "FaraNord Parties")).

The Committee has conducted an extensive investigation and has identified the following potential claims and Challenges:

(a) Fraudulent Transfer Claims. The Committee has identified potential constructive (and actual) fraudulent transfer claims against the FaraNord Parties.

(b) Lien Challenges. The Committee has identified potential bases to challenge the validity, extent, and priority of the Prepetition Secured Parties' liens as to certain categories of assets, including commercial tort claims, certificated goods, Chapter 5 avoidance actions, and a foreign patent.

49

71306/0001-53374288v10

(c) Equitable Subordination. The Committee is investigating the potential equitable subordination of the FaraNord Parties' debt claims.

(d) Recharacterization. The Committee is investigating the potential recharacterization of the FaraNord Parties' equity and debt claims.

The Committee and BGC Lender Rep LLC and Birch Grove Investments LLC (collectively, "BGC") (on behalf of the First Lien Secured Parties) have agreed in principle regarding a potential settlement of the Committee's Challenges as to the First Lien Secured Parties (the "Potential First Lien Settlement"). As of the date hereof, the Potential First Lien Settlement has not been approved by the Bankruptcy Court and is not yet effective. The Potential First Lien Settlement is subject to documentation and the terms of a Plan being acceptable to the First Lien Secured Parties in all respects. The material terms of the Potential First Lien Settlement, if approved, would resolve the Committee's lien challenges – as to the First Lien Secured Parties – and include mutual releases between the Committee, the Debtors, BGC and the First Lien Secured Parties. The Potential First Lien Settlement, if approved, would expressly preserve the Committee's claims against the FaraNord Parties in full.

The Committee's Challenge against the FaraNord Parties remains pending and has not been resolved. If successful, the Committee's Challenges against the FaraNord Parties could result in a material increase in the assets available for distribution to holders of General Unsecured Claims. The FaraNord Parties dispute the Committee's claims.

Holders of Claims and Interests should be aware that the Plan's release and injunction provisions (Article VIII) would, if confirmed as currently drafted, release the FaraNord Parties and the First Lien Secured Parties from all Claims and Causes of Action, including the Committee's pending Challenges. Without resolution, the Committee anticipates objecting to the scope of these release provisions as they apply to the FaraNord Parties and the First Lien Secured Parties.

## IX.   CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING.

Holders of Claims and Interests entitled to vote should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.      *Risks Related to the Confirmation and Consummation of the Plan.*

1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or

50

Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or met, the Effective Date will not take place.

3.    The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind-down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

4.    The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests.  The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a

71306/0001-53374288v10

distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

5.      Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

6.      The Debtors Could Lose Exclusivity.

In addition, at the outset of these Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors obtained the exclusive right to propose the Plan upon filing their petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

7.      These Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code or One or More of the Chapter 11 Cases May be Dismissed.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals.  Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes.  *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).

8.      The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an

52

71306/0001-53374288v10

objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.      Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

10.     Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

11.     The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Released Parties.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

12.     The Total Amount of Allowed Administrative Claims and/or General Unsecured Claims May Be Higher Than Anticipated by the Debtors.

With respect to Holders of Allowed Administrative Claims and/or General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.

13.     The Committee's Pending Challenges May or May Not Be Resolved Prior to Confirmation

The Committee has identified potential claims and Challenges against the First Lien Secured Parties and the FaraNord Parties, as described in Section VIII.K of this Disclosure Statement. The Committee is separately negotiating a settlement with the First Lien Secured Parties (described above) that is being documented.  The Committee is also negotiating with the FaraNord Parties. There can be no assurance that these negotiations will result in a settlement, or that any settlement will be approved by the Bankruptcy Court. If the Committee's Challenges are not resolved prior to Confirmation, the Plan's release provisions could extinguish the Committee's Challenges, which the Committee believes are potentially the largest source of recovery available

53

to holders of General Unsecured Claims. The treatment of Class 6 General Unsecured Claims may be materially affected by the resolution (or non-resolution) of the Committee's Challenges, including whether the Potential First Lien Settlement is approved and whether any recovery is obtained from the FaraNord Parties. Holders of Claims should carefully consider these uncertainties before voting on the Plan.

14.    13.Certain Tax Implications of the Plan.

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "*Material United States Federal Income Tax Consequences*," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtors, Liquidating Trust, and Holders of Claims.

B.    *Disclosure Statement Disclaimer.*

1.    The Financial Information Contained in this Disclosure Statement Has Not Been Audited.

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

2.    Information Contained in this Disclosure Statement is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.    This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

4.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

**This Disclosure Statement does not constitute legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.

This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

> 5.      This Disclosure Statement May Contain Forward Looking Statements.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology. All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein is an estimate only, based upon information currently available to the Debtors.

> 6.      No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

> 7.      Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors, Wind-Down Debtors, Liquidating Trustee, or the Plan Administrator, as applicable, may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

> 8.      No Waiver of Right to Object Claims or Interests.

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

> 9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

55

71306/0001-53374288v10

10.      <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>.

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.      <u>No Representations Outside this Disclosure Statement Are Authorized</u>.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## X.     SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

THE DISCLOSURE STATEMENT ORDER IS INCORPORATED HEREIN BY REFERENCE AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND IN FORMULATING A DECISION TO VOTE TO ACCEPT OR REJECT THE PLAN.

---

**<u>THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY</u>.**
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

---

A.     *Holders of Claims Entitled to Vote on the Plan.*

Under the provisions of the Bankruptcy Code, not all Holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan.  The table in <u>Article III.C</u> of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

71306/0001-53374288v10

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 3, 7, 8, 9, or 10.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

B.      *Voting Record Date.*

**The Voting Record Date is August 6, 2026**.  The Voting Record Date (as defined in the Disclosure Statement Order) is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.      *Voting on the Plan.*

**The Voting Deadline is September 15, 2026, at 5:00 p.m., prevailing Eastern Time**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' Claims and Noticing Agent on or before the Voting Deadline:

D.      *Ballots Not Counted.*

**No ballot will be counted toward Confirmation if, among other things**:  (i) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT AT**

**AT (888) 454-0938  (U.S./CANADA, TOLL FREE) OR +1 (646) 452-8302 (INTERNATIONAL) OR EMAIL FRESHREALMINFO@RA.KROLL.COM AND**

> **REFERENCE "IN RE FRESHREALM – SOLICITATION INQUIRY" IN THE SUBJECT LINE.**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN.

The following is a brief summary of the confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in the Disclosure Statement.

### A.    *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  **The Bankruptcy Court has scheduled the Confirmation Hearing for September 24, 2026 at 10:00 a.m., prevailing Eastern Time.**  The Confirmation Hearing may be adjourned from time to time by the Debtors or Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and solicitation procedures.  Any objection to the Plan must:  (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of New Jersey; (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any; (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (5) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is actually received by the notice parties no later than the Confirmation Objection Deadline.  **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court**.

### B.    *Confirmation Standards.*

#### 1.    <u>Requirements of Section 1129(a) of the Bankruptcy Code.</u>

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1)  the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for

58

71306/0001-53374288v10

plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

2.   Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide the same or a substantially greater return to holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

A substantial part of the Debtors' business and assets have been liquidated pursuant to the Blue Apron/Misfits Transaction with the balance to be liquidated through further de minimis asset, liquidation, or ordinary course transactions. The Plan effects a wind down of the Debtors' remaining assets not otherwise sold or liquidated to date. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses. Therefore, the appointment of a chapter 7 trustee would

71306/0001-53374288v10

potentially delay distributions to creditors and reduce the present value of any recovery for Holders.  *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).  Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.

The conversion to chapter 7 would also require entry of a new bar date.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

> 3.     Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

> 4.     Valuation

As described above, the Debtors simultaneously conducted the Blue Apron/Misfits Transaction and engaged in marketing process for the rest of their business assets pursuant to the Bidding Procedures Order.  The Debtors believe that this process provided the best method of valuing their enterprise, as it allows the market to speak as to that value.  The Debtors' marketing and sale process was a comprehensive and arm's length processes with the goal of identifying counterparties for one or more potential value-maximizing sale transactions.  Based on the marketing process, this Disclosure Statement does not include a valuation analysis (which the Debtors at this time do not anticipate filing).  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."); *In re LBI Media, Inc.*, Case No. 18-12655 (CSS) (Bankr. D. Del. Jan. 22, 2019) (ECF No. 360) (order approving disclosure statement without a valuation analysis and approving the filing of a valuation analysis at a later date, if necessary); *In re Gastar Exploration Inc.*, Case No. 18-36057 (MI)

71306/0001-53374288v10

(Bankr. S.D. Tex. Dec. 21, 2018) (ECF No. 282) (order approving disclosure statement that conducted valuation analysis through a comprehensive marketing process).

C.     *Acceptance by Impaired Classes.*

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

D.     *Confirmation Without Acceptance by All Impaired Classes.*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided,* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.     No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts

61

71306/0001-53374288v10

consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

> 2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder").  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who

71306/0001-53374288v10

hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein.  Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders of Claims (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (b) that are deemed to reject the Plan, or (c) that are otherwise not entitled to vote to accept or reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.    *Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors*

The Sale Transactions and the liquidation of any remaining assets of the Debtors are generally expected to be treated as one or more taxable sales of assets and/or equity interests of the Debtors, with the Debtors recognizing gain or loss equal to the difference between the value

63

of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b) to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor  remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.

The Debtors expect to realize significant COD Income as a result of the consummation of the Plan.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan.

B.    *Character of Gain or Loss*

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated.  Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

64

C.   *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID"), its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

D.   *Accrued Interest.*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear.  Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

E.   *Limitation on Use of Capital Losses*

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for

65

married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains.  A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years.  For corporate Holders, capital losses recognized may only be used to offset capital gains recognized.  A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

F.   *Information Reporting and Backup Withholding*

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

G.   *U.S. Federal Income Tax Treatment of the Liquidating Trust*

1.   <u>Liquidating Trust</u>

It is intended that any Liquidating Trust will qualify as a "liquidating trust" under Treasury Regulation section 301.7701-4(d).  Accordingly, it is intended that any Liquidating Trust will be

71306/0001-53374288v10

treated as a grantor trust for U.S. federal income tax purposes, and that the beneficiaries will be treated as grantors of such trust.

In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, sets forth the general criteria for obtaining an advance ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Consistent with the requirements of Revenue Procedure 94-45, the Liquidating Trust agreement will require all relevant parties to treat the transfer of the Liquidating Trust Assets for U.S. federal income tax purposes as (i) a transfer of the Liquidating Trust Assets directly to the beneficiaries in satisfaction of the Claims against the Debtors (to the extent of the value of the beneficiaries' respective interests in the applicable Liquidating Trust Assets) followed by (ii) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets in exchange for beneficial interests in the Liquidating Trust (to the extent of the value of the beneficiaries' respective interests in the applicable Liquidating Trust Assets), provided, however, that the Liquidating Trust Assets will be subject to any post-Effective Date liabilities or obligations incurred by the Liquidating Trust relating to the pursuit of Liquidating Trust Assets.

Accordingly, the beneficiaries should be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets.  The foregoing treatment should also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As a grantor trust, the Liquidating Trust agreement will require all items of income, gain, loss, deduction and credit to be included in the income of the beneficiaries, and reported on such beneficiaries' U.S. federal income tax returns as if such items had been recognized directly by the beneficiaries in the proportions in which they own beneficial interests in the Liquidating Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the trustee of any Liquidating Trust so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee of any Liquidating Trust), the  trustee of any Liquidating Trust may (i) timely elect to treat any portion or all of the Liquidating Trust or any Liquidating Trust Assets as a "disputed ownership fund" within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes (the "Disputed Ownership Fund") and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Disputed Ownership Fund will be subject to tax annually on a separate entity basis on any net income earned with respect to any Liquidating Trust Assets held in any such Disputed Ownership Fund, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

No ruling is currently being requested from the IRS concerning the tax status of the Liquidating Trust as a liquidating trust.  As such, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a liquidating trust.  If the IRS were to successfully challenge the liquidating trust classification, the U.S. federal income tax consequences to the Liquidating Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).  Certain U.S. federal income tax consequences of the Liquidating Trust or portions thereof

67

71306/0001-53374288v10

relating to Disputed Claims and being treated as a Disputed Ownership Fund are also discussed below.

2.        Reporting.

Any Liquidating Trust shall comply with all tax reporting requirements, including, without limitation, filing returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and, in connection therewith, the Liquidating Trustee may require the beneficiaries to provide certain tax information as a condition to receipt of distributions. The trustee of any Liquidating Trust shall also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such beneficiary will be required to report such items on its U.S. federal income tax return; provided, however, that any reporting under this section is subject to the  discretion of the trustee of any Liquidating Trust to elect to treat the Liquidating Trust or any Liquidating Trust Assets (in whole or in part) as a Disputed Ownership Fund, which election may alter the requirement in accordance with federal tax laws and regulations.

All taxable income and loss of the Liquidating Trust will be allocated among, and treated as directly earned and incurred by, the beneficiaries with respect to such beneficiary's interest in the assets of the Liquidating Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims.  The character of any income or gain and the character and ability to use any loss or loss will depend on the particular situation of the beneficiary.

The U.S. federal income tax obligations of a beneficiary with respect to its beneficial interest in the Liquidating Trust are not dependent on the Liquidating Trust distributing any Cash or other proceeds, subject to any portion(s) of the Liquidating Trust allocable to Disputed Claims. Thus, a beneficiary may incur U.S. federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent distribution to the U.S. Holder.

In general, other than in respect of amounts retained on account of Disputed Claims, a distribution of Cash by the Liquidating Trust will not be separately taxable to a beneficiary of the Liquidating Trust, since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and will be taxed at the time the Cash was earned or received by the Liquidating Trust).  Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

3.        Valuation.

After the Effective Date, the Liquidating Trustee shall (i) determine the fair market value of the Liquidating Trust Assets as of the Effective Date, based on the Liquidating Trustee's good faith determination (in conjunction with guidance provided by trust professionals if any); and (ii) establish appropriate means to apprise the beneficiaries of such valuation; provided, however, that no such valuation will be required if the trustee of any Liquidating Trust  elects to treat the Liquidating Trust or the Liquidating Trust Assets (in whole or in part) as a Disputed Ownership Fund. The valuation, if established pursuant to the terms of the Liquidating Trust agreement, shall

71306/0001-53374288v10

be used consistently by all Parties (including, without limitation, the Debtors, the Liquidating Trust, the trustee of any Liquidating Trust, and the beneficiaries) for all U.S. federal income tax purposes.

4.       Tax Returns.

In accordance with the provisions of section 6012(b)(3) of the Tax Code (and any comparable provision of state or local tax law), the trustee of any Liquidating Trust  shall cause to be prepared, at the cost and expense of the Liquidating Trust, the income tax returns (federal, state and local) that the Debtors are required to file (to the extent such returns have not already been filed by the Effective Date).  The trustee of any Liquidating Trust  shall also cause to be prepared, at the cost and expense of the Liquidating Trust, the income tax returns (federal, and if applicable, state and local) required to be filed on behalf of the Liquidating Trust, and such returns filed on behalf of the Liquidating Trust shall be consistent with the treatment of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) (other than with respect to any election by the trustee of any Liquidating Trust  to treat the Liquidating Trust or any of the Liquidating Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund), and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  The trustee of any Liquidating Trust  shall timely file each such tax return with the appropriate taxing authority and shall pay out of the assets of the Liquidating Trust all taxes due with respect to the period covered by each such tax return.

5.       Attribution of Income.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the trustee of any Liquidating Trust  of a private letter ruling if the trustee of such Liquidating Trust  so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the trustee of such Liquidating Trust), taxable income, gain, loss or deduction in respect of the Liquidating Trust Assets shall be attributed to the beneficiaries in proportion to their beneficial interests in the Liquidating Trust Assets.  Notwithstanding anything in the Plan or Disclosure Statement, the timing of distributions shall comply with the requirements of Revenue Procedure 94-45, as determined by the Liquidating Trustee in its reasonable discretion.

6.       Tax Identification Numbers.

The trustee of any Liquidating Trust  may require any beneficiary to furnish to the trustee of such Liquidating Trust  its employer or taxpayer identification number as assigned by the IRS (e.g., via signed W-9 or for any non-U.S. Beneficiary a W-8) or otherwise certify in writing to the satisfaction of the trustee of such Liquidating Trust that distributions from the Liquidating Trust to the beneficiary are exempt from backup withholding.  The trustee of any Liquidating Trust may condition any distribution to any beneficiary upon receipt of such identification number or exemption certification.  If after reasonable inquiry and reasonable time constraints for responding (in each case, as determined by the trustee of any Liquidating Trust in its sole discretion), any beneficiary fails to provide such identification number, then distributions to such beneficiary shall

71306/0001 53374288v10

become undeliverable property to be made available for distribution to the remaining beneficiaries, in accordance with the terms of the Plan and the Liquidating Trust agreement.

7.      <u>Annual Statements.</u>

The trustee of any Liquidating Trust  shall annually (for tax years in which distributions from the Liquidating Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit, and all such beneficiaries shall report such items on their federal income tax returns; provided, however, that any such reporting obligation under this subsection is subject to the discretion trustee of such Liquidating Trust to elect to treat the Liquidating Trust or any of the Liquidating Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund, which may impact the requirement of such annual statements pursuant to federal tax regulations and applicable laws.

8.      <u>Notices.</u>

The trustee of any Liquidating Trust shall distribute such notices to the beneficiaries as the trustee of such Liquidating Trust determines are necessary or desirable.

9.      <u>Expedited Determination</u>

The trustee of any Liquidating Trust may request an expedited determination of taxes of the Debtors or of the Liquidating Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

10.      <u>Withholding.</u>

The trustee of any Liquidating Trust will comply with all applicable governmental withholding requirements.

## XIII.  RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: July 27, 2026                  FRESHREALM, INC., on behalf of itself and
                                            all other Debtors

                                     */s/ John Hanson*
                                     John Hanson
                                     Chief Financial Officer

70

71306/0001-53374288v10

## EXHIBIT A

## Chapter 11 Plan

[Filed Separately]

A-1

71306/0001-53374288v10

**EXHIBIT B**

**Liquidation Analysis**

(To Be Filed)

B-1

71306/0001-53374288v10

**<u>Exhibit B-1</u>**

**Revised Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| FRESHREALM, INC., *et al.*,[1] | ) | Case No. 26-14656 (MEH) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**COLE SCHOTZ P.C.**
Michael Sirota, Esq.
Warren Usatine, Esq.
Ryan Jareck, Esq.
Daniel Harris, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:     (201) 489-3000
Facsimile:     (201) 489-1536
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           rjareck@coleschotz.com
           dharris@coleschotz.com
           mpercontino@coleschotz.com

*Counsel for the Debtors*
*and Debtors in Possession*

Dated: July 27, 2026

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

## TABLE OF CONTENTS

**INTRODUCTION**............................................................................................................................1

**ARTICLE I . DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...........................................................1
   A.     Defined Terms. ......................................................................................................1
   B.     Rules of Interpretation. .........................................................................................23
   C.     Computation of Time. ...........................................................................................24
   D.     Governing Law. ....................................................................................................24
   E.     Reference to Monetary Figures.............................................................................24
   F.     Reference to the Debtors or the Wind-Down Debtors...........................................24
   G.     No Substantive Consolidation; Limited Administrative Consolidation. ...............24
   H.     Controlling Document. .........................................................................................25

**ARTICLE II . ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS**........................................................................25
   A.     General Administrative Claims..............................................................................25
   B.     Professional Fee Claims........................................................................................26
   C.     DIP Claims............................................................................................................28
   D.     Priority Tax Claims................................................................................................28
   E.     Statutory Fees........................................................................................................28

**ARTICLE III . CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ..................................................................................................................................29
   A.     Classification of Claims and Interests...................................................................29
   B.     Treatment of Claims and Interests. .......................................................................30
   C.     Special Provision Governing Unimpaired Claims.................................................35
   D.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ......................................................................................................................35
   E.     Subordinated Claims..............................................................................................35
   F.     Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes. ..............35
   G.     Intercompany Interests...........................................................................................36
   H.     Controversy Concerning Impairment. ...................................................................36
   I.     Insurance...............................................................................................................36

**ARTICLE IV . MEANS FOR IMPLEMENTATION OF THE PLAN**..................................36
   A.     Sources of Consideration for Plan Distributions. .................................................36
   B.     Vesting of Assets. .................................................................................................37
   C.     Wind-Down Debtors..............................................................................................37
   D.     Plan Administrator.................................................................................................38
   E.     Liquidating Trust. .................................................................................................41
   F.     Corporate Existence Post-Effective Date..............................................................45
   G.     Statutory Committee and Cessation of Fee and Expense Payment. ......................46
   H.     Cancellation of Securities and Agreements. ..........................................................46
   I.     Corporate Action...................................................................................................46

J. Effectuating Documents; Further Transactions. ..............................................47

K. Section 1146 Exemption. ..............................................47

L. Causes of Action. ..............................................47

M. Books and Records. ..............................................48

N. Insurance Claims: Business Interruption Insurance Claims, D&O Claims and Others. ..............................................48

O. Section 1145 Exemption. ..............................................49

**ARTICLE V . TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ..............................................**49**

A. Assumption and Rejection of Executory Contracts and Unexpired Leases. ..............................................49

B. Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..............................................50

C. Insurance Policies. ..............................................50

D. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..............................................51

E. Modifications, Amendments, Supplements, Restatements, or Other Agreements. ..............................................52

F. Reservation of Rights. ..............................................52

G. Nonoccurrence of Effective Date. ..............................................52

**ARTICLE VI . PROVISIONS GOVERNING DISTRIBUTIONS** ..............................................**52**

A. Timing and Calculation of Amounts to Be Distributed. ..............................................52

B. Disbursing Agent. ..............................................53

C. Rights and Powers of the Disbursing Agent. ..............................................53

D. Delivery of Distributions and Undeliverable or Unclaimed Distributions. ..............................................53

E. Manner of Payment. ..............................................54

F. Compliance with Tax Requirements. ..............................................54

G. Allocations. ..............................................55

H. No Postpetition or Default Interest on Claims. ..............................................55

I. Foreign Currency Exchange Rate. ..............................................55

J. Setoffs and Recoupment. ..............................................55

K. No Double Payment of Claims. ..............................................56

L. Satisfaction of Claims. ..............................................56

M. Claims Paid or Payable by Third Parties. ..............................................56

**ARTICLE VII . PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ..............................................**57**

A. Allowance of Claims and Interests. ..............................................57

B. Claims and Interests Administration Responsibilities. ..............................................58

C. Estimation of Claims and Interests. ..............................................58

D. Adjustment to Claims or Interests Without Objection. ..............................................59

E. Time to File Objections to Claims ..............................................59

F. Disallowance of Claims. ..............................................59

G. Amendments to Proofs of Claims or Interests. ..............................................60

H. No Distributions Pending Allowance. ..............................................60

I. Distributions After Allowance. ..............................................60

J. Single Satisfaction of Claims. ..............................................60

K. Claims Not Receiving a Distribution. ..............................................60

**ARTICLE VIII . SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**....................................................................................................................**61**
    A.    Settlement, Compromise, and Release of Claims and Interests........................................61
    B.    Release of Liens. .............................................................................................................61
    C.    Releases by the Debtors. ................................................................................................62
    D.    Releases by Holders of Claims and Interests. ................................................................63
    E.    Exculpation. ....................................................................................................................64
    F.    Injunction. ......................................................................................................................65
    G.    Protections Against Discriminatory Treatment. .............................................................66
    H.    Document Retention. ......................................................................................................66
    I.    Reimbursement or Contribution. ...................................................................................66

**ARTICLE IX . CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE**...........................................................................................................**67**
    A.    Conditions Precedent to the Effective Date. ..................................................................67
    B.    Waiver of Conditions. ....................................................................................................68
    C.    Effect of Failure of Conditions. .....................................................................................68
    D.    Substantial Consummation. ............................................................................................68

**ARTICLE X . MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**.................................................................................................................................**68**
    A.    Modifications and Amendments. ....................................................................................68
    B.    Effect of Confirmation on Modifications. .....................................................................69
    C.    Revocation or Withdrawal of the Plan............................................................................69

**ARTICLE XI . RETENTION OF JURISDICTION** ................................................................**69**

**ARTICLE XII . MISCELLANEOUS PROVISIONS** ............................................................**72**
    A.    Immediate Binding Effect...............................................................................................72
    B.    Additional Documents. ...................................................................................................72
    C.    Reservation of Rights......................................................................................................72
    D.    Successors and Assigns...................................................................................................72
    E.    Service of Documents. ....................................................................................................73
    F.    Term of Injunctions or Stays..........................................................................................75
    G.    Enforcement of Confirmation Order...............................................................................75
    H.    Entire Agreement. ..........................................................................................................75
    I.    Exhibits. .........................................................................................................................75
    J.    Nonseverability of Plan Provisions.................................................................................75
    K.    Votes Solicited in Good Faith.........................................................................................76
    L.    Closing of Chapter 11 Cases...........................................................................................76
    M.    Waiver or Estoppel. ........................................................................................................76

iv

**INTRODUCTION**

FreshRealm, Inc. and the above-captioned debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this Plan for the resolution of the outstanding claims against, and equity interests in, the Debtors.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters.  Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

*A.*      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings given to them below.

1.      "*1L Protective Advance*" means that certain $1,800,000 protective advance provided by the First Lien Agent to the DIP Borrower on April 14, 2026, as a "Collateral Agent Advance" under and as defined in the First Lien Credit Agreement, which, pursuant to the express terms of the First Lien Credit Agreement, constitutes "Obligations" under the First Lien Documents.

2.      "*1L Roll-Up DIP Loans*" means the $22,800,000 in aggregate principal amount of the term loans outstanding under the First Lien Credit Agreement rolled-up pursuant to the Final DIP Order.

3.      "*2L Priority Collateral*" shall have the same meaning ascribed to such term in the Prepetition Intercreditor Agreement.

4.      "*2L Protective Advance*" means that certain $1,200,000 protective advance provided by the Second Lien Agent to the DIP Borrower on April 15, 2026, as a "Collateral Agent Advance" under and as defined in the Second Lien Credit Agreement, which, pursuant to the express terms of the Second Lien Credit Agreement, constitute "Obligations" under the Second Lien Documents.

5.      "*2L Roll-Up DIP Loans*" means the $15,200,000 in aggregate principal amount of the term loans outstanding under the Second Lien Credit Agreement rolled-up pursuant to the Final DIP Order.

6.      "*A&M Order*" means the *Order Authorizing the Debtors to (A) Retain Alvarez & Marsal North America, LLC to Provide Certain Executive Officers and Certain Additional Personnel, and (B) Designate Certain Executive Officers, and (II) Granting Related Relief* [Docket No. 255].

7.      "*Administrative Claim*" means a Claim against a Debtor arising on or after the Petition Date and before the Effective Date for the costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (d) adequate protection claims provided for in the DIP Orders.

8.      "*Administrative Claims Bar Date*" means the applicable deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be 30 days after the Effective Date for Administrative Claims that may have arisen, accrued, or otherwise become due and payable at any time on and subsequent to the Petition Date.

9.      "*Administrative Claims Objection Bar Date*" means the deadline for Filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of the Administrative Claims.

10.      "*Administrative Claims Reserve Amount*" means a reserve, in the amount of not less than [$●] of the funds available solely under the Wind-Down Budget, which shall be dedicated to the payment of Allowed Administrative Claims.

11.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

12.      "*Agent*" means each of, and in each case in its capacity as such, the First Lien Agent, the Second Lien Agent, and the DIP Agent.

13.      "*Allowed*" means with respect to any Claim or Interest, except as otherwise provided herein:  (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim

or Interest, as applicable, timely Filed by the Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or pursuant to a Final Order; (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed (or assumed and assigned) in connection with the Plan, or (iv) by Final Order of the Bankruptcy Court (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order).  With respect to any Claim or Interest described in clauses (a) and (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that, (w) no objection to the Allowance of such Claim or Interest has been or, in the Debtors' or Wind-Down Debtors' reasonable good faith judgment may be, interposed on or before the Claims Objection Deadline (which shall have the meaning set forth in Article VII.E.) or Administrative Claims Objection Bar Date, as applicable, (x) an objection to such Claim or Interest is asserted and such Claim or Interest is subsequently Allowed pursuant to a Final Order, (y) such Claim or Interest is settled pursuant to, or is authorized under, a Final Order, or (z) such Claim or Interest is Allowed pursuant to the Plan or the Confirmation Order.  For the avoidance of doubt, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors or the Wind-Down Debtors, as applicable, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever. "*Allow*," "*Allowing*," and "*Allowance*" shall have correlative meanings.

14.     "*Asset Purchase Agreements*" means any asset purchase agreements whereby the Debtors sold some or all of their assets under section 363 of the Bankruptcy Code and as approved by the Sale Orders, including all exhibits, appendices, supplements, and documents, schedules, and agreements thereto, and as may be amended, modified, or supplemented in accordance with the terms thereof.

15.     "*Available Cash*" means, collectively, all Cash on hand held by the Debtors and the Wind-Down Debtors on and after the Effective Date, which shall include the proceeds reserved to fund the Wind Down as set forth in the Wind-Down Budget.

16.     "*Avoidance Actions*" means any and all avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code.

17.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

18.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the District of New Jersey.

3

19.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code, and the general, local, and chambers' rules of the Bankruptcy Court.

20.    "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 256] (as the same may be amended, supplemented, or modified from time to time after entry thereof), entered by the Bankruptcy Court on June 18, 2026.

21.    "*Bidding Procedures*" means the procedures governing the sale and marketing process for the Sale Transactions as approved pursuant to the Bidding Procedures Order.

22.    "*Bidding Procedures Order*" means the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 160] (as may be modified, amended, or supplemented by further Final Order), entered by the Bankruptcy Court on May 21, 2026.

23.    "*Blue Apron*" means Blue Apron, LLC, a Delaware limited liability company.

24.    "*Blue Apron Deferred Payments*" means $32,000,000 in Cash that Blue Apron shall pay or cause to be paid to the DIP Agent, for the benefit of the DIP Lenders, beginning on the first business day of the first month following the Service Transfer Date (as defined in the TSA), by wire transfer to an account designated by the DIP Agent, for the benefit of the DIP Lenders, with such Blue Apron Deferred Payments being guaranteed by Wonder Group, Inc., as guarantor.

25.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

26.    "*Business Interruption Insurance Claims*" means all rights and claims under the Business Interruption Insurance Policies.

27.    "*Business Interruption Insurance Policies*" means all insurance policies (including any "tail policy" or run-off endorsement) that have been issued or provide coverage at any time to any of the Debtors (or any of their predecessors or successors) providing business interruption liability coverage and all agreements, documents, or instruments related thereto.

28.    "*Carve Out*" shall have the same meaning ascribed to it in the Final DIP Order.

29.    "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

30.    "*Cash Collateral*" has the meaning ascribed to it under section 363(a) of the Bankruptcy Code.

4

31.     "*Cause of Action*" or "*Causes of Action*" means any actions, claims, cross-claims, third-party claims, interests, damages, controversies, remedies, disputes, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, interests, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in Law or in equity, or pursuant to any other theory of Law or otherwise.  "Causes of Action" also include:  (a) any rights of setoff, counterclaims, or recoupments, and any claims under contracts or for breaches of duties imposed by Law or in equity; (b) any and all claims based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal Law, or breach of any duty imposed by Law or in equity, including Securities laws, negligence, and gross negligence; (c) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate, or disallow Claims or Interests; (d) any claims pursuant to section 362 or chapter 5 of the Bankruptcy Code (including, for the avoidance of doubt, Avoidance Actions); (e) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign Law fraudulent transfer or similar claims.

32.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code, and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

33.     "*Claim(s)*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's Estate.

34.     "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC in its capacity as claims and noticing agent for the Debtors and any successor.

35.     "*Claims Bar Date*" means, collectively, the date established by the Bankruptcy Court in the Bar Date Order by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims for which the Bankruptcy Court entered an order excluding the Holders of such Claims from the requirement of Filing Proofs of Claim.

36.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

37.     "*Class*" means a class of Claims or Interests as set forth in Article III hereof in accordance with section 1122(a) of the Bankruptcy Code.

38.     "*Collateral*" shall have the meaning ascribed to such collateral in the DIP Orders, which shall include, for the avoidance of doubt, the meaning ascribed to it in the DIP Term Sheet.

5

39.     "*Committee*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on May 14, 2026, as set forth in the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 118].

40.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

41.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

42.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

43.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Required DIP Lenders.

44.     "*Consummation*" means the occurrence of the Effective Date.

45.     "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

46.     "*D&O Claims*" means any and all Causes of Action of the Debtors against a D&O Party.

47.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy" or run-off endorsement) that have been issued, may be procured pursuant to this Plan, or provide coverage at any time to any of the Debtors (or any of their predecessors or successors) providing directors', members', trustees', officers', or managers' liability coverage and all agreements, documents, or instruments related thereto.

48.     "*D&O Party*" means all current and former directors, officers, or managers of the Debtors in their respective capacities as such, which are not Released Parties.

49.     "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

50.     "*Debtor Release*" means the releases given on behalf of the Debtors and their Estates as set forth in the Article VIII hereof.

6

51.   "*Debtors*" means, collectively, FreshRealm, Inc., FreshRealm Holdings, Inc., FreshRealm HR, LLC, FreshRealm Texas, LLC, and IHEC, LLC.

52.   "*Deemed DIP Paydown Amount*" means $27,200,000, which represents the Blue Apron Deferred Payment, discounted at a rate of 15%, and shall be deemed remitted to the DIP Agent as a paydown of the DIP Loans as of the Effective Date.

53.   "*DIP Agent*" means BGC Lender Rep LLC, in its capacity as administrative agent and collateral agent for the DIP Lenders.

54.   "*DIP Borrower*" means FreshRealm, Inc.

55.   "*DIP Claims*" means any and all Claims arising under, derived from, or based upon the DIP Documents, the DIP Facility, and the DIP Orders, including all Claims for principal amounts outstanding, interest, fees, expenses, costs, indemnification obligations, reimbursement obligations, and other charges of the DIP Secured Parties arising under or related to the DIP New Money Loans, the Protective Advances, the DIP Roll-Up Loans, DIP Documents, the DIP Facility, or the DIP Orders, after and subject to receipt of the DIP Paydown Amount.

56.   "*DIP Collateral*" shall have the meaning ascribed to such collateral in the Final DIP Order.

57.   "*DIP Credit Agreement*" means that certain Super-Priority Senior Secured Debtor-In-Possession Financing Agreement, dated as of June 1, 2026, by and among the DIP Borrower, the DIP Guarantors (as defined in the DIP Credit Agreement), the DIP Lenders and the DIP Agent.

58.   "*DIP Facility*" means the superpriority senior secured debtor-in-possession credit facility provided under the DIP Documents.

59.   "*DIP Documents*" means the DIP Credit Agreement together with the schedules and exhibits attached thereto, and all security agreements, pledge agreements, and related agreements, documents, and instruments and amendments executed and delivered in connection therewith, including the DIP Orders.

60.   "*DIP Lenders*" means the various lenders party thereto to the DIP Credit Agreement.

61.   "*DIP Liens*" shall have the meaning ascribed to such liens in the Final DIP Order.

62.   "*DIP Loans*" means collectively, the DIP New Money Loans and DIP Roll-Up Loans.

63.   "*DIP New Money Loans*" means the term loans made under that certain superpriority senior secured debtor-in-possession credit facility pursuant to the DIP Credit Agreement, in the currently outstanding principal amount of $18 million.

7

64.     "*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

65.     "*DIP Paydown*" means the payment to the DIP Agent of the DIP Paydown Amount.

66.     "*DIP Paydown Amount*" means the (i) Cash proceeds of the Sale Transactions or Excess Cash as set forth in the Distributable Waterfall and (ii) the Blue Apron Deferred Payments remitted to the DIP Agent equal to the Deemed DIP Paydown Amount.

67.     "*DIP Roll-Up Loans*" means collectively, the 1L Roll-up DIP Loans and the Faranord Roll-Up DIP Loans, issued under the DIP Credit Agreement and as approved by the DIP Orders, in the currently outstanding principal amount of $38 million.

68.     "*DIP Secured Parties*" means the DIP Lenders and the DIP Agent.

69.     "*DIP Term Sheet*" has the meaning ascribed to it in the Final DIP Order.

70.     "*Directed 1L Priority Collateral*" means all of the Debtors' rights in, to and under all Business Interruption Insurance Policies and Business Interruption Insurance Claims, all claims outstanding thereunder and all products and proceeds of such insurance and claims.

71.     "*Disbursing Agent*" means (a) prior to the Effective Date, the Debtors and (b) on and after the Effective Date, the Liquidating Trustee, the Plan Administrator, or the Entity or Entities selected by the Liquidating Trustee or Plan Administrator, which Entity or Entities may include the Claims and Noticing Agent, as applicable, to make or facilitate distributions contemplated under the Plan.

72.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules attached thereto, and as amended, modified, or supplemented from time to time in accordance with the terms thereof.

73.     "*Disclosure Statement Order*" means any order of the Bankruptcy Court approving or conditionally approving the adequacy of the Disclosure Statement.

74.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest: (a) that is not Allowed, (b) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law, or (c) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed.

75.     "*Distributable Value*" means in accordance with the Sale Orders, Sale and Settlement Order, and the DIP Orders, an amount equal to the proceeds available to be distributed to the DIP Secured Parties on account of the DIP Obligations, the First Lien Secured Parties on account of the First Lien Obligations, and the Second Lien Secured Parties on account of the Second Lien Obligations, after giving effect to the treatment and satisfaction of the DIP Obligations under this Plan, including the DIP Paydown, all in accordance with the Distributable Waterfall, <u>minus</u> the sum of: (i) the amount necessary to fund the Wind-Down Debtor Account with the Wind-Down Debtor Account Amount, (ii) the amount necessary to pay in full satisfaction all Claims required to be satisfied pursuant to section 1129 of the Bankruptcy Code

8

to confirm the Plan (which, for the avoidance of doubt, shall include payment of Administrative Claims, Priority Tax Claims, and Other Priority Claims, in each case, solely to the extent Allowed), (iii) subject to the reasonable consent of the Required DIP Lenders, the amount necessary to make any other required payments in order to implement the terms of the Plan, and (iv) subject to the consent of the Required DIP Lenders, any other fees, costs, or expenses in excess of the Wind-Down Budget reasonably necessary to liquidate, monetize, or collect the Wind-Down Debtor Assets.

76. "*Distributable Waterfall*" means proceeds of Collateral (subject to the Carve Out, except that the proceeds of the Blue Apron Deferred Payment shall not be subject to the Carve Out) which shall be applied in accordance with the following priorities:

(a) First, the DIP New Money Loans shall be repaid, *pro rata*, from (i) all Excess Cash and (ii) all proceeds from the sale of Collateral, including the proceeds of the Blue Apron Deferred Payment. The proceeds of the Blue Apon Deferred Payment shall only be applied to repay the DIP New Money Loans in an amount equal to the Deemed DIP Paydown Amount.

(b) After repayment in full of the DIP New Money Loans:

(i) The proceeds of all Collateral (other than the proceeds of the Directed 1L Priority Collateral and the 2L Priority Collateral), including Excess Cash shall be applied in an allocation to be agreed to the 1L and 2L Roll-Up DIP Loans until an aggregate principal amount of the 2L Roll-Up DIP Loans of $7,000,000 is repaid with the proceeds thereto (the "Initial 2L Roll-Up DIP Repayment"), after which time such proceeds shall be applied solely to the 1L Roll-Up DIP Loans and, to the extent the 1L Roll-Up DIP Loans are paid in full, to any outstanding First Lien Obligations until discharge of the First Lien Obligations. The proceeds of the Blue Apon Deferred Payment shall only be applied to repay 1L and 2L Roll-Up DIP Loans in an amount equal to the Deemed DIP Paydown Amount.

(ii) The proceeds of the 2L Priority Collateral shall be applied to the 2L Roll-Up DIP Loans and to the extent the 2L Roll-Up DIP Loans have been paid in full, to any outstanding prepetition Second Lien Obligations.

(iii) The proceeds of the Directed 1L Priority Collateral shall be applied to repay any remaining 1L Roll-Up DIP Loans or as otherwise agreed and, to the extent the 1LRoll-Up DIP Loans are paid in full, to any outstanding prepetition First Lien Obligations in accordance with the Prepetition Intercreditor Agreement or as otherwise agreed.

(c)     If any proceeds of Collateral remain after discharge of First Lien Obligations as set forth in (b)(i) or (iii) above, such remainder shall be applied consistent with the Prepetition Intercreditor Agreement.

77.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated in a Final Order.

78.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived in accordance with Article IX of the Plan.

79.     "*Entity*" or "*Entities*" means any entity or entities, as defined in section 101(15) of the Bankruptcy Code.

80.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

81.     "*Excess Cash*" means all Cash on hand on the Effective Date that is in excess of (a) the Wind Down Debtor Account Amount and  (b) the Professional Fee Escrow Amount.

82.     "*Exculpated Party*" or "*Exculpated Parties*" means, in each case solely in its capacity as such: (a) each of the Debtors; (b) the Independent Directors; (c) the Committee and its members; and (d) with respect to the Debtors and the Committee, each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors, as applicable, that served in such capacity between the Petition Date and Effective Date.

83.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

84.     "*Existing Equity Interests*" means, collectively, all Interests in FreshRealm Holdings, Inc. outstanding immediately prior to the Effective Date.

85.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

86.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent or the Bankruptcy Court.

87.     "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and*

10

*Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, and (V) Granting Related Relief* [Docket No. 210], entered by the Bankruptcy Court on June 2, 2026.

88.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or Filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

89.     "*First Day Pleadings*" means the first day pleadings that the Debtors Filed with the Bankruptcy Court upon the commencement of the Chapter 11 Cases.

90.     "*First Lien Agent*" means BGC Lender Rep LLC, FSB as administrative agent and collateral agent (in such capacities) under the First Lien Credit Agreement.

91.     "*First Lien Claim*" means the Claim associated with the First Lien Loan Obligations.

92.     "*First Lien Collateral*" means the Collateral (as defined in the Prepetition Intercreditor Agreement) of the First Lien Lenders pursuant to the Prepetition Intercreditor Agreement, the First Lien Collateral Agreement and the other First Lien Documents.

93.     "*First Lien Collateral Agreement*" means that certain Pledge and Security Agreement, dated as of March 11, 2025, made by Parent, the DIP Borrower, and the other Grantors (as defined therein) from time to time party thereto in favor of the First Lien Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

94.     "*First Lien Credit Agreement*" means that certain Financing Agreement, dated as of March 11, 2025 (such credit agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among the DIP Borrower, Parent, certain subsidiaries of the DIP Borrower as guarantors, First Lien Lenders, and the First Lien Agent.

95.     "*First Lien Deficiency Claim*" means the unsecured Claims held by the First Lien Lenders pursuant to the First Lien Documents pursuant to applicable law and sections 502 and 506(a) of the Bankruptcy Code or any other similar provisions.

96.     "*First Lien Deficiency Claim Amount*" means an amount equal to the First Lien Obligations minus the amounts paid on account of the First Lien Claim from the proceeds of First Lien Collateral.  Solely for purposes of voting under Bankruptcy Rule 3018, the First Lien

11

Deficiency Claim Amount shall be $19,009,660.85. For the purposes of distributions under the Plan, the First Lien Deficiency Claim shall equal the First Lien Deficiency Claim Amount.

97. "*First Lien Documents*" means the First Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement).

98. "*First Lien Lenders*" means the various lenders from time to time party to the First Lien Credit Agreement.

99. "*First Lien Loan Obligations*" means the obligations of the Debtors to the First Lien Secured Parties pursuant to the First Lien Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $51,327,785.56 as of the Petition Date, on account of First Lien Term Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the First Lien Credit Agreement), in each case, owing under or in connection with the First Lien Documents.

100. "*First Lien Secured Parties*" means the First Lien Agent, and together with the First Lien Lenders and the other Secured Parties (as defined in the First Lien Credit Agreement).

101. "*First Lien Term Loans*" means those certain term loans in a total aggregate principal amount outstanding as of the Petition Date of $51,327,785.56, under the First Lien Credit Agreement.

102. "*General Unsecured Claim*" means any Claim that is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) a DIP Claim (f) a Secured Claim; (g) an Other Secured Claim; (h) a First Lien Claim (i) a Second Lien Claim; (j) an Intercompany Claim; (k) a Section 510(b) Claim; or (l) any Claim to the extent satisfied prior to the Effective Date. For the avoidance of doubt, "General Unsecured Claim" shall include (i) First Lien Deficiency Claims, and (ii) Second Lien Deficiency Claims.

103. "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or any Wind-Down Debtors, as applicable.

104. "*Governmental Bar Date*" means October 26, 2026, at 5:00 p.m. (prevailing Eastern Time), which is the date by which Proofs of Claim must be Filed with respect to such Claims held by Governmental Units pursuant to the Bar Date Order.

105. "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

106. "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

12

107. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

108. "*Independent Directors*" means Jill Frizzley and Charlie Piper, in their capacities as current or former independent directors of certain of the Debtors.

109. "*Insurance Collateral*" means all of the Debtors' rights in, to and under all Insurance Policies, all claims outstanding thereunder and all products and proceeds of such insurance and claims.

110. "*Insurance Policies*" means all insurance policies, including the D&O Liability Insurance Policies and Business Interruption Insurance Policies, that have been issued (or provide coverage) at any time to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

111. "*Insurer*" means any company or other entity that issued an Insurance Policy and any third-party administrator of or for any Insurance Policy, along with any predecessors and/or successor thereof.

112. "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate of a Debtor against a Debtor arising before the Petition Date.

113. "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor. For the avoidance of doubt, no Interest transferred to a Purchaser in connection with the Sale Transactions shall be an Intercompany Interest.

114. "*Interest*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

115. "*Interim Compensation Order*" means the *Administrative Fee Order Establishing Procedures for the Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of the Court* [Docket No. 159], entered by the Bankruptcy Court on May 21, 2026.

116. "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 51], entered by the Bankruptcy Court on April 29, 2026.

13

117.   "*IRS*" means the United States Internal Revenue Service.

118.   "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

119.   "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

120.   "*Lender Professionals*" shall have the meaning ascribed to such term in the DIP Orders.

121.   "*Lien(s)*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

122.   "*Liquidating Trust*" means the liquidating trust established on the Effective Date pursuant to Article IV herein and the Liquidating Trust Agreement.

123.   "*Liquidating Trust Agreement*" means the agreement, filed with the Plan Supplement and executed as of the Effective Date, that establishes and governs the Liquidating Trust, subject to the reasonable consent of the DIP Agent and the First Lien Agent.

124.   "*Liquidating Trust Assets*" means the Liquidating Trust Contribution and the Liquidating Trust Retained Causes of Action.

125.   "*Liquidating Trust Beneficiaries*" means all Holders of Liquidating Trust Interests.

126.   "*Liquidating Trust Contribution*" means a contribution from Blue Apron, pursuant to the Sale and Settlement Order and Settlement Agreement, in the amount of $500,000, which amount has been paid and is currently being held by the Debtors in a segregated account.

127.   "*Liquidating Trust Distributable Proceeds*" means the Liquidating Trust Assets or the Cash proceeds thereof; *minus* Liquidating Trust Expenses.

128.   "*Liquidating Trust Expenses*" means any fees and expenses incurred by the Liquidating Trustee (including, but not limited to, the compensation of the Liquidating Trustee and the reasonable fees and expenses of professionals or other persons retained by the Liquidating Trustee) in connection with the administration of the Liquidating Trust.

129.   "*Liquidating Trust Interests*" means all of the interests in the Liquidating Trust allocable to applicable Holders of Allowed Claims (in accordance with the Plan and the Liquidating Trust Agreement, which shall not include Allowed Secured Claims or Interests (if any) held by any Party, but shall include the (i) First Lien Deficiency Claims and (ii) Second Lien Deficiency Claims). For the avoidance of doubt, the Liquidating Trust Interests shall represent only the right to receive distributions from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement and shall not be deemed "securities" or "equity interests" in any Debtor or in any successor entity, and shall not grant any ownership, control or

14

governance rights in the Liquidating Trust or in any entity whose assets are held by the Liquidating Trust.

130.   "*Liquidating Trust Retained Causes of Action*" means those Causes of Action that shall vest in the Liquidating Trust on the Effective Date.  For the avoidance of doubt, Liquidating Trust Retained Causes of Action shall not include any Causes of Action that are settled, released, or exculpated under the Plan or that are expressly sold or assigned to any Purchaser, as set forth in the applicable Asset Purchase Agreement, pursuant to the applicable Sale Order.  The list of Liquidating Trust Retained Causes of Action shall be filed with the Plan Supplement.

131.   "*Liquidating Trustee*" means the Person or Entity, or any successor thereto, designated by the Debtors and the Committee, but subject to the consent of the Prepetition Secured Parties, to have all powers and authorities set forth in the Plan and the Liquidating Trust Agreement.

132.   "*Misfits Market*" means Misfits Market, Inc., a Delaware corporation.

133.   "*Other Priority Claim*" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

134.   "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, a First Lien Claim, or a Second Lien Claim.

135.   "*Parent*" means FreshRealm Holdings, Inc.

136.   "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

137.   "*Petition Date*" means April 27, 2026, the date on which FreshRealm Holdings, Inc. and certain of its subsidiaries commenced the Chapter 11 Cases.

138.   "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules (as amended, modified, or supplemented from time to time in accordance with the terms hereof).

139.   "*Plan Administrator*" means the Person or Entity, or any successor thereto, designated by the Debtors, subject to the consent of the DIP Agent and the First Lien Agent and the Second Lien Agent, to have all powers and authorities set forth in the Plan and the Plan Administrator Agreement, and as the sole director and the sole officer of each Wind-Down Debtor, succeeding to the powers of such Wind-Down Debtor's directors and officers.

140.   "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Plan Administrator, and the Wind-Down Debtors, which shall be subject to the DIP Agent, First Lien Agent's and Second Lien Agent's consent, which shall be included in the Plan Supplement.

15

141.    "*Plan Administration Assets*" means (i) the Wind-Down Debtor Assets; (ii) the Administrative Claims Reserve Amount; and (iii) any Wind-Down Debtor Retained Causes of Action designated as Plan Administration Assets in the Plan Supplement.

142.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) acceptable to the Required DIP Lenders and to be Filed initially by the Debtors no later than the Plan Supplement Filing Date and may be further amended thereafter, including the following to the extent applicable and known at such time:  (a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, (c) the Plan Administrator Agreement, (d) the Liquidating Trust Agreement, (e) the Wind-Down Budget, (f) any other necessary documentation in accordance with the Plan, and (g) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

143.    "*Plan Supplement Filing Date*" means (a) the date that is seven days prior to the deadline to object to Confirmation of the Plan or (b) such later date as may be approved by the Bankruptcy Court.

144.    "*Prepetition Agent*" means collectively, the First Lien Agent and Second Lien Agent.

145.    "*Prepetition Collateral*" means collectively, the First Lien Collateral and the Second Lien Collateral.

146.    "*Prepetition Deficiency Claims*" means collectively, the First Lien Deficiency Claims and the Second Lien Deficiency Claims, which shall be Allowed General Unsecured Claims under Class 6 of the Plan.

147.    "*Prepetition Intercreditor Agreement*" means that certain Amended and Restated Intercreditor Agreement, dated as of December 4, 2025, among DIP Borrower, each of the Grantors party thereto, BGC Lender Rep LLC, as First Lien Representative, and Faranord (US) III Pte Ltd, as Second Lien Representative, as amended, restated, supplemented or otherwise modified.

148.    "*Prepetition Liens*" means collectively, the First Lien Claim and the Second Lien Claim.

149.    "*Prepetition Loan Documents*" means collectively, the First Lien Documents and Second Lien Documents, and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

150.    "*Prepetition Secured Parties*" means collectively, the First Lien Secured Parties and the Second Lien Secured Parties.

151. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code that is not otherwise a Secured Tax Claim.

152. "*Professional*" means an Entity: (a) retained pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

153. "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims that the Professionals reasonably estimated in good faith that they have incurred or will incur in rendering services to the Debtors, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

154. "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

155. "*Professional Fee Escrow Account*" means an account funded with Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date in an amount equal to the total Professional Fee Amount.

156. "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Administrative Claims Bar Date, or the Governmental Bar Date, as applicable.

157. "*Protective Advances*" means collectively, the 1L Protective Advance and the 2L Protective Advance.

158. "*Purchaser*" means Misfits Market or any other purchaser, pursuant to the applicable Asset Purchase Agreement and as set forth in the applicable Sale Order.

159. "*Quarterly Fees*" means any and all fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable.

160. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

161. "*Rejection Damages Claims Bar Date*" shall have the meaning set forth in Article V.B.

162. "*Related Party*" means, each of, and in each case in its capacity as such, current and former managers, Released Officers, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law

17

or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys (including any attorneys or professionals retained by any current or former director or manager of a Debtor in his or her capacity as director or manager as a Debtor), accountants, investment bankers, consultants, representatives, and other professionals and advisors, and any such Person's or Entity's respective predecessors, successors, and assigns.  For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

163.    "*Released Officers*" means current and former officers of the Debtors who served in such capacity on or after October 16, 2025, other than Mr. Carlos Iniguez and Ms. Snow Le, which, for the avoidance of doubt, are not Released Officers.

164.    "*Released Party*" or "*Released Parties*" means, each of, and in each case, in their respective capacities as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) each Releasing Party; (g) each current and former Affiliate of each Entity in clause (a) through the following clause (f); each Related Party of each Entity in clause (a) through this clause (g), each in their capacity as such; (h) the current members of the Board or Boards of the Debtors, Jill Frizzley and Charlie Piper; and (i) the Released Officers; *provided, however,* that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered. For the avoidance of doubt and notwithstanding anything herein to the contrary, no former director (in their capacity as such) or non-Releasing Party shall be a Released Party under this Plan.

165.    "*Releasing Party*" or "*Releasing Parties*" means, each of, and in each case, in their respective capacities as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (g); (i) each Related Party of each Entity in clause (a) through this clause (g), for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided, however,* that each Entity in the foregoing clause (f) or (g) that (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered shall not be a Releasing Party.

166.    "*Required DIP Lenders*" has the meaning ascribed to such term under the DIP Credit Agreement.

167.    "*Sale and Settlement Order*" means that certain *Order (I) Approving The Settlement Between the Debtors and Blue Apron Pursuant to Bankruptcy Rule 9019, (II) Approving the Sale of Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (III) Authorizing the Debtors to Enter Into and Perform Their Obligations Under an Asset Purchase Agreement, (IV) Authorizing the Debtors to Enter Into a Transition Services Agreement, (V) Approving the Procedures Authorizing the Debtors to Assume and Assign*

18

*Executory Contracts and Unexpired Leases, (VI) Authorizing the Debtors to Reject Certain Agreements, and (VII) Granting Related Relief* [Docket No. 209], entered by the Bankruptcy Court on June 2, 2026.

168. "*Sale Orders*" means any Orders entered by the Bankruptcy Court authorizing the Debtors' sale of some or all of the Debtors' assets under section 363 of the Bankruptcy Code, including but not limited to, the Sale and Settlement Order.

169. "*Sale Transactions*" means the sale or series of sales of all, or substantially all, or a portion of the Debtors' assets to the applicable Purchaser and any transactions undertaken in connection therewith as set forth in the Asset Purchase Agreements and approved by the Sale Orders.

170. "*Sale Transactions Documentation*" means all motions, filings, documents, and agreements related to the Sale Transactions, including without limitation, any Asset Purchase Agreement, any Sale Order, the Bidding Procedures, and the Bidding Procedures Order.

171. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Wind-Down Debtors on behalf of the applicable Debtor pursuant to the Plan.

172. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Wind-Down Debtors on behalf of the applicable Debtor pursuant to the Plan.

173. "*Schedule of Retained Causes of Action*" means the schedule of Wind-Down Debtor Retained Causes of Action and Liquidating Trust Retained Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be filed as an Exhibit to the Plan Supplement.

174. "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as such Schedules may be amended, modified, or supplemented from time to time.

175. "*Second Lien Agent*" means Faranord (US) III Pte Ltd, as administrative agent and collateral agent under the Second Lien Credit Agreement.

176. "*Second Lien Claim*" means the Claim on account of the Second Lien Term Loans or otherwise arising under the Second Lien Credit Agreement and Second Lien Loan Obligations (which, for the avoidance of doubt shall include interest, fees, and all other amounts due and owing under the Second Lien Credit Agreement).

19

177.    "*Second Lien Collateral*" means the Collateral (as defined in the Prepetition Intercreditor Agreement) of the Second Lien Lenders pursuant to the Prepetition Intercreditor Agreement, the Second Lien Collateral Agreement and the other Second Lien Documents

178.    "*Second Lien Collateral Agreement*" means that certain Pledge and Security Agreement, dated as of October 16, 2025, made by Parent, the DIP Borrower, and the other Grantors (as defined therein) from time to time party thereto in favor of the Second Lien Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

179.    "*Second Lien Credit Agreement*" means that certain Financing Agreement, dated as of October 16, 2025 (such credit agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) by and among the DIP Borrower, Parent, certain subsidiaries of the DIP Borrower as guarantors, the Second Lien Lenders, and the Second Lien Agent.

180.    "*Second Lien Deficiency Claim*" means unsecured Claims held by the Second Lien Lenders pursuant to the Second Lien Documents pursuant to applicable law and sections 502 and 506(a) of the Bankruptcy Code or any other similar provisions.

181.    "*Second Lien Deficiency Claim Amount*" means an amount equal to the Second Lien Obligations minus the amounts paid on account of the Second Lien Claim from the proceeds of Second Lien Collateral.  Solely for purposes of voting under Bankruptcy Rule 3018, the Second Lien Deficiency Claim Amount shall be $[●].  For the purposes of distributions under the Plan, the Second Lien Deficiency Claim shall equal the Second Lien Deficiency Claim Amount.

182.    "*Second Lien Lenders*" means the various lenders from time to time party thereto to the Second Lien Credit Agreement.

183.    "*Second Lien Documents*" means the Second Lien Credit Agreement and other Loan Documents (as defined in the Second Lien Credit Agreement).

184.    "*Second Lien Loan Obligations*" means the Debtors' obligations to the Second Lien Secured Parties pursuant to the Second Lien Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $117,400,000.00 as of the Petition Date, on account of Second Lien Term Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Second Lien Credit Agreement), in each case, owing under or in connection with the Second Lien Documents

185.    "*Second Lien Term Loans*" means the term loans issued pursuant to the Second Lien Credit Agreement, in the currently outstanding principal amount of not less than $117,400,000.00 as of the Petition Date.

20

186.     "*Second Lien Secured Parties*" means the Second Lien Agent, the Second Lien Lenders and the other Secured Parties (as defined in the Second Lien Credit Agreement).

187.     "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; *provided* that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.  For the avoidance of doubt, neither DIP Claims, First Lien Claims, or Second Lien Claims are, and shall not be, Section 510(b) Claims.

188.     "*Secured*" means, when referring to a Claim, a Claim that is:  (a) secured by a Lien on collateral in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Debtor's interest in such collateral or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code and applicable Law or (b) Allowed pursuant to the Plan as a Secured Claim.

189.     "*Secured Tax Claim*" means any Secured Claim that, absent its secured status would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claims for penalties.

190.     "*Securities Act*" means the U.S. Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

191.     "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

192.     "*Settlement Agreement*" means that certain settlement agreement by and among the Debtors and Blue Apron, as amended, approved by the Bankruptcy Court pursuant to the Sale and Settlement Order.

193.     "*Tax Code*" means the United States Internal Revenue Code of 1986, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

194.     "*Term Loan Credit Agreements*" means collectively, the First Lien Credit Agreement and Second Lien Credit Agreement.

195.     "*Transferred Causes of Action*" means any and all Causes of Action held by the Debtors that were or shall be transferred to the Purchasers pursuant to any Sale Transactions.

196.     "*TSA*" means that certain Transition Services Agreement by and between DIP Borrower, Misfits Market, and, solely for the purposes of Sections 2.4, 3.2(e) and 3.6 of the TSA, Blue Apron, dated April 27, 2026, and approved by the Sale and Settlement Order.

197.     "*U.S. Trustee*" means the Office of the United States Trustee for the District of New Jersey.

198.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or section 1123 of the Bankruptcy Code.

199.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

200.    "*Wind Down*" means, the wind down, liquidation, and dissolution of the Debtors' Estates following the Effective Date as set forth in Article IV hereof.

201.    "*Wind-Down Budget*" means the budget funding the Wind Down, in an amount no more than [$●] million and which shall include certain amounts required to satisfy certain required obligations in connection therewith (each in accordance with the Asset Purchase Agreements and the Sale Orders), as acceptable to the Debtors and the Required DIP Lenders, as may be amended by the Debtors, Wind-Down Debtors, or the Plan Administrator, as applicable, with the consent of the Required DIP Lenders.

202.    "*Wind-Down Debtor*" means the Debtor or Debtors or any successor or successors thereto after the Effective Date responsible for effectuating the Wind Down and implementing the terms of the Plan.

203.    "*Wind-Down Debtor Account*" means the Debtors' bank account or accounts used to fund all expenses and payments required to be made by the Wind-Down Debtors, which account will be funded on the Effective Date with Available Cash in the amount of the Wind-Down Debtor Account Amount.  Following the Wind Down, any remaining amounts in the Wind-Down Debtor Account shall be distributed in accordance with Article III hereof.  For the avoidance of doubt, the Wind-Down Debtor Account and the proceeds therein shall become property of the Wind-Down Debtors on the Effective Date.

204.    "*Wind-Down Debtor Account Amount*" means the amount reserved by the Plan Administrator, in an amount acceptable to the Required DIP Lenders, to fund the Wind Down in accordance with the Wind-Down Budget which, for avoidance of doubt, shall be no more than [$●].

205.    "*Wind-Down Debtor Assets*" means, following the consummation of the Sale Transactions, all of the remaining assets of the Debtors' Estates, including the Wind-Down Debtor Account Amount but excluding the (i) DIP Paydown Amount and (ii) the Liquidating Trust Assets.

206.    "*Wind-Down Debtor Retained Causes of Action*" means those Causes of Action that shall vest in the Wind-Down Debtors on the Effective Date.  For the avoidance of doubt, Wind-Down Debtor Retained Causes of Action shall not include the Liquidating Trust Retained Causes of Action or any Causes of Action that are settled, released, or exculpated under the Plan or that are expressly sold or assigned to any Purchaser, as set forth in the applicable Asset Purchase Agreement, pursuant to the applicable Sale Order.  The list of Wind-Down Debtor Retained Causes of Action shall be filed with the Plan Supplement.

B.       *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan or Confirmation Order, as applicable; (iv) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (vi) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (vii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (viii) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws; (ix) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (x) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xi) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xii) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xiii) any effectuating provisions may be interpreted by the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (xiv) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (xv) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (xvi) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (xvii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

23

*C.      Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

*D.      Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control); *provided*, *however*, that corporate, limited liability company, or limited liability partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, not incorporated in Delaware shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or the Wind-Down Debtor, as applicable.

*E.      Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*F.      Reference to the Debtors or the Wind-Down Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors means the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

*G.      No Substantive Consolidation; Limited Administrative Consolidation.*

Although for purposes of administrative convenience and efficiency the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors except for the limited purposes set forth herein. The entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the limited consolidation of each of the Debtors, and their respective estates, solely for voting, confirmation, and distribution purposes under the Plan. This limited consolidation shall not affect (other than for purposes related to funding distributions under the Plan) (a) the legal and organizational structure of the Debtors, (b) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (c) distributions out of any insurance policies or proceeds of such policies.

24

*H.      Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document or instrument in the Plan Supplement, the terms of the relevant document or instrument in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

# ARTICLE II.
# ADMINISTRATIVE CLAIMS,
# PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

*A.      General Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, the DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which (i) an order Allowing such Administrative Claim becomes a Final Order, or (ii) the Plan Administrator, on the one hand, and the Holder of the Administrative Claim, on the other hand, agree to the Allowed amount of such claim, or as soon as reasonably practicable thereafter; or (3) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claim.

Objections to such requests must be Filed and served on the Wind-Down Debtors and the requesting party by the Administrative Claims Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be

25

determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

**Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down Debtors, or their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Wind-Down Debtors or any notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.**

The Wind-Down Debtors or the Plan Administrator (on behalf of the Wind-Down Debtors), may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.

B.      *Professional Fee Claims.*

1.   Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Wind-Down Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account, when such Professional Fee Claims are Allowed or awarded by entry of an order of the Bankruptcy Court.

2.   Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, and in consultation with the DIP Lenders, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors.

The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to each such Professional by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account or the Wind-Down Debtor Account, as applicable, as soon as reasonably practicable after such Professional Fee Claims are Allowed by

26

an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute part of the Wind-Down Debtor Assets without any further notice to or action, order, or approval of the Bankruptcy Court.

  3. <u>Professional Fee Amount</u>.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than 5 days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Wind-Down Debtors shall use Cash on hand or from the Wind-Down Debtor Account to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

  4. <u>Post-Confirmation Date Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtors. If the Debtors or the Wind-Down Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or the Wind-Down Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors or the Plan Administrator, as applicable, may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding anything in this Plan, nothing alters the terms of the A&M Order and the requirement to seek approval of the Completion Fee (as defined in the A&M Order) as set forth in the A&M Order.

C.      *DIP Claims.*

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable or alternative treatment, on or before the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) has consented to receive and shall receive, (i) Cash in an amount necessary to pay the reasonable and documented fees, expenses, and disbursements of the Lender Professionals, to the extent any amount remains outstanding, (ii) Cash proceeds of the Sale Transactions, (ii) the Deemed DIP Paydown Amount, and (iii) the Distributable Value under the Distributable Waterfall, until such Allowed DIP Claim is indefeasibly paid in full, but at all times subject to the Distributable Waterfall.  The DIP Liens shall remain in place until the Allowed DIP Claims are indefeasibly paid in full.  For the avoidance of doubt, any distribution made pursuant to verse (i) above shall be made directly to the applicable Lender Professional and not to the Holder of an Allowed DIP Claim.

D.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Statutory Fees.*

The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-PCR. On and after the Effective Date, the Wind-Down Debtors or Liquidating Trustee, as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  All Quarterly Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date (or funded by the Wind-Down Debtors and disbursed by the Disbursing Agent on behalf of each of the Wind-Down Debtors). After the Effective Date, each of the Wind-Down Debtors or the Liquidating Trust shall be severally (but not jointly and severally) liable to pay Quarterly Fees for the disbursements made by such Wind-Down Debtor (or Disbursement Agent on behalf of the Wind-Down Debtors) or Liquidating Trust (or the Liquidating Trustee or Disbursement Agent on behalf of the Liquidating Trustee, if applicable), in full in cash when due and payable in the applicable Debtor's or Wind-Down Debtor's Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of the applicable Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided that* the several (rather than joint and several) nature of those parties' liability for Quarterly Fees shall not be binding upon the U.S. Trustee in carrying out his responsibilities for billing and collecting fees pursuant to 28 U.S.C. § 1930(a)(6) until the earliest of a particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. For the avoidance of doubt, the Liquidating Trust Contribution disbursed to the Liquidating Trust upon the Effective Date will be included in the calculation of the Quarterly Fees payable to the U.S. Trustee by the Debtors for the quarter in which the Effective Date occurs, and neither the Debtors, the Wind-Down

28

Debtors, nor the Liquidating Trust will be responsible for any statutory fees based on the Liquidating Trust's subsequent distribution of such Cash.  If other Liquidating Trust Assets are liquidated and disbursed, the Liquidating Trustee shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  The U.S. Trustee may assess Quarterly Fees against the Liquidating Trust upon the liquidation and disbursement of such assets, and the Liquidating Trust's rights to contest the assessment and/or amount of such fees are expressly preserved.  Notwithstanding the foregoing, any Quarterly Fee assessed on account of the Liquidating Trust Assets shall be paid by the Liquidating Trust, and the Wind-Down Debtors shall have no obligation to pay such fees (if any).  The U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Quarterly Fees in these Chapter 11 Cases and shall not be treated as providing any release under the Plan. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest, qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Claims for the Debtors are set forth herein.

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |

29

| 5 | Second Lien Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

*B.*      *Treatment of Claims and Interests.*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 – Secured Tax Claims.

   (a)    *Classification*:  Class 1 consists of all Secured Tax Claims.

   (b)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Plan Administrator:

      (i)    payment in full in Cash of such Holder's Allowed Secured Tax Claim;

      (ii)   equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the

30

Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)     *Voting*: Class 1 is Unimpaired under the Plan.  Each Holder of a Class 1 Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Class 1 Secured Tax Claim is not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Secured Claims.

(d)     *Classification*:  Class 2 consists of all Other Secured Claims.

(e)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtors or Wind-Down Debtors:

   (i)     payment in full in Cash of such Holder's Allowed Other Secured Claim;

   (ii)    the collateral securing such Holder's Allowed Other Secured Claim;

   (iii)   Reinstatement of such Holder's Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or

   (iv)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(f)     *Voting*: Class 2 is Unimpaired under the Plan.  Each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Class 2 Other Secured Claim is not entitled to vote to accept or reject the Plan.

3.   Class 3 – Other Priority Claims.

(a)     *Classification*: Class 3 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, on or as soon as reasonably

practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Administrative, Allowed Priority Tax Claim, or Allowed Other Claims, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c) *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4. Class 4 – First Lien Claims.

(a) *Classification*:  Class 4 consists of all First Lien Claims.

(b) *Allowance*:  The First Lien Claims shall be Allowed in an amount equal to $34,955,008.32.[2]

(c) *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed First Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Claim shall receive its *pro rata* share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Article II of this Plan; *provided*, *however*, that: (i) in no event shall any Holder of a First Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(d) *Voting*:  Class 4 is Impaired under the Plan.  Holders of First Lien Claims are entitled to vote to accept or reject the Plan.

5. Class 5 –Second Lien Claims.

(a) *Classification*:  Class 5 consists of all Second Lien Claims.

(b) *Allowance*:  The Second Lien Claims shall be Allowed in an amount equal to [$●].

(c) *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Second Lien Claim shall

---

[2] The Allowed amount of the First Lien Claims excludes the 1L Roll-Up DIP Loans, which is part of the DIP Facility.

receive its *pro rata* share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Articles II and III of this Plan; *provided*, *however*, that in no event shall any Holder of Second Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(d) *Voting*: Class 5 is Impaired under the Plan. Holders of Second Lien Claims are entitled to vote to accept or reject the Plan.

6. Class 6 – General Unsecured Claims.

(a) *Classification*: Class 6 consists of the General Unsecured Claims.

(b) *Allowance*: The First Lien Deficiency Claim shall be Allowed as a General Unsecured Claim. The Second Lien Deficiency Claim shall be Allowed as a General Unsecured Claim. All other General Unsecured Claims shall be Allowed pursuant to the procedures set forth in this Plan.

(c) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Liquidating Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed General Unsecured Claim, each Holder thereof will receive its *pro rata* share of the Liquidating Trust Interests.

(d) *Voting*: Class 6 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan. Solely for the purpose of voting, (a) the First Lien Lenders shall have an Allowed General Unsecured Claim in the amount equal to the First Lien Deficiency Claim Amount as set forth in such definition, and (b) the Second Lien Lenders shall have an Allowed General Unsecured Claim in the amount equal to the Second Lien Deficiency Claim Amount as set forth in such definition.

7. Class 7 – Intercompany Claims.

(a) *Classification*: Class 7 consists of all Intercompany Claims.

(b) *Treatment*: Each Allowed Intercompany Claim shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released; or (d) otherwise addressed at the option of the Debtors or Wind-Down Debtors without any distribution on account of such Intercompany Claims.

(c) *Voting*: Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or

Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Intercompany Interests</u>.

    (a)    *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)    *Treatment*:  Allowed Intercompany Interests shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise addressed at the option of the Wind-Down Debtors or Debtors without any distribution on account of such Intercompany Interests.

    (c)    *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

9. <u>Class 9 – Existing Equity Interests</u>.

    (a)    *Classification*:  Class 9 consists of all Existing Equity Interests.

    (b)    *Treatment*:  On the Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished, and will be of no further force or effect.  Holders of Interests shall receive no recovery or distribution on account of their Interests.

    (c)    *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Section 510(b) Claims</u>.

    (a)    *Classification*:  Class 10 consists of all Section 510(b) Claims.

    (b)    *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be cancelled, released, and extinguished, and will be of no further force or effect.  Holders of Section 510(b) Claims shall not receive recovery or distribution on account of such Claims.

    (c)    *Voting*:  Class 10 is Impaired under the Plan.  Holders of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section

1126(g) of the Bankruptcy Code. Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.      *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Wind-Down Debtors', the Plan Administrator's, or the Liquidating Trustee's rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B herein. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X herein to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.      *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee (as applicable) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.      *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. To the extent a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, such Class shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

35

G.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are being received by Holders of such Intercompany Interests solely to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Wind-Down Debtors to the Holders of certain Allowed Claims and otherwise for uses as are contemplated by the Plan, in each case, in accordance with the terms of the applicable Sale Order.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Insurance.*

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

If a Claim may be covered by an Insurance Policy that has a self insured retention (an "SIR") or deductible (a "Deductible"), the Allowed amount of such Claim that is within the applicable SIR or Deductible shall constitute an Allowed General Unsecured Claim against the applicable Debtor's Estate. Such SIR or Deductible shall be considered satisfied pursuant to this Plan through allowance of such General Unsecured Claim solely in the amount of the applicable SIR or Deductible; *provided*, *however*, that nothing herein obligates the Liquidating Trust to otherwise satisfy any SIR or Deductible under any Insurance Policy. Any recovery on account of a Claim, that may be payable, in full or in part, pursuant to the terms and conditions of one of the Debtors' Insurance Policies in excess of the SIR or Deductible shall be payable pursuant to the terms and conditions of the applicable Insurance Policy, if any.  Nothing in this Plan shall (1) be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an Insurance Policy, (2) alter or modify the terms and conditions of any Insurance Policy, or (3) be a determination that any Insurance Policy is an Executory Contract or is capable of assumption or rejection. In no event shall the Debtors or the Liquidating Trust be required to pay any amounts within a SIR or Deductible, including defense costs, other than though the allowance of a General Unsecured Claim up to the amount of the applicable SIR or Deductible.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Sources of Consideration for Plan Distributions.*

Distributions on account of the DIP Claims, First Lien Claims, and Second Lien Claims shall be funded by the Debtors and the Wind-Down Debtors, as applicable, consistent with the

36

Plan, *provided, however*, to the extent any of the preceding Claims are satisfied in whole or in part from the Blue Apron Deferred Payments, such Claims shall be funded by Blue Apron or Wonder Group, Inc, or an affiliate thereof.  The applicable Purchaser shall be responsible for payment of all Allowed Claims that constitute Assumed Liabilities under any Purchase Agreement.  Administrative Claims, Priority Tax Claims and Secured Tax Claims, Other Secured Claims, and Other Priority Claims which were not assumed by any Purchaser, shall be funded by the Debtors with Cash on hand or through the Administrative Claims Reserve Amount under the Wind-Down Budget, on the Effective Date or shortly thereafter consistent with the Plan.  The Liquidating Trustee shall fund distributions to all other Holders of Allowed General Unsecured Claims under the Plan with the Liquidating Trust Assets, in each case in a manner consistent with the Plan.

B.      *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, (i) the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests except as otherwise expressly provided in this Plan; and (ii) the Plan Administration Assets shall vest in the Wind-Down Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests except for those concerning the DIP Claims, the First Lien Claims, and the Second Lien Claims, or as otherwise expressly provided in this Plan.

C.      *Wind-Down Debtors.*

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors solely for the purposes of (i) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, and liquidating all Wind-Down Debtor Assets, (ii) performing any remaining obligations under the TSA; (iii) enforcing and prosecuting Claims, interests, rights, and privileges under the Wind-Down Debtor Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the First Lien Lenders and Second Lien Lenders to outweigh the costs associated therewith; (iv) resolving any Disputed non-General Unsecured Claims, (v) paying or otherwise satisfying Allowed non-General Unsecured Claims, (vi) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtor are entitled and file any tax returns or other filings as are required in connection therewith), (vii) complying with its continuing obligations under the Asset Purchase Agreements, if any, (viii) otherwise administering the Plan in an efficacious manner, and (ix) undertaking any restructuring transactions as are necessary or advisable in connection with the foregoing.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter.

On the Effective Date, the Wind-Down Debtor Assets shall vest in the Wind-Down Debtors for the primary purpose of administering the Wind-Down Debtors' Estates, which may

include liquidating the Wind-Down Debtor Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business, other than performance under the TSA.  In consultation with the DIP Agent, the First Lien Agent and the Second Lien Agent, the Wind-Down Debtors will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Debtor Assets, make timely distributions pursuant to the Plan and Confirmation Order, and not unduly prolong its duration, provided that the DIP Agent and First Lien Agent shall have sole discretion over the Wind-Down Debtors' and Plan Administrator's pursuit, settlement or compromise of the Directed 1L Priority Collateral, and only after the First Lien Obligations have been paid in full, then the Second Lien Agent shall have sole discretion over the Wind-Down Debtors' and Plan Administrator's pursuit, settlement or compromise of any residual Directed 1L Priority Collateral.  The Wind-Down Debtor Assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan.  The Wind-Down Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

*D.      Plan Administrator.*

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor, subject to the consent of the DIP Agent, the First Lien Agent and the Second Lien Agent, as the sole director and the sole officer of such Wind-Down Debtor and shall succeed to the powers of such Debtor's directors and officers.  The Plan Administrator shall be the sole representative of, and shall act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all Governance Documents are deemed amended by the Plan to permit and authorize the same).

The Debtors shall include, in the Plan Supplement, the information set forth in Sections 1129(a)(4) and (5) of the Bankruptcy Code and the identity of the Person or Entity that the Debtors have selected as the Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

1.  The Plan Administrator Agreement

Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date, which shall be subject to the consent of the DIP Agent, the First Lien Agent and the Second Lien Agent, are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan.

2.    Rights, Powers, and Duties of the Debtors and Plan Administrator

On and after the Effective Date, the Plan Administrator will act for the Post-Effective Date Debtors in the same capacity as applicable to a board of managers or directors, or to officers, subject to the provisions of the Plan. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Wind-Down Debtors. Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all corporate actions consistent with the Plan, the Confirmation Order, any Asset Purchase Agreements, all other applicable orders of the Bankruptcy Court, and the Plan Administrator Agreement, in each case, that are necessary and/or desirable to effectuate the terms of the Plan on behalf of the Wind-Down Debtors and use its reasonable best efforts to assist with or effectuate the transition of the Debtors' business, wind down, dissolution, or liquidation of the Wind-Down Debtors. In taking such actions, the Plan Administrator may control and exercise authority over any Assets, vested in the Wind-Down Debtors pursuant to the Plan, over the acquisition, management, and disposition thereof and over the management and conduct of the affairs of the Wind-Down Debtors. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Wind-Down Debtors pursuant to the Plan and the Plan Administrator Agreement, shall include, among others, (a) making distributions to Holders of Allowed Claims and Interests as provided for in the Plan (except for Allowed General Unsecured Claims), (b) administering, reconciling and resolving (i) Administrative Claims, Secured Claims, and Priority Tax Claims, and (ii) upon one (1) business days' notice to the Liquidating Trustee, DIP Claims, First Lien Claims, Second Lien Claims, and Other Priority Claims, (c) filing tax returns and paying taxes, (d) commencing and pursuing the Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets and managing and administering any proceeds thereof, (e) paying certain Quarterly Fees, (f) defending the Debtors in any pending or future litigation, (g) selling, abandoning, or otherwise fully administering the Estates, (h) in consultation with the Liquidating Trustee, closing the Chapter 11 Cases, (i) dissolving the Wind-Down Debtors, and (j) performing other duties and functions that are consistent with the implementation of the Plan.

For the avoidance of doubt, the Plan Administrator shall administer the Wind-Down Debtors and the Plan in accordance with the Wind-Down Budget and shall have the authority to authorize, make, or cause to be made payments in accordance with the Wind-Down Budget. The Plan Administrator shall use commercially reasonable efforts to adhere to (or outperform) the Wind-Down Budget; provided that the Plan Administrator shall have the authority to reallocate funding between line items within the Wind-Down Budget without further order of the Court, but in all cases in consultation with the DIP Agent, the First Lien Agent, and the Second Lien Agent, provided that if the Directed 1L Priority Collateral is a Wind-Down Debtor Asset, the Plan Administrator shall obtain the consent of the DIP Agent and the First Lien Agent prior to reallocation of any funding relating to recovery of the Directed 1L Priority Collateral.

In pursuing any Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, under this Plan, the Plan Administrator shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be

39

entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, may be brought under Section 546 of the Bankruptcy Code.

The Plan Administrator shall have the right, in consultation with the First Lien Agent and Second Lien Agent, to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator and in accordance with the Wind-Down Budget. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

The Plan Administrator and all professionals retained by the Plan Administrator shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each Wind-Down Debtor. The Plan Administrator may rely upon written information previously generated by the Debtors.

3. <u>Compensation of the Plan Administrator</u>

The Plan Administrator shall be compensated pursuant to the terms of the Plan Administrator Agreement; *provided that* the Plan Administrator shall be permitted to use the Wind-Down Amount, which has been allocated and approved pursuant to the Approved Budget, to pay the Plan Administrator's fees and expenses as set forth in the Plan Administrator Agreement.

4. <u>Insurance for the Plan Administrator</u>

The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Amount all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Wind-Down Debtors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator after the termination of the Plan Administrator Agreement. The Plan Administrator may also obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.

5. <u>Transition Services</u>

On the Effective Date, the Plan Administrator shall serve as an appointed agent of the designated operator or as the operator of the Debtors in accordance with the Plan for the purposes of fulfilling any obligations under the TSA.

6.   Termination of the Plan Administrator's Responsibilities and Obligations

Upon the conclusion of the Plan Administrator's obligations under the post-Effective Date Wind Down in accordance with the Plan and Plan Administrator Agreement, the Plan Administrator shall remit any remaining balance of the Wind-Down Account Amount to the DIP Lenders or Prepetition Secured Parties, as applicable, for distribution pursuant to the terms of this Plan.

E.   *Liquidating Trust.*

1.   Establishment of the Liquidating Trust

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement, which will be Filed with the Bankruptcy Court as part of the Plan Supplement. Upon establishment of the Liquidating Trust, title to the Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of the Debtors or any managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors.

The Liquidating Trust Interests to be distributed to Liquidating Trust Beneficiaries under this Plan shall not constitute "securities" under applicable securities laws and shall represent only the right to receive distributions from the Liquidating Trust in accordance with the Liquidating Trust Agreement. The Liquidating Trust Interests shall be non-transferable, except as required by law or as provided in the Liquidating Trust Agreement.

2.   Transfer of the Liquidating Trust Assets

Pursuant to section 1141 of the Bankruptcy Code, all property transferred to the Liquidating Trust shall be made free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as may be otherwise provided for in this Plan. Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust. For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof.

3.   Liquidating Trust Agreement

On the Effective Date, the Debtors shall execute the Liquidating Trust Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Liquidating Trust Agreement made by the Debtors, subject to the reasonable consent of the First Lien Agent and the Second Lien Agent, will be ratified. The Liquidating Trust Agreement will contain provisions permitting the amendment or modification of the Liquidating Trust Agreement necessary to implement the provisions of the Plan.

41

4.    Purpose of the Liquidating Trust

The Liquidating Trust shall be established for, among other purposes, the purpose of (a) receiving and holding the Liquidating Trust Assets; (b) administering, disputing, objecting to, compromising, or otherwise resolving all Claims and Interests other than (i) DIP Claims, (ii) First Lien Claims, (iii) Second Lien Claims, (iv) Administrative Claims, (v) Secured Claims, (vi) Priority Tax Claims, and (vii) Prepetition Deficiency Claims; (c) making distributions to the Liquidating Trust Beneficiaries in accordance with this Plan and the Liquidating Trust Agreement; (d) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries; and (e) commencing and pursuing the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, if any, and managing and administering any proceeds thereof with no objective to continue or engage in the conduct of a trade or business in accordance with Treas. Reg. § 301.7701-4(d).

The Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

5.    Liquidating Trustee

Upon the occurrence of the Effective Date, the Liquidating Trustee shall be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement. The Liquidating Trustee, subject to the terms and conditions of the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable. The Liquidating Trustee shall owe fiduciary duties solely to the Liquidating Trust Beneficiaries and shall act in the best interests of such Liquidating Trust Beneficiaries in connection with the foregoing and the administration, monetization or distribution of any Liquidating Trust Assets.

In pursuing any Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, the Liquidating Trustee shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets may be brought under Section 546 of the Bankruptcy Code.

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in this Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust

42

Agreement. The Liquidating Trustee (and any professionals retained by the Liquidating Trustee) shall not be required to File a fee application to receive compensation.

The Liquidating Trustee shall have the right, and subject to any consent or consultation rights as set forth in the Liquidating Trust Agreement, and without Bankruptcy Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement.

6. Liquidating Trust Insurance

The Liquidating Trustee shall be authorized to obtain and pay for out of the Liquidating Trust Assets all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Liquidating Trustee and its agents, representatives, employees or independent contractors under the Liquidating Trust Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Liquidating Trustee after the termination of the Liquidating Trust Agreement.

7. U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust

The Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect

43

to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than 5 years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the 6 month period prior to the fifth anniversary (or within the 6 month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

8. Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account

44

(and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

*F.      Corporate Existence Post-Effective Date*

      1.      <u>Directors and Officers</u>

Immediately following the occurrence of the Effective Date, (i) the respective boards of directors or managers, as applicable, and the current officers, of each of the Debtors, shall be terminated without cause and such members of the boards of directors or managers, as applicable, and the current officers of the Debtors shall be deemed to have resigned; and (ii) the Plan Administrator shall: (1) be appointed as the sole member of the board of directors or board of managers, as applicable, and the sole officer; (2) succeed as the sole Holder of Interests in each Wind-Down Debtor; (3) have the rights and powers of a debtor in possession under Section 1107 of the Bankruptcy Code; (4) be a "representative of the estate" pursuant to Section 1123(b)(3) of the Bankruptcy Code; (5) be vested with the rights, powers, and benefits afforded to a "trustee" under Sections 704 and 1106 of the Bankruptcy Code; and (6) have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval.

      2.      <u>Organizational Governance Documents</u>

Immediately following the occurrence of the Effective Date, the Wind-Down Debtors shall continue to exist in accordance with the laws of their respective states of formation and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with the Plan. The Wind-Down Debtors shall exist for the limited purposes of fully administering the Estates. Promptly after performing all duties and functions that are consistent with the implementation of the Plan, the Confirmation Order, and the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all actions to wind down, dissolve, or liquidate the Wind-Down Debtors without the necessity for any other or further actions to be taken by or on behalf of such dissolving Wind-Down Debtors or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

The certificate and articles of in-corporation and by-laws of each Wind-Down Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under Section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Wind-Down Debtors to matters authorized under the Plan.

*G.      Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation and objections thereto.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (y) applications for payment of any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court; and (z) responding to objections to its applications for payment of fees and expenses rendered prior to the Effective Date.

*H.      Cancellation of Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except (i) such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan and (ii) any indemnification obligations set forth in Article V.E hereof) shall be cancelled solely as to the Debtors and their Affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Debtor affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds (but not including any surety bonds issued on behalf of any of the Debtors), indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged, provided that, notwithstanding the foregoing, the liens supporting the First Lien Obligations and the Second Lien Obligations shall remain in place until such Obligations are either paid in full or to the extent there is no further collateral to support such obligations, satisfied in accordance with this Plan. Notwithstanding the foregoing, (a) no executory contract or unexpired lease that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code shall be terminated or cancelled on the Effective Date, and (b) no Prepetition Loan Document shall be cancelled to the extent such document evidences indebtedness and/or grants a Prepetition Secured Party a security interest in the Debtors' or Wind-Down Debtors' property.

*I.       Corporate Action.*

Upon the Effective Date, by virtue of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator or the Liquidating Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, Wind-Down Debtors, or any other Entity or Person.  All matters provided for in this

Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

### J.     *Effectuating Documents; Further Transactions.*

On and after the Effective Date the Plan Administrator and the Agents may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Confirmation Order, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

### K.     *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtor or to any other Person or from any of the Wind-Down Debtors to the Liquidating Trust or any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtors; (2) any Sale Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  No provision of the Plan or of the Confirmation Order shall be construed to broaden the tax exemption under section 1146(a) beyond what the statute allows.

### L.     *Causes of Action.*

Except as otherwise provided in Article IX herein or in any contract, instrument, release, or agreement entered into in connection with the Plan or the Sale (including the Asset Purchase Agreement), in accordance with section 1123(b) of the Bankruptcy Code, (a)(i) all Liquidating

47

Trust Retained Causes of Action constituting Liquidating Trust Assets are preserved and transferred to the Liquidating Trust on the Effective Date and (ii) all Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets are preserved and transferred to the Wind-Down Debtors on the Effective Date, and (b) all Causes of Action constituting Acquired Assets are preserved and transferred to the applicable purchaser (to the extent not previously transferred).

*M.     Books and Records.*

On the Effective Date, each of the Liquidating Trust and Plan Administrator shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with any Asset Purchase Agreement and that relate to the operation and business of the Liquidating Trust or Wind-Down Debtors; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee and Plan Administrator, determines, in accordance with the Liquidating Trust Agreement and Plan Administrator Agreement, that retention of same is no longer necessary or beneficial.

*N.     Insurance Claims: Business Interruption Insurance Claims, D&O Claims and Others.*

Nothing in this Plan or Confirmation Order shall affect, impair or diminish in any form the Business Interruption Insurance Claims or any rights thereto.  Similarly, any rights and Claims under any applicable Business Interruption Insurance Policies shall not be affected, impaired or diminished by operation of the Plan or Confirmation Order.  For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Business Interruption Insurance Policies of the Debtors.

To the extent any D&O Claims are designated as Liquidating Trust Retained Causes of Action or Wind-Debtor Retained Causes of Action, nothing in this Plan, including the releases provided under Article VIII of the Plan, shall have the effect of prohibiting the initiation or continuation of an action by the Plan Administrator or Liquidating Trustee up to and through the entry of a judgment or settlement against any D&O Party. No D&O Party shall be released or absolved from the legal obligation to pay as a result of any D&O Claims for which such D&O Party is responsible for an insurable loss under the D&O Liability Insurance Policies under which the D&O Party is insured; provided, however, that such D&O Party shall not be liable for any D&O Claims to the extent, and only to the extent, such D&O Claims exceed the amounts paid by the Insurer pursuant to the applicable D&O Liability Insurance Policies. For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Insurance Policies of the Debtors (including, for the avoidance of doubt, any defense costs, professional fees, indemnification or other disbursements payable from insurance).

For the avoidance of doubt, nothing in this Plan shall: (a) constitute a discharge of any D&O Party for the purposes of the D&O Liability Insurance Policies; (b) be deemed to trigger any policy exclusion, including without limitation any exclusions for amounts for which an insured is "absolved from payment"; and (c) impair the obligations of an Insurer to pay any covered "Loss" on behalf of any "Insured" under the D&O Liability Insurance Policies.

48

The Wind-Down Debtors, the Plan Administrator, and the Liquidating Trust (if applicable) shall use commercially reasonable efforts to cooperate with the DIP Agent and the First Lien Agent in providing information and documents and in pursuing proceeds under the Insurance Collateral to the extent practicable. The extent and specifics of such cooperation shall be governed by the Liquidating Trust Agreement and Plan Administrator Agreement, as applicable, which shall be included in the Plan Supplement.

*O.*      *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Interests pursuant to the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local Law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Interests issued pursuant to the Plan are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.*      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is:  (1) the TSA; (2) the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) an Insurance Policy; (5) an Asset Purchase Agreement; or (6) to be assumed by the Debtors and assigned to any Purchaser in connection with any Sale Transactions and pursuant to any Sale Transactions Documentation or the TSA.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Orders to assume and assign Executory Contracts and Unexpired Leases to the Purchasers pursuant to the Asset Purchase Agreements.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors.  Each Executory Contract and Unexpired

49

Lease assumed pursuant to the Plan or by any Final Order, including the Confirmation Order, which has not been assigned to a Purchaser pursuant to the applicable Asset Purchase Agreement or the applicable Sale Order, shall revest in and be fully enforceable by the Wind-Down Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

For the avoidance of doubt, this Article V relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of any Sale Order.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date (the "Rejection Damages Claims Bar Date"). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, the Liquidating Trust (if any), the Purchasers, or their respective property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Wind-Down Debtors and the Holder of such Claim.

C.      *Insurance Policies.*

Except as otherwise provided in this Plan, nothing in the Plan, the Confirmation Order, the Plan Administrator Agreement, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder, or the terms and conditions thereof, or diminishes or impairs the enforceability of the Insurance Policies. In addition, on and after the Effective Date and subject to the terms and conditions of the D&O Liability Insurance Policies, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies in effect or purchased as of the Effective Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies. Notwithstanding anything herein to the contrary, the Debtors or Wind-Down Debtors, as applicable, shall retain the ability to supplement such D&O Liability

50

Insurance Policies as the Debtors or Wind-Down Debtors deem necessary, including by purchasing any tail coverage or tail policies.

Upon the Effective Date, each of the Insurance Policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors (or a Wind-Down Debtor identified as first named insured or counterparty thereto) effective as of the Effective Date, pursuant to sections 105, 365 and 1123 of the Bankruptcy Code, and coverage for defense and indemnity under any D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any such policies, subject to the terms and conditions of such D&O Liability Insurance Policies.  For the avoidance of doubt, this section shall not apply to any obligations as to any equity owner of any of the Debtors in its capacity as such, but this section shall only apply to any representatives or appointees of such equity owner if they are the Debtors' current or former officers, directors, individual managers, members, partners, supervisors, agents, or employees, in each case in their capacities as such.

The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.F hereof, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court: (i) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, (ii) claims where an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII.F hereof to proceed with its claim; and (iii) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Policies, and take other actions relating thereto (including effectuating a setoff), in each case in accordance with the terms of the Insurance Policies and/or applicable non-bankruptcy law.  Nothing in Article VIII.F of the Plan or any corresponding paragraph of the Confirmation Order requires, precludes and/or prohibits Insurers to or from administering, handling, defending, settling and/or paying claims covered by any Insurance Policies in accordance with and subject to the terms and conditions of such Insurance Policies and/or applicable non-bankruptcy law.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

*E.*      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*F.*      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Rejected Executory Contracts and Unexpired Leases, or any other exhibit, schedule or annex, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Wind-Down Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

*G.*      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

*A.*      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan or the Confirmation Order, on the Effective Date (or if a Claim is not an Allowed Claim or on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims (as applicable) in the applicable Class.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have

52

been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or at such other time as provided for herein.  The Debtors and the Disbursing Agent, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Rights and Powers of the Disbursing Agent.*

1.   Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Confirmation Order;  (b) make all distributions contemplated hereby;  (c) employ professionals to represent it with respect to its responsibilities (in accordance with the Wind-Down Budget); and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Confirmation Order, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof; *provided*, *however*, that the Debtors or the Wind-Down Debtors, as applicable, shall maintain the Claims Register.

2.   Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out of pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent (a) on behalf of the Wind-Down Debtors, shall be paid in Cash by the Wind-Down Debtors in accordance with the Wind-Down Budget, and (b) on behalf of the Liquidating Trustee, shall be paid in Cash by the Liquidating Trustee and shall constitute Liquidating Trust Expenses.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.   Record Date for Distributions.

On the Distribution Record Date, (i) the Claims Register and (ii) the loan registers maintained by each of the Agents, respectively, shall each be deemed closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred 20 or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if

53

the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

    2.   <u>Delivery of Distributions</u>.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided*, *further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Distributions to Holders of DIP Claims, Allowed First Lien Claims, and Allowed Second Lien Claims shall be consistent with the DIP Order and the Prepetition Loan Documents.

    3.   <u>Minimum Distributions</u>.

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $250 in value, and each such Claim to which this limitation applies shall be forever barred pursuant to Article VII from asserting that Claim against the Debtors or their respective property.

    4.   <u>Undeliverable Distributions and Unclaimed Property</u>.

In the event that any distribution to any Holder of an Allowed Claim (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder related to such property or interest in property shall be discharged and forever barred.  The Wind-Down Debtors, the Disbursing Agent, and the Plan Administrator shall have no obligation to attempt to locate a Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the filings on the docket of the Chapter 11 Cases.

*E.*    *Manner of Payment.*

Any distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Wind-Down Debtor.  At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise set forth in the Plan Supplement.

*F.*    *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Liquidating Trustee or Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements

imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Liquidating Trustee and Plan Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.     *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

H.     *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or the DIP Orders, or required by applicable bankruptcy and non-bankruptcy law, (a) postpetition and/or default interest shall not accrue or be paid on any Claims, and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claims, if and when such Disputed Claim becomes an Allowed Claim.

I.     *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* as of 5:00 p.m., prevailing Eastern Time, on the Petition Date.

J.     *Setoffs and Recoupment.*

Except as expressly provided in the Plan, the Plan Administrator or Liquidating Trustee (as applicable) may, pursuant to section 553 of the Bankruptcy Code, applicable bankruptcy and/or non-bankruptcy law, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that a Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment (other than for the DIP Claims held by the DIP Lenders, a First Lien Claim held by the First Lien Lenders, a Second Lien Claim held by the Second Lien Lenders or a Prepetition Deficiency Claim held by any Prepetition Secured Party) is either (i) agreed in amount among

55

the relevant Wind-Down Debtor(s) and Holder of the Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that such Wind-Down Debtor or its successor may possess against the applicable Holder.

K.      *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

L.      *Satisfaction of Claims.*

Notwithstanding anything to the contrary herein, in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Claims and Noticing Agent, as applicable, shall adjust the Claims Register to reflect the adjustment or expungement, as applicable, of any and all Claims that are duplicative or have been satisfied or amended and superseded without further order of the Bankruptcy Court prior to making distributions, if any, to General Unsecured Creditors entitled to payment in Article III.B.6. herein.

M.      *Claims Paid or Payable by Third Parties.*

1.  Claims Paid by Third Parties.

The Debtors, Wind-Down Debtors, Liquidating Trustee, and Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Wind-Down Debtor, or Liquidating Trust (as applicable) provided that the Debtors, Wind-Down Debtors, or Liquidating Trust (as applicable), shall provide notice of such reduction to the Holder of such Claim.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Wind-Down Debtor, or the Liquidating Trust (as applicable) on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, Wind-Down Debtor, or the Liquidating Trustee to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor, Wind-Down Debtor, or the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business

56

Day after the 14-day grace period specified above until the amount is repaid.  Notwithstanding anything to the contrary herein, this Article VI.M.1 shall not apply to payments received by the Holders of Allowed DIP Claims, Holders of Allowed First Lien Claims, or Holders of Allowed Second Lien Claims, which shall be subject to the Prepetition Intercreditor Agreement); *provided however,* that for the avoidance of doubt, claims paid by third-parties from any Collateral in satisfaction or partial satisfaction of Allowed DIP Claims, Allowed First Lien Claims, or Allowed Second Lien Claims, shall reduce such claims by the amount of such payments (or the Deemed DIP Paydown Amount).

2.  Claims Payable by Insurers.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' Insurers agrees to pay in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that notice of such satisfaction is served by the Debtors or the Wind-Down Debtors, as applicable, on the Holder of such Claim.

3.  Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.   Allowance of Claims and Interests.*

After the Effective Date, the Wind-Down Debtors, the Plan Administrator, or Liquidating Trustee, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately before the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee, as applicable, and without further notice to any party or action, approval, or order of the Bankruptcy Court.

57

*B.      Claims and Interests Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, (a)(i) the Liquidating Trustee shall have the authority to File, withdraw, or litigate to judgment, objections to Filed General Unsecured Claims that are not Allowed; and (ii) the Plan Administrator shall have the authority to File, withdraw, or litigate to judgment objections to all Administrative Claims, First Lien Claims, Second Lien Claims, Priority Tax Claims, Other Priority Claims, and Secured Claims; *provided* that the Plan Administrator and the Liquidating Trustee, as applicable, shall have the authority to settle or compromise any respective Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court and (b) the Plan Administrator and the Liquidating Trustee, as applicable, shall administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Plan Administrator, Wind-Down Debtors, and Liquidating Trustee (as applicable) shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Retained Causes of Action.

The Debtors up to the Effective Date, and the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) on and after the Effective Date, shall be responsible and obligated to maintain the Claims Register, and to administer and adjust the Claims Register in regard to allowance of Claims.  The Debtors, the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee, as applicable, may maintain the retention of the Claims and Noticing Agent and develop a budget for compensation of the Claims and Noticing Agent.

*C.      Estimation of Claims and Interests.*

Before, on, or after the Effective Date, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee, as applicable, may (but is not required to) at any time request that the Bankruptcy Court estimate the amount of any Claim, in each case solely to the extent that they have authority to File objections to such Claim under this Plan, pursuant to applicable Law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any

58

contingent, unliquidated or Disputed Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) may elect to pursue any supplemental proceedings to object to the allowance of, or any ultimate distribution on, such Claim or Interest.

D.      *Adjustment to Claims or Interests Without Objection.*

Any Claim or Interest that has been paid or satisfied may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) after notice to the Holder of such Claim (or such Holder's known counsel), but without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, that the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) shall file a notice of satisfaction or other pleading evidencing such satisfactions and serve the same on the Holders of such Claims, or seek an order of the Bankruptcy Court with respect to the same, upon notice to the Holders of such Claim or Interest.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (i) 180 days after the Effective Date and (ii) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court, subject to a notice and objection period, for objecting to such Claims (the "Claims Objection Deadline").  For the avoidance of doubt, the period of limitation set forth in this Article VII.E shall not apply to Administrative Claims.

F.      *Disallowance of Claims.*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtors or Liquidating Trust, as applicable.  All Proofs of Claim Filed on account of an indemnification obligation to a director, manager, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is honored or reaffirmed pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims,**

**unless such late Claim has been deemed timely Filed by a Final Order of the Bankruptcy Court.**

G.      *Amendments to Proofs of Claims or Interests.*

On or after the applicable bar date, a Proof of Claim or Interest may not be Filed or amended without the prior written authorization of the Bankruptcy Court or the applicable Debtor, Wind-Down Debtor, or Liquidating Trustee, as applicable.  Absent such authorization, any new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan or the Confirmation Order, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions, if any, shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan and the Confirmation Order.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution, if any, that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy Law or as otherwise provided in Article III.B of the Plan.

J.      *Single Satisfaction of Claims.*

Holders of Allowed Claims may assert such Claims against the applicable Debtor or Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the applicable Debtor(s) based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

K.      *Claims Not Receiving a Distribution.*

Notwithstanding anything in the Plan to the contrary, the Debtors and the Wind-Down Debtors, as applicable, will not undertake any claims resolution process, steps related thereto or any action with respect to claims that are classified in a Class for which there will be no distribution.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests.*

To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, and in consideration of the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith release, compromise, and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI hereof, all distributions, if any, made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Release of Liens.*

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order or any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan, and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien and/or security interest, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**If any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancelation and/or**

extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      *Releases by the Debtors.*

Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action

62

arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.     *Releases by Holders of Claims and Interests.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the

63

**Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

*E.     Exculpation.*

**Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and solely to the extent such acts or omissions occurred between the Petition Date and the Effective Date, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, any other Definitive Document, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transactions, any other Definitive Document, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the Sale and Settlement Order, the pursuit of the Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of**

property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*F.*      *Injunction.*

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  To the fullest extent permissible under applicable law, except as otherwise specifically provided in this Plan or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims against or Interests in the Debtors and/or Wind-Down Debtors or Causes of Action, in each case that have been released or are subject to exculpation pursuant to the Plan, shall be precluded and are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties (including the Debtors and Wind-Down Debtors) or the Released Parties, and any successors, assigns or representatives of such Persons or Entities:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation, of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to

65

**bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.**

G.       *Protections Against Discriminatory Treatment.*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

H.       *Document Retention.*

On and after the Effective Date, the Wind-Down Debtors, the Debtors, the Plan Administrator, or Liquidating Trustee, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by each, subject to the applicable provisions of the Plan Administrator Agreement or Liquidating Trust Agreement.

I.       *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE**

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition precedent to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX hereof:

a.  The Sale Transactions shall have been implemented and/or consummated, as applicable, in all material respects;

b.  the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance acceptable to the Required DIP Lenders;

c.  the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and acceptable to the Required DIP Lenders and such order shall have become a Final Order;

d.  the DIP Facility shall be in full force and effect, and there shall be no defaults under the DIP Facility Documents continuing unless waived by the Required DIP Lenders in accordance with the terms and conditions of the DIP Documents;

e.  the Plan Supplement, Plan, and all schedules, documents, supplements, and exhibits thereto, as applicable, shall be acceptable to the Required DIP Lenders and have become Filed;

f.  the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

g.  the Debtors shall have established the Administrative Claims Reserve;

h.  all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date into the Professional Fee Escrow Account pending approval of such fees and expenses by the Bankruptcy Court;

i.  The Debtors have funded the Wind-Down Debtor Account Amount in Cash;

j.  The Liquidating Trust shall have been established and funded with the Liquidating Trust Assets;

k.  no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan; and

l.  the following documents shall be in full force and effect, and shall not have been terminated prior to the Effective Date: (a) any Sale Orders; (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and

67

document the transactions contemplated by this Plan; and (c) all other material customary documents delivered in connection with transactions of this type.

### B.    *Waiver of Conditions.*

The conditions to Consummation set forth in Article IX may be waived by the Debtors, subject to the consent of the Required DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### C.    *Effect of Failure of Conditions.*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.  Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of (a) the DIP Orders, including without limitation, any releases provided therein, or (b) the Sale Transaction(s) under the Asset Purchase Agreements or the revocation of the Debtors' authority under the Sale Orders to consummate such Sale Transaction(s).

### D.    *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.    *Modifications and Amendments.*

Except as otherwise specifically provided in the Plan and subject to section 1127 of the Bankruptcy Code, the Debtors reserve the right, with the consent of the Required DIP Lenders, to modify the Plan whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided*, *however*, that the Debtors or the Wind-Down Debtors, as the case may be, shall not amend or modify the Plan in a manner that adversely affects the treatment of any Class of Claims and/or Interests without resoliciting such Class of Holders of Claims or Interests.

68

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof, but before entry of the Confirmation Order, are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan (and not assumed in connection with an Asset Purchase Agreement and pursuant to the Sale Order), and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to (for the avoidance of doubt, notwithstanding whether such treatment arises under the terms of the Plan or the Sale Order):  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Debtors amending, modifying, or supplementing, after

69

the Effective Date, pursuant to Article X of the Plan, any Executory Contracts or Unexpired Leases to the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide, or resolve any and all matters related to sections 1141 or 1146 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

9.      Resolve any cases, controversies, suits, or disputes that may arise in connection with the interpretation of any Sale Order;

10.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

11.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

14.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to the Plan;

15.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.      Enter an order or final decree concluding or closing any of the Chapter 11 Cases;

17.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

18.     Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

19.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or the Sale Orders, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.     Hear and determine matters concerning section 1145 of the Bankruptcy Code;

24.     Hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

25.     Hear and determine all disputes related to the Sale and Settlement Order or the TSA;

26.     Hear and determine all disputes with respect to the Liquidating Trust or the Liquidating Trust Assets;

27.     To recover all assets of the Debtors, property of the Estates, or Wind-Down Debtors, wherever located;

28.     To consider requests for extensions of the term of the Liquidating Trust or Wind-Down Debtors as provided herein;

29.     Enforce all orders previously entered by the Bankruptcy Court;

30.     Hear any other matter over which the Court has jurisdiction under the Bankruptcy Code; and

31.     Enter an order or final decree concluding or closing the Chapter 11 Cases.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Plan Administrator, the Liquidating Trustee, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtors, Plan Administrator, Liquidating Trustee, and all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

C.      *Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

*E.*        *Service of Documents.*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served, including via email in addition to any other method of service, on the parties listed below:

1. <u>If to the Debtors:</u>

> c/o FreshRealm, Inc.
> 901 W. Linden Avenue
> Linden, New Jersey 07036
> Attn:  John Hanson, Chief Financial Officer
> E-mail: jhanson@alvarezandmarsal.com

> with copies to:

> Cole Schotz P.C.
> Court Plaza North, 25 Main Street
> Hackensack, New Jersey 07601
> Attn:  Ryan T. Jareck, Esq.
> E-mail:  rjareck@coleschotz.com

2. <u>If to the Required DIP Lenders:</u>

(a)     *Counsel to BGC*
> Herbert Smith Freehills Kramer (US) LLP
> 1177 Avenue of the Americas
> New York, New York 10036
> Attn: Robert T. Schmidt, Esq.
> Email: Robert.Schmidt@hsfkramer.com

> With copies to:

> Sills Cummis & Gross P.C.
> The Legal Center
> One Riverfront Drive
> Newark, New Jersey 07102
> Attn: Andrew H. Sherman, Esq.
> Email: Asherman@sillscummis.com

(b)     *Counsel to Faranord*
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attn: Christopher Marcus, Esq.
> Email: cmarcus@kirkland.com
> With copies to:

73

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Attn: Jeffrey Testa, Esq.
Email: jtesta@mccarter.com

3.  If to the Committee:

Fox Rothschild LLP
49 Market Street
Morristown, New Jersey 07960
Attn: Joseph J. DiPasquale, Esq.
Email: jdipasquale@foxrothschild.com

-and-

Fox Rothschild LLP
Two Commerce Square
2001 Market Street, Suite 1700
Philadelphia, Pennsylvania 19103
Attn: Jesse M. Harris, Esq.
Email: jesseharris@foxrothschild.com

4.  If to the U.S. Trustee:

United States Department of Justice
Office of the United States
One Newark Center, Suite 2100
Newark, New Jersey 07102
Attn: Andrew R. Vara, U.S. Trustee, Regions 3& 9
Attn: Fran B. Steele, Esq. and David Gerardi, Esq.
Email: Fran.B.Steele@usdoj.gov; David.Gerardi@usdoj.gov

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (which may be by email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received and telephonically confirmed.  After the Effective Date, the Debtors shall have authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those (i) Entities who have Filed such renewed requests; and (ii) those Entities whose rights are affected by such documents.

74

F.     *Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.     *Enforcement of Confirmation Order.*

On and after the Effective Date, the Debtors, the Wind-Down Debtors, Liquidating Trustee, and Plan Administrator, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

H.     *Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.     *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/FreshRealm.

J.     *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors, the Wind-Down Debtors, Liquidating Trustee, or Plan Administrator, as applicable; and (iii) nonseverable and mutually dependent.

*K.       Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code, and, therefore, neither any of such parties nor individuals nor the Wind-Debtors, Plan Administrator, or Liquidating Trustee will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or any previous plan.

*L.       Closing of Chapter 11 Cases.*

The Plan Administrator or Liquidating Trustee, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 or Local Rule 3002-1, including the motion required by Local Rule 3002-1, and any applicable order necessary to close the Chapter 11 Cases. Furthermore, the Claims and Noticing Agent is authorized to destroy all paper or hardcopy records related to the Chapter 11 Cases two (2) years after the Effective Date has occurred.

*M.       Waiver or Estoppel.*

Each Holder of a Claim, Interest, or Intercompany Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim, Interest, or Intercompany Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*[Remainder of Page Intentionally Left Blank.]*

Respectfully submitted,

Dated: July 27, 2026                     FreshRealm, Inc.
                                         on behalf of itself and all other Debtors


                                         */s/ John Hanson*
                                         _____
                                         Name:      John Hanson
                                         Title:     Chief Financial Officer

**<u>Exhibit B-2</u>**

**Plan Redline**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| FRESHREALM, INC., *et al.*,[1] | ) | Case No. 26-14656 (MEH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**COLE SCHOTZ P.C.**
Michael Sirota, Esq.
Warren Usatine, Esq.
Ryan Jareck, Esq.
Daniel Harris, Esq.
Matteo Percontino, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone:      (201) 489-3000
Facsimile:      (201) 489-1536
Email:      msirota@coleschotz.com
      wusatine@coleschotz.com
      rjareck@coleschotz.com
      dharris@coleschotz.com
      mpercontino@coleschotz.com

*Counsel for the Debtors
and Debtors in Possession*

Dated: July 27, 2026

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

i

## TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................................................1

**ARTICLE I . DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, AND GOVERNING LAW** ..........................................................1
   A.     Defined Terms. ...........................................................................................................1
   B.     Rules of Interpretation. ...........................................................................................23
   C.     Computation of Time. ..............................................................................................24
   D.     Governing Law. .......................................................................................................24
   E.     Reference to Monetary Figures.................................................................................24
   F.     Reference to the Debtors or the Wind-Down Debtors.............................................24
   G.     No Substantive Consolidation; Limited Administrative Consolidation. ..................24
   H.     Controlling Document. ............................................................................................25

**ARTICLE II . ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS,
DIP CLAIMS, AND PRIORITY TAX CLAIMS** ....................................................................25
   A.     General Administrative Claims..................................................................................25
   B.     Professional Fee Claims............................................................................................26
   C.     DIP Claims................................................................................................................28
   D.     Priority Tax Claims...................................................................................................28
   E.     Statutory Fees............................................................................................................28

**ARTICLE III . CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS** ...........................................................................................................................29
   A.     Classification of Claims and Interests.......................................................................29
   B.     Treatment of Claims and Interests. ..........................................................................30
   C.     Special Provision Governing Unimpaired Claims.....................................................35
   D.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
         Code. ........................................................................................................................35
   E.     Subordinated Claims. ...............................................................................................35
   F.     Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes. ......35
   G.     Intercompany Interests..............................................................................................36
   H.     Controversy Concerning Impairment. ......................................................................36
   I.     Insurance. .................................................................................................................36

**ARTICLE IV . MEANS FOR IMPLEMENTATION OF THE PLAN** ..................................36
   A.     Sources of Consideration for Plan Distributions. .....................................................36
   B.     Vesting of Assets. .....................................................................................................37
   C.     Wind-Down Debtors.................................................................................................37
   D.     Plan Administrator. ...................................................................................................38
   E.     Liquidating Trust. .....................................................................................................41
   F.     Corporate Existence Post-Effective Date.................................................................45
   G.     Statutory Committee and Cessation of Fee and Expense Payment. ..........................46
   H.     Cancellation of Securities and Agreements. .............................................................46
   I.     Corporate Action.......................................................................................................46

71306/0001-53355255v12

J.      Effectuating Documents; Further Transactions. ...............................................47
K.      Section 1146 Exemption. ..................................................................................47
L.      Causes of Action. ..............................................................................................47
M.      Books and Records. ...........................................................................................48
N.      Insurance Claims: Business Interruption Insurance Claims, D&O Claims and Others. ...............................................................................................................48
O.      Section 1145 Exemption. ..................................................................................49

**ARTICLE V . TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .................................................................................................................**49**
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases. ....49
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......50
C.      Insurance Policies. .............................................................................................50
D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..............................................................................................51
E.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ...........52
F.      Reservation of Rights. ........................................................................................52
G.      Nonoccurrence of Effective Date. .....................................................................52

**ARTICLE VI . PROVISIONS GOVERNING DISTRIBUTIONS** .......................................**52**
A.      Timing and Calculation of Amounts to Be Distributed. ...................................52
B.      Disbursing Agent. ..............................................................................................53
C.      Rights and Powers of the Disbursing Agent. ....................................................53
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. ......53
E.      Manner of Payment. ...........................................................................................54
F.      Compliance with Tax Requirements. .................................................................54
G.      Allocations. ........................................................................................................55
H.      No Postpetition or Default Interest on Claims. .................................................55
I.      Foreign Currency Exchange Rate. .....................................................................55
J.      Setoffs and Recoupment. ...................................................................................55
K.      No Double Payment of Claims. .........................................................................56
L.      Satisfaction of Claims. .......................................................................................56
M.      Claims Paid or Payable by Third Parties. ..........................................................56

**ARTICLE VII . PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ..............................................................**57**
A.      Allowance of Claims and Interests. ...................................................................57
B.      Claims and Interests Administration Responsibilities. ......................................58
C.      Estimation of Claims and Interests. ...................................................................58
D.      Adjustment to Claims or Interests Without Objection. ......................................59
E.      Time to File Objections to Claims .....................................................................59
F.      Disallowance of Claims. ....................................................................................59
G.      Amendments to Proofs of Claims or Interests. ..................................................60
H.      No Distributions Pending Allowance. ...............................................................60
I.      Distributions After Allowance. ..........................................................................60
J.      Single Satisfaction of Claims. ...........................................................................60
K.      Claims Not Receiving a Distribution. ................................................................60

71306/0001-53355255v12

**ARTICLE VIII . SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**................................................................................................................**61**
   A.   Settlement, Compromise, and Release of Claims and Interests........................................61
   B.   Release of Liens. ................................................................................................................61
   C.   Releases by the Debtors. ...................................................................................................62
   D.   Releases by Holders of Claims and Interests....................................................................63
   E.   Exculpation. ......................................................................................................................64
   F.   Injunction. .........................................................................................................................65
   G.   Protections Against Discriminatory Treatment. ...............................................................66
   H.   Document Retention. ........................................................................................................66
   I.   Reimbursement or Contribution. .....................................................................................66

**ARTICLE IX . CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE** ...................................................................................................................**67**
   A.   Conditions Precedent to the Effective Date. ....................................................................67
   B.   Waiver of Conditions. ......................................................................................................68
   C.   Effect of Failure of Conditions. .......................................................................................68
   D.   Substantial Consummation. ..............................................................................................68

**ARTICLE X . MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**..........................................................................................................................................**68**
   A.   Modifications and Amendments. ......................................................................................68
   B.   Effect of Confirmation on Modifications. ........................................................................69
   C.   Revocation or Withdrawal of the Plan..............................................................................69

**ARTICLE XI . RETENTION OF JURISDICTION** ...................................................................**69**

**ARTICLE XII . MISCELLANEOUS PROVISIONS** .................................................................**72**
   A.   Immediate Binding Effect................................................................................................72
   B.   Additional Documents. .....................................................................................................72
   C.   Reservation of Rights........................................................................................................72
   D.   Successors and Assigns.....................................................................................................72
   E.   Service of Documents. ......................................................................................................73
   F.   Term of Injunctions or Stays.............................................................................................75
   G.   Enforcement of Confirmation Order..................................................................................75
   H.   Entire Agreement. .............................................................................................................75
   I.   Exhibits. ............................................................................................................................75
   J.   Nonseverability of Plan Provisions...................................................................................75
   K.   Votes Solicited in Good Faith...........................................................................................76
   L.   Closing of Chapter 11 Cases.............................................................................................76
   M.   Waiver or Estoppel. ..........................................................................................................76

71306/0001-53355255v12

**INTRODUCTION**

FreshRealm, Inc. and the above-captioned debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors") propose this Plan for the resolution of the outstanding claims against, and equity interests in, the Debtors.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters.  Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

*A.      Defined Terms.*

As used in this Plan, capitalized terms have the meanings given to them below.

1.      "*1L Protective Advance*" means that certain $1,800,000 protective advance provided by the First Lien Agent to the DIP Borrower on April 14, 2026, as a "Collateral Agent Advance" under and as defined in the First Lien Credit Agreement, which, pursuant to the express terms of the First Lien Credit Agreement, constitutes "Obligations" under the First Lien Documents.

2.      "*1L Roll-Up DIP Loans*" means the $22,800,000 in aggregate principal amount of the term loans outstanding under the First Lien Credit Agreement rolled-up pursuant to the Final DIP Order.

3.      "*2L Priority Collateral*" shall have the same meaning ascribed to such term in the Prepetition Intercreditor Agreement.

4.      "*2L Protective Advance*" means that certain $1,200,000 protective advance provided by the Second Lien Agent to the DIP Borrower on April 15, 2026, as a "Collateral Agent Advance" under and as defined in the Second Lien Credit Agreement, which, pursuant to the express terms of the Second Lien Credit Agreement, constitute "Obligations" under the Second Lien Documents.

1

71306/0001-53355255v12

5.  "*2L Roll-Up DIP Loans*" means the $15,200,000 in aggregate principal amount of the term loans outstanding under the Second Lien Credit Agreement rolled-up pursuant to the Final DIP Order.

6.  "*A&M Order*" means the *Order Authorizing the Debtors to (A) Retain Alvarez & Marsal North America, LLC to Provide Certain Executive Officers and Certain Additional Personnel, and (B) Designate Certain Executive Officers, and (II) Granting Related Relief* [Docket No. 255].

7.  "*Administrative Claim*" means a Claim against a Debtor arising on or after the Petition Date and before the Effective Date for the costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911–1930; and (d) adequate protection claims provided for in the DIP Orders.

8.  "*Administrative Claims Bar Date*" means the applicable deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be 30 days after the Effective Date for Administrative Claims that may have arisen, accrued, or otherwise become due and payable at any time on and subsequent to the Petition Date.

9.  "*Administrative Claims Objection Bar Date*" means the deadline for Filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of the Administrative Claims.

10.  "*Administrative Claims Reserve Amount*" means a reserve, in the amount of not less than [$●] of the funds available solely under the Wind-Down Budget, which shall be dedicated to the payment of Allowed Administrative Claims.

11.  "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

12.  "*Agent*" means each of, and in each case in its capacity as such, the First Lien Agent, the Second Lien Agent, and the DIP Agent.

13.  "*Allowed*" means with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim

2

71306/0001-53355255v12

or Interest, as applicable, timely Filed by the Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or pursuant to a Final Order; (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed (or assumed and assigned) in connection with the Plan, or (iv) by Final Order of the Bankruptcy Court (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order).  With respect to any Claim or Interest described in clauses (a) and (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that, (w) no objection to the Allowance of such Claim or Interest has been or, in the Debtors' or Wind-Down Debtors' reasonable good faith judgment may be, interposed on or before the Claims Objection Deadline (which shall have the meaning set forth in Article VII.E.) or Administrative Claims Objection Bar Date, as applicable, (x) an objection to such Claim or Interest is asserted and such Claim or Interest is subsequently Allowed pursuant to a Final Order, (y) such Claim or Interest is settled pursuant to, or is authorized under, a Final Order, or (z) such Claim or Interest is Allowed pursuant to the Plan or the Confirmation Order.  For the avoidance of doubt, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors or the Wind-Down Debtors, as applicable, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever. "*Allow*," "*Allowing*," and "*Allowance*" shall have correlative meanings.

14.     "*Asset Purchase Agreements*" means any asset purchase agreements whereby the Debtors sold some or all of their assets under section 363 of the Bankruptcy Code and as approved by the Sale Orders, including all exhibits, appendices, supplements, and documents, schedules, and agreements thereto, and as may be amended, modified, or supplemented in accordance with the terms thereof.

15.     "*Available Cash*" means, collectively, all Cash on hand held by the Debtors and the Wind-Down Debtors on and after the Effective Date, which shall include the proceeds reserved to fund the Wind Down as set forth in the Wind-Down Budget.

16.     "*Avoidance Actions*" means any and all avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code.

17.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

18.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the District of New Jersey.

71306/0001-53355255v12

19. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code, and the general, local, and chambers' rules of the Bankruptcy Court.

20. "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Submitting Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form, Manner, and Procedures for Filing Proofs of Claim, (IV) Approving Notice Thereof, and (V) Granting Related Relief* [Docket No. 256] (as the same may be amended, supplemented, or modified from time to time after entry thereof), entered by the Bankruptcy Court on June 18, 2026.

21. "*Bidding Procedures*" means the procedures governing the sale and marketing process for the Sale Transactions as approved pursuant to the Bidding Procedures Order.

22. "*Bidding Procedures Order*" means the *Order (I) Approving the Bidding Procedures, (II) Approving the Stalking Horse Bid Protections, (III) Scheduling Bid Deadlines and Auction(s), (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* [Docket No. 160] (as may be modified, amended, or supplemented by further Final Order), entered by the Bankruptcy Court on May 21, 2026.

23. "*Blue Apron*" means Blue Apron, LLC, a Delaware limited liability company.

24. "*Blue Apron Deferred Payments*" means $32,000,000 in Cash that Blue Apron shall pay or cause to be paid to the DIP Agent, for the benefit of the DIP Lenders, beginning on the first business day of the first month following the Service Transfer Date (as defined in the TSA), by wire transfer to an account designated by the DIP Agent, for the benefit of the DIP Lenders, with such Blue Apron Deferred Payments being guaranteed by Wonder Group, Inc., as guarantor.

25. "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

26. "*Business Interruption Insurance Claims*" means all rights and claims under the Business Interruption Insurance Policies.

27. "*Business Interruption Insurance Policies*" means all insurance policies (including any "tail policy" or run-off endorsement) that have been issued or provide coverage at any time to any of the Debtors (or any of their predecessors or successors) providing business interruption liability coverage and all agreements, documents, or instruments related thereto.

28. "*Carve Out*" shall have the same meaning ascribed to it in the Final DIP Order.

29. "*Cash*" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

30. "*Cash Collateral*" has the meaning ascribed to it under section 363(a) of the Bankruptcy Code.

4

71306/0001-53355255v12

31. "*Cause of Action*" or "*Causes of Action*" means any actions, claims, cross-claims, third-party claims, interests, damages, controversies, remedies, disputes, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, interests, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in Law or in equity, or pursuant to any other theory of Law or otherwise. "Causes of Action" also include: (a) any rights of setoff, counterclaims, or recoupments, and any claims under contracts or for breaches of duties imposed by Law or in equity; (b) any and all claims based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal Law, or breach of any duty imposed by Law or in equity, including Securities laws, negligence, and gross negligence; (c) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate, or disallow Claims or Interests; (d) any claims pursuant to section 362 or chapter 5 of the Bankruptcy Code (including, for the avoidance of doubt, Avoidance Actions); (e) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign Law fraudulent transfer or similar claims.

32. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code, and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

33. "*Claim(s)*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's Estate.

34. "*Claims and Noticing Agent*" means Kroll Restructuring Administration LLC in its capacity as claims and noticing agent for the Debtors and any successor.

35. "*Claims Bar Date*" means, collectively, the date established by the Bankruptcy Court in the Bar Date Order by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims for which the Bankruptcy Court entered an order excluding the Holders of such Claims from the requirement of Filing Proofs of Claim.

36. "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

37. "*Class*" means a class of Claims or Interests as set forth in Article III hereof in accordance with section 1122(a) of the Bankruptcy Code.

38. "*Collateral*" shall have the meaning ascribed to such collateral in the DIP Orders, which shall include, for the avoidance of doubt, the meaning ascribed to it in the DIP Term Sheet.

71306/0001-53355255v12

39.     "*Committee*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on May 14, 2026, as set forth in the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 118].

40.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

41.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

42.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

43.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to the Required DIP Lenders.

44.     "*Consummation*" means the occurrence of the Effective Date.

45.     "*Cure*" or "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

46.     "*D&O Claims*" means any and all Causes of Action of the Debtors against a D&O Party.

47.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy" or run-off endorsement) that have been issued, may be procured pursuant to this Plan, or provide coverage at any time to any of the Debtors (or any of their predecessors or successors) providing directors', members', trustees', officers', or managers' liability coverage and all agreements, documents, or instruments related thereto.

48.     "*D&O Party*" means all current and former directors, officers, or managers of the Debtors in their respective capacities as such, which are not Released Parties.

49.     "*Debtor*" means one or more of the Debtors, as debtors and debtors in possession, each in its respective individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

50.     "*Debtor Release*" means the releases given on behalf of the Debtors and their Estates as set forth in the Article VIII hereof.

71306/0001-53355255v12

51.     "*Debtors*" means, collectively, FreshRealm, Inc., FreshRealm Holdings, Inc., FreshRealm HR, LLC, FreshRealm Texas, LLC, and IHEC, LLC.

52.     "*Deemed DIP Paydown Amount*" means [$●]27,200,000, which represents the Blue Apron Deferred Payment, discounted at a rate of [●15%], and shall be deemed remitted to the DIP Agent as a paydown of the DIP Loans as of the Effective Date.

53.     "*DIP Agent*" means BGC Lender Rep LLC, in its capacity as administrative agent and collateral agent for the DIP Lenders.

54.     "*DIP Borrower*" means FreshRealm, Inc.

55.     "*DIP Claims*" means any and all Claims arising under, derived from, or based upon the DIP Documents, the DIP Facility, and the DIP Orders, including all Claims for principal amounts outstanding, interest, fees, expenses, costs, indemnification obligations, reimbursement obligations, and other charges of the DIP Secured Parties arising under or related to the DIP New Money Loans, the Protective Advances, the DIP Roll-Up Loans, DIP Documents, the DIP Facility, or the DIP Orders, after and subject to receipt of the DIP Paydown Amount.

56.     "*DIP Collateral*" shall have the meaning ascribed to such collateral in the Final DIP Order.

57.     "*DIP Credit Agreement*" means that certain Super-Priority Senior Secured Debtor-In-Possession Financing Agreement, dated as of June 1, 2026, by and among the DIP Borrower, the DIP Guarantors (as defined in the DIP Credit Agreement), the DIP Lenders and the DIP Agent.

58.     "*DIP Facility*" means the superpriority senior secured debtor-in-possession credit facility provided under the DIP Documents.

59.     "*DIP Documents*" means the DIP Credit Agreement together with the schedules and exhibits attached thereto, and all security agreements, pledge agreements, and related agreements, documents, and instruments and amendments executed and delivered in connection therewith, including the DIP Orders.

60.     "*DIP Lenders*" means the various lenders party thereto to the DIP Credit Agreement.

61.     "*DIP Liens*" shall have the meaning ascribed to such liens in the Final DIP Order.

62.     "*DIP Loans*" means collectively, the DIP New Money Loans and DIP Roll-Up Loans.

63.     "*DIP New Money Loans*" means the term loans made under that certain superpriority senior secured debtor-in-possession credit facility pursuant to the DIP Credit Agreement, in the currently outstanding principal amount of [$18 million].

7

64.　　"*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

65.　　"*DIP Paydown*" means the payment to the DIP Agent of the DIP Paydown Amount.

66.　　"*DIP Paydown Amount*" means the (i) Cash proceeds of the Sale Transactions or Excess Cash as set forth in the Distributable Waterfall and (ii) the Blue Apron Deferred Payments remitted to the DIP Agent equal to the Deemed DIP Paydown Amount.

67.　　"*DIP Roll-Up Loans*" means collectively, the 1L Roll-up DIP Loans and the Faranord Roll-Up DIP Loans, issued under the DIP Credit Agreement and as approved by the DIP Orders, in the currently outstanding principal amount of $38 million.

68.　　"*DIP Secured Parties*" means the DIP Lenders and the DIP Agent.

69.　　"*DIP Term Sheet*" has the meaning ascribed to it in the Final DIP Order.

70.　　"*Directed 1L Priority Collateral*" means all of the Debtors' rights in, to and under all Business Interruption Insurance Policies and Business Interruption Insurance Claims, all claims outstanding thereunder and all products and proceeds of such insurance and claims.

71.　　"*Disbursing Agent*" means (a) prior to the Effective Date, the Debtors and (b) on and after the Effective Date, the Liquidating Trustee, the Plan Administrator, or the Entity or Entities selected by the Liquidating Trustee or Plan Administrator, which Entity or Entities may include the Claims and Noticing Agent, as applicable, to make or facilitate distributions contemplated under the Plan.

72.　　"*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules attached thereto, and as amended, modified, or supplemented from time to time in accordance with the terms thereof.

73.　　"*Disclosure Statement Order*" means any order of the Bankruptcy Court approving or conditionally approving the adequacy of the Disclosure Statement.

74.　　"*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest: (a) that is not Allowed, (b) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law, or (c) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed.

75.　　"*Distributable Value*" means in accordance with the Sale Orders, Sale and Settlement Order, and the DIP Orders, an amount equal to the proceeds available to be distributed to the DIP Secured Parties on account of the DIP Obligations, the First Lien Secured Parties on account of the First Lien Obligations, and the Second Lien Secured Parties on account of the Second Lien Obligations, after giving effect to the treatment and satisfaction of the DIP Obligations under this Plan, including the DIP Paydown, all in accordance with the Distributable Waterfall, minus the sum of: (i) the amount necessary to fund the Wind-Down Debtor Account with the Wind-Down Debtor Account Amount, (ii) the amount necessary to pay in full satisfaction all Claims required to be satisfied pursuant to section 1129 of the Bankruptcy Code

8

to confirm the Plan (which, for the avoidance of doubt, shall include payment of Administrative Claims, Priority Tax Claims, and Other Priority Claims, in each case, solely to the extent Allowed), (iii) subject to the reasonable consent of the Required DIP Lenders, the amount necessary to make any other required payments in order to implement the terms of the Plan, and (iv) subject to the consent of the Required DIP Lenders, any other fees, costs, or expenses in excess of the Wind-Down Budget reasonably necessary to liquidate, monetize, or collect the Wind-Down Debtor Assets.

76. "*Distributable Waterfall*" means proceeds of Collateral (subject to the Carve Out, except that the proceeds of the Blue Apron Deferred Payment shall not be subject to the Carve Out) which shall be applied in accordance with the following priorities:

(a) First, the DIP New Money Loans shall be repaid, *pro rata*, from (i) all Excess Cash and (ii) all proceeds from the sale of Collateral, including the proceeds of the Blue Apron Deferred Payment. The proceeds of the Blue Apon Deferred Payment shall only be applied to repay the DIP New Money Loans in an amount equal to the Deemed DIP Paydown Amount.

(b) After repayment in full of the DIP New Money Loans:

(i) The proceeds of all Collateral (other than the proceeds of the Directed 1L Priority Collateral and the 2L Priority Collateral), including Excess Cash shall be applied in an allocation to be agreed to the 1L and 2L Roll-Up DIP Loans until an aggregate principal amount of the 2L Roll-Up DIP Loans of $7,000,000 is repaid with the proceeds thereto (the "Initial 2L Roll-Up DIP Repayment"), after which time such proceeds shall be applied solely to the 1L Roll-Up DIP Loans and, to the extent the 1L Roll-Up DIP Loans are paid in full, to any outstanding First Lien Obligations until discharge of the First Lien Obligations. The proceeds of the Blue Apon Deferred Payment shall only be applied to repay 1L and 2L Roll-Up DIP Loans in an amount equal to the Deemed DIP Paydown Amount.

(ii) The proceeds of the 2L Priority Collateral shall be applied to the 2L Roll-Up DIP Loans and to the extent the 2L Roll-Up DIP Loans have been paid in full, to any outstanding prepetition Second Lien Obligations.

(iii) The proceeds of the Directed 1L Priority Collateral shall be applied to repay any remaining 1L Roll-Up DIP Loans or as otherwise agreed and, to the extent the 1LRoll-Up DIP Loans are paid in full, to any outstanding prepetition First Lien Obligations in accordance with the Prepetition Intercreditor Agreement or as otherwise agreed.

71306/0001-53355255v12

(c)     If any proceeds of Collateral remain after discharge of First Lien Obligations as set forth in (b)(i) or (iii) above, such remainder shall be applied consistent with the Prepetition Intercreditor Agreement.

77.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is determined by the Debtors or designated in a Final Order.

78.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect, and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived in accordance with Article IX of the Plan.

79.     "*Entity*" or "*Entities*" means any entity or entities, as defined in section 101(15) of the Bankruptcy Code.

80.     "*Estate*" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

81.     "*Excess Cash*" means all Cash on hand on the Effective Date that is in excess of (a) the Wind Down Debtor Account Amount and  (b) the Professional Fee Escrow Amount.

82.     "*Exculpated Party*" or "*Exculpated Parties*" means, in each case solely in its capacity as such: (a) each of the Debtors; (b) the Independent Directors; (c) the Committee and its members; and (d) with respect to the Debtors and the Committee, each of their respective current and former directors, managers, officers, attorneys, financial advisors, consultants, or other professionals or advisors, as applicable, that served in such capacity between the Petition Date and Effective Date.

83.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or 1123 of the Bankruptcy Code.

84.     "*Existing Equity Interests*" means, collectively, all Interests in FreshRealm Holdings, Inc. outstanding immediately prior to the Effective Date.

85.     "*Federal Judgment Rate*" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

86.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent or the Bankruptcy Court.

87.     "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and*

10

71306/0001-53355255v12

*Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying Automatic Stay, and (V) Granting Related Relief* [Docket No. 210], entered by the Bankruptcy Court on June 2, 2026.

88.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or Filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

89.    "*First Day Pleadings*" means the first day pleadings that the Debtors Filed with the Bankruptcy Court upon the commencement of the Chapter 11 Cases.

90.    "*First Lien Agent*" means BGC Lender Rep LLC, FSB as administrative agent and collateral agent (in such capacities) under the First Lien Credit Agreement.

91.    "*First Lien Claim*" means the Claim associated with the First Lien Loan Obligations.

92.    "*First Lien Collateral*" means the Collateral (as defined in the Prepetition Intercreditor Agreement) of the First Lien Lenders pursuant to the Prepetition Intercreditor Agreement, the First Lien Collateral Agreement and the other First Lien Documents.

93.    "*First Lien Collateral Agreement*" means that certain Pledge and Security Agreement, dated as of March 11, 2025, made by Parent, the DIP Borrower, and the other Grantors (as defined therein) from time to time party thereto in favor of the First Lien Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

94.    "*First Lien Credit Agreement*" means that certain Financing Agreement, dated as of March 11, 2025 (such credit agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among the DIP Borrower, Parent, certain subsidiaries of the DIP Borrower as guarantors, First Lien Lenders, and the First Lien Agent.

95.    "*First Lien Deficiency Claim*" means the unsecured Claims held by the First Lien Lenders pursuant to the First Lien Documents pursuant to applicable law and sections 502 and 506(a) of the Bankruptcy Code or any other similar provisions.

96.    "*First Lien Deficiency Claim Amount*" means an amount equal to the First Lien Obligations minus the amounts paid on account of the First Lien Claim from the proceeds of First Lien Collateral.  Solely for purposes of voting under Bankruptcy Rule 3018, the First Lien

11

71306/0001-53355255v12

Deficiency Claim Amount shall be $[•]19,009,660.85.  For the purposes of distributions under the Plan, the First Lien Deficiency Claim shall equal the First Lien Deficiency Claim Amount.

97.  "*First Lien Documents*" means the First Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement).

98.  "*First Lien Lenders*" means the various lenders from time to time party to the First Lien Credit Agreement.

99.  "*First Lien Loan Obligations*" means the obligations of the Debtors to the First Lien Secured Parties pursuant to the First Lien Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $51,327,785.56 as of the Petition Date, on account of First Lien Term Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the First Lien Credit Agreement), in each case, owing under or in connection with the First Lien Documents.

100.  "*First Lien Secured Parties*" means the First Lien Agent, and together with the First Lien Lenders and the other Secured Parties (as defined in the First Lien Credit Agreement).

101.  "*First Lien Term Loans*" means those certain term loans in a total aggregate principal amount outstanding as of the Petition Date of $51,327,785.56, under the First Lien Credit Agreement.

102.  "*General Unsecured Claim*" means any Claim that is not:  (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) a DIP Claim (f) a Secured Claim; (g) an Other Secured Claim; (h) a First Lien Claim (i) a Second Lien Claim; (j) an Intercompany Claim; (k) a Section 510(b) Claim; or (l) any Claim to the extent satisfied prior to the Effective Date.  For the avoidance of doubt, "General Unsecured Claim" shall include (i) First Lien Deficiency Claims, and (ii) Second Lien Deficiency Claims.

103.  "*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or any Wind-Down Debtors, as applicable.

104.  "*Governmental Bar Date*" means October 26, 2026, at 5:00 p.m. (prevailing Eastern Time), which is the date by which Proofs of Claim must be Filed with respect to such Claims held by Governmental Units pursuant to the Bar Date Order.

105.  "*Governmental Unit*" means any governmental unit, as defined in section 101(27) of the Bankruptcy Code.

106.  "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

12

107.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

108.    "*Independent Directors*" means Jill Frizzley and Charlie Piper, in their capacities as current or former independent directors of certain of the Debtors.

109.    "*Insurance Collateral*" means all of the Debtors' rights in, to and under all Insurance Policies, all claims outstanding thereunder and all products and proceeds of such insurance and claims.

110.    "*Insurance Policies*" means all insurance policies, including the D&O Liability Insurance Policies and Business Interruption Insurance Policies, that have been issued (or provide coverage) at any time to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

111.    "*Insurer*" means any company or other entity that issued an Insurance Policy and any third-party administrator of or for any Insurance Policy, along with any predecessors and/or successor thereof.

112.    "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate of a Debtor against a Debtor arising before the Petition Date.

113.    "*Intercompany Interest*" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.  For the avoidance of doubt, no Interest transferred to a Purchaser in connection with the Sale Transactions shall be an Intercompany Interest.

114.    "*Interest*" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

115.    "*Interim Compensation Order*" means the *Administrative Fee Order Establishing Procedures for the Allowance and Payment of Interim Compensation and Reimbursement of Expenses of Professionals Retained by Order of the Court* [Docket No. 159], entered by the Bankruptcy Court on May 21, 2026.

116.    "*Interim DIP Order*" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 51], entered by the Bankruptcy Court on April 29, 2026.

13

71306/0001-53355255v12

117.    "*IRS*" means the United States Internal Revenue Service.

118.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

119.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

120.    "*Lender Professionals*" shall have the meaning ascribed to such term in the DIP Orders.

121.    "*Lien(s)*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

122.    "*Liquidating Trust*" means the liquidating trust established on the Effective Date pursuant to Article IV herein and the Liquidating Trust Agreement.

123.    "*Liquidating Trust Agreement*" means the agreement, filed with the Plan Supplement and executed as of the Effective Date, that establishes and governs the Liquidating Trust, subject to the reasonable consent of the DIP Agent and the First Lien Agent.

124.    "*Liquidating Trust Assets*" means the Liquidating Trust Contribution and the Liquidating Trust Retained Causes of Action.

125.    "*Liquidating Trust Beneficiaries*" means all Holders of Liquidating Trust Interests.

126.    "*Liquidating Trust Contribution*" means a contribution from Blue Apron, pursuant to the Sale and Settlement Order and Settlement Agreement, in the amount of $500,000, which amount has been paid and is currently being held by the Debtors in a segregated account.

127.    "*Liquidating Trust Distributable Proceeds*" means the Liquidating Trust Assets or the Cash proceeds thereof; *minus* Liquidating Trust Expenses.

128.    "*Liquidating Trust Expenses*" means any fees and expenses incurred by the Liquidating Trustee (including, but not limited to, the compensation of the Liquidating Trustee and the reasonable fees and expenses of professionals or other persons retained by the Liquidating Trustee) in connection with the administration of the Liquidating Trust.

129.    "*Liquidating Trust Interests*" means all of the interests in the Liquidating Trust allocable to applicable Holders of Allowed Claims (in accordance with the Plan and the Liquidating Trust Agreement, which shall not include Allowed Secured Claims or Interests (if any) held by any Party, but shall include the (i) First Lien Deficiency Claims and (ii) Second Lien Deficiency Claims). For the avoidance of doubt, the Liquidating Trust Interests shall represent only the right to receive distributions from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement and shall not be deemed "securities" or "equity interests" in any Debtor or in any successor entity, and shall not grant any ownership, control or

14

governance rights in the Liquidating Trust or in any entity whose assets are held by the Liquidating Trust.

130.    "*Liquidating Trust Retained Causes of Action*" means those Causes of Action that shall vest in the Liquidating Trust on the Effective Date.  For the avoidance of doubt, Liquidating Trust Retained Causes of Action shall not include any Causes of Action that are settled, released, or exculpated under the Plan or that are expressly sold or assigned to any Purchaser, as set forth in the applicable Asset Purchase Agreement, pursuant to the applicable Sale Order.  The list of Liquidating Trust Retained Causes of Action shall be filed with the Plan Supplement.

131.    "*Liquidating Trustee*" means the Person or Entity, or any successor thereto, designated by the Debtors and the Committee, but subject to the consent of the Prepetition Secured Parties, to have all powers and authorities set forth in the Plan and the Liquidating Trust Agreement.

132.    "*Misfits Market*" means Misfits Market, Inc., a Delaware corporation.

133.    "*Other Priority Claim*" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

134.    "*Other Secured Claim*" means any Secured Claim that is not a DIP Claim, a First Lien Claim, or a Second Lien Claim.

135.    "*Parent*" means FreshRealm Holdings, Inc.

136.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

137.    "*Petition Date*" means April 27, 2026, the date on which FreshRealm Holdings, Inc. and certain of its subsidiaries commenced the Chapter 11 Cases.

138.    "*Plan*" means this chapter 11 plan, including all exhibits, supplements (including the Plan Supplement), appendices, and schedules (as amended, modified, or supplemented from time to time in accordance with the terms hereof).

139.    "*Plan Administrator*" means the Person or Entity, or any successor thereto, designated by the Debtors, subject to the consent of the DIP Agent and the First Lien Agent and the Second Lien Agent, to have all powers and authorities set forth in the Plan and the Plan Administrator Agreement, and as the sole director and the sole officer of each Wind-Down Debtor, succeeding to the powers of such Wind-Down Debtor's directors and officers.

140.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Plan Administrator, and the Wind-Down Debtors, which shall be subject to the DIP Agent, First Lien Agent's and Second Lien Agent's consent, which shall be included in the Plan Supplement.

71306/0001-53355255v12

141.    "*Plan Administration Assets*" means (i) the Wind-Down Debtor Assets; (ii) the Administrative Claims Reserve Amount; and (iii) any Wind-Down Debtor Retained Causes of Action designated as Plan Administration Assets in the Plan Supplement.

142.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) acceptable to the Required DIP Lenders and to be Filed initially by the Debtors no later than the Plan Supplement Filing Date and may be further amended thereafter, including the following to the extent applicable and known at such time:  (a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, (c) the Plan Administrator Agreement, (d) the Liquidating Trust Agreement, (e) the Wind-Down Budget, (f) any other necessary documentation in accordance with the Plan, and (g) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

143.    "*Plan Supplement Filing Date*" means (a) the date that is seven days prior to the deadline to object to Confirmation of the Plan or (b) such later date as may be approved by the Bankruptcy Court.

144.    "*Prepetition Agent*" means collectively, the First Lien Agent and Second Lien Agent.

145.    "*Prepetition Collateral*" means collectively, the First Lien Collateral and the Second Lien Collateral.

146.    "*Prepetition Deficiency Claims*" means collectively, the First Lien Deficiency Claims and the Second Lien Deficiency Claims, which shall be Allowed General Unsecured Claims under Class 6 of the Plan.

147.    "*Prepetition Intercreditor Agreement*" means that certain Amended and Restated Intercreditor Agreement, dated as of December 4, 2025, among DIP Borrower, each of the Grantors party thereto, BGC Lender Rep LLC, as First Lien Representative, and Faranord (US) III Pte Ltd, as Second Lien Representative, as amended, restated, supplemented or otherwise modified.

148.    "*Prepetition Liens*" means collectively, the First Lien Claim and the Second Lien Claim.

149.    "*Prepetition Loan Documents*" means collectively, the First Lien Documents and Second Lien Documents, and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

150.    "*Prepetition Secured Parties*" means collectively, the First Lien Secured Parties and the Second Lien Secured Parties.

16

151.   "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code that is not otherwise a Secured Tax Claim.

152.   "*Professional*" means an Entity: (a) retained pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

153.   "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims that the Professionals reasonably estimated in good faith that they have incurred or will incur in rendering services to the Debtors, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

154.   "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 363, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

155.   "*Professional Fee Escrow Account*" means an account funded with Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date in an amount equal to the total Professional Fee Amount.

156.   "*Proof of Claim*" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Administrative Claims Bar Date, or the Governmental Bar Date, as applicable.

157.   "*Protective Advances*" means collectively, the 1L Protective Advance and the 2L Protective Advance.

158.   "*Purchaser*" means Misfits Market or any other purchaser, pursuant to the applicable Asset Purchase Agreement and as set forth in the applicable Sale Order.

159.   "*Quarterly Fees*" means any and all fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable.

160.   "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

161.   "*Rejection Damages Claims Bar Date*" shall have the meaning set forth in Article V.B.

162.   "*Related Party*" means, each of, and in each case in its capacity as such, current and former ~~directors,~~ managers, ~~the~~ Released Officers, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by

71306/0001-53355255v12

operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys (including any attorneys or professionals retained by any current or former director or manager of a Debtor in his or her capacity as director or manager as a Debtor), accountants, investment bankers, consultants, representatives, and other professionals and advisors, and any such Person's or Entity's respective predecessors, successors, and assigns.  For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

163.     "*Released Officers*" means current and former officers of the Debtors who served in such capacity on or after October 16, 2025, other than Mr. Carlos Iniguez and Ms. Snow Le, which, for the avoidance of doubt, are not Released Officers.

164.     "*Released Party*" or "*Released Parties*" means, each of, and in each case, in their respective capacities as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) each Releasing Party; (g) each current and former Affiliate of each Entity in clause (a) through the following clause (f); each Related Party of each Entity in clause (a) through this clause (g), each in their capacity as such; (h) the current members of the Board or Boards of the Debtors, Jill Frizzley and Charlie Piper; and (i) the Released Officers; *provided, however,* that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered. For the avoidance of doubt and notwithstanding anything herein to the contrary, no former director (in their capacity as such) or non-Releasing Party shall be a Released Party under this Plan.

165.     "*Releasing Party*" or "*Releasing Parties*" means, each of, and in each case, in their respective capacities as such:  (a) the Debtors; (b) the Committee and its members; (c) the DIP Secured Parties; (d) the First Lien Secured Parties; (e) the Second Lien Secured Parties; (f) all Holders of Claims; (g) all Holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (g); (i) each Related Party of each Entity in clause (a) through this clause (g), for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided, however,* that each Entity in the foregoing clause (f) or (g) that (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not withdrawn or otherwise resolved before the Confirmation Order is entered shall not be a Releasing Party.

166.     "*Required DIP Lenders*" has the meaning ascribed to such term under the DIP Credit Agreement.

167.     "*Sale and Settlement Order*" means that certain *Order (I) Approving The Settlement Between the Debtors and Blue Apron Pursuant to Bankruptcy Rule 9019, (II) Approving the Sale of Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (III) Authorizing the Debtors to Enter Into and Perform Their Obligations Under an Asset Purchase Agreement, (IV) Authorizing the Debtors to Enter Into a Transition Services Agreement, (V) Approving the Procedures Authorizing the Debtors to Assume and Assign*

18

71306/0001-53355255v12

*Executory Contracts and Unexpired Leases, (VI) Authorizing the Debtors to Reject Certain Agreements, and (VII) Granting Related Relief* [Docket No. 209], entered by the Bankruptcy Court on June 2, 2026.

168.     "*Sale Orders*" means any Orders entered by the Bankruptcy Court authorizing the Debtors' sale of some or all of the Debtors' assets under section 363 of the Bankruptcy Code, including but not limited to, the Sale and Settlement Order.

169.     "*Sale Transactions*" means the sale or series of sales of all, or substantially all, or a portion of the Debtors' assets to the applicable Purchaser and any transactions undertaken in connection therewith as set forth in the Asset Purchase Agreements and approved by the Sale Orders.

170.     "*Sale Transactions Documentation*" means all motions, filings, documents, and agreements related to the Sale Transactions, including without limitation, any Asset Purchase Agreement, any Sale Order, the Bidding Procedures, and the Bidding Procedures Order.

171.     "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, by the Wind-Down Debtors on behalf of the applicable Debtor pursuant to the Plan.

172.     "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Wind-Down Debtors on behalf of the applicable Debtor pursuant to the Plan.

173.     "*Schedule of Retained Causes of Action*" means the schedule of Wind-Down Debtor Retained Causes of Action and Liquidating Trust Retained Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors, which shall be filed as an Exhibit to the Plan Supplement.

174.     "*Schedules*" means, collectively, the schedules of assets and liabilities, Schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as such Schedules may be amended, modified, or supplemented from time to time.

175.     "*Second Lien Agent*" means Faranord (US) III Pte Ltd, as administrative agent and collateral agent under the Second Lien Credit Agreement.

176.     "*Second Lien Claim*" means the Claim on account of the Second Lien Term Loans or otherwise arising under the Second Lien Credit Agreement and Second Lien Loan Obligations (which, for the avoidance of doubt shall include interest, fees, and all other amounts due and owing under the Second Lien Credit Agreement).

19

71306/0001-53355255v12

177.    "*Second Lien Collateral*" means the Collateral (as defined in the Prepetition Intercreditor Agreement) of the Second Lien Lenders pursuant to the Prepetition Intercreditor Agreement, the Second Lien Collateral Agreement and the other Second Lien Documents

178.    "*Second Lien Collateral Agreement*" means that certain Pledge and Security Agreement, dated as of October 16, 2025, made by Parent, the DIP Borrower, and the other Grantors (as defined therein) from time to time party thereto in favor of the Second Lien Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

179.    "*Second Lien Credit Agreement*" means that certain Financing Agreement, dated as of October 16, 2025 (such credit agreement, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time) by and among the DIP Borrower, Parent, certain subsidiaries of the DIP Borrower as guarantors, the Second Lien Lenders, and the Second Lien Agent.

180.    "*Second Lien Deficiency Claim*" means unsecured Claims held by the Second Lien Lenders pursuant to the Second Lien Documents pursuant to applicable law and sections 502 and 506(a) of the Bankruptcy Code or any other similar provisions.

181.    "*Second Lien Deficiency Claim Amount*" means an amount equal to the Second Lien Obligations minus the amounts paid on account of the Second Lien Claim from the proceeds of Second Lien Collateral.  Solely for purposes of voting under Bankruptcy Rule 3018, the Second Lien Deficiency Claim Amount shall be $[●].  For the purposes of distributions under the Plan, the Second Lien Deficiency Claim shall equal the Second Lien Deficiency Claim Amount.

182.    "*Second Lien Lenders*" means the various lenders from time to time party thereto to the Second Lien Credit Agreement.

183.    "*Second Lien Documents*" means the Second Lien Credit Agreement and other Loan Documents (as defined in the Second Lien Credit Agreement).

184.    "*Second Lien Loan Obligations*" means the Debtors' obligations to the Second Lien Secured Parties pursuant to the Second Lien Documents without objection, defense, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $117,400,000.00 as of the Petition Date, on account of Second Lien Term Loans *plus* accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Second Lien Credit Agreement), in each case, owing under or in connection with the Second Lien Documents

185.    "*Second Lien Term Loans*" means the term loans issued pursuant to the Second Lien Credit Agreement, in the currently outstanding principal amount of not less than $117,400,000.00 as of the Petition Date.

20

186.    "*Second Lien Secured Parties*" means the Second Lien Agent, the Second Lien Lenders and the other Secured Parties (as defined in the Second Lien Credit Agreement).

187.    "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; *provided* that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.  For the avoidance of doubt, neither DIP Claims, First Lien Claims, or Second Lien Claims are, and shall not be, Section 510(b) Claims.

188.    "*Secured*" means, when referring to a Claim, a Claim that is:  (a) secured by a Lien on collateral in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Debtor's interest in such collateral or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code and applicable Law or (b) Allowed pursuant to the Plan as a Secured Claim.

189.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claims for penalties.

190.    "*Securities Act*" means the U.S. Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

191.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

192.    "*Settlement Agreement*" means that certain settlement agreement by and among the Debtors and Blue Apron, as amended, approved by the Bankruptcy Court pursuant to the Sale and Settlement Order.

193.    "*Tax Code*" means the United States Internal Revenue Code of 1986, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

194.    "*Term Loan Credit Agreements*" means collectively, the First Lien Credit Agreement and Second Lien Credit Agreement.

195.    "*Transferred Causes of Action*" means any and all Causes of Action held by the Debtors that were or shall be transferred to the Purchasers pursuant to any Sale Transactions.

196.    "*TSA*" means that certain Transition Services Agreement by and between DIP Borrower, Misfits Market, and, solely for the purposes of Sections 2.4, 3.2(e) and 3.6 of the TSA, Blue Apron, dated April 27, 2026, and approved by the Sale and Settlement Order.

197.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of New Jersey.

21

198.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 or section 1123 of the Bankruptcy Code.

199.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

200.    "*Wind Down*" means, the wind down, liquidation, and dissolution of the Debtors' Estates following the Effective Date as set forth in Article IV hereof.

201.    "*Wind-Down Budget*" means the budget funding the Wind Down, in an amount no more than [$●] million and which shall include certain amounts required to satisfy certain required obligations in connection therewith (each in accordance with the Asset Purchase Agreements and the Sale Orders), as acceptable to the Debtors and the Required DIP Lenders, as may be amended by the Debtors, Wind-Down Debtors, or the Plan Administrator, as applicable, with the consent of the Required DIP Lenders.

202.    "*Wind-Down Debtor*" means the Debtor or Debtors or any successor or successors thereto after the Effective Date responsible for effectuating the Wind Down and implementing the terms of the Plan.

203.    "*Wind-Down Debtor Account*" means the Debtors' bank account or accounts used to fund all expenses and payments required to be made by the Wind-Down Debtors, which account will be funded on the Effective Date with Available Cash in the amount of the Wind-Down Debtor Account Amount.  Following the Wind Down, any remaining amounts in the Wind-Down Debtor Account shall be distributed in accordance with Article III hereof.  For the avoidance of doubt, the Wind-Down Debtor Account and the proceeds therein shall become property of the Wind-Down Debtors on the Effective Date.

204.    "*Wind-Down Debtor Account Amount*" means the amount reserved by the Plan Administrator, in an amount acceptable to the Required DIP Lenders, to fund the Wind Down in accordance with the Wind-Down Budget which, for avoidance of doubt, shall be no more than [$●].

205.    "*Wind-Down Debtor Assets*" means, following the consummation of the Sale Transactions, all of the remaining assets of the Debtors' Estates, including the Wind-Down Debtor Account Amount but excluding the (i) DIP Paydown Amount and (ii) the Liquidating Trust Assets.

206.    "*Wind-Down Debtor Retained Causes of Action*" means those Causes of Action that shall vest in the Wind-Down Debtors on the Effective Date.  For the avoidance of doubt, Wind-Down Debtor Retained Causes of Action shall not include the Liquidating Trust Retained Causes of Action or any Causes of Action that are settled, released, or exculpated under the Plan or that are expressly sold or assigned to any Purchaser, as set forth in the applicable Asset Purchase Agreement, pursuant to the applicable Sale Order.  The list of Wind-Down Debtor Retained Causes of Action shall be filed with the Plan Supplement.

22

B.      *Rules of Interpretation.*

For purposes of this Plan:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan or Confirmation Order, as applicable; (iv) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (v) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (vi) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (vii) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (viii) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws; (ix) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (x) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (xi) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (xii) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (xiii) any effectuating provisions may be interpreted by the Wind-Down Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (xiv) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (xv) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (xvi) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (xvii) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

23

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control); *provided*, *however*, that corporate, limited liability company, or limited liability partnership governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, not incorporated in Delaware shall be governed by the laws of the jurisdiction of incorporation or formation of the relevant Debtor or the Wind-Down Debtor, as applicable.

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Wind-Down Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors means the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

G.      *No Substantive Consolidation; Limited Administrative Consolidation.*

Although for purposes of administrative convenience and efficiency the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors except for the limited purposes set forth herein.  The entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the limited consolidation of each of the Debtors, and their respective estates, solely for voting, confirmation, and distribution purposes under the Plan.  This limited consolidation shall not affect (other than for purposes related to funding distributions under the Plan) (a) the legal and organizational structure of the Debtors, (b) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (c) distributions out of any insurance policies or proceeds of such policies.

24

71306/0001-53355255v12

*H.      Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document or instrument in the Plan Supplement, the terms of the relevant document or instrument in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS,
## PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

*A.      General Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, the DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which (i) an order Allowing such Administrative Claim becomes a Final Order, or (ii) the Plan Administrator, on the one hand, and the Holder of the Administrative Claim, on the other hand, agree to the Allowed amount of such claim, or as soon as reasonably practicable thereafter; or (3) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtors no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claim.

Objections to such requests must be Filed and served on the Wind-Down Debtors and the requesting party by the Administrative Claims Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be

71306/0001-53355255v12

determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

**Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down Debtors, or their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Wind-Down Debtors or any notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.**

The Wind-Down Debtors or the Plan Administrator (on behalf of the Wind-Down Debtors), may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.

B.      *Professional Fee Claims.*

1.   Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Wind-Down Debtors shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account, when such Professional Fee Claims are Allowed or awarded by entry of an order of the Bankruptcy Court.

2.   Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, and in consultation with the DIP Lenders, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtors.

The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to each such Professional by the Debtors or the Wind-Down Debtors, as applicable, from the funds held in the Professional Fee Escrow Account or the Wind-Down Debtor Account, as applicable, as soon as reasonably practicable after such Professional Fee Claims are Allowed by

26

an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining Cash held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors and constitute part of the Wind-Down Debtor Assets without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Professional Fee Amount.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than 5 days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that may be Allowed pursuant to the Professional's final request for payment of Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or the Wind-Down Debtors, as applicable, may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Wind-Down Debtors shall use Cash on hand or from the Wind-Down Debtor Account to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.   Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or the Wind-Down Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtors. If the Debtors or the Wind-Down Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or the Wind-Down Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors or the Plan Administrator, as applicable, may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything in this Plan, nothing alters the terms of the A&M Order and the requirement to seek approval of the Completion Fee (as defined in the A&M Order) as set forth in the A&M Order.

27

C.      *DIP Claims.*

On the Effective Date, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable or alternative treatment, on or before the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for all Allowed DIP Claims, each Holder of an Allowed DIP Claim (which shall include interest, fees, and all other amounts due and owing under the DIP Facility) has consented to receive and shall receive, (i) Cash in an amount necessary to pay the reasonable and documented fees, expenses, and disbursements of the Lender Professionals, to the extent any amount remains outstanding, (ii) Cash proceeds of the Sale Transactions, (ii) the Deemed DIP Paydown Amount, and (iii) the Distributable Value under the Distributable Waterfall, until such Allowed DIP Claim is indefeasibly paid in full, but at all times subject to the Distributable Waterfall.  The DIP Liens shall remain in place until the Allowed DIP Claims are indefeasibly paid in full.  For the avoidance of doubt, any distribution made pursuant to verse (i) above shall be made directly to the applicable Lender Professional and not to the Holder of an Allowed DIP Claim.

D.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.      *Statutory Fees.*

The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-PCR. On and after the Effective Date, the Wind-Down Debtors or Liquidating Trustee, as applicable, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  All Quarterly Fees due and payable prior to the Effective Date shall be paid by the Debtors on the Effective Date (or funded by the Wind-Down Debtors and disbursed by the Disbursing Agent on behalf of each of the Wind-Down Debtors). After the Effective Date, each of the Wind-Down Debtors or the Liquidating Trust shall be severally (but not jointly and severally) liable to pay Quarterly Fees for the disbursements made by such Wind-Down Debtor (or Disbursement Agent on behalf of the Wind-Down Debtors) or Liquidating Trust (or the Liquidating Trustee or Disbursement Agent on behalf of the Liquidating Trustee, if applicable), in full in cash when due and payable in the applicable Debtor's or Wind-Down Debtor's Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of the applicable Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided that* the several (rather than joint and several) nature of those parties' liability for Quarterly Fees shall not be binding upon the U.S. Trustee in carrying out his responsibilities for billing and collecting fees pursuant to 28 U.S.C. § 1930(a)(6) until the earliest of a particular Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. For the avoidance of doubt, the Liquidating Trust Contribution disbursed to the Liquidating Trust upon the Effective Date will be included in the calculation of the Quarterly Fees payable to the U.S. Trustee by the Debtors for the quarter in which the Effective Date occurs, and neither the Debtors, the Wind-Down

28

Debtors, nor the Liquidating Trust will be responsible for any statutory fees based on the Liquidating Trust's subsequent distribution of such Cash.   If other Liquidating Trust Assets are liquidated and disbursed, the Liquidating Trustee shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  The U.S. Trustee may assess Quarterly Fees against the Liquidating Trust upon the liquidation and disbursement of such assets, and the Liquidating Trust's rights to contest the assessment and/or amount of such fees are expressly preserved.  Notwithstanding the foregoing, any Quarterly Fee assessed on account of the Liquidating Trust Assets shall be paid by the Liquidating Trust, and the Wind-Down Debtors shall have no obligation to pay such fees (if any).  The U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Quarterly Fees in these Chapter 11 Cases and shall not be treated as providing any release under the Plan. The provisions of this paragraph shall control notwithstanding any other provision(s) in the Plan to the contrary.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest, qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Claims for the Debtors are set forth herein.

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | First Lien Claims | Impaired | Entitled to Vote |

29

| 5 | Second Lien Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.     *Treatment of Claims and Interests.*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.   Class 1 – Secured Tax Claims.

(a)   *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)   *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Plan Administrator:

(i)   payment in full in Cash of such Holder's Allowed Secured Tax Claim;

(ii)   equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the

30

71306/0001-53355255v12

Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Each Holder of a Class 1 Secured Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Class 1 Secured Tax Claim is not entitled to vote to accept or reject the Plan.

2.   Class 2 – Other Secured Claims.

(d)     *Classification*:  Class 2 consists of all Other Secured Claims.

(e)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtors or Wind-Down Debtors:

(i)     payment in full in Cash of such Holder's Allowed Other Secured Claim;

(ii)    the collateral securing such Holder's Allowed Other Secured Claim;

(iii)   Reinstatement of such Holder's Allowed Other Secured Claim pursuant to section 1124 of the Bankruptcy Code; or

(iv)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(f)     *Voting*:  Class 2 is Unimpaired under the Plan.  Each Holder of a Class 2 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of a Class 2 Other Secured Claim is not entitled to vote to accept or reject the Plan.

3.   Class 3 – Other Priority Claims.

(a)     *Classification*:  Class 3 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, on or as soon as reasonably

31

71306/0001-53355255v12

practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Administrative, Allowed Priority Tax Claim, or Allowed Other Claims, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)   *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.   <u>Class 4 – First Lien Claims</u>.

(a)   *Classification*:  Class 4 consists of all First Lien Claims.

(b)   *Allowance*:  The First Lien Claims shall be Allowed in an amount equal to [$●].34,955,008.32.[2]

(c)   *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed First Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Claim shall receive its *pro rata* share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Article II of this Plan; *provided*, *however*, that: (i) in no event shall any Holder of a First Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(d)   *Voting*:  Class 4 is Impaired under the Plan.  Holders of First Lien Claims are entitled to vote to accept or reject the Plan.

5.   <u>Class 5 –Second Lien Claims</u>.

(a)   *Classification*:  Class 5 consists of all Second Lien Claims.

(b)   *Allowance*:  The Second Lien Claims shall be Allowed in an amount equal to [$●].

(c)   *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Second Lien Claim shall

---

[2]   The Allowed amount of the First Lien Claims excludes the 1L Roll-Up DIP Loans, which is part of the DIP Facility.

71306/0001-53355255v12

receive its *pro rata* share of Distributable Value pursuant to the Distributable Waterfall, if any, in accordance with Articles II and III of this Plan; *provided*, *however*, that in no event shall any Holder of Second Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim.

(d) *Voting*: Class 5 is Impaired under the Plan. Holders of Second Lien Claims are entitled to vote to accept or reject the Plan.

6. <u>Class 6 – General Unsecured Claims</u>.

(a) *Classification*: Class 6 consists of the General Unsecured Claims.

(b) *Allowance*: The First Lien Deficiency Claim shall be Allowed as a General Unsecured Claim. The Second Lien Deficiency Claim shall be Allowed as a General Unsecured Claim. All other General Unsecured Claims shall be Allowed pursuant to the procedures set forth in this Plan.

(c) *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Liquidating Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed General Unsecured Claim, each Holder thereof will receive its *pro rata* share of the Liquidating Trust Interests.

(d) *Voting*: Class 6 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan. Solely for the purpose of voting, (a) the First Lien Lenders shall have an Allowed General Unsecured Claim in the amount equal to the First Lien Deficiency Claim Amount as set forth in such definition, and (b) the Second Lien Lenders shall have an Allowed General Unsecured Claim in the amount equal to the Second Lien Deficiency Claim Amount as set forth in such definition.

7. <u>Class 7 – Intercompany Claims</u>.

(a) *Classification*: Class 7 consists of all Intercompany Claims.

(b) *Treatment*: Each Allowed Intercompany Claim shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released; or (d) otherwise addressed at the option of the Debtors or Wind-Down Debtors without any distribution on account of such Intercompany Claims.

(c) *Voting*: Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or

71306/0001-53355255v12

Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Intercompany Interests</u>.

    (a)     *Classification*:  Class 8 consists of all Intercompany Interests.

    (b)     *Treatment*:  Allowed Intercompany Interests shall, at the election of the Debtors or Wind-Down Debtors, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise addressed at the option of the Wind-Down Debtors or Debtors without any distribution on account of such Intercompany Interests.

    (c)     *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

9. <u>Class 9 – Existing Equity Interests</u>.

    (a)     *Classification*:  Class 9 consists of all Existing Equity Interests.

    (b)     *Treatment*:  On the Effective Date, all Existing Equity Interests shall be cancelled, released, and extinguished, and will be of no further force or effect.  Holders of Interests shall receive no recovery or distribution on account of their Interests.

    (c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Section 510(b) Claims</u>.

    (a)     *Classification*:  Class 10 consists of all Section 510(b) Claims.

    (b)     *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be cancelled, released, and extinguished, and will be of no further force or effect.  Holders of Section 510(b) Claims shall not receive recovery or distribution on account of such Claims.

    (c)     *Voting*:  Class 10 is Impaired under the Plan.  Holders of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section

34

71306/0001-53355255v12

1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Wind-Down Debtors', the Plan Administrator's, or the Liquidating Trustee's rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B herein.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X herein to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.     *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee (as applicable) reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.     *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. To the extent a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, such Class shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

35

*G.      Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are being received by Holders of such Intercompany Interests solely to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Wind-Down Debtors to the Holders of certain Allowed Claims and otherwise for uses as are contemplated by the Plan, in each case, in accordance with the terms of the applicable Sale Order.

*H.      Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*I.      Insurance.*

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

If a Claim may be covered by an Insurance Policy that has a self insured retention (an "SIR") or deductible (a "Deductible"), the Allowed amount of such Claim that is within the applicable SIR or Deductible shall constitute an Allowed General Unsecured Claim against the applicable Debtor's Estate. Such SIR or Deductible shall be considered satisfied pursuant to this Plan through allowance of such General Unsecured Claim solely in the amount of the applicable SIR or Deductible; *provided*, *however*, that nothing herein obligates the Liquidating Trust to otherwise satisfy any SIR or Deductible under any Insurance Policy. Any recovery on account of a Claim, that may be payable, in full or in part, pursuant to the terms and conditions of one of the Debtors' Insurance Policies in excess of the SIR or Deductible shall be payable pursuant to the terms and conditions of the applicable Insurance Policy, if any.  Nothing in this Plan shall (1) be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an Insurance Policy, (2) alter or modify the terms and conditions of any Insurance Policy, or (3) be a determination that any Insurance Policy is an Executory Contract or is capable of assumption or rejection. In no event shall the Debtors or the Liquidating Trust be required to pay any amounts within a SIR or Deductible, including defense costs, other than though the allowance of a General Unsecured Claim up to the amount of the applicable SIR or Deductible.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

*A.      Sources of Consideration for Plan Distributions.*

Distributions on account of the DIP Claims, First Lien Claims, and Second Lien Claims shall be funded by the Debtors and the Wind-Down Debtors, as applicable, consistent with the

36

Plan, *provided, however*, to the extent any of the preceding Claims are satisfied in whole or in part from the Blue Apron Deferred Payments, such Claims shall be funded by Blue Apron or Wonder Group, Inc, or an affiliate thereof.  The applicable Purchaser shall be responsible for payment of all Allowed Claims that constitute Assumed Liabilities under any Purchase Agreement.  Administrative Claims, Priority Tax Claims and Secured Tax Claims, Other Secured Claims, and Other Priority Claims which were not assumed by any Purchaser, shall be funded by the Debtors with Cash on hand or through the Administrative Claims Reserve Amount under the Wind-Down Budget, on the Effective Date or shortly thereafter consistent with the Plan.  The Liquidating Trustee shall fund distributions to all other Holders of Allowed General Unsecured Claims under the Plan with the Liquidating Trust Assets, in each case in a manner consistent with the Plan.

B.      *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, (i) the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests except as otherwise expressly provided in this Plan; and (ii) the Plan Administration Assets shall vest in the Wind-Down Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests except for those concerning the DIP Claims, the First Lien Claims, and the Second Lien Claims, or as otherwise expressly provided in this Plan.

C.      *Wind-Down Debtors.*

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtors solely for the purposes of (i) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, and liquidating all Wind-Down Debtor Assets, (ii) performing any remaining obligations under the TSA; (iii) enforcing and prosecuting Claims, interests, rights, and privileges under the Wind-Down Debtor Retained Causes of Action in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the First Lien Lenders and Second Lien Lenders to outweigh the costs associated therewith; (iv) resolving any Disputed non-General Unsecured Claims, (v) paying or otherwise satisfying Allowed non-General Unsecured Claims, (vi) filing appropriate tax returns (and, for the avoidance of doubt, may pursue any refunds, credits, or other tax benefits to which the Debtors and/or the Wind-Down Debtor are entitled and file any tax returns or other filings as are required in connection therewith), (vii) complying with its continuing obligations under the Asset Purchase Agreements, if any, (viii) otherwise administering the Plan in an efficacious manner, and (ix) undertaking any restructuring transactions as are necessary or advisable in connection with the foregoing.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter.

On the Effective Date, the Wind-Down Debtor Assets shall vest in the Wind-Down Debtors for the primary purpose of administering the Wind-Down Debtors' Estates, which may

71306/0001-53355255v12

include liquidating the Wind-Down Debtor Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business, other than performance under the TSA. In consultation with the DIP Agent, the First Lien Agent and the Second Lien Agent, the Wind-Down Debtors will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Debtor Assets, make timely distributions pursuant to the Plan and Confirmation Order, and not unduly prolong its duration, provided that the DIP Agent and First Lien Agent shall have sole discretion over the Wind-Down Debtors' and Plan Administrator's pursuit, settlement or compromise of the Directed 1L Priority Collateral, and only after the First Lien Obligations have been paid in full, then the Second Lien Agent shall have sole discretion over the Wind-Down Debtors' and Plan Administrator's pursuit, settlement or compromise of any residual Directed 1L Priority Collateral. The Wind-Down Debtor Assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. The Wind-Down Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

*D.      Plan Administrator.*

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor, subject to the consent of the DIP Agent, the First Lien Agent and the Second Lien Agent, as the sole director and the sole officer of such Wind-Down Debtor and shall succeed to the powers of such Debtor's directors and officers. The Plan Administrator shall be the sole representative of, and shall act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all Governance Documents are deemed amended by the Plan to permit and authorize the same).

The Debtors shall include, in the Plan Supplement, the information set forth in Sections 1129(a)(4) and (5) of the Bankruptcy Code and the identity of the Person or Entity that the Debtors have selected as the Plan Administrator. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.

1. The Plan Administrator Agreement

Prior to or on the Effective Date, the Debtors shall execute a Plan Administrator Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Plan Administrator Agreement made by the Debtors prior to the Effective Date, which shall be subject to the consent of the DIP Agent, the First Lien Agent and the Second Lien Agent, are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement as necessary to implement the provisions of the Plan.

71306/0001 53355255v12

2. <u>Rights, Powers, and Duties of the Debtors and Plan Administrator</u>

On and after the Effective Date, the Plan Administrator will act for the Post-Effective Date Debtors in the same capacity as applicable to a board of managers or directors, or to officers, subject to the provisions of the Plan. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Wind-Down Debtors. Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all corporate actions consistent with the Plan, the Confirmation Order, any Asset Purchase Agreements, all other applicable orders of the Bankruptcy Court, and the Plan Administrator Agreement, in each case, that are necessary and/or desirable to effectuate the terms of the Plan on behalf of the Wind-Down Debtors and use its reasonable best efforts to assist with or effectuate the transition of the Debtors' business, wind down, dissolution, or liquidation of the Wind-Down Debtors. In taking such actions, the Plan Administrator may control and exercise authority over any Assets, vested in the Wind-Down Debtors pursuant to the Plan, over the acquisition, management, and disposition thereof and over the management and conduct of the affairs of the Wind-Down Debtors. Such rights, powers and duties, which shall be exercisable by the Plan Administrator on behalf of the Wind-Down Debtors pursuant to the Plan and the Plan Administrator Agreement, shall include, among others, (a) making distributions to Holders of Allowed Claims and Interests as provided for in the Plan (except for Allowed General Unsecured Claims), (b) administering, reconciling and resolving (i) Administrative Claims, Secured Claims, and Priority Tax Claims, and (ii) upon one (1) business days' notice to the Liquidating Trustee, DIP Claims, First Lien Claims, Second Lien Claims, and Other Priority Claims, (c) filing tax returns and paying taxes, (d) commencing and pursuing the Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets and managing and administering any proceeds thereof, (e) paying certain Quarterly Fees, (f) defending the Debtors in any pending or future litigation, (g) selling, abandoning, or otherwise fully administering the Estates, (h) in consultation with the Liquidating Trustee, closing the Chapter 11 Cases, (i) dissolving the Wind-Down Debtors, and (j) performing other duties and functions that are consistent with the implementation of the Plan.

For the avoidance of doubt, the Plan Administrator shall administer the Wind-Down Debtors and the Plan in accordance with the Wind-Down Budget and shall have the authority to authorize, make, or cause to be made payments in accordance with the Wind-Down Budget. The Plan Administrator shall use commercially reasonable efforts to adhere to (or outperform) the Wind-Down Budget; provided that the Plan Administrator shall have the authority to reallocate funding between line items within the Wind-Down Budget without further order of the Court, but in all cases in consultation with the DIP Agent, the First Lien Agent, and the Second Lien Agent, provided that if the Directed 1L Priority Collateral is a Wind-Down Debtor Asset, the Plan Administrator shall obtain the consent of the DIP Agent and the First Lien Agent prior to reallocation of any funding relating to recovery of the Directed 1L Priority Collateral.

In pursuing any Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, under this Plan, the Plan Administrator shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be

39

entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Wind-Down Debtor Retained Causes of Action transferred to the Plan Administrator, on behalf of the Wind-Down Debtors, may be brought under Section 546 of the Bankruptcy Code.

The Plan Administrator shall have the right, in consultation with the First Lien Agent and Second Lien Agent, to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator and in accordance with the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

The Plan Administrator and all professionals retained by the Plan Administrator shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each Wind-Down Debtor.  The Plan Administrator may rely upon written information previously generated by the Debtors.

3. Compensation of the Plan Administrator

The Plan Administrator shall be compensated pursuant to the terms of the Plan Administrator Agreement; *provided that* the Plan Administrator shall be permitted to use the Wind-Down Amount, which has been allocated and approved pursuant to the Approved Budget, to pay the Plan Administrator's fees and expenses as set forth in the Plan Administrator Agreement.

4. Insurance for the Plan Administrator

The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Amount all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, and the Wind-Down Debtors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Plan Administrator and its agents, representatives, employees or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Plan Administrator after the termination of the Plan Administrator Agreement. The Plan Administrator may also obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.

5. Transition Services

On the Effective Date, the Plan Administrator shall serve as an appointed agent of the designated operator or as the operator of the Debtors in accordance with the Plan for the purposes of fulfilling any obligations under the TSA.

40

71306/0001-53355255v12

6.   Termination of the Plan Administrator's Responsibilities and Obligations

Upon the conclusion of the Plan Administrator's obligations under the post-Effective Date Wind Down in accordance with the Plan and Plan Administrator Agreement, the Plan Administrator shall remit any remaining balance of the Wind-Down Account Amount to the DIP Lenders or Prepetition Secured Parties, as applicable, for distribution pursuant to the terms of this Plan.

E.   *Liquidating Trust.*

1.   Establishment of the Liquidating Trust

On the Effective Date, the Liquidating Trust will be established pursuant to the Liquidating Trust Agreement, which will be Filed with the Bankruptcy Court as part of the Plan Supplement. Upon establishment of the Liquidating Trust, title to the Liquidating Trust Assets shall be deemed transferred to the Liquidating Trust without any further action of the Debtors or any managers, employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors.

The Liquidating Trust Interests to be distributed to Liquidating Trust Beneficiaries under this Plan shall not constitute "securities" under applicable securities laws and shall represent only the right to receive distributions from the Liquidating Trust in accordance with the Liquidating Trust Agreement. The Liquidating Trust Interests shall be non-transferable, except as required by law or as provided in the Liquidating Trust Agreement.

2.   Transfer of the Liquidating Trust Assets

Pursuant to section 1141 of the Bankruptcy Code, all property transferred to the Liquidating Trust shall be made free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as may be otherwise provided for in this Plan. Upon completion of the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Debtors will have no further interest in, or with respect to, the Liquidating Trust Assets or the Liquidating Trust. For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms herein as a transfer to the Liquidating Trust Beneficiaries, followed by a transfer of such assets by such Liquidating Trust Beneficiaries to the Liquidating Trust, and the Liquidating Trust Beneficiaries will be treated as the grantors and owners thereof.

3.   Liquidating Trust Agreement

On the Effective Date, the Debtors shall execute the Liquidating Trust Agreement in substantially the same form as set forth in the Plan Supplement. Any nonmaterial modifications to the Liquidating Trust Agreement made by the Debtors, subject to the reasonable consent of the First Lien Agent and the Second Lien Agent, will be ratified. The Liquidating Trust Agreement will contain provisions permitting the amendment or modification of the Liquidating Trust Agreement necessary to implement the provisions of the Plan.

41

4.    Purpose of the Liquidating Trust

The Liquidating Trust shall be established for, among other purposes, the purpose of (a) receiving and holding the Liquidating Trust Assets; (b) administering, disputing, objecting to, compromising, or otherwise resolving all Claims and Interests other than (i) DIP Claims, (ii) First Lien Claims, (iii) Second Lien Claims, (iv) Administrative Claims, (v) Secured Claims, (vi) Priority Tax Claims, and (vii) Prepetition Deficiency Claims; (c) making distributions to the Liquidating Trust Beneficiaries in accordance with this Plan and the Liquidating Trust Agreement; (d) maximizing recoveries for the benefit of the Liquidating Trust Beneficiaries; and (e) commencing and pursuing the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, if any, and managing and administering any proceeds thereof with no objective to continue or engage in the conduct of a trade or business in accordance with Treas. Reg. § 301.7701-4(d).

The Liquidating Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes, with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. To the extent permitted by applicable law, all parties, including the Liquidating Trustee and any Liquidating Trust Beneficiaries, shall report consistently with the foregoing for all applicable tax reporting purposes (including consistent reporting for valuation purposes).

5.    Liquidating Trustee

Upon the occurrence of the Effective Date, the Liquidating Trustee shall be deemed appointed to serve as the trustee and administrator of the Liquidating Trust established pursuant to the Plan and the Liquidating Trust Agreement. The Liquidating Trustee, subject to the terms and conditions of the Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust Agreement, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Liquidating Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Liquidating Trust Agreement, as applicable. The Liquidating Trustee shall owe fiduciary duties solely to the Liquidating Trust Beneficiaries and shall act in the best interests of such Liquidating Trust Beneficiaries in connection with the foregoing and the administration, monetization or distribution of any Liquidating Trust Assets.

In pursuing any Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets, the Liquidating Trustee shall be deemed a trustee for all purposes under Section 108 of the Bankruptcy Code, shall be entitled to the tolling provisions provided under Section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the periods in which any of the Liquidating Trust Retained Causes of Action constituting Liquidating Trust Assets may be brought under Section 546 of the Bankruptcy Code.

The Liquidating Trustee shall be compensated as set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall fully comply with the terms, conditions and rights set forth in this Plan, the Plan Supplement, the Confirmation Order, and the Liquidating Trust

42

Agreement. The Liquidating Trustee (and any professionals retained by the Liquidating Trustee) shall not be required to File a fee application to receive compensation.

The Liquidating Trustee shall have the right, and subject to any consent or consultation rights as set forth in the Liquidating Trust Agreement, and without Bankruptcy Court approval, to retain the services of attorneys, accountants, and other professionals and agents, to assist and advise the Liquidating Trustee in the performance of his, her, or its duties, and to compensate and reimburse expenses of such professionals in accordance with the Liquidating Trust Agreement.

6.  Liquidating Trust Insurance

The Liquidating Trustee shall be authorized to obtain and pay for out of the Liquidating Trust Assets all reasonably necessary insurance coverage for itself, its agents, representatives, employees or independent contractors, including, but not limited to, coverage with respect to (a) any property that is or may in the future become the property of the Debtors or their Estates and (b) the liabilities, duties and obligations of the Liquidating Trustee and its agents, representatives, employees or independent contractors under the Liquidating Trust Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may remain in effect for a reasonable period of time as determined by the Liquidating Trustee after the termination of the Liquidating Trust Agreement.

7.  U.S. Federal Income Tax Treatment and Reporting of Liquidating Trust

The Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect

71306/0001-53355255v12

to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than 5 years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the 6 month period prior to the fifth anniversary (or within the 6 month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 5 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit).  Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items.  The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

8.   Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account

44

71306/0001-53355255v12

(and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

*F.     Corporate Existence Post-Effective Date*

      1.     <u>Directors and Officers</u>

Immediately following the occurrence of the Effective Date, (i) the respective boards of directors or managers, as applicable, and the current officers, of each of the Debtors, shall be terminated without cause and such members of the boards of directors or managers, as applicable, and the current officers of the Debtors shall be deemed to have resigned; and (ii) the Plan Administrator shall: (1) be appointed as the sole member of the board of directors or board of managers, as applicable, and the sole officer; (2) succeed as the sole Holder of Interests in each Wind-Down Debtor; (3) have the rights and powers of a debtor in possession under Section 1107 of the Bankruptcy Code; (4) be a "representative of the estate" pursuant to Section 1123(b)(3) of the Bankruptcy Code; (5) be vested with the rights, powers, and benefits afforded to a "trustee" under Sections 704 and 1106 of the Bankruptcy Code; and (6) have such other rights, powers, and duties incidental to causing performance of the obligations under the Plan or otherwise as may be reasonably necessary. All certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same without further action by any Entity and without Bankruptcy Court approval.

      2.     <u>Organizational Governance Documents</u>

Immediately following the occurrence of the Effective Date, the Wind-Down Debtors shall continue to exist in accordance with the laws of their respective states of formation and pursuant to their respective certificates of incorporation, by-laws, articles of formation, operating agreements, and other organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates and making distributions in accordance with the Plan. The Wind-Down Debtors shall exist for the limited purposes of fully administering the Estates. Promptly after performing all duties and functions that are consistent with the implementation of the Plan, the Confirmation Order, and the Plan Administrator Agreement, the Plan Administrator shall be authorized and directed to take all actions to wind down, dissolve, or liquidate the Wind-Down Debtors without the necessity for any other or further actions to be taken by or on behalf of such dissolving Wind-Down Debtors or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities, pursuant to Section 303 of the Delaware General Corporation Law codified at title 8 of the Delaware Code or other applicable state law.

The certificate and articles of in-corporation and by-laws of each Wind-Down Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, a provision (a) prohibiting the issuance of non-voting equity securities under Section 1123(a)(6) of the Bankruptcy Code and (b) limiting the activities of the Wind-Down Debtors to matters authorized under the Plan.

71306/0001-53355255v12

G.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation and objections thereto.  The Wind-Down Debtors shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (y) applications for payment of any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court; and (z) responding to objections to its applications for payment of fees and expenses rendered prior to the Effective Date.

H.      *Cancellation of Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except (i) such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan and (ii) any indemnification obligations set forth in Article V.E hereof) shall be cancelled solely as to the Debtors and their Affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Debtor affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds (but not including any surety bonds issued on behalf of any of the Debtors), indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged, provided that, notwithstanding the foregoing, the liens supporting the First Lien Obligations and the Second Lien Obligations shall remain in place until such Obligations are either paid in full or to the extent there is no further collateral to support such obligations, satisfied in accordance with this Plan. Notwithstanding the foregoing, (a) no executory contract or unexpired lease that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code shall be terminated or cancelled on the Effective Date, and (b) no Prepetition Loan Document shall be cancelled to the extent such document evidences indebtedness and/or grants a Prepetition Secured Party a security interest in the Debtors' or Wind-Down Debtors' property.

I.      *Corporate Action.*

Upon the Effective Date, by virtue of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator or the Liquidating Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, the Debtors, Wind-Down Debtors, or any other Entity or Person.  All matters provided for in this

46

Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

*J.      Effectuating Documents; Further Transactions.*

On and after the Effective Date the Plan Administrator and the Agents may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Confirmation Order, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

*K.      Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtor or to any other Person or from any of the Wind-Down Debtors to the Liquidating Trust or any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtors; (2) any Sale Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  No provision of the Plan or of the Confirmation Order shall be construed to broaden the tax exemption under section 1146(a) beyond what the statute allows.

*L.      Causes of Action.*

Except as otherwise provided in Article IX herein or in any contract, instrument, release, or agreement entered into in connection with the Plan or the Sale (including the Asset Purchase Agreement), in accordance with section 1123(b) of the Bankruptcy Code, (a)(i) all Liquidating

47

71306/0001-53355255v12

Trust Retained Causes of Action constituting Liquidating Trust Assets are preserved and transferred to the Liquidating Trust on the Effective Date and (ii) all Wind-Down Debtor Retained Causes of Action constituting Plan Administration Assets are preserved and transferred to the Wind-Down Debtors on the Effective Date, and (b) all Causes of Action constituting Acquired Assets are preserved and transferred to the applicable purchaser (to the extent not previously transferred).

*M.*      *Books and Records.*

On the Effective Date, each of the Liquidating Trust and Plan Administrator shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with any Asset Purchase Agreement and that relate to the operation and business of the Liquidating Trust or Wind-Down Debtors; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee and Plan Administrator, determines, in accordance with the Liquidating Trust Agreement and Plan Administrator Agreement, that retention of same is no longer necessary or beneficial.

*N.*      *Insurance Claims: Business Interruption Insurance Claims, D&O Claims and Others.*

Nothing in this Plan or Confirmation Order shall affect, impair or diminish in any form the Business Interruption Insurance Claims or any rights thereto. Similarly, any rights and Claims under any applicable Business Interruption Insurance Policies shall not be affected, impaired or diminished by operation of the Plan or Confirmation Order. For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Business Interruption Insurance Policies of the Debtors.

To the extent any D&O Claims are designated as Liquidating Trust Retained Causes of Action or Wind-Debtor Retained Causes of Action, nothing in this Plan, including the releases provided under Article VIII of the Plan, shall have the effect of prohibiting the initiation or continuation of an action by the Plan Administrator or Liquidating Trustee up to and through the entry of a judgment or settlement against any D&O Party. No D&O Party shall be released or absolved from the legal obligation to pay as a result of any D&O Claims for which such D&O Party is responsible for an insurable loss under the D&O Liability Insurance Policies under which the D&O Party is insured; provided, however, that such D&O Party shall not be liable for any D&O Claims to the extent, and only to the extent, such D&O Claims exceed the amounts paid by the Insurer pursuant to the applicable D&O Liability Insurance Policies. For the avoidance of doubt, the foregoing shall not limit the availability of coverage under any applicable Insurance Policies of the Debtors (including, for the avoidance of doubt, any defense costs, professional fees, indemnification or other disbursements payable from insurance).

For the avoidance of doubt, nothing in this Plan shall: (a) constitute a discharge of any D&O Party for the purposes of the D&O Liability Insurance Policies; (b) be deemed to trigger any policy exclusion, including without limitation any exclusions for amounts for which an insured is "absolved from payment"; and (c) impair the obligations of an Insurer to pay any covered "Loss" on behalf of any "Insured" under the D&O Liability Insurance Policies.

71306/0001-53355255v12

The Wind-Down Debtors, the Plan Administrator, and the Liquidating Trust (if applicable) shall use commercially reasonable efforts to cooperate with the DIP Agent and the First Lien Agent in providing information and documents and in pursuing proceeds under the Insurance Collateral to the extent practicable. The extent and specifics of such cooperation shall be governed by the Liquidating Trust Agreement and Plan Administrator Agreement, as applicable, which shall be included in the Plan Supplement.

O.    *Section 1145 Exemption.*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Interests pursuant to the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local Law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Interests issued pursuant to the Plan are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtors (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is:  (1) the TSA; (2) the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) an Insurance Policy; (5) an Asset Purchase Agreement; or (6) to be assumed by the Debtors and assigned to any Purchaser in connection with any Sale Transactions and pursuant to any Sale Transactions Documentation or the TSA.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Orders to assume and assign Executory Contracts and Unexpired Leases to the Purchasers pursuant to the Asset Purchase Agreements.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtors.  Each Executory Contract and Unexpired

49

Lease assumed pursuant to the Plan or by any Final Order, including the Confirmation Order, which has not been assigned to a Purchaser pursuant to the applicable Asset Purchase Agreement or the applicable Sale Order, shall revest in and be fully enforceable by the Wind-Down Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

For the avoidance of doubt, this Article V relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of any Sale Order.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date (the "Rejection Damages Claims Bar Date"). **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, the Liquidating Trust (if any), the Purchasers, or their respective property without the need for any objection by the Wind-Down Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Wind-Down Debtors and the Holder of such Claim.

C.      *Insurance Policies.*

Except as otherwise provided in this Plan, nothing in the Plan, the Confirmation Order, the Plan Administrator Agreement, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder, or the terms and conditions thereof, or diminishes or impairs the enforceability of the Insurance Policies. In addition, on and after the Effective Date and subject to the terms and conditions of the D&O Liability Insurance Policies, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies in effect or purchased as of the Effective Date for the full term of such policy, regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies. Notwithstanding anything herein to the contrary, the Debtors or Wind-Down Debtors, as applicable, shall retain the ability to supplement such D&O Liability

71306/0001-53355255v12

Insurance Policies as the Debtors or Wind-Down Debtors deem necessary, including by purchasing any tail coverage or tail policies.

Upon the Effective Date, each of the Insurance Policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtors (or a Wind-Down Debtor identified as first named insured or counterparty thereto) effective as of the Effective Date, pursuant to sections 105, 365 and 1123 of the Bankruptcy Code, and coverage for defense and indemnity under any D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any such policies, subject to the terms and conditions of such D&O Liability Insurance Policies.  For the avoidance of doubt, this section shall not apply to any obligations as to any equity owner of any of the Debtors in its capacity as such, but this section shall only apply to any representatives or appointees of such equity owner if they are the Debtors' current or former officers, directors, individual managers, members, partners, supervisors, agents, or employees, in each case in their capacities as such.

The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.F hereof, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court: (i) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, (ii) claims where an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII.F hereof to proceed with its claim; and (iii) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Policies, and take other actions relating thereto (including effectuating a setoff), in each case in accordance with the terms of the Insurance Policies and/or applicable non-bankruptcy law.  Nothing in Article VIII.F of the Plan or any corresponding paragraph of the Confirmation Order requires, precludes and/or prohibits Insurers to or from administering, handling, defending, settling and/or paying claims covered by any Insurance Policies in accordance with and subject to the terms and conditions of such Insurance Policies and/or applicable non-bankruptcy law.

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

51

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Schedule of Rejected Executory Contracts and Unexpired Leases, or any other exhibit, schedule or annex, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Wind-Down Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan or the Confirmation Order, on the Effective Date (or if a Claim is not an Allowed Claim or on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims (as applicable) in the applicable Class.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have

52

been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or at such other time as provided for herein.  The Debtors and the Disbursing Agent, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.      *Rights and Powers of the Disbursing Agent.*

1.   Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Confirmation Order;  (b) make all distributions contemplated hereby;  (c) employ professionals to represent it with respect to its responsibilities (in accordance with the Wind-Down Budget); and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Confirmation Order, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof; *provided*, *however*, that the Debtors or the Wind-Down Debtors, as applicable, shall maintain the Claims Register.

2.   Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out of pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent (a) on behalf of the Wind-Down Debtors, shall be paid in Cash by the Wind-Down Debtors in accordance with the Wind-Down Budget, and (b) on behalf of the Liquidating Trustee, shall be paid in Cash by the Liquidating Trustee and shall constitute Liquidating Trust Expenses.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.   Record Date for Distributions.

On the Distribution Record Date, (i) the Claims Register and (ii) the loan registers maintained by each of the Agents, respectively, shall each be deemed closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred 20 or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if

53

71306/0001-53355255v12

the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.  Delivery of Distributions.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided*, *further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Distributions to Holders of DIP Claims, Allowed First Lien Claims, and Allowed Second Lien Claims shall be consistent with the DIP Order and the Prepetition Loan Documents.

3.  Minimum Distributions.

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $250 in value, and each such Claim to which this limitation applies shall be forever barred pursuant to Article VII from asserting that Claim against the Debtors or their respective property.

4.  Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of an Allowed Claim (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder related to such property or interest in property shall be discharged and forever barred.  The Wind-Down Debtors, the Disbursing Agent, and the Plan Administrator shall have no obligation to attempt to locate a Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the filings on the docket of the Chapter 11 Cases.

E.  *Manner of Payment.*

Any distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Wind-Down Debtor.  At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise set forth in the Plan Supplement.

F.  *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Liquidating Trustee or Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements

71306/0001-53355255v12

imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, any applicable withholding or reporting agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Liquidating Trustee and Plan Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

G.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

H.      *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or the DIP Orders, or required by applicable bankruptcy and non-bankruptcy law, (a) postpetition and/or default interest shall not accrue or be paid on any Claims, and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.   Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claims, if and when such Disputed Claim becomes an Allowed Claim.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)* as of 5:00 p.m., prevailing Eastern Time, on the Petition Date.

J.      *Setoffs and Recoupment.*

Except as expressly provided in the Plan, the Plan Administrator or Liquidating Trustee (as applicable) may, pursuant to section 553 of the Bankruptcy Code, applicable bankruptcy and/or non-bankruptcy law, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that a Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment (other than for the DIP Claims held by the DIP Lenders, a First Lien Claim held by the First Lien Lenders, a Second Lien Claim held by the Second Lien Lenders or a Prepetition Deficiency Claim held by any Prepetition Secured Party) is either (i) agreed in amount among

71306/0001-53355255v12

the relevant Wind-Down Debtor(s) and Holder of the Allowed Claim or (ii) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that such Wind-Down Debtor or its successor may possess against the applicable Holder.

K.      *No Double Payment of Claims.*

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims.  No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

L.      *Satisfaction of Claims.*

Notwithstanding anything to the contrary herein, in the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Claims and Noticing Agent, as applicable, shall adjust the Claims Register to reflect the adjustment or expungement, as applicable, of any and all Claims that are duplicative or have been satisfied or amended and superseded without further order of the Bankruptcy Court prior to making distributions, if any, to General Unsecured Creditors entitled to payment in Article III.B.6. herein.

M.      *Claims Paid or Payable by Third Parties.*

1.   Claims Paid by Third Parties.

The Debtors, Wind-Down Debtors, Liquidating Trustee, and Plan Administrator, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Wind-Down Debtor, or Liquidating Trust (as applicable) provided that the Debtors, Wind-Down Debtors, or Liquidating Trust (as applicable), shall provide notice of such reduction to the Holder of such Claim.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Wind-Down Debtor, or the Liquidating Trust (as applicable) on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor, Wind-Down Debtor, or the Liquidating Trustee to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor, Wind-Down Debtor, or the Liquidating Trust annualized interest at the Federal Judgment Rate on such amount owed for each Business

56

71306/0001-53355255v12

Day after the 14-day grace period specified above until the amount is repaid.  Notwithstanding anything to the contrary herein, this Article VI.M.1 shall not apply to payments received by the Holders of Allowed DIP Claims, Holders of Allowed First Lien Claims, or Holders of Allowed Second Lien Claims, which shall be subject to the Prepetition Intercreditor Agreement); *provided however,* that for the avoidance of doubt, claims paid by third-parties from any Collateral in satisfaction or partial satisfaction of Allowed DIP Claims, Allowed First Lien Claims, or Allowed Second Lien Claims, shall reduce such claims by the amount of such payments (or the Deemed DIP Paydown Amount).

2.  Claims Payable by Insurers.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' Insurers agrees to pay in full or in part a Claim, then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that notice of such satisfaction is served by the Debtors or the Wind-Down Debtors, as applicable, on the Holder of such Claim.

3.  Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.      Allowance of Claims and Interests.*

After the Effective Date, the Wind-Down Debtors, the Plan Administrator, or Liquidating Trustee, as applicable, shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately before the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed, or that is not or has not been Allowed by the Plan or a Final Order, is not considered Allowed and shall be expunged without further action by the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee, as applicable, and without further notice to any party or action, approval, or order of the Bankruptcy Court.

57

B.      *Claims and Interests Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, (a)(i) the Liquidating Trustee shall have the authority to File, withdraw, or litigate to judgment, objections to Filed General Unsecured Claims that are not Allowed; and (ii) the Plan Administrator shall have the authority to File, withdraw, or litigate to judgment objections to all Administrative Claims, First Lien Claims, Second Lien Claims, Priority Tax Claims, Other Priority Claims, and Secured Claims; *provided* that the Plan Administrator and the Liquidating Trustee, as applicable, shall have the authority to settle or compromise any respective Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court and (b) the Plan Administrator and the Liquidating Trustee, as applicable, shall administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Plan Administrator, Wind-Down Debtors, and Liquidating Trustee (as applicable) shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Retained Causes of Action.

The Debtors up to the Effective Date, and the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) on and after the Effective Date, shall be responsible and obligated to maintain the Claims Register, and to administer and adjust the Claims Register in regard to allowance of Claims. The Debtors, the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee, as applicable, may maintain the retention of the Claims and Noticing Agent and develop a budget for compensation of the Claims and Noticing Agent.

C.      *Estimation of Claims and Interests.*

Before, on, or after the Effective Date, the Debtors, the Wind-Down Debtors, the Plan Administrator, or the Liquidating Trustee, as applicable, may (but is not required to) at any time request that the Bankruptcy Court estimate the amount of any Claim, in each case solely to the extent that they have authority to File objections to such Claim under this Plan, pursuant to applicable Law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Disputed Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Disputed Claim or Interest, including during the litigation of any objection to any Disputed Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Disputed Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any

58

contingent, unliquidated or Disputed Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) may elect to pursue any supplemental proceedings to object to the allowance of, or any ultimate distribution on, such Claim or Interest.

D.      *Adjustment to Claims or Interests Without Objection.*

Any Claim or Interest that has been paid or satisfied may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) after notice to the Holder of such Claim (or such Holder's known counsel), but without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, that the Wind-Down Debtors, Plan Administrator, or Liquidating Trustee (as applicable) shall file a notice of satisfaction or other pleading evidencing such satisfactions and serve the same on the Holders of such Claims, or seek an order of the Bankruptcy Court with respect to the same, upon notice to the Holders of such Claim or Interest.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (i) 180 days after the Effective Date and (ii) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court, subject to a notice and objection period, for objecting to such Claims (the "Claims Objection Deadline").  For the avoidance of doubt, the period of limitation set forth in this Article VII.E shall not apply to Administrative Claims.

F.      *Disallowance of Claims.*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtors or Liquidating Trust, as applicable.  All Proofs of Claim Filed on account of an indemnification obligation to a director, manager, officer, or employee shall automatically be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is honored or reaffirmed pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims,**

59

**unless such late Claim has been deemed timely Filed by a Final Order of the Bankruptcy Court.**

G.      *Amendments to Proofs of Claims or Interests.*

On or after the applicable bar date, a Proof of Claim or Interest may not be Filed or amended without the prior written authorization of the Bankruptcy Court or the applicable Debtor, Wind-Down Debtor, or Liquidating Trustee, as applicable.  Absent such authorization, any new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan or the Confirmation Order, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

I.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions, if any, shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan and the Confirmation Order.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution, if any, that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy Law or as otherwise provided in Article III.B of the Plan.

J.      *Single Satisfaction of Claims.*

Holders of Allowed Claims may assert such Claims against the applicable Debtor or Debtors obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the applicable Debtor(s) based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

K.      *Claims Not Receiving a Distribution.*

Notwithstanding anything in the Plan to the contrary, the Debtors and the Wind-Down Debtors, as applicable, will not undertake any claims resolution process, steps related thereto or any action with respect to claims that are classified in a Class for which there will be no distribution.

60

71306/0001-53355255v12

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests.*

To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, and in consideration of the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith release, compromise, and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. To the greatest extent permissible under the Bankruptcy Code or applicable non-bankruptcy law, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies, and entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VI hereof, all distributions, if any, made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Release of Liens.*

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order or any contract, instrument, release, or other agreement or document created pursuant to the Plan or the Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan, and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Debtors or the Wind-Down Debtors, as applicable, to evidence the release of such Lien and/or security interest, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**If any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancelation and/or**

61

**extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

C.      *Releases by the Debtors.*

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action**

62

arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.     *Releases by Holders of Claims and Interests.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the

63

**Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

*E.     Exculpation.*

**Except as otherwise expressly provided in the Plan or the Confirmation Order, to the fullest extent permitted by applicable law and solely to the extent such acts or omissions occurred between the Petition Date and the Effective Date, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Plan Supplement, any other Definitive Document, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transactions, any other Definitive Document, the filing of the Chapter 11 Cases, the participation in the DIP Facility, the Sale and Settlement Order, the pursuit of the Sale Transactions, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of**

71306/0001-53355255v12

property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.      *Injunction.*

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  To the fullest extent permissible under applicable law, except as otherwise specifically provided in this Plan or for obligations issued or required to be paid pursuant to this Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims against or Interests in the Debtors and/or Wind-Down Debtors or Causes of Action, in each case that have been released or are subject to exculpation pursuant to the Plan, shall be precluded and are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Exculpated Parties (including the Debtors and Wind-Down Debtors) or the Released Parties, and any successors, assigns or representatives of such Persons or Entities:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation, of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to

65

**bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.**

G.      *Protections Against Discriminatory Treatment.*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Wind-Down Debtors, the Debtors, the Plan Administrator, or Liquidating Trustee, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by each, subject to the applicable provisions of the Plan Administrator Agreement or Liquidating Trust Agreement.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

66

71306/0001-53355255v12

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE**

*A.     Conditions Precedent to the Effective Date.*

It shall be a condition precedent to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX hereof:

a.   The Sale Transactions shall have been implemented and/or consummated, as applicable, in all material respects;

b.   the Bankruptcy Court shall have entered an order approving the Disclosure Statement, in form and substance acceptable to the Required DIP Lenders;

c.   the Bankruptcy Court shall have entered the Confirmation Order, Filed in a manner consistent in all material respects with the Plan, and acceptable to the Required DIP Lenders and such order shall have become a Final Order;

d.   the DIP Facility shall be in full force and effect, and there shall be no defaults under the DIP Facility Documents continuing unless waived by the Required DIP Lenders in accordance with the terms and conditions of the DIP Documents;

e.    the Plan Supplement, Plan, and all schedules, documents, supplements, and exhibits thereto, as applicable, shall be acceptable to the Required DIP Lenders and have become Filed;

f.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

g.   the Debtors shall have established the Administrative Claims Reserve;

h.   all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date into the Professional Fee Escrow Account pending approval of such fees and expenses by the Bankruptcy Court;

i.   The Debtors have funded the Wind-Down Debtor Account Amount in Cash;

j.   The Liquidating Trust shall have been established and funded with the Liquidating Trust Assets;

k.   no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan; and

l.   the following documents shall be in full force and effect, and shall not have been terminated prior to the Effective Date: (a) any Sale Orders; (b) such other motions, orders, agreements, and documentation necessary or desirable to consummate and

67

71306/0001-53355255v12

document the transactions contemplated by this Plan; and (c) all other material customary documents delivered in connection with transactions of this type.

B.       *Waiver of Conditions.*

The conditions to Consummation set forth in Article IX may be waived by the Debtors, subject to the consent of the Required DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

C.       *Effect of Failure of Conditions.*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (ii) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.  Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of (a) the DIP Orders, including without limitation, any releases provided therein, or (b) the Sale Transaction(s) under the Asset Purchase Agreements or the revocation of the Debtors' authority under the Sale Orders to consummate such Sale Transaction(s).

D.       *Substantial Consummation.*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.       *Modifications and Amendments.*

Except as otherwise specifically provided in the Plan and subject to section 1127 of the Bankruptcy Code, the Debtors reserve the right, with the consent of the Required DIP Lenders, to modify the Plan whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided*, *however*, that the Debtors or the Wind-Down Debtors, as the case may be, shall not amend or modify the Plan in a manner that adversely affects the treatment of any Class of Claims and/or Interests without resoliciting such Class of Holders of Claims or Interests.

68

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof, but before entry of the Confirmation Order, are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan (and not assumed in connection with an Asset Purchase Agreement and pursuant to the Sale Order), and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to (for the avoidance of doubt, notwithstanding whether such treatment arises under the terms of the Plan or the Sale Order): (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed and/or assigned; (c) the Debtors amending, modifying, or supplementing, after

69

71306/0001-53355255v12

the Effective Date, pursuant to Article X of the Plan, any Executory Contracts or Unexpired Leases to the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. Ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5. Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. Adjudicate, decide, or resolve any and all matters related to sections 1141 or 1146 of the Bankruptcy Code;

8. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

9. Resolve any cases, controversies, suits, or disputes that may arise in connection with the interpretation of any Sale Order;

10. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

11. Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

14. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to the Plan;

15. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16. Enter an order or final decree concluding or closing any of the Chapter 11 Cases;

71306/0001-53355255v12

17.    Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

18.    Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

19.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

20.    Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

21.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or the Sale Orders, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

22.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.    Hear and determine matters concerning section 1145 of the Bankruptcy Code;

24.    Hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

25.    Hear and determine all disputes related to the Sale and Settlement Order or the TSA;

26.    Hear and determine all disputes with respect to the Liquidating Trust or the Liquidating Trust Assets;

27.    To recover all assets of the Debtors, property of the Estates, or Wind-Down Debtors, wherever located;

28.    To consider requests for extensions of the term of the Liquidating Trust or Wind-Down Debtors as provided herein;

29.    Enforce all orders previously entered by the Bankruptcy Court;

30.    Hear any other matter over which the Court has jurisdiction under the Bankruptcy Code; and

31.    Enter an order or final decree concluding or closing the Chapter 11 Cases.

71

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.      Immediate Binding Effect.*

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Plan Administrator, the Liquidating Trustee, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

*B.      Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Wind-Down Debtors, Plan Administrator, Liquidating Trustee, and all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

*C.      Reservation of Rights.*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by the Debtors or any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or any Debtor with respect to the Holders of Claims or Interests, unless and until the Effective Date has occurred.

*D.      Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assign, Affiliate, officer, director, manager, trustee, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

71306/0001-53355255v12

*E.*       *Service of Documents.*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served, including via email in addition to any other method of service, on the parties listed below:

1.   If to the Debtors:

    c/o FreshRealm, Inc.
    901 W. Linden Avenue
    Linden, New Jersey 07036
    Attn:  John Hanson, Chief Financial Officer
    E-mail: jhanson@alvarezandmarsal.com

    with copies to:

    Cole Schotz P.C.
    Court Plaza North, 25 Main Street
    Hackensack, New Jersey 07601
    Attn:  Ryan T. Jareck, Esq.
    E-mail:  rjareck@coleschotz.com

2.   If to the Required DIP Lenders:

(a)    *Counsel to BGC*
       Herbert Smith Freehills Kramer (US) LLP
       1177 Avenue of the Americas
       New York, New York 10036
       Attn: Robert T. Schmidt, Esq.
       Email: Robert.Schmidt@hsfkramer.com

       With copies to:

       Sills Cummis & Gross P.C.
       The Legal Center
       One Riverfront Drive
       Newark, New Jersey 07102
       Attn: Andrew H. Sherman, Esq.
       Email: Asherman@sillscummis.com

(b)    *Counsel to Faranord*
       Kirkland & Ellis LLP
       601 Lexington Avenue
       New York, New York 10022
       Attn: Christopher Marcus, Esq.
       Email: cmarcus@kirkland.com
       With copies to:

73

71306/0001-53355255v12

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Attn: Jeffrey Testa, Esq.
Email: jtesta@mccarter.com

3.   If to the Committee:

Fox Rothschild LLP
49 Market Street
Morristown, New Jersey 07960
Attn: Joseph J. DiPasquale, Esq.
Email: jdipasquale@foxrothschild.com

-and-

Fox Rothschild LLP
Two Commerce Square
2001 Market Street, Suite 1700
Philadelphia, Pennsylvania 19103
Attn: Jesse M. Harris, Esq.
Email: jesseharris@foxrothschild.com

4.   If to the U.S. Trustee:

United States Department of Justice
Office of the United States
One Newark Center, Suite 2100
Newark, New Jersey 07102
Attn: Andrew R. Vara, U.S. Trustee, Regions 3& 9
Attn: Fran B. Steele, Esq. and David Gerardi, Esq.
Email: Fran.B.Steele@usdoj.gov; David.Gerardi@usdoj.gov

To be effective, all notices, requests, and demands to or upon the Debtors shall be in writing (which may be by email), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received and telephonically confirmed. After the Effective Date, the Debtors shall have authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those (i) Entities who have Filed such renewed requests; and (ii) those Entities whose rights are affected by such documents.

74

*F.      Term of Injunctions or Stays.*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*G.      Enforcement of Confirmation Order.*

On and after the Effective Date, the Debtors, the Wind-Down Debtors, Liquidating Trustee, and Plan Administrator, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

*H.      Entire Agreement.*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

*I.      Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/FreshRealm.

*J.      Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to this Plan and may not be deleted or modified without the consent of the Debtors, the Wind-Down Debtors, Liquidating Trustee, or Plan Administrator, as applicable; and (iii) nonseverable and mutually dependent.

71306/0001-53355255v12

K.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code, and, therefore, neither any of such parties nor individuals nor the Wind-Debtors, Plan Administrator, or Liquidating Trustee will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or any previous plan.

L.      *Closing of Chapter 11 Cases.*

The Plan Administrator or Liquidating Trustee, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 or Local Rule 3002-1, including the motion required by Local Rule 3002-1, and any applicable order necessary to close the Chapter 11 Cases. Furthermore, the Claims and Noticing Agent is authorized to destroy all paper or hardcopy records related to the Chapter 11 Cases two (2) years after the Effective Date has occurred.

M.      *Waiver or Estoppel.*

Each Holder of a Claim, Interest, or Intercompany Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim, Interest, or Intercompany Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

*[Remainder of Page Intentionally Left Blank.]*

76

71306/0001-53355255v12

Respectfully submitted,

Dated: July 27, 2026          FreshRealm, Inc.
                             on behalf of itself and all other Debtors


                             /s/ John Hanson
                             Name:       John Hanson
                             Title:      Chief Financial Officer

71306/0001-53355255v12

**<u>Exhibit C-1</u>**

**Revised Disclosure Statement Order**

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>**COLE SCHOTZ P.C.**<br>Michael D. Sirota<br>Warren A. Usatine<br>Ryan T. Jareck<br>Daniel J. Harris<br>Matteo Percontino<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Telephone: (201) 489-3000<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>rjareck@coleschotz.com<br>dharris@coleschotz.com<br>mpercontino@coleschotz.com<br><br>*Counsel to the Debtors and Debtors in Possession* | |
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br>    Debtors. | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

### ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (II) APPROVING (A) THE SOLICITATION PROCEDURES; (B) THE FORMS OF BALLOTS AND NOTICES IN CONNECTION THEREWITH; AND (C) CERTAIN DATES WITH RESPECT THERETO; AND (III) <u>GRANTING RELATED RELIEF</u>

The relief set forth on the following pages, numbered two (2) through seventeen (17), is

hereby **ORDERED**.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

(Page 2)

| | |
|---|---|
| Debtors: | FRESHREALM, INC., *et al*. |
| Case No. | 26-14656 (MEH) |
| Caption of Order: | Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures; (B) the Forms of Ballots and Notices in Connection Therewith; and (C) Certain Dates With Respect Thereto; and (III) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures; (B) the Forms of Ballots and Notices in Connection Therewith; and (C) Certain Dates With Respect Thereto; and (III) Granting Related Relief* (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") conditionally approving: (i) the adequacy of the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and its Debtor Affiliates*, [Docket No. 352] (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); (ii) the Solicitation Procedures; (iii) the Ballots; (iv) the Cover Letter; (v) the Notice of Non-Voting Status; (vi) the Opt-Out Form; (vii) the Combined Hearing Notice; (viii) the Publication Notice; (ix) the Plan Supplement Notice; (x) the Assumption Notice; (xi) any other notices in connection therewith; and (xii) certain dates with respect thereto, including but not limited to the Voting Record Date, the Solicitation Packages Mailing Deadline, the Publication Deadline, the Initial Plan Supplement Deadline, the Voting and Opt-Out Deadline, the Confirmation Objection Deadline, the Voting Report Deadline, the Confirmation Brief Deadline, and the Confirmation Hearing Date; and based upon the First Day Declaration; and based on the record in these Chapter 11 Cases; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended June 6, 2025 (Bumb, C.J.).; and the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that sufficient notice of the Motion has been given; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court, if any; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** to the extent set forth herein.

2.      Any objections to entry of this Order, to the extent not withdrawn or settled, are overruled.

**A.      Approval of the Disclosure Statement on a Conditional Basis.**

3.      The Disclosure Statement, substantially in the form attached hereto as **<u>Exhibit 1</u>**, is conditionally approved as providing Holders of Claims entitled to vote on the Plan adequate information, within the meaning of section 1125(a)(1) of the Bankruptcy Code, to make an informed decision as to whether to vote to accept or reject the Plan. Any objections to the adequacy of the information contained in the Disclosure Statement are expressly reserved for consideration at the Combined Hearing.

4.      The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims and Equity Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rules 2002(c)(3) and 3016(b) and (c).

**II.**     **Approval of the Procedures, Materials, and Timeline for Soliciting Votes on and Confirming the Plan.**

     **A.**     **Approval of the Solicitation Procedures.**

     5.     The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation Procedures attached hereto as **Exhibit 2**, which are hereby approved in their entirety and comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

     **B.**     **Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.**

     6.     The following Confirmation Schedule is hereby established (subject to modifications as necessary) with respect to the solicitation of votes to accept the Plan, voting on the Plan, and confirming the Plan:

| Event | Date | Description |
|---|---|---|
| Conditional Disclosure Statement Hearing Date | August 13, 2026 at 10:00 a.m. (ET) | The date of the hearing to conditionally approve the Disclosure Statement, subject to the Court's availability. |
| Voting Record Date | August 6, 2026 | The date for determining which Holders of Claims in the Voting Classes (as defined herein) are entitled to vote to accept or reject the Plan (such date, the "Voting Record Date"). |
| Solicitation Deadline | Three (3) business days following entry of the Order (or as soon as reasonably practicable thereafter) | The deadline by which the Debtors must distribute Solicitation Packages (including Ballots) and Notices of Non-Voting Status (including Opt-Out Forms), as applicable (the "Solicitation Packages Mailing Deadline"). |
| General Bar Date | July 27, 2026 | The deadline for creditors (that are not governmental entities) to file proofs of claim (the "General Bar Date"). |

| Event | Date | Description |
|---|---|---|
| Publication Deadline | Three (3) business days following entry of the Order (or as soon as reasonably practicable thereafter) | The date by which the Debtors will submit the Combined Hearing Notice in a format modified for publication (such notice, the "Publication Notice," and such date, the "Publication Deadline"). |
| Initial Plan Supplement Deadline | September 8, 2026, at 11:59 p.m. (ET) | The date by which the Debtors shall File the initial version of the Plan Supplement (the "Initial Plan Supplement Deadline"). |
| Assumption Notice Deadline | September 8, 2026, at 11:59 p.m. (ET) | The date by which the Debtors shall serve an Assumption Notice, if any (the "Assumption Notice Deadline"). |
| Voting and Opt-Out Deadline | September 15, 2026, at 5:00 p.m. (ET) | The deadline by which all Ballots and Opt-Out Forms must be properly executed, completed, and submitted so that they are **actually received** by Kroll Restructuring Administration LLC (the "Balloting Agent" or "Kroll," and such deadline, the "Voting and Opt-Out Deadline"). |
| Confirmation Objection Deadline | September 15, 2026, at 5:00 p.m. (ET) | The deadline by which parties in interest may File objections to final approval of the adequacy of the Disclosure Statement and Confirmation of the Plan, including the assumption or rejection of any Executory Contract or Unexpired Lease thereunder or as set forth in the Plan Supplement (the "Confirmation Objection Deadline"). |
| Voting Report Deadline | September 21, 2026, at 11:59 p.m. (ET) | The date by which the report tabulating the voting on the Plan (the "Voting Report") shall be Filed with the Court (the "Voting Report Deadline"). |
| Confirmation Brief and Objection Reply Deadline | September 21, 2026, at 11:59 p.m. (ET) | The deadline by which the Debtors shall File their brief in support of Confirmation of the Plan and reply to objections to Confirmation of the Plan (the "Confirmation Brief Deadline"). |
| Confirmation Hearing Date | September 24, 2026, at 10:00 a.m. (ET) or such other date as may be scheduled by the Court | The date and time of the Confirmation Hearing (the "Confirmation Hearing Date"). |

7. The Solicitation Packages Mailing Deadline provides sufficient time for Holders of Claims entitled to vote on the Plan to make informed decisions with respect to voting on the Plan. The Debtors may adjourn the Confirmation Hearing Date, any related dates and deadlines from time to time, without notice to the parties in interest other than announcement of such adjournment in open court, or by posting such notice of adjournment on Kroll's website, and/or filing a notice of adjournment with the Court and serving such notice on the Core 2002 Service List.

**C.** **Approval of the Form and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

8. The Solicitation Packages to be transmitted on or before the Solicitation Packages Mailing Deadline, or as soon as reasonably practicable thereafter, to those Holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

(a) the conditionally approved Disclosure Statement, substantially in the form attached hereto as **Exhibit 1** (and exhibits thereto, including the Plan);

(b) a copy of the Solicitation Procedures, substantially in the form attached hereto as **Exhibit 2**;

(c) the applicable form of Ballots, substantially in one of the forms of Ballots attached hereto as **Exhibits 3A**, **3B**, and **3C**, together with detailed voting instructions and instructions on how to submit the Ballots;

(d) the Cover Letter, substantially in the form attached hereto as **Exhibit 5**, describing the contents of the Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

(e) the Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 6**;

(f) this Order (without exhibits, except for the Solicitation Procedures);

(g) a pre-addressed, postage pre-paid reply envelope (if applicable); and

(h) any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Classes.

9. The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Packages Mailing Deadline, or as soon as reasonably practicable thereafter. Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

10. The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Rules.

11. The Debtors are authorized to cause the Solicitation Packages to be delivered via first-class mail and/or distributed in electronic format via email, as applicable, through the Balloting Agent to Holders of Claims in the Voting Classes. Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Balloting Agent and request paper copies of the materials previously received in electronic format (to be provided at the Debtors' expense). For Solicitation Packages distributed via first class mail, the Debtors are authorized to distribute the Disclosure Statement, Order, and Solicitation Procedures on a flash drive, and the Ballot, Cover Letter, and Confirmation Hearing Notice via hardcopy (in paper format).

12. The form of letter (the "Cover Letter"), attached hereto as **Exhibit 5**, describing the contents of the Solicitation Packages and recommending that such parties vote in favor of the Plan, is hereby approved.

13. The Ballots substantially in the forms attached hereto as **Exhibits 3A**, **3B**, and **3C** are hereby approved and comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

14.     The Debtors are authorized to cause the Notices of Non-Voting Status to be delivered via first-class mail and/or distributed in electronic format via email, as applicable, through the Balloting Agent to Holders of Claims and Equity Interests in the Non-Voting Classes.

15.     On or before the Solicitation Packages Mailing Deadline, the Debtors (through the Balloting Agent) shall provide complete Solicitation Packages (excluding the Ballots) to the U.S. Trustee (in paper format) and all parties on the Master Service List (in electronic format) as of the Voting Record Date.

16.     For purposes of serving the solicitation materials, the Debtors are authorized to rely on the mailing and email address information (for voting and non-voting parties alike) maintained by the Debtors and provided by the Debtors to the Balloting Agent or, with respect to Holders of Claims in the Voting Classes, by the applicable administrative agents therefor. The Debtors and the Balloting Agent shall not be obligated to conduct any additional research for updated addresses based on undeliverable solicitation materials (including undeliverable Ballots, Notices of Non-Voting Status, Opt-Out Forms, and Combined Hearing Notices), and that the Balloting Agent shall not be required to resend Solicitation Packages or other solicitation materials, including the Combined Hearing Notice and Notices of Non-Voting Status, that are returned as undeliverable, unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

17.     The Balloting Agent is authorized to assist the Debtors in: (a) distributing the Solicitation Packages and Notices of Non-Voting Status; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims against the Debtors; (c) receiving, tabulating, and reporting on Opt-Out Forms received by Holders of Claims and Equity Interests; (d) responding to inquiries from Holders of Claims and Equity Interests and other parties in interest

relating to the approved Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, the Notices of Non-Voting Status, the Opt-Out Forms, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan, opting out of the Third-Party Release, and objecting to Confirmation of the Plan; (e) soliciting votes on the Plan; and (f) if necessary, contacting Holders of Claims or Equity Interests regarding the Plan and/or the conditionally approved Disclosure Statement. The Debtors and the Balloting Agent may, but are not obligated to, contact parties that submit incomplete or otherwise deficient ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor the Balloting Agent are required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification.

18.     The Debtors and/or the Balloting Agent are authorized, as applicable, in consultation with the Committee, to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots, which determination, absent contrary ruling by the Court, shall be final and binding.

19.     In addition to accepting Ballots and Opt-Out Forms, the Balloting Agent is also authorized to accept Ballots and Opt-Out Forms via electronic online transmission through an online balloting portal on the Debtors' case website (the "E-Ballot Portal"), as set forth in the Solicitation Procedures. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot or Opt-Out Form submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

20.     All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable

voting instructions by: (a) submitting such Ballot electronically through the E-Ballot Portal, after clicking "Submit E-Ballot" under the Case Navigation section of the Debtors' case website, at https://restructuring.ra.kroll.com/Freshrealm; (b) first-class mail, in the return envelope provided with each Ballot; (c) overnight delivery; or (d) personal delivery, so that the Ballots are actually received by the Balloting Agent, through the E-Ballot Portal, or at the return address set forth in the applicable Ballot, by no later than the Voting and Opt-Out Deadline.

21.     Ballots and Opt-Out Forms otherwise sent by facsimile, telecopy, or electronic submissions (other than through the online portal) will <u>not</u> be accepted.  Only properly completed, executed, and timely submitted Ballots and Opt-Out Forms will be accepted.

**D.     Approval of the Form and Notice of Non-Voting Classes and Opt-Out Form.**

22.     On or before the Solicitation Packages Mailing Deadline, or as soon as reasonably practicable thereafter, the Balloting Agent shall mail and/or email, as applicable, the Combined Hearing Notice and a Notice of Non-Voting Status, attached hereto as **Exhibit 4**, and which shall include the Opt-Out Form, to those parties outlined below, who are not entitled to vote on the Plan. The Notice of Non-Voting Status is hereby approved and complies with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

| Class | Status | Treatment |
|---|---|---|
| Classes 1, 2, 3 | Unimpaired (Presumed to Accept) | Holders of Claims that are presumed to accept the Plan are not entitled to vote. Therefore, in lieu of a Solicitation Package, Holders of such Claims will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |

| Classes 7 and 8 | Unimpaired / Impaired (Presumed to Accept or Deemed to Reject) | Holders of Claims or Intercompany Interests that are presumed to accept or deemed to reject the Plan are not entitled to vote. Therefore, in lieu of a Solicitation Package, Holders of such Claims or Interests will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |
|---|---|---|
| Classes 9 and 10 | Impaired (Deemed to Reject) | Holders of Claims or Equity Interests that are deemed to reject the Plan are not entitled to vote. Therefore, in lieu of a Solicitation Package, Holders of such Claims will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection Filed by the Debtors are not entitled to vote the disputed portions of their Claims. Therefore, in lieu of a Solicitation Package, Holders of such Claims will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |

23.    The Debtors are not required to distribute Solicitation Packages or other solicitation materials to parties that receive a Notice of Non-Voting Status. The Debtors are not required to distribute Solicitation Packages, other solicitation materials, or Notices of Non-Voting Status to: (a) Holders of Claims that have already been paid in full during these Chapter 11 Cases or that are otherwise paid in full in the ordinary course of business pursuant to an order previously entered by this Court; (b) any party to whom the notice of the Motion was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; or (c) the holders of Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests).

E.    **Approval of the Combined Hearing Notice**

24.     The Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 6**, which shall be Filed by the Debtors and served upon parties in interest in these Chapter 11 Cases by no later than the Solicitation Packages Mailing Deadline and published in a format modified for publication one time no later than the Publication Deadline, in the New York Times (national edition) constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan and Disclosure Statement can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

**F.     Approval of Notice of Filing of the Plan Supplement.**

25.     The Debtors are authorized to mail and/or email, as applicable, notice of the filing of the Plan Supplement to parties in interest, substantially in the form attached hereto as **Exhibit 7**, within the time periods specified in the Plan. Notwithstanding the foregoing, the Debtors may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with the Plan.

**G.     Approval of Assumption Notice**

26.     The Debtors are authorized to mail and/or email, as applicable, the notice of assumption of Executory Contracts or Unexpired Leases, in the forms attached hereto as **Exhibit 8** to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed pursuant to the Plan, within the time periods specified in the Motion. Counterparties who receive such notice shall have fourteen (14) calendar days to object to the Debtors' proposed assumption. The date by which the Debtors shall file the initial Plan Supplement, which shall include the list of assumed Executory Contracts and Unexpired Leases, if any, is the Initial Plan Supplement Deadline.

### H.        Non-Substantive Modifications

27.        The Debtors are authorized to make non-substantive changes to the Plan, the Disclosure Statement, the Solicitation Procedures, the Ballots, the Notice of Non-Voting Status, the Opt-Out Form, the Combined Hearing Notice, the Publication Notice, the Cover Letter, the Plan Supplement Notice, the Assumption Notice, and any notice attached hereto, and any related documents without further order of the Bankruptcy Court, including formatting changes, changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan, and any other materials (including any appendices thereto) in the Solicitation Packages before distribution. Subject to the foregoing, the Debtors are authorized to solicit, receive, and tabulate votes to accept or reject the Plan in accordance with this Order, without further order of the Bankruptcy Court.

### III.    Approval of Procedures for Confirming the Plan.

#### A.        Approval of the Procedures for Filing Objections to the Confirmation of the Plan.

28.        Objections to the Confirmation of the Plan will not be considered by the Court unless such objections are timely Filed and properly served in accordance with this Order and *Chapter 11 Complex Case Management Order* [Docket No. 43]. Specifically, all objections to the Confirmation of the Plan or requests for modifications to the Plan, if any, must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of this Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be Filed with the Court (contemporaneously with a proof of service) and served upon the notice parties so as to be actually received on or before the Confirmation Objection Deadline by each of the notice parties identified in the Combined Hearing Notice.

## IV. Miscellaneous

29. The Debtors' rights are reserved to modify the Plan without further order of the Bankruptcy Court in accordance with Article X of the Plan, including the right to withdraw the Plan at any time before the Confirmation Date.

30. Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

31. Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Order or the Motion or any order granting the relief requested by the Motion; (e) a request, approval, or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code); (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all

such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim. Any payment made pursuant to this Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

32.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

33.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

34.     Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Complex Case Procedures, the terms and conditions of this Order shall be effective and enforceable immediately upon entry hereof.

35.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures are satisfied by such notice.

36.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# EXHIBIT 1

## (Disclosure Statement on File at Docket No. __)

KL2 3479844.4

# **EXHIBIT 2**

(Solicitation Procedures)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al*.,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

## SOLICITATION PROCEDURES

      **PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

    **A.** **Voting Record Date.**

      The Court has established **August 6, 2026**, as the record date for purposes of determining which Holders of Claims in Class 4 (First Lien Claims), Class 5 (Second Lien Claims) and Class 6 (General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date").

    **B.** **The Voting Deadline.**

      The Court has established **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**, as the voting deadline (the "Voting Deadline") for the Plan. The Debtors may extend the Voting Deadline without further order of the Bankruptcy Court. To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be executed, completed, and delivered pursuant to the instructions set forth therein so that they are actually received by Kroll Restructuring Administration LLC ("Kroll" or the "Balloting Agent") no later than the Voting Deadline.

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

**C. Form, Content, and Manner of Notices.**

    **1. The Solicitation Package.**

The following materials shall constitute the solicitation package (the "Solicitation Package"):

    (a) these solicitation procedures (the "Solicitation Procedures");

    (b) the applicable form of Ballot, together with detailed voting instructions, and instructions on how to submit the Ballot;

    (c) a cover letter (the "Cover Letter") which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Classes to vote to accept the Plan;

    (d) the notice of the Confirmation Hearing (the "Combined Hearing Notice");

    (e) the Disclosure Statement (and exhibits thereto, including the Plan);

    (f) the Disclosure Statement Order (without exhibits except these Solicitation Procedures);

    (g) a pre-addressed, postage prepaid reply envelope (if applicable); and

    (h) such other materials as the Court may direct.

    **2. Distribution of the Solicitation Package.**

The Debtors shall serve, or cause to be served, copies of the Solicitation Package to Holders of Claims in the Voting Classes. In addition, these Solicitation Procedures, the Disclosure Statement, the Plan, the Disclosure Statement Order, and all pleadings filed with the Bankruptcy Court shall be made available on the Debtors' case website https://restructuring.ra.kroll.com/Freshrealm; provided that any party that would prefer paper format may contact the Balloting Agent by: (a) calling the Balloting Agent at (888) 454-0938 (USA or Canada, Toll Free) or +1 (646) 452-8302 (international); (b) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Solicitation Inquiry" in the subject line; or (c) writing to Kroll at FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.

The Debtors shall distribute, or cause to be distributed, the Solicitation Package to all Holders of Claims in the Voting Classes as of the Voting Record Date within three (3) business days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) who are entitled to vote, as described in Section D.1 below.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding Ballots) on the U.S. Trustee (in paper format) and all parties who have requested service of papers in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

The Debtors will not distribute Solicitation Packages or other solicitation materials to: (i) Holders of Claims that have already been paid in full during these Chapter 11 Cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, (ii) any party to whom notice of the *Debtors' Motion for Entry of an Order Conditionally Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation Procedures, (III) the Forms of Ballots and Notices In*

*Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. __] was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; (iii) the Holders in Class 7 (Intercompany Claims) or Class 8 (Intercompany Interests); or (iv) parties that received the Notice of Non-Voting Status, as applicable.

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

**3.    Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

(a) If a Claim in a Voting Class is subject to an objection that is filed with the Bankruptcy Court and served on the applicable Holder(s) on or prior to fourteen (14) days before the Voting Deadline: (i) the Debtors shall cause the applicable Holder to be served with a Notice of Non-Voting Status (the "Notice of Non-Voting Status") substantially in the form annexed as Exhibit 4 to the Disclosure Statement Order, and which will include an opt-out form (the "Opt-Out Form") whereby the Holder may opt out of the Plan's Third-Party Release; and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined herein) occurs as provided herein. In the event a Holder in a Voting Class receives a timely filed and served objection under this paragraph, such Holder may file with the Court a motion on an emergency basis seeking a determination that its Claim be allowed for voting purposes.

(b) If a Claim in a Voting Class is subject to an objection that is filed with the Bankruptcy Court less than fourteen (14) days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Bankruptcy Court, unless the Bankruptcy Court orders otherwise.

(c) A "Resolution Event" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

i.    an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code;

ii.    an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a);

iii.    a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder of such Claim to vote its Claim in an agreed upon amount and such stipulation or agreement is conveyed to the Balloting Agent by e-mail or otherwise; or

iv.    the pending objection is voluntarily withdrawn by the objecting party.

(d) No later than two (2) business days following the occurrence of a Resolution Event, the Debtors shall cause the Balloting Agent to distribute to the relevant Holder via hand

delivery, first-class mail, or email, a Solicitation Package and a pre-paid envelope to the relevant Holder.

### 4.   Forms of Non-Voting Status

Certain (i) Holders of Claims and Equity Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, (ii) Holders of Claims or Equity Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, and (iii) Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their claims unless a Resolution Event occurs will receive the Combined Hearing Notice and a Notice of Non-Voting Status. Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots), as well as how they may opt out of the Third-Party Release using the opt out form provided therein.

In addition, the Notice of Non-Voting Status contains the full text of the release provision set forth in the Plan (the "Third-Party Release") and advises such holders in the Non-Voting Classes that they will be bound by the Third-Party Release unless they timely and properly opt out. The Notice of Non-Voting Status also includes a form to complete and return if the holder elects to opt out of such Third-Party Release (the "Third-Party Release Opt-Out Form"). A holder of Claims in a Non-Voting Class who properly and timely elects to opt out of the Third-Party Release will not be a Releasing Party or Released Party under the Plan. Holders of Claims in the Non-Voting Classes who choose to opt out of the Third-Party Release may do so (i) by first-class mail, (ii) by overnight courier, (iii) by hand delivery, or (iv) via the E-Ballot Portal so that (in each instance) it is actually received by the Solicitation Agent no later than the Voting and Opt-Out Deadline (as defined above), which the Debtors may extend, in their discretion, without further order of the Court. The Notice of Non-Voting Status includes information on how parties can opt out electronically via the E-Ballot Portal. An encrypted opt out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner. Additionally, the parties' electronic signature will be deemed to be legally valid and effective immediately.

### 5.   Notices With Respect to Executory Contracts and Unexpired Leases.

Counterparties to Executory Contracts or Unexpired Leases that receive an Assumption Notice substantially in the form attached as Exhibit 8 to the Disclosure Statement Order, may file an objection to the Debtors' proposed assumption, assumption and assignment and/or cure amount, each under the Plan, as applicable. Such objections **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received no later than fourteen (14) calendar days** after the date the Debtors file and serve the relevant assumption notice. If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by Final Order of the Bankruptcy Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Wind-Down Debtors, the Plan Administrator, the Liquidating Trustee, or any of their respective assets and properties unless a Proof of Claim is Filed with Kroll and served upon counsel to the Plan Administrator and Liquidating Trustee within thirty (30) days from the Effective Date.  The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order.

| Counsel to the Debtors |
|---|
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |

| United States Trustee |
|---|
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Fran B. Steele and David Gerardi<br>Email: fran.b.steele@usdoj.gov; David.gerardi@usdoj.gov |

| Official Committee of Unsecured Creditors |
|---|
| **Fox Rothschild LLP**<br>49 Market Street,<br>Morristown, New Jersey 07960<br>Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris<br>Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com |

| Counsel to Birch Grove Investments LLC | |
|---|---|
| **Herbert Smith Freehills Kramer (US) LLP**<br>1177 Avenue of the Americas, New York, NY 10036,<br>Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga<br>Email: robert.schmidt@hsfkramer.com;<br>richard.farley@hsfkramer.com;<br>Andrew.citron@hsfkramer.com;<br>marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.**<br>The Legal Center, One Riverfront Plaza,<br>Newark, NJ 07102,<br>Attn: Andrew Sherman and Boris Mankovetskiy<br>Email: asherman@sillscummis.com;<br>bmankovetskiy@sillscummis.com |

| Counsel to FaraNord (US) IV Pte Ltd | |
|---|---|
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue, New York, NY 10022<br>Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer<br>Email: cmarcus@kirkland.com;<br>jordan.roberts@kirkland.com;<br>jess.lepper@kirkland.com;<br>Charles.martin@kirkland.com;<br>kelly.meyer@kirkland.com | **McCarter & English, LLP**<br>Four Gateway Center<br>100 Mulberry St.<br>Newark, NJ 07102<br>Attn: Jeffrey T. Testa<br>Email: jtesta@mccarter.com |

### D.  **Voting and Tabulation Procedures.**

### 1.  **Holders of Claims Entitled to Vote.**

Only the following Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

> (a)  Unless otherwise provided, Holders of Claims who have timely filed a Proof of Claim (or an untimely Proof of Claim that has been Allowed as timely by the Bankruptcy

Court under applicable law) that: (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection filed with the Bankruptcy Court at least seven (7) days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Bankruptcy Court;

(b) Holders of Claims that are listed in the Schedules; provided that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be allowed to vote only in the amounts set forth in Section D.2 of these Solicitation Procedures;

(c) Holders whose Claims arise: (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Bankruptcy Court or conveyed to the Balloting Agent by e-mail with the Debtors and counterparty copied thereto; (ii) from an order entered by the Bankruptcy Court; or (iii) from a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim has been filed or the Claim was scheduled as contingent, unliquidated, or disputed;

(d) Holders of any Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

(e) with respect to any Entity described in subparagraphs (a) through (d) above, who, on or before the Voting Record Date, has filed a Claim and transferred such Entity's Claim to another Entity, the assignee of such Claim; provided that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date. Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code and (b) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that (x) a Ballot, (y) a group of Ballots within one Voting Class received from a single creditor, or (z) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion, and the Debtors' treatment of such Ballots will be set forth in the Voting Report.

(f) For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package on account of a Claim arising from the rejection of an Executory Contract or Unexpired Lease if the Claim is filed by the Voting Record Date.

**2.  Establishing Claim Amounts for Voting Purposes.**

Class 4 First Lien Claims and Class 5 Second Lien Claims. Notwithstanding anything to the contrary set forth herein, the Claims amounts, for voting purposes only, of Class 4 Claims and Class 5 Claims will be established based on the amounts of the applicable positions held by such Class 4 Claim Holders and Class 5 Claim Holders, as applicable, as of the Voting Record Date, as evidenced by the

applicable records provided by the Prepetition Agent in electronic Microsoft Excel format to the Debtors or the Balloting Agent no later than two (2) business days following the Voting Record Date.

Filed and Scheduled Claims. The Claim amounts established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Debtors through the Balloting Agent, as applicable, are not binding for purposes of allowance and distribution. In tabulating votes, the amount of the Claim associated with each claimant's vote shall be determined as follows:

(a) the Claim amount: (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Bankruptcy Court or conveyed to the Balloting Agent with both the Debtors and counterparty copied thereon; (ii) set forth in an order of the Bankruptcy Court; or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

(b) the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event;

(c) the Claim amount contained in a Proof of Claim that has been timely filed by the applicable bar date (or deemed timely filed by the Bankruptcy Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided, however*, that any Ballot cast by a Holder of a Claim who timely files a Proof of Claim in respect of a (i) contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Balloting Agent) that is not the subject of a pending objection will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim, which Claim will be Allowed for voting purposes only in the liquidated amount; *provided, further*, *however*, that to the extent that any Claim amount contained in a Proof of Claim is different from the Claim amount set forth in a document filed with the Bankruptcy Court referenced in subparagraph (a) above, the Claim amount in the document filed with the Bankruptcy Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

(d) the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely Filed Proof of Claim); provided that such Claim is not scheduled as contingent, disputed, or unliquidated; if a Claim is listed in the Debtors' Schedules as contingent, unliquidated, or disputed and a proof of claim was not (i) filed by the applicable bar date for filing Proofs of Claim established by the Bankruptcy Court or (ii) deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline, such Claim shall be disallowed for voting purposes; *provided, however,* that, to the extent that such holder's deadline to file a Claim has not yet occurred, in which case the holder will be entitled to vote in the amount of $1.00 on account of their Claim that has been scheduled in an undetermined amount or as contingent, unliquidated, or disputed;

(e) Holders of Proofs of Claim filed for $0.00 are not entitled to vote;

(f) Claims that have been paid, scheduled to be paid in the ordinary course, or otherwise satisfied are disallowed for voting purposes;

(g) notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class shall, to the extent possible, be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

(h) in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

If a Proof of Claim is amended, the last filed Claim shall be subject to these rules and will supersede any earlier filed Claim, and any earlier filed Claim will be disallowed for voting purposes; *provided that* any amendment(s) to any Proof of Claim after the Voting Record Date shall not be considered for purposes of these voting procedures.

### 3. Voting and Ballot Tabulation Procedures.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

(a) except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted and actually received by the Balloting Agent on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

(b) the Balloting Agent will date-stamp all Ballots when received;

(c) the Balloting Agent shall retain copies of Ballots and all solicitation-related correspondence for two (2) years following the closing of the Chapter 11 Cases, whereupon the Balloting Agent is authorized to destroy and/or otherwise dispose of: (a) all copies of Ballots; (b) printed solicitation materials including unused copies of the Solicitation Package; and (c) all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Bankruptcy Court in writing within such two (2) year period;

(d) the Debtors will file the Voting Report by no later than September 21, 2026. The Voting Report shall, among other things, delineate every Ballot that was excluded from the voting results (each an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or other necessary information, or damaged. The Voting Report shall indicate the Debtors' decision with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

(e) the method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each Holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Balloting Agent actually receives the executed Ballot;

(f) an executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Balloting Agent by facsimile or any electronic means other than expressly provided in the applicable Ballot will not be valid;

(g) no Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

(h) if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly submitted, valid Ballot timely received by the Balloting Agent will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

(i) Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

(j) a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

(k) the Debtors, subject to a contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable;

(l) neither the Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

(m) unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with submissions of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted; provided that a valid opt-out election on an otherwise defective or irregular Ballot submitted prior to the Voting Deadline shall be honored as a valid opt-out election;

(n) in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

(o) subject to any order of the Bankruptcy Court, the Debtors reserve the right to reject any and all ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

(p) if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Bankruptcy Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or distribution;

(q) if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

(r) the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the General Bar Date; (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Balloting Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

(s) after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or further order of the Bankruptcy Court; and

(t) the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes, and for tabulation purposes, the Balloting Agent may rely on any e-mails sent to it by the Debtors conveying the terms of the stipulation as long as the Debtors copy the Holder of the affected Claim.

## E. **Amendments to the Plan and Solicitation Procedures.**

The Debtors reserve the right to make changes to the Disclosure Statement, Plan, Solicitation Procedures, Combined Hearing Notice, Notice of Non-Voting Status, Ballots, Opt-Out Form, Publication Notice, Cover Letter, Plan Supplement Notice, Assumption Notice, and any related documents without further order of the Bankruptcy Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to any materials in the Solicitation Packages before distribution.

*     *     *     *

**EXHIBIT 3A**

(Class 4 Ballot)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING THE JOINT CHAPTER 11 PLAN OF**
**FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 4 — FIRST LIEN CLAIMS**

---

**PLEASE READ - YOUR RESPONSE IS REQUIRED BY SEPTEMBER 15, 2026**

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] FOR FRESHREALM, INC., ET AL. (THE "COMPANY") INCLUDED WITH THIS BALLOT BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN).

THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **ACTUALLY RECEIVED** BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") PRIOR TO **5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026** (THE "VOTING DEADLINE").

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Plan"), attached as Exhibit A to the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Disclosure Statement") from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Class, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in Exhibit A attached hereto. For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.

You have received this Ballot because the Company's books and records indicate that you are a Holder of a Claim in Class 4 (First Lien Claims) as of August 6, 2026 (the "Voting Record Date") and as set forth in Item 1 of the Ballot. Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of those Claims.

This Ballot may not be used for any purpose other than for casting votes with respect to the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Balloting Agent immediately.

You should review the Plan before you vote. You may wish to seek legal advice concerning the proposals related to the Plan.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials (the "Solicitation Package") have been distributed under separate cover from this Ballot. This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto. Once completed and returned in accordance with the attached instructions, the votes on the Plan will be counted as set forth herein.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Equity Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Balloting Agent **actually receives** it on or before the Voting Deadline.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

**THE VOTING DEADLINE IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 15, 2026.**

**VOTING – COMPLETE THIS SECTION**

**Item 1. Principal Amount of Claims, Vote on Plan, Release Opt Out**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Claim in the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan in order to have your vote counted. Please note that you are voting all of your Claims either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted. If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted. The Holder of a Claim in the Voting Class set forth below votes and elects to:

| Voting Class | Description | Amount | Vote to Accept Plan | Vote to Reject Plan | Opt Out of Third-Party Release |
|---|---|---|---|---|---|
| Class 4 | First Lien Claim | $19,009,660.85 | ☐ | ☐ | ☐ |

**IF YOU VOTE TO ACCEPT THE PLAN, YOU ARE ALSO CONSENTING TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN AND COPIED IN ITEM 2 BELOW, AND YOU MAY NOT OPT OUT OF SUCH THIRD-PARTY RELEASE**

**PLEASE NOTE THAT YOUR VOTE ON ACCOUNT OF YOUR CLASS 4 – FIRST LIEN CLAIM WILL ALSO BE APPLIED TO YOUR CLASS 6 – GENERAL UNSECURED CLAIM ON ACCOUNT OF THE FIRST LIEN DEFICIENCY CLAIM, AS APPROPRIATE.**

**YOUR VOTE ON THE PLAN WILL BE APPLIED TO EACH APPLICABLE DEBTOR IN THE SAME MANNER AND IN THE SAME AMOUNT AS INDICATED IN THIS ITEM 1.**

**Important Information Regarding the Plan Releases**

**If the Plan is confirmed and consummated through the Chapter 11 Cases, the Third-Party Release and Debtor Release shall apply. You are deemed to provide the Third-Party Release and receive the Debtor Release and Third-Party Release, however, if you do not vote to accept the Plan, you may opt out of providing the Third-Party Release.**

**By opting out of providing the Third-Party Release, you will forego the benefit of becoming a "Released Party" and receiving the Debtor Release and Third-Party Release. You will receive the same treatment on account of your Claim(s) under the Plan regardless of whether or not you opt out of providing the Third-Party Release.**

**If you vote to accept the Plan, you cannot opt out of providing the Third-Party Release. If your ballot indicates that you have accepted the Plan but have also opted out of the Third-Party Release, such opt out election will be disregarded and you will be deemed to have accepted the Plan and consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you do not check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will be deemed to have consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will not grant the Third-Party Release.**

**Item 2. Release Information**

Article VIII.C of the Plan provides a release by the Debtors (the "**Debtor Release**"):

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY*" or "*RELEASED PARTIES*" MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR

CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ARE NOT RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER MANAGERS, RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

\* \* \* \* \*

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and to the Debtor:

a. That as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims in the Voting Class as set forth in Item 1; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims in the Voting Class as set forth in Item 1;

b. that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the undersigned has cast the same vote with respect to all Claims in each particular Voting Class; and

d. that no other Ballots with respect to the Claims in the Voting Class identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots voting those Claims are hereby revoked.

---

BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION

---

**Name of Holder:** _____

(Print or Type)

**Signature:** _____

**Name of Signatory:** _____

(If other than Holder)

**Title:** _____

**Address:** _____

**Email Address:** _____

**Date Completed:** _____

---

**RETURN INSTRUCTIONS**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY. THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON**

**SEPTEMBER 15, 2026.**

**To submit a paper Ballot by First Class Mail, Overnight Courier, or Hand Delivery (with a signature):**

FreshRealm, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Ballot, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**To submit your Ballot via electronic, online submission:**

To submit your ballot via the Claims and Noticing Agent's online portal, visit
https://restructuring.ra.kroll.com/Freshrealm, click on the "E-Ballot" section of the website (the "E-Ballot
Portal"), and follow the instructions to submit your Ballot.

**IMPORTANT NOTE**: **You will need the following information to retrieve and submit your customized
unique Ballot:**

Unique E-Ballot ID#: _____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.
Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS,
OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL
AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION
INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND
CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

**INSTRUCTIONS FOR COMPLETING THIS CLASS 4 BALLOT**

1. This Ballot contains voting options with respect to the Plan.

2. To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered by (a) submitting it electronically through the E-Ballot Portal at https://restructuring.ra.kroll.com/Freshrealm or (b) first-class mail, overnight courier, or hand delivery to FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232, so that this Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline, **5:00 p.m. prevailing Eastern Time on September 15, 2026.**

3. To vote, you MUST deliver your completed Ballot (whether via first-class mail or hand delivery to the Balloting Agent) so that it is ACTUALLY RECEIVED by the Balloting Agent on or before the Voting Deadline by one of the methods described above. **The Voting Deadline is 5:00 p.m. prevailing Eastern Time on September 15, 2026**.

4. Any Ballot received by the Balloting Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Company determines otherwise. No Ballot may be withdrawn or modified after the Voting Deadline without the Company's prior written consent.

5. Additionally, the following Ballots will not be counted: (a) any Ballot that partially rejects and partially accepts the Plan; (b) Ballots sent to the Debtors, the Debtors' agents (other than Balloting Agent), the Debtors' financial or legal advisors or any other person (other than the Balloting Agent); (c) Ballots sent by facsimile or electronic mail; (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (e) any Ballot cast by an Entity that does not hold a Class 4—First Lien Claim (as of the Voting Record Date); (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan; (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or (i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

6. Delivery of a Ballot reflecting your vote to the Balloting Agent will be deemed to have occurred only when the Balloting Agent actually receives your paper Ballot or E-Ballot. In all cases, you should allow sufficient time to assure timely delivery.

7. If you deliver multiple Ballots to the Balloting Agent, ONLY the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Ballot(s).

8. You must vote all of your Claims in the Voting Class either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims in the Voting Class, the Company may direct the Balloting Agent to aggregate those Claims for the purpose of counting votes.

9. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Equity Interest, or an assertion or admission of a Claim, in the Company's Chapter 11 Cases.

10. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

11. <u>SIGN AND DATE</u> your Ballot.[1] In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot. Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

12. PLEASE RETURN YOUR BALLOT PROMPTLY.

13. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY**</u>

---

[1] If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Company, the Company's counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

## **Exhibit A**

Subject to the terms and conditions of the Plan, you will receive the following treatment if the Plan is consummated:

| | | |
|---|---|---|
| Class 4 | First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed First Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Claim shall receive solely its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, after all Allowed DIP Claims have been satisfied in full in accordance with Article II of the Plan; *provided, however*, that in no event shall any Holder of a First Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |

**For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.**

**EXHIBIT 3B**

(Class 5 Ballot)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING THE JOINT CHAPTER 11 PLAN OF**
**FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 5 — SECOND LIEN CLAIMS**

---

**PLEASE READ - YOUR RESPONSE IS REQUIRED BY SEPTEMBER 15, 2026**

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] FOR FRESHREALM, INC., ET AL. (THE "COMPANY") INCLUDED WITH THIS BALLOT BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN).

THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **ACTUALLY RECEIVED** BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") PRIOR TO **5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026** (THE "VOTING DEADLINE").

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Plan"), attached as Exhibit A to the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Disclosure Statement") from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Class, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in Exhibit A attached hereto. For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.

You have received this Ballot because the Company's books and records indicate that you are a Holder of a Claim in Class 5 (Second Lien Claims) as of August 6, 2026 (the "Voting Record Date") and as set forth in Item 1 of the Ballot. Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of those Claims.

This Ballot may not be used for any purpose other than for casting votes with respect to the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Balloting Agent immediately.

You should review the Plan before you vote. You may wish to seek legal advice concerning the proposals related to the Plan.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials (the "Solicitation Package") have been distributed under separate cover from this Ballot. This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto. Once completed and returned in accordance with the attached instructions, the votes on the Plan will be counted as set forth herein.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Equity Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Balloting Agent **actually receives** it on or before the Voting Deadline.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

**THE VOTING DEADLINE IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 15, 2026.**

**VOTING – COMPLETE THIS SECTION**

**Item 1. Principal Amount of Claims, Vote on Plan, Release Opt Out**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Claim in the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan in order to have your vote counted. Please note that you are voting all of your Claims either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted. If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted. The Holder of a Claim in the Voting Class set forth below votes and elects to:

| Voting Class | Description | Amount | Vote to Accept Plan | Vote to Reject Plan | Opt Out of Third-Party Release |
|---|---|---|---|---|---|
| Class 5 | Second Lien Claim | $_____ | ☐ | ☐ | ☐ |

**IF YOU VOTE TO ACCEPT THE PLAN, YOU ARE ALSO CONSENTING TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN AND COPIED IN ITEM 2 BELOW, AND YOU MAY NOT OPT OUT OF SUCH THIRD-PARTY RELEASE**

**PLEASE NOTE THAT YOUR VOTE ON ACCOUNT OF YOUR CLASS 5 – SECOND LIEN CLAIM WILL ALSO BE APPLIED TO YOUR CLASS 6 – GENERAL UNSECURED CLAIM ON ACCOUNT OF THE SECOND LIEN DEFICIENCY CLAIM, AS APPROPRIATE.**

**YOUR VOTE ON THE PLAN WILL BE APPLIED TO EACH APPLICABLE DEBTOR IN THE SAME MANNER AND IN THE SAME AMOUNT AS INDICATED IN THIS ITEM 1.**

**Important Information Regarding the Plan Releases**

**If the Plan is confirmed and consummated through the Chapter 11 Cases, the Third-Party Release and Debtor Release shall apply. You are deemed to provide the Third-Party Release and receive the Debtor Release and Third-Party Release, however, if you do not vote to accept the Plan, you may opt out of providing the Third-Party Release.**

**By opting out of providing the Third-Party Release, you will forego the benefit of becoming a "Released Party" and receiving the Debtor Release and Third-Party Release. You will receive the same treatment on account of your Claim(s) under the Plan regardless of whether or not you opt out of providing the Third-Party Release.**

**If you vote to accept the Plan, you cannot opt out of providing the Third-Party Release. If your ballot indicates that you have accepted the Plan but have also opted out of the Third-Party Release, such opt out election will be disregarded and you will be deemed to have accepted the Plan and consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you do not check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will be deemed to have consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will not grant the Third-Party Release.**

**Item 2. Release Information**

Article VIII.C of the Plan provides a release by the Debtors (the "**Debtor Release**"):

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY*" or "*RELEASED PARTIES*" MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER

AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ARE NOT RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER MANAGERS, RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

\* \* \* \* \*

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and to the Debtor:

e.   That as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims in the Voting Class as set forth in Item 1; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims in the Voting Class as set forth in Item 1;

f.   that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

g.   that the undersigned has cast the same vote with respect to all Claims in each particular Voting Class; and

h.   that no other Ballots with respect to the Claims in the Voting Class identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots voting those Claims are hereby revoked.

---

BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION

---

**Name of Holder:** _____
(Print or Type)

**Signature:** _____

**Name of Signatory:** _____
(If other than Holder)

**Title:** _____

**Address:** _____

**Email Address:** _____

**Date Completed:** _____

---

**RETURN INSTRUCTIONS**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY. THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON**

**SEPTEMBER 15, 2026.**

**To submit a paper Ballot by First Class Mail, Overnight Courier, or Hand Delivery (with a signature):**

FreshRealm, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Ballot, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**To submit your Ballot via electronic, online submission:**

To submit your ballot via the Claims and Noticing Agent's online portal, visit
https://restructuring.ra.kroll.com/Freshrealm, click on the "E-Ballot" section of the website (the "E-Ballot
Portal"), and follow the instructions to submit your Ballot.

**IMPORTANT NOTE**: **You will need the following information to retrieve and submit your customized
unique Ballot:**

Unique E-Ballot ID#: _____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.
Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS,
OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL
AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION
INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND
CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

**<u>INSTRUCTIONS FOR COMPLETING THIS CLASS 5 BALLOT</u>**

1.  This Ballot contains voting options with respect to the Plan.

2.  To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered by (a) submitting it electronically through the E-Ballot Portal at <u>https://restructuring.ra.kroll.com/Freshrealm</u> or (b) first-class mail, overnight courier, or hand delivery to FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232, so that this Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline, **5:00 p.m. prevailing Eastern Time on September 15, 2026.**

3.  To vote, you <u>MUST</u> deliver your completed Ballot (whether via first-class mail or hand delivery to the Balloting Agent) so that it is <u>ACTUALLY RECEIVED</u> by the Balloting Agent on or before the Voting Deadline by one of the methods described above. **The Voting Deadline is 5:00 p.m. prevailing Eastern Time on September 15, 2026**.

4.  Any Ballot received by the Balloting Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Company determines otherwise. No Ballot may be withdrawn or modified after the Voting Deadline without the Company's prior written consent.

5.  Additionally, the following Ballots will not be counted: (a) any Ballot that partially rejects and partially accepts the Plan; (b) Ballots sent to the Debtors, the Debtors' agents (other than Balloting Agent), the Debtors' financial or legal advisors or any other person (other than the Balloting Agent); (c) Ballots sent by facsimile or electronic mail; (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (e) any Ballot cast by an Entity that does not hold a Class 5—Second Lien Claim (as of the Voting Record Date); (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan; (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or (i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

6.  Delivery of a Ballot reflecting your vote to the Balloting Agent will be deemed to have occurred only when the Balloting Agent actually receives your paper Ballot or E-Ballot. In all cases, you should allow sufficient time to assure timely delivery.

7.  If you deliver multiple Ballots to the Balloting Agent, <u>ONLY</u> the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Ballot(s).

8.  You must vote all of your Claims in the Voting Class either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims in the Voting Class, the Company may direct the Balloting Agent to aggregate those Claims for the purpose of counting votes.

9.  This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Equity Interest, or an assertion or admission of a Claim, in the Company's Chapter 11 Cases.

10. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

11. <u>SIGN AND DATE</u> your Ballot.[1] In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot. Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

12. PLEASE RETURN YOUR BALLOT PROMPTLY.

13. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

**<u>PLEASE SUBMIT YOUR BALLOT PROMPTLY</u>**

---

[1] If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Company, the Company's counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

## **Exhibit A**

Subject to the terms and conditions of the Plan, you will receive the following treatment if the Plan is consummated:

| Class 5 | Second Lien Claims | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Second Lien Claim shall receive solely its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, after all Allowed DIP Claims and all Allowed Claims in Class 4 have been satisfied in full in accordance with Articles II and III of the Plan; provided, however, that in no event shall any Holder of Second Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |
|---------|---------|---------|

**For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.**

**EXHIBIT 3C**

(Class 6 Ballot)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING THE JOINT CHAPTER 11 PLAN OF**
**FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 6 — GENERAL UNSECURED CLAIMS**

---

**PLEASE READ - YOUR RESPONSE IS REQUIRED BY SEPTEMBER 15, 2026**

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] FOR FRESHREALM, INC., ET AL. (THE "COMPANY") INCLUDED WITH THIS BALLOT BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE VIII OF THE PLAN).

THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **ACTUALLY RECEIVED** BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") PRIOR TO **5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026** (THE "VOTING DEADLINE").

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

> RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Plan"), attached as Exhibit A to the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Disclosure Statement") from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Class, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in Exhibit A attached hereto. For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.

You have received this Ballot because the Company's books and records indicate that you are a Holder of a Claim in Class 6 (General Unsecured Claims) as of August 6, 2026 (the "Voting Record Date") and as set forth in Item 1 of the Ballot. Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of those Claims.

This Ballot may not be used for any purpose other than for casting votes with respect to the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Balloting Agent immediately.

You should review the Plan before you vote. You may wish to seek legal advice concerning the proposals related to the Plan.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials (the "Solicitation Package") have been distributed under separate cover from this Ballot. This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto. Once completed and returned in accordance with the attached instructions, the votes on the Plan will be counted as set forth herein.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Equity Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Balloting Agent **actually receives** it on or before the Voting Deadline.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

**THE VOTING DEADLINE IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 15, 2026.**

**VOTING – COMPLETE THIS SECTION**

**Item 1. Amount of Claims, Vote on Plan, Release Opt Out**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Claim in the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan in order to have your vote counted. Please note that you are voting all of your Claims either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted. If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted. The Holder of a Claim in the Voting Class set forth below votes and elects to:

| Voting Class | Description | Amount | Debtor | Vote to Accept Plan | Vote to Reject Plan | Opt Out of Third-Party Release |
|---|---|---|---|---|---|---|
| Class 6 | General Unsecured Claim | $_____ | _____ | ☐ | ☐ | ☐ |

**<u>IF YOU VOTE TO ACCEPT THE PLAN, YOU ARE ALSO CONSENTING TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN AND COPIED IN ITEM 2 BELOW, AND YOU MAY NOT OPT OUT OF SUCH THIRD-PARTY RELEASE</u>**

**<u>Important Information Regarding the Plan Releases</u>**

**If the Plan is confirmed and consummated through the Chapter 11 Cases, the Third-Party Release and Debtor Release shall apply. You are deemed to provide the Third-Party Release and receive the Debtor Release and Third-Party Release, however, if you do not vote to accept the Plan, you may opt out of providing the Third-Party Release.**

**By opting out of providing the Third-Party Release, you will forego the benefit of becoming a "Released Party" and receiving the Debtor Release and Third-Party Release. You will receive the same treatment on account of your Claim(s) under the Plan regardless of whether or not you opt out of providing the Third-Party Release.**

**If you vote to accept the Plan, you cannot opt out of providing the Third-Party Release. If your ballot indicates that you have accepted the Plan but have also opted out of the Third-Party Release, such opt out election will be disregarded and you will be deemed to have accepted the Plan and consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you do not check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will be deemed to have consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will not grant the Third-Party Release.**

**Item 2. Release Information**

Article VIII.C of the Plan provides a release by the Debtors (the "**Debtor Release**"):

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "***RELEASED PARTY" or "RELEASED PARTIES"*** MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER

AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ARE NOT RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER MANAGERS, RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

\* \* \* \* \*

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and to the Debtor:

    i. That as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims in the Voting Class as set forth in Item 1; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims in the Voting Class as set forth in Item 1;

j.  that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

k.  that the undersigned has cast the same vote with respect to all Claims in each particular Voting Class; and

l.  that no other Ballots with respect to the Claims in the Voting Class identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots voting those Claims are hereby revoked.

---

BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION

---

**Name of Holder:** _____

(Print or Type)

**Signature:** _____

**Name of Signatory:** _____

(If other than Holder)

**Title:** _____

**Address:** _____

**Email Address:** _____

**Date Completed:** _____

---

**RETURN INSTRUCTIONS**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY. THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT PRIOR TO THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON**

**SEPTEMBER 15, 2026.**

**To submit a paper Ballot by First Class Mail, Overnight Courier, or Hand Delivery (with a signature):**

FreshRealm, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Ballot, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**To submit your Ballot via electronic, online submission:**

To submit your ballot via the Claims and Noticing Agent's online portal, visit
https://restructuring.ra.kroll.com/Freshrealm, click on the "E-Ballot" section of the website (the "E-Ballot
Portal"), and follow the instructions to submit your Ballot.

**IMPORTANT NOTE**: **You will need the following information to retrieve and submit your customized
unique Ballot:**

Unique E-Ballot ID#: _____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.
Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS,
OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL
AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION
INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND
CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

**INSTRUCTIONS FOR COMPLETING THIS CLASS 6 BALLOT**

1.  This Ballot contains voting options with respect to the Plan.

2.  To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered by (a) submitting it electronically through the E-Ballot Portal at https://restructuring.ra.kroll.com/Freshrealm or (b) first-class mail, overnight courier, or hand delivery to FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232, so that this Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline, **5:00 p.m. prevailing Eastern Time on September 15, 2026.**

3.  To vote, you <u>MUST</u> deliver your completed Ballot (whether via first-class mail or hand delivery to the Balloting Agent) so that it is <u>ACTUALLY RECEIVED</u> by the Balloting Agent on or before the Voting Deadline by one of the methods described above. **The Voting Deadline is 5:00 p.m. prevailing Eastern Time on September 15, 2026**.

4.  Any Ballot received by the Balloting Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Company determines otherwise. No Ballot may be withdrawn or modified after the Voting Deadline without the Company's prior written consent.

5.  Additionally, the following Ballots will not be counted: (a) any Ballot that partially rejects and partially accepts the Plan; (b) Ballots sent to the Debtors, the Debtors' agents (other than Balloting Agent), the Debtors' financial or legal advisors or any other person (other than the Balloting Agent); (c) Ballots sent by facsimile or electronic mail; (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (e) any Ballot cast by an Entity that does not hold a Class 6—General Unsecured Claim (as of the Voting Record Date); (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan; (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or (i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

6.  Delivery of a Ballot reflecting your vote to the Balloting Agent will be deemed to have occurred only when the Balloting Agent actually receives your paper Ballot or E-Ballot. In all cases, you should allow sufficient time to assure timely delivery.

7.  If you deliver multiple Ballots to the Balloting Agent, <u>ONLY</u> the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Ballot(s).

8.  You must vote all of your Claims in the Voting Class either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims in the Voting Class, the Company may direct the Balloting Agent to aggregate those Claims for the purpose of counting votes.

9.  This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Equity Interest, or an assertion or admission of a Claim, in the Company's Chapter 11 Cases.

10. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

11. <u>SIGN AND DATE</u> your Ballot.[1] In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot. Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

12. PLEASE RETURN YOUR BALLOT PROMPTLY.

13. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY**</u>

---

[1]   If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Company, the Company's counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

## Exhibit A

Subject to the terms and conditions of the Plan, you will receive the following treatment if the Plan is consummated:

| | | |
|---|---|---|
| Class 6 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Liquidating Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed General Unsecured Claim, each Holder thereof will receive its pro rata share of the Liquidating Trust Distributable Proceeds. |

**For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.**

## **EXHIBIT 4**

(Notice of Non-Voting Status and Opt-Out Form)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

**NOTICE OF NON-VOTING STATUS AND OPT-OUT FORM TO HOLDERS OR POTENTIAL HOLDERS OF UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN, HOLDERS OR POTENTIAL HOLDERS OF IMPAIRED CLAIMS OR INTERESTS CONCLUSIVELY PRESUMED TO REJECT THE PLAN, AND HOLDERS OR POTENTIAL HOLDERS OF DISPUTED CLAIMS**

**PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kroll Restructuring Administration LLC, the Debtors' balloting agent in the Chapter 11 Cases (the "Balloting Agent"), by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm, Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International). You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE THAT** you are a Holder or potential Holder of a Claim against or Equity Interest in the Debtors that, due to the nature and treatment of such Claim or Equity Interest under the Plan, is not entitled to vote on the Plan. Specifically, under the terms of the Plan, (i) a Holder of a Claim in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) a Holder of a Claim or Equity Interest in a Class that is Impaired under the Plan and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, or (iii) a Holder of a Claim that is subject to a pending objection by the Debtors, is not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m., (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

> **PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 15, 2026, at 5:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline"). Any objection to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| **Counsel to the Debtors** |
|:---:|
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |
| **United States Trustee** |
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Fran B. Steele and David Gerardi<br>Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |
| **Official Committee of Unsecured Creditors** |
| **Fox Rothschild LLP**<br>49 Market Street,<br>Morristown, New Jersey 07960<br>Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris |

| Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com | |
|---|---|
| **Counsel to Birch Grove Investments LLC** | |
| **Herbert Smith Freehills Kramer (US) LLP**<br>1177 Avenue of the Americas, New York, NY 10036,<br>Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga<br>Email: robert.schmidt@hsfkramer.com;<br>richard.farley@hsfkramer.com;<br>Andrew.citron@hsfkramer.com;<br>marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.**<br>The Legal Center, One Riverfront Plaza,<br>Newark, NJ 07102,<br>Attn: Andrew Sherman and Boris Mankovetskiy<br>Email: asherman@sillscummis.com;<br>bmankovetskiy@sillscummis.com |
| **Counsel to FaraNord (US) IV Pte Ltd** | |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue, New York, NY 10022<br>Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer<br>Email: cmarcus@kirkland.com;<br>jordan.roberts@kirkland.com;<br>jess.lepper@kirkland.com;<br>Charles.martin@kirkland.com;<br>kelly.meyer@kirkland.com | **McCarter & English, LLP**<br>Four Gateway Center<br>100 Mulberry St.<br>Newark, NJ 07102<br>Attn: Jeffrey T. Testa<br>Email: jtesta@mccarter.com |

**PLEASE TAKE FURTHER NOTICE THAT** if you are a Holder of a Claim that is subject to a pending objection by the Debtors, **you are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before a date that is two (2) business days before the Voting Deadline** (each, a "Resolution Event"):

   i.   an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code;

   ii.  an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a);

   iii. a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder of such Claim to vote its Claim in an agreed upon amount; or

   iv.  the pending objection is voluntarily withdrawn by the objecting party.

**PLEASE TAKE FURTHER NOTICE THAT** the following provisions are included in the Plan:

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D OF THE PLAN PROVIDES FOR THE FOLLOWING THIRD-PARTY RELEASE (THE "THIRD-PARTY RELEASE"):**

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their**

**Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY*" *or* "*RELEASED PARTIES*" MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER

AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ARE NOT RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER MANAGERS, RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY AND TO PROVIDE YOU WITH THE ATTACHED OPT-OUT FORM WITH RESPECT TO THE EXCULPATION, INJUNCTION, AND THIRD-PARTY RELEASE PROVIDED IN THE PLAN. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT.**

*[Reminder of the Page Left Intentionally Blank]*

Dated: August __, 2026

*/s/ DRAFT*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            rjareck@coleschotz.com
            dharris@coleschotz.com
            mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

## OPTIONAL: THIRD-PARTY RELEASE OPT-OUT FORM

You are receiving this opt out form (the "Opt-Out Form") because you are or may be a Holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of FreshRealm, Inc. and its Debtor Affiliates* [Docket No. [●]]  (as amended, supplemented, or otherwise modified from time to time, the "Plan").  Except as otherwise set forth in the definition of Releasing Party in the Plan, Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in Article VIII.D (the "Third-Party Release"), set forth in the Notice unless a Holder affirmatively opts out of the Third-Party Release or timely objects to the Third-Party Release on or before **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**, and such objection is not resolved before confirmation.

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM CAREFULLY BEFORE COMPLETING THIS OPT-OUT FORM.

**UNLESS YOU CHECK THE BOX ON THIS OPT-OUT FORM BELOW AND FOLLOW ALL INSTRUCTIONS, YOU WILL BE HELD TO FOREVER RELEASE THE RELEASED PARTIES (AS DEFINED HEREIN) IN ACCORDANCE WITH THE PLAN.**

**THIS OPT-OUT FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026 (THE "OPT-OUT DEADLINE").**

All questions as to the validity, form, eligibility (including time of receipt), and acceptance and revocation of an opt-out election will be resolved by the Debtors or Reorganized Debtors (as applicable), in their sole discretion, which resolution will be final and binding.

This Opt-Out Form may not be used for any purpose other than opting out of the Third-Party Release contained in the Plan. If you believe you have received this Opt-Out Form in error, or if you believe that you have received the wrong opt-out form, please contact the Balloting Agent immediately by email at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm, Inc. – Solicitation Inquiry" in the subject line, or by phone at (888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International).

**Item 1**. **Optional Third-Party Release.**

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH BELOW. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN ONLY IF (I) THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND (II) YOU (A) CHECK THE BOX BELOW AND SUBMIT THE OPT OUT FORM BY THE OPT-OUT DEADLINE OR (B) TIMELY OBJECT TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.

☐ **By checking this box, you elect to opt out of the Third-Party Release set forth below.**

Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):

> **Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

> **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document,**

instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY" or "RELEASED PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, "**RELEASED OFFICERS**" MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ARE NOT RELEASED OFFICERS.

UNDER THE PLAN, "*RELATED PARTY*" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER MANAGERS, RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS.  FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

## Item 2. Certifications.

By signing this Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

- that, as of July 27, 2026, either: (i) the undersigned is the Holder of Claims or Interests; or (ii) the undersigned is an authorized signatory for an Entity or Person that is the Holder of Claims or Interests;

- that the Holder has received a copy of the Notice of Non-Voting Status and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

- that the undersigned has made the same election with respect to all Claims or Interests; and

- that no other Opt-Out Form has been cast with respect to the Holder's Claims or Equity Interests, or, if any other Opt-Out Forms have been cast with respect to such Claims or Interests, such Opt-Out Forms are hereby revoked.

YOUR RECEIPT OF THIS OPT-OUT FORM DOES NOT SIGNIFY THAT YOUR CLAIM OR EQUITY INTEREST HAS BEEN OR WILL BE ALLOWED.

**Name of Holder:** _____

(Print or Type)

**Signature:** _____

**Name of Signatory:** _____

(If other than Holder)

**Title:** _____

**Address:** _____

**Date Completed:** _____

If your address or contact information has changed, please note the new information here.

**TO OPT OUT, PLEASE SUBMIT YOUR OPT-OUT FORM BY ONE OF THE FOLLOWING TWO METHODS:**

**Via Opt-Out Portal. To submit your Opt-Out Form via the Balloting Agent's online portal, visit https://restructuring.ra.kroll.com/Freshrealm, click on the "Submit E-Ballot" section of the website (the "E-Ballot Portal"), and follow the instructions to submit your Opt-Out Form.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Opt-Out Form:**

**Unique E-Opt-Out ID#:** _____

**Kroll's Opt-Out Portal is the sole manner in which forms will be accepted via electronic or online transmission. Forms submitted by facsimile, email, or other means of electronic transmission will not be counted.**

**Please complete and submit an electronic Opt-Out Form for each E-Opt-Out ID# you receive, as applicable.**

**Via Paper Form. Complete, sign, and date this Opt-Out Form and return it promptly by first-class mail, overnight courier, or hand delivery to the address below.**

```
FreshRealm, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232
```

**To arrange hand delivery of your Opt-Out Form, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Opt-Out Form Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.**

Parties that submit their Opt-Out Form using the Opt-Out Portal should NOT also submit a paper Opt-Out Form.

IF THE BALLOTING AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THIS OPT-OUT FORM ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026, THEN YOUR ELECTION TRANSMITTED HEREBY WILL NOT BE EFFECTIVE.

OPT-OUT FORMS SENT BY FACSIMILE OR EMAIL WILL <u>NOT</u> BE ACCEPTED.

### INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM

1. Capitalized terms used in the Opt-Out Form or in these instructions (the "Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2. To ensure that your election is counted, you must complete the Opt-Out Form and take the following steps: (a) clearly indicate your decision to "opt out" of the Third-Party Release set forth in the Plan in Item 1 above; (b) make sure that the information required by Item 2 above has been correctly inserted; and (c) sign, date and return your Opt-Out Form in accordance with paragraph 3 directly below.

3. **Return of Opt-Out Form**: Your Opt-Out Form MUST be returned to the Balloting Agent so as to be **actually received** by the Balloting Agent on or before the Opt-Out Deadline, which is **5:00 p.m. (prevailing Eastern Time) on September 15, 2026.**

4. If an Opt-Out Form is received by the Balloting Agent after the Opt-Out Deadline, it will not be effective. Additionally, the following Opt-Out Forms will NOT be counted:

   - ANY OPT-OUT FORM THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM OR EQUITY INTEREST;

   - ANY OPT-OUT FORM CAST BY OR ON BEHALF OF AN ENTITY THAT IS NOT ENTITLED TO OPT OUT OF THE RELEASE;

   - ANY OPT-OUT FORM SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE BALLOTING AGENT), OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

   - ANY OPT-OUT FORM TRANSMITTED BY FACSIMILE OR EMAIL;

   - ANY UNSIGNED OPT-OUT FORM; OR

   - ANY OPT-OUT FORM NOT COMPLETED IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE SOLICITATION ORDER.

5. The method of delivery of Opt-Out Forms to the Balloting Agent is at the election and risk of each Holder of a Claim or Interest. Except as otherwise provided herein, such delivery will be deemed made to the Balloting Agent only when the Balloting Agent **actually receives** the executed Opt-Out Form. Holders should allow sufficient time to assure timely delivery.

6. If multiple Opt-Out Forms are received from the same Holder with respect to the same Claim or Interest prior to the Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Forms.

7. The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to Opt-Out of the Third-Party Release. Accordingly, at this time, Holders of Interests should not surrender certificates or instruments representing or evidencing their Interests, and neither the Debtors nor the Balloting Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

8. The Opt-Out Form does not constitute, and shall not be deemed to be, (a) a proof of claim, (b) proof of interest, or (c) an assertion or admission of a Claim or Interest.

9. <u>Please be sure to sign and date your Opt-Out Form</u>. If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form

10. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**<u>PLEASE RETURN YOUR OPT-OUT FORM PROMPTLY!</u>**

**IF YOU HAVE RECEIVED A DAMAGED OPT-OUT FORM OR HAVE LOST YOUR OPT-OUT FORM, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-OUT FORM OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT AT:**

**(888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International)**

**Or via email at FreshRealmInfo@ra.kroll.com**

> **IF THE BALLOTING AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THE OPT-OUT FORM ON OR BEFORE THE OPT-OUT DEADLINE, WHICH IS 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026, THEN YOUR OPT-OUT ELECTION TRANSMITTED THEREBY WILL NOT BE EFFECTIVE.**

## **EXHIBIT 5**

(Cover Letter)

## COMPANY LETTERHEAD

Via First-Class Mail

**RE: FreshRealm, Inc.,** *et al.*
**Chapter 11 Case No. 26-14656 (MEH) (Jointly Administered)**

Dear Holders of Claims entitled to vote on the Plan,

You have received this letter and the enclosed materials because you are entitled to vote on the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[1]

FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") on April 27, 2026.

On [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing the Debtors, to solicit acceptances for the Plan; (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and (e) for filing objections to the Plan.

Additionally, Article VIII of the Plan contains release, exculpation, and injunction provisions, and Article VIII.D of the Plan includes a third-party release. Thus, you are advised to review and consider the Plan carefully because your rights may be affected thereunder. You may elect not to grant the third-party release contained in Article VIII.D of the Plan only if you (a) do not vote to accept the Plan or are deemed to accept the Plan, and (b) return a Ballot or Opt-Out Form, as applicable, checking the box to "opt-out" from the third-party release.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.
> THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR
> ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Bankruptcy Court for distribution to Holders of Claims in connection with the solicitation of votes to accept the Plan. The Solicitation Package consists of the following, as applicable:

1. a copy of the Solicitation Procedures;

2. Ballot, together with detailed voting instructions and instructions on how to submit the Ballots, and a pre-addressed, postage prepaid return envelope;

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

3.  this letter;

4.  the Combined Hearing Notice;

5.  the Disclosure Statement (and exhibits thereto, including the Plan) as conditionally approved by the Bankruptcy Court;

6.  the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures);

7.  a pre-addressed, postage prepaid reply envelope (if applicable); and

8.  any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Classes.

The Debtors have approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their estates, Holders of Claims, and all other parties in interest. Moreover, the Debtors believe that any alternative to Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the Chapter 11 Cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE INSTRUCTIONS IN YOUR BALLOT. THE VOTING DEADLINE IS SEPTEMBER 15, 2026, AT 5:00 P.M. (PREVAILING EASTERN TIME).**

The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER on the Bankruptcy Court's website at: https://www.njb.uscourts.gov/.  Please be advised that Kroll/the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may not advise you as to whether you should vote to accept or reject the Plan or provide legal advice.

Sincerely,

_____
John Hanson, CFO

**<u>Exhibit 6</u>**

(Combined Hearing Notice)

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br><div align="center">Debtors.</div> | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

<div align="center">

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN**
**FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

</div>

**PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m. (prevailing Eastern Time),** or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

> **PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

### CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **August 6, 2026** (the "Voting Record Date"), which is the date for determining which certain Holders of Claims are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is **September 15, 2026. At 5:00 p.m. (prevailing Eastern Time)** (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete all of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' balloting agent, Kroll Restructuring Administration LLC (the "Balloting Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

### CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

**Objection Deadline.** The deadline for filing objections to the Plan is **September 15, 2026, at 5:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline"). Any objection to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| Counsel to the Debtors |
| --- |
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |
| **United States Trustee** |
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Fran B. Steele and David Gerardi |

| Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |
|---|
| **Official Committee of Unsecured Creditors** |
| **Fox Rothschild LLP**<br>49 Market Street,<br>Morristown, New Jersey 07960<br>Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris<br>Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com |
| **Counsel to Birch Grove Investments LLC** |

| **Herbert Smith Freehills Kramer (US) LLP**<br>1177 Avenue of the Americas, New York, NY 10036,<br>Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga<br>Email: robert.schmidt@hsfkramer.com;<br>richard.farley@hsfkramer.com;<br>Andrew.citron@hsfkramer.com;<br>marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.**<br>The Legal Center, One Riverfront Plaza,<br>Newark, NJ 07102,<br>Attn: Andrew Sherman and Boris Mankovetskiy<br>Email: asherman@sillscummis.com;<br>bmankovetskiy@sillscummis.com |
|---|---|
| **Counsel to FaraNord (US) IV Pte Ltd** | |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue, New York, NY 10022<br>Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer<br>Email: cmarcus@kirkland.com;<br>jordan.roberts@kirkland.com;<br>jess.lepper@kirkland.com;<br>Charles.martin@kirkland.com;<br>kelly.meyer@kirkland.com | **McCarter & English, LLP**<br>Four Gateway Center<br>100 Mulberry St.<br>Newark, NJ 07102<br>Attn: Jeffrey T. Testa<br>Email: jtesta@mccarter.com |

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**YOU MAY ELECT NOT TO GRANT THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU (A) DO NOT VOTE TO ACCEPT THE PLAN OR ARE DEEMED TO ACCEPT THE PLAN AND (B) RETURN A BALLOT OR OPT-OUT FORM, AS APPLICABLE, CHECKING THE BOX TO "OPT-OUT" FROM THE THIRD-PARTY RELEASE. SUBJECT TO ANY FINAL ORDER OF THE BANKRUPTCY COURT TO THE CONTRARY, REGARDLESS OF WHETHER THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE A RIGHT TO OPT-OUT OF THE RELEASE, IF YOU (A) VOTE TO ACCEPT THE PLAN, OR (B) (I) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (II) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (III) VOTE TO REJECT OR ARE DEEMED TO REJECT THE PLAN AND, IN EACH CASE OF (B)(I)-(III), FAIL TO CHECK THE BOX TO "OPT-OUT" FROM THE THIRD-PARTY RELEASE ON THE APPLICABLE BALLOT OR OPT-OUT FORM, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.D OF THE PLAN. IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL BE DEEMED TO GRANT THE THIRD-PARTY RELEASE IN ARTICLE VIII.D OF THE PLAN.**

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein. Please be advised that the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may not advise you as to whether you should vote to accept or reject the Plan.

**Filing the Initial Plan Supplement**. The Debtors will file the Initial Plan Supplement (as defined in the Plan) by **September 8, 2026** and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

### BINDING NATURE OF THE PLAN

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

Dated: August __, 2026

*/s/ DRAFT*
**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
                 wusatine@coleschotz.com
                 rjareck@coleschotz.com
                 dharris@coleschotz.com
                 mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

**<u>Exhibit 7</u>**

(Plan Supplement Notice)

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

      **PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement with the Bankruptcy Court on or before August 24, 2026 [Docket No. [●]]. The Plan Supplement contains the following documents, each as defined in the Plan: ((a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, (c) the Plan Administrator Agreement, (d) the Liquidating Trust Agreement, (e) the Wind-Down Budget, (f) any other necessary documentation in accordance with the Plan and (g) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

> **PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 15, 2026, at 5:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline"). Any objection to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| **Counsel to the Debtors** |
|---|
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |
| **United States Trustee** |
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Fran B. Steele and David Gerardi<br>Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |
| **Official Committee of Unsecured Creditors** |
| **Fox Rothschild LLP**<br>49 Market Street,<br>Morristown, New Jersey 07960<br>Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris<br>Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com |

| Counsel to Birch Grove Investments LLC | |
|---|---|
| **Herbert Smith Freehills Kramer (US) LLP**<br>1177 Avenue of the Americas, New York, NY 10036,<br>Attn: Robert T. Schmidt, Richard E. Farley, Andrew<br>Citron, and Marie Soga<br>Email: robert.schmidt@hsfkramer.com;<br>richard.farley@hsfkramer.com;<br>Andrew.citron@hsfkramer.com;<br>marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.**<br>The Legal Center, One Riverfront Plaza,<br>Newark, NJ 07102,<br>Attn: Andrew Sherman and Boris Mankovetskiy<br>Email: asherman@sillscummis.com;<br>bmankovetskiy@sillscummis.com |

| Counsel to FaraNord (US) IV Pte Ltd | |
|---|---|
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue, New York, NY 10022<br>Attn: Christopher Marcus, Jordan D. Roberts, Jess<br>Lepper, Charles H. Martin, and Kelly Meyer<br>Email: cmarcus@kirkland.com;<br>jordan.roberts@kirkland.com;<br>jess.lepper@kirkland.com;<br>Charles.martin@kirkland.com;<br>kelly.meyer@kirkland.com | **McCarter & English, LLP**<br>Four Gateway Center<br>100 Mulberry St.<br>Newark, NJ 07102<br>Attn: Jeffrey T. Testa<br>Email: jtesta@mccarter.com |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact Kroll Restructuring Administration LLC (the "Balloting Agent") by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

> **ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**
>
> **THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.**

Dated: August __, 2026

/s/ DRAFT

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
          wusatine@coleschotz.com
          rjareck@coleschotz.com
          dharris@coleschotz.com
          mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

**<u>Exhibit 8</u>**

(Assumption Notice)

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

<div align="center">

**NOTICE OF REGARDING EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES TO BE ASSUMED PURSUANT TO THE PLAN**

</div>

PLEASE TAKE NOTICE THAT on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the

---

[1]  The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]  Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

<div align="center">1</div>

solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE ASSUMED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

**PLEASE TAKE FURTHER NOTICE THAT** on [●], the Debtors filed the Schedule of Assumed Executory Contracts and Unexpired Leases [Docket No. [●]] (the "Assumed Executory Contracts and Unexpired Leases List") with the Bankruptcy Court as part of the Plan Supplement as contemplated under the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to a contract that is listed on the Assumed Executory Contracts and Unexpired Leases List. Therefore, you are advised to carefully review the information contained in this notice and the related provisions of the Plan, including the Assumed Executory Contracts and Unexpired Leases List.

**PLEASE TAKE FURTHER NOTICE THAT** counterparties to Executory Contracts and Unexpired Leases that receive a Notice of Assumption of Executory Contracts and Unexpired Leases may file an objection to the Debtors' proposed assumption. Such objections **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received no later than fourteen (14) calendar days** after the date the Debtors file and serve the relevant assumption notice.

| Counsel to the Debtors |
|---|
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |

| United States Trustee |
|---|
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102 |

---

[3] Neither the inclusion nor exclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Leases List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. Further, the Debtors expressly reserve all rights with respect to the Assumed Contracts, including the right to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List pursuant to the terms of the Plan, at any time prior to the Effective Date.

| Attn: Fran B. Steele and David Gerardi |
|---|
| Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |

| **Official Committee of Unsecured Creditors** |
|---|
| **Fox Rothschild LLP** |
| 49 Market Street, |
| Morristown, New Jersey 07960 |
| Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris |
| Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com |

| **Counsel to Birch Grove Investments LLC** | |
|---|---|
| **Herbert Smith Freehills Kramer (US) LLP** | **Sills Cummis & Gross P.C.** |
| 1177 Avenue of the Americas, New York, NY 10036, | The Legal Center, One Riverfront Plaza, |
| Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga | Newark, NJ 07102, |
| | Attn: Andrew Sherman and Boris Mankovetskiy |
| Email: robert.schmidt@hsfkramer.com; | Email: asherman@sillscummis.com; |
| richard.farley@hsfkramer.com; | bmankovetskiy@sillscummis.com |
| Andrew.citron@hsfkramer.com; | |
| marie.soga@hsfkramer.com | |

| **Counsel to FaraNord (US) IV Pte Ltd** | |
|---|---|
| **Kirkland & Ellis LLP** | **McCarter & English, LLP** |
| 601 Lexington Avenue, New York, NY 10022 | Four Gateway Center |
| Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer | 100 Mulberry St. |
| | Newark, NJ 07102 |
| Email: cmarcus@kirkland.com; | Attn: Jeffrey T. Testa |
| jordan.roberts@kirkland.com; | Email: jtesta@mccarter.com |
| jess.lepper@kirkland.com; | |
| Charles.martin@kirkland.com; | |
| kelly.meyer@kirkland.com | |

**PLEASE TAKE FURTHER NOTICE THAT**, on the Effective Date, the applicable Wind-Down Debtor, Liquidating Trustee or the Plan Administrator, as applicable, will assume the contracts (the "Assumed Contracts") listed on the Assumed Executory Contracts and Unexpired Leases List, attached hereto as Exhibit A, one or more of which you are a counterparty. The Assumed Executory Contracts and Unexpired Leases List can also be viewed on the Debtors case website, https://restructuring.ra.kroll.com/Freshrealm.

**PLEASE TAKE FURTHER NOTICE THAT**, on the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is:  (1) the TSA; (2) the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) an Insurance Policy; (5) an Asset Purchase Agreement; or (6) to be assumed by the Debtors and assigned to any Purchaser in connection with any Sale Transactions and pursuant to any Sale Transactions Documentation or the TSA.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

> **PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**PLEASE TAKE FURTHER NOTICE** that section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to Cure, or provide adequate assurance that it will promptly Cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to Cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in Exhibit A hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no Cure amount outstanding for such Executory Contract or Unexpired Lease.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with proposed Cure amounts, your objection (a "Cure Objection") **must**: (i) be in writing; (ii) state with particularity the basis of the objection and, if the objection pertains to the proposed Cure amounts, state the correct Cure amount alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iii) be Filed with the Clerk of the United States Bankruptcy Court for the district of New Jersey, Martin Luther King Jr. Building, 50 Walnut Street, Newark, NJ 07102, or electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest and shall be served in accordance with the General Order and the Supplemental Commentary no later than fourteen (14) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court (the "Cure Objection Deadline").

**PLEASE TAKE FURTHER NOTICE THAT** if no objection is filed by the Cure Objection Deadline, then: **(i) you will be deemed to have stipulated that the Cure amounts as determined by the Debtors are correct; (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure amount under the proposed Assumed Contract; and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assumption**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption or assumption and assignment of the Executory Contract(s) and Unexpired Lease(s) and/or proposed Cure amounts in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing or a later date as fixed by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** nothing herein: (i) alters in any way the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract; (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact Kroll Restructuring Administration LLC (the "Balloting Agent") by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing

Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND <u>ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE</u>. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.**

---

[*Remainder of Page Intentionally Left Blank*]

Dated: August __, 2026

*/s/ DRAFT*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            rjareck@coleschotz.com
            dharris@coleschotz.com
            mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

## <u>SCHEDULE A</u>

## SCHEDULE OF CONTRACTS AND LEASES AND PROPOSED CURE AMOUNTS

## [OMITTED]

## Exhibit C-2

**Disclosure Statement Order Redline**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE
DISCLOSURE STATEMENT; (II) APPROVING (A) THE SOLICITATION
PROCEDURES; (B) THE FORMS OF BALLOTS AND NOTICES IN CONNECTION
THEREWITH; AND (C) CERTAIN DATES WITH RESPECT THERETO; AND (III)
<u>GRANTING RELATED RELIEF</u>**

The relief set forth on the following pages, numbered two (2) through seventeen (17), is

hereby **ORDERED**.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

(Page 2)

| | |
|---|---|
| Debtors: | FRESHREALM, INC., *et al.* |
| Case No. | 26-14656 (MEH) |
| Caption of Order: | Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures; (B) the Forms of Ballots and Notices in Connection Therewith; and (C) Certain Dates With Respect Thereto; and (III) Granting Related Relief |

Upon the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving (A) the Solicitation Procedures; (B) the Forms of Ballots and Notices in Connection Therewith; and (C) Certain Dates With Respect Thereto; and (III) Granting Related Relief* (the "Motion")[1] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order") conditionally approving: (i) the adequacy of the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and its Debtor Affiliates*, [Docket No. —352] (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); (ii) the Solicitation Procedures; (iii) the Ballots; (iv) the Cover Letter; (v) the Notice of Non-Voting Status; (vi) the Opt-Out Form; (vii) the Combined Hearing Notice; (viii) the Publication Notice; (ix) the Cover Letter; (x) the Plan Supplement Notice; (xix) the Assumption Notice; (xii) any other notices in connection therewith; and (xiii) certain dates with respect thereto, including but not limited to the Voting Record Date, the Solicitation Packages Mailing Deadline, the Publication Deadline, the Initial Plan Supplement Deadline, the Voting and Opt-Out Deadline, the Confirmation Objection Deadline, the Voting Report Deadline, the Confirmation Brief Deadline, and the Confirmation Hearing Date; and based upon the First Day Declaration; and based on the record in these Chapter 11 Cases; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended June 6, 2025

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

71306/0001-53758738v1

(Bumb, C.J.).; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that sufficient notice of the Motion has been given; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court, if any; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED** to the extent set forth herein.

2.      Any objections to entry of this Order, to the extent not withdrawn or settled, are overruled.

**A.      Approval of the Disclosure Statement on a Conditional Basis.**

3.      The Disclosure Statement, substantially in the form attached hereto as **Exhibit 1**, is conditionally approved as providing Holders of Claims entitled to vote on the Plan adequate information, within the meaning of section 1125(a)(1) of the Bankruptcy Code, to make an informed decision as to whether to vote to accept or reject the Plan. Any objections to the adequacy of the information contained in the Disclosure Statement are expressly reserved for consideration at the Combined Hearing.

4.      The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims and Equity Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rules 2002(c)(3) and 3016(b) and (c).

**II.    Approval of the Procedures, Materials, and Timeline for Soliciting Votes on and Confirming the Plan.**

**A.    Approval of the Solicitation Procedures.**

5.    The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation Procedures attached hereto as **Exhibit 2**, which are hereby approved in their entirety and comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

**B.    Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.**

6.    The following Confirmation Schedule is hereby established (subject to modifications as necessary) with respect to the solicitation of votes to accept the Plan, voting on the Plan, and confirming the Plan:

| Event | Date | Description |
|---|---|---|
| Conditional Disclosure Statement Hearing Date | August 13, 2026 at 10:00 a.m. (ET) | The date of the hearing to conditionally approve the Disclosure Statement, subject to the Court's availability. |
| Voting Record Date | August 6, 2026 | The date for determining which Holders of Claims in the Voting Classes (as defined herein) are entitled to vote to accept or reject the Plan (such date, the "Voting Record Date"). |
| Solicitation Deadline | Three (3) business days following entry of the Order (or as soon as reasonably practicable thereafter) | The deadline by which the Debtors must distribute Solicitation Packages (including Ballots) and Notices of Non-Voting Status (including Opt-Out Forms), as applicable (the "Solicitation Packages Mailing Deadline"). |
| General Bar Date | July 27, 2026 | The deadline for creditors (that are not governmental entities) to file proofs of claim (the "General Bar Date"). |

| Event | Date | Description |
|---|---|---|
| Publication Deadline | Three (3) business days following entry of the Order (or as soon as reasonably practicable thereafter) | The date by which the Debtors will submit the Combined Hearing Notice in a format modified for publication (such notice, the "Publication Notice," and such date, the "Publication Deadline"). |
| Initial Plan Supplement Deadline | September 8, 2026, at 11:59 p.m. (ET) | The date by which the Debtors shall File the initial version of the Plan Supplement (the "Initial Plan Supplement Deadline"). |
| Assumption Notice Deadline | September 8, 2026, at 11:59 p.m. (ET) | The date by which the Debtors shall serve an Assumption Notice, if any (the "Assumption Notice Deadline"). |
| Voting and Opt-Out Deadline | September 15, 2026, at 5:00 p.m. (ET) | The deadline by which all Ballots and Opt-Out Forms must be properly executed, completed, and submitted so that they are **actually received** by Kroll Restructuring Administration LLC (the "Balloting Agent" or "Kroll," and such deadline, the "Voting and Opt-Out Deadline"). |
| Confirmation Objection Deadline | September 15, 2026, at 5:00 p.m. (ET) | The deadline by which parties in interest may File objections to final approval of the adequacy of the Disclosure Statement and Confirmation of the Plan, including the assumption or rejection of any Executory Contract or Unexpired Lease thereunder or as set forth in the Plan Supplement (the "Confirmation Objection Deadline"). |
| Voting Report Deadline | September 21, 2026, at 11:59 p.m. (ET) | The date by which the report tabulating the voting on the Plan (the "Voting Report") shall be Filed with the Court (the "Voting Report Deadline"). |
| Confirmation Brief and Objection Reply Deadline | September 21, 2026, at 11:59 p.m. (ET) | The deadline by which the Debtors shall File their brief in support of Confirmation of the Plan and reply to objections to Confirmation of the Plan (the "Confirmation Brief Deadline"). |
| Confirmation Hearing Date | September 24, 2026, at 10:00 a.m. (ET) or such other date as may be scheduled by the Court | The date and time of the Confirmation Hearing (the "Confirmation Hearing Date"). |

71306/0001-53758738v1

7.      The Solicitation Packages Mailing Deadline provides sufficient time for Holders of Claims entitled to vote on the Plan to make informed decisions with respect to voting on the Plan. The Debtors may adjourn the Confirmation Hearing Date, any related dates and deadlines from time to time, without notice to the parties in interest other than announcement of such adjournment in open court, or by posting such notice of adjournment on Kroll's website, and/or filing a notice of adjournment with the Court and serving such notice on the Core 2002 Service List.

**C.      Approval of the Form and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

8.      The Solicitation Packages to be transmitted on or before the Solicitation Packages Mailing Deadline, or as soon as reasonably practicable thereafter, to those Holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

(a)      the conditionally approved Disclosure Statement, substantially in the form attached hereto as **Exhibit 1** (and exhibits thereto, including the Plan);

(b)      a copy of the Solicitation Procedures, substantially in the form attached hereto as **Exhibit 2**;

(c)      the applicable form of Ballots, substantially in one of the forms of Ballots attached hereto as **Exhibits 3A**, **3B**, and **3C**, together with detailed voting instructions and instructions on how to submit the Ballots;

(d)      the Cover Letter, substantially in the form attached hereto as **Exhibit 5**, describing the contents of the Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan;

(e)      the Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 6**;

(f)      this Order (without exhibits, except for the Solicitation Procedures);

(g)      a pre-addressed, postage pre-paid reply envelope (if applicable); and

(h)      any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Classes.

9.      The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Packages Mailing Deadline, or as soon as reasonably practicable thereafter. Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

10.      The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Rules.

11.      The Debtors are authorized to cause the Solicitation Packages to be delivered via first-class mail and/or distributed in electronic format via email, as applicable, through the Balloting Agent to Holders of Claims in the Voting Classes. Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Balloting Agent and request paper copies of the materials previously received in electronic format (to be provided at the Debtors' expense). For Solicitation Packages distributed via first class mail, the Debtors are authorized to distribute the Disclosure Statement, Order, and Solicitation Procedures on a flash drive, and the Ballot, Cover Letter, and Confirmation Hearing Notice via hardcopy (in paper format).

12.      The form of letter (the "Cover Letter"), attached hereto as **Exhibit 5**, describing the contents of the Solicitation Packages and recommending that such parties vote in favor of the Plan, is hereby approved.

13.      The Ballots substantially in the forms attached hereto as **Exhibits 3A**, **3B**, and **3C** are hereby approved and comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

71306/0001-53758738v1

14.     The Debtors are authorized to cause the Notices of Non-Voting Status to be delivered via first-class mail and/or distributed in electronic format via email, as applicable, through the Balloting Agent to Holders of Claims and Equity Interests in the Non-Voting Classes.

15.     On or before the Solicitation Packages Mailing Deadline, the Debtors (through the Balloting Agent) shall provide complete Solicitation Packages (excluding the Ballots) to the U.S. Trustee (in paper format) and all parties on the Master Service List (in electronic format) as of the Voting Record Date.

16.     For purposes of serving the solicitation materials, the Debtors are authorized to rely on the mailing and email address information (for voting and non-voting parties alike) maintained by the Debtors and provided by the Debtors to the Balloting Agent or, with respect to Holders of Claims in the Voting Classes, by the applicable administrative agents therefor. The Debtors and the Balloting Agent shall not be obligated to conduct any additional research for updated addresses based on undeliverable solicitation materials (including undeliverable Ballots, Notices of Non-Voting Status, Opt-Out Forms, and Combined Hearing Notices), and that the Balloting Agent shall not be required to resend Solicitation Packages or other solicitation materials, including the Combined Hearing Notice and Notices of Non-Voting Status, that are returned as undeliverable, unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

17.     The Balloting Agent is authorized to assist the Debtors in: (a) distributing the Solicitation Packages and Notices of Non-Voting Status; (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims against the Debtors; (c) receiving, tabulating, and reporting on Opt-Out Forms received by Holders of Claims and Equity Interests; (d) responding to inquiries from Holders of Claims and Equity Interests and other parties in interest

71306/0001-53758738v1

relating to the approved Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, the Notices of Non-Voting Status, the Opt-Out Forms, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan, opting out of the Third-Party Release, and objecting to Confirmation of the Plan; (e) soliciting votes on the Plan; and (f) if necessary, contacting Holders of Claims or Equity Interests regarding the Plan and/or the conditionally approved Disclosure Statement. The Debtors and the Balloting Agent may, but are not obligated to, contact parties that submit incomplete or otherwise deficient ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor the Balloting Agent are required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification.

18.    The Debtors and/or the Balloting Agent are authorized, as applicable, in consultation with the Committee, to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots, which determination, absent contrary ruling by the Court, shall be final and binding.

19.    In addition to accepting Ballots and Opt-Out Forms, the Balloting Agent is also authorized to accept Ballots and Opt-Out Forms via electronic online transmission through an online balloting portal on the Debtors' case website (the "E-Ballot Portal"), as set forth in the Solicitation Procedures. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot or Opt-Out Form submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

20.    All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable

voting instructions by: (a) submitting such Ballot electronically through the E-Ballot Portal, after clicking "Submit E-Ballot" under the Case Navigation section of the Debtors' case website, at https://restructuring.ra.kroll.com/Freshrealm; (b) first-class mail, in the return envelope provided with each Ballot; (c) overnight delivery; or (d) personal delivery, so that the Ballots are actually received by the Balloting Agent, through the E-Ballot Portal, or at the return address set forth in the applicable Ballot, by no later than the Voting and Opt-Out Deadline.

21.     Ballots and Opt-Out Forms otherwise sent by facsimile, telecopy, or electronic submissions (other than through the online portal) will <u>not</u> be accepted.  Only properly completed, executed, and timely submitted Ballots and Opt-Out Forms will be accepted.

**D.       Approval of the Form and Notice of Non-Voting Classes and Opt-Out Form.**

22.     On or before the Solicitation Packages Mailing Deadline, or as soon as reasonably practicable thereafter, the Balloting Agent shall mail and/or email, as applicable, the Combined Hearing Notice and a Notice of Non-Voting Status, attached hereto as **Exhibit 4**, and which shall include the Opt-Out Form, to those parties outlined below, who are not entitled to vote on the Plan. The Notice of Non-Voting Status is hereby approved and complies with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

| Class | Status | Treatment |
|---|---|---|
| Classes 1, 2, 3 | Unimpaired<br>(Presumed to Accept) | Holders of Claims that are presumed to accept the Plan are not entitled to vote. Therefore, in lieu of a Solicitation Package, Holders of such Claims, will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |

| Classes 7 and 8 | Unimpaired / Impaired (Presumed to Accept or Deemed to Reject) | Holders of Claims or Intercompany Interests that are presumed to accept or deemed to reject the Plan are not entitled to vote. Therefore, in lieu of a Solicitation Package, Holders of such Claims or Interests, will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |
|---|---|---|
| Classes 9 and 10 | Impaired (Deemed to Reject) | Holders of Claims or Equity Interests that are deemed to reject the Plan are not entitled to vote. Therefore, in lieu of a Solicitation Package, Holders of such Claims, will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection Filed by the Debtors are not entitled to vote the disputed portions of their Claims. Therefore, in lieu of a Solicitation Package, Holders of such Claims, will receive the Combined Hearing Notice and a Notice of Non-Voting Status, substantially in the form attached to the Order as Exhibit 4, which notice includes an Opt-Out Form. |

23.     The Debtors are not required to distribute Solicitation Packages or other solicitation materials to parties that receive a Notice of Non-Voting Status. The Debtors are not required to distribute Solicitation Packages, other solicitation materials, or Notices of Non-Voting Status to: (a) Holders of Claims that have already been paid in full during these Chapter 11 Cases or that are otherwise paid in full in the ordinary course of business pursuant to an order previously entered by this Court; (b) any party to whom the notice of the Motion was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; or (c) the holders of Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests).

**E.     Approval of the Combined Hearing Notice**

24.      The Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 6**, which shall be Filed by the Debtors and served upon parties in interest in these Chapter 11 Cases by no later than the Solicitation Packages Mailing Deadline and published in a format modified for publication one time no later than the Publication Deadline, in the New York Times (national edition) constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan and Disclosure Statement can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

   **F.      Approval of Notice of Filing of the Plan Supplement.**

25.      The Debtors are authorized to mail and/or email, as applicable, notice of the filing of the Plan Supplement to parties in interest, substantially in the form attached hereto as **Exhibit 7**, within the time periods specified in the Plan. Notwithstanding the foregoing, the Debtors may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with the Plan.

   **G.      Approval of Assumption Notice**

26.      The Debtors are authorized to mail and/or email, as applicable, the notice of assumption of Executory Contracts or Unexpired Leases, in the forms attached hereto as **Exhibit 8** to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed pursuant to the Plan, within the time periods specified in the Motion. Counterparties who receive such notice shall have fourteen (14) calendar days to object to the Debtors' proposed assumption. The date by which the Debtors shall file the initial Plan Supplement, which shall include the list of assumed Executory Contracts and Unexpired Leases, if any, is the Initial Plan Supplement Deadline.

**H.      Non-Substantive Modifications**

27.      The Debtors are authorized to make non-substantive changes to the Plan, the Disclosure Statement, the Solicitation Procedures, the Ballots, the Notice of Non-Voting Status, the Opt-Out Form, the Combined Hearing Notice, the Publication Notice, the Cover Letter, the Plan Supplement Notice, the Assumption Notice, and any notice attached hereto, and any related documents without further order of the Bankruptcy Court, including formatting changes, changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Disclosure Statement, the Plan, and any other materials (including any appendices thereto) in the Solicitation Packages before distribution. Subject to the foregoing, the Debtors are authorized to solicit, receive, and tabulate votes to accept or reject the Plan in accordance with this Order, without further order of the Bankruptcy Court.

**III.    Approval of Procedures for Confirming the Plan.**

**A.      Approval of the Procedures for Filing Objections to the Confirmation of the Plan.**

28.      Objections to the Confirmation of the Plan will not be considered by the Court unless such objections are timely Filed and properly served in accordance with this Order and *Chapter 11 Complex Case Management Order* [Docket No. 43]. Specifically, all objections to the Confirmation of the Plan or requests for modifications to the Plan, if any, must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of this Court; (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be Filed with the Court (contemporaneously with a proof of service) and served upon the notice parties so as to be actually received on or before the Confirmation Objection Deadline by each of the notice parties identified in the Combined Hearing Notice.

## IV.    Miscellaneous

29.     The Debtors' rights are reserved to modify the Plan without further order of the Bankruptcy Court in accordance with Article X of the Plan, including the right to withdraw the Plan at any time before the Confirmation Date.

30.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

31.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Order or the Motion or any order granting the relief requested by the Motion; (e) a request, approval, or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code (or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code); (f) an admission by the Debtors as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all

such liens; or (i) a waiver of the obligation of any party in interest to file a proof of claim. Any payment made pursuant to this Order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

32. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

33. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

34. Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or the Complex Case Procedures, the terms and conditions of this Order shall be effective and enforceable immediately upon entry hereof.

35. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures are satisfied by such notice.

36. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# EXHIBIT 1

## (Disclosure Statement on File at Docket No. __)

KL2 3479844.4
71306/0001-53758738v1

## **EXHIBIT 2**

(Solicitation Procedures)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br><div align="right">Debtors.</div> | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

**SOLICITATION PROCEDURES**

**PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

A. **Voting Record Date.**

The Court has established **August 6, 2026**, as the record date for purposes of determining which Holders of Claims in Class 4 (First Lien Claims), Class 5 (Second Lien Claims) and Class 6 (General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date").

B. **The Voting Deadline.**

The Court has established **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**, as the voting deadline (the "Voting Deadline") for the Plan. The Debtors may extend the Voting Deadline without further order of the Bankruptcy Court. To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be executed, completed, and delivered pursuant to the instructions set forth on therein so that they are actually received by Kroll Restructuring Administration LLC ("Kroll" or the "Balloting Agent") no later than the Voting Deadline.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

71306/0001-53758738v1

C. **Form, Content, and Manner of Notices.**

1. **The Solicitation Package.**

The following materials shall constitute the solicitation package (the "Solicitation Package"):

(a) these solicitation procedures (the "Solicitation Procedures");

(b) the applicable form of Ballot, together with detailed voting instructions, and instructions on how to submit the Ballot;

(c) a cover letter (the "Cover Letter") which describes the contents of the Solicitation Package and urges Holders of Claims in the Voting Classes to vote to accept the Plan;

(d) the notice of the Confirmation Hearing (the "Combined Hearing Notice");

(e) the Disclosure Statement (and exhibits thereto, including the Plan);

(f) the Disclosure Statement Order (without exhibits except these Solicitation Procedures);

(g) a pre-addressed, postage prepaid reply envelope (if applicable); and

(h) such other materials as the Court may direct.

2. **Distribution of the Solicitation Package.**

The Debtors shall serve, or cause to be served, copies of the Solicitation Package to Holders of Claims in the Voting Classes. In addition, these Solicitation Procedures, the Disclosure Statement, the Plan, the Disclosure Statement Order, and all pleadings filed with the Bankruptcy Court shall be made available on the Debtors' case website https://restructuring.ra.kroll.com/Freshrealm; provided that any party that would prefer paper format may contact the Balloting Agent by: (a) calling the Balloting Agent at (888) 454-0938 (USA or Canada, Toll Free) or +1 (646) 452-8302 (international); (b) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Solicitation Inquiry" in the subject line; or (c) writing to Kroll at FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232.

The Debtors shall distribute, or cause to be distributed, the Solicitation Package to all Holders of Claims in the Voting Classes as of the Voting Record Date within three (3) business days following entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) who are entitled to vote, as described in Section D.1 below.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding Ballots) on the U.S. Trustee (in paper format) and all parties who have requested service of papers in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

The Debtors will not distribute Solicitation Packages or other solicitation materials to: (i) Holders of Claims that have already been paid in full during these Chapter 11 Cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, (ii) any party to whom notice of the *Debtors' Motion for Entry of an Order Conditionally Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation Procedures, (III) the Forms of Ballots and Notices In*

71306/0001-53758738v1

*Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Docket No. __] was sent but was subsequently returned as undeliverable without a forwarding address by the Voting Record Date; (iii) the Holders in Class 7 (Intercompany Claims) or Class 8 (Intercompany Interests); or (iv) parties that received the Notice of Non-Voting Status, as applicable.

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

3. **Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

(a) If a Claim in a Voting Class is subject to an objection that is filed with the Bankruptcy Court and served on the applicable Holder(s) on or prior to ~~seven~~fourteen (~~7~~14) days before the Voting Deadline: (i) the Debtors shall cause the applicable Holder to be served with a Notice of Non-Voting Status (the "Notice of Non-Voting Status") substantially in the form annexed as Exhibit 4 to the Disclosure Statement Order, and which will include an opt-out form (the "Opt-Out Form") whereby the Holder may opt out of the Plan's Third-Party Release; and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event (as defined herein) occurs as provided herein. In the event a Holder in a Voting Class receives a timely filed and served objection under this paragraph, such Holder may file with the Court a motion on an emergency basis seeking a determination that its Claim be allowed for voting purposes.

(b) If a Claim in a Voting Class is subject to an objection that is filed with the Bankruptcy Court less than ~~seven~~fourteen (~~7~~14) days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Bankruptcy Court, unless the Bankruptcy Court orders otherwise.

(c) A "Resolution Event" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

    i.   an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code;

    ii.  an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a);

    iii. a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder of such Claim to vote its Claim in an agreed upon amount and such stipulation or agreement is conveyed to the Balloting Agent by e-mail or otherwise; or

    iv.  the pending objection is voluntarily withdrawn by the objecting party.

(d) No later than two (2) business days following the occurrence of a Resolution Event, the Debtors shall cause the Balloting Agent to distribute to the relevant Holder via hand

delivery, first-class mail, or email, a Solicitation Package and a pre-paid envelope to the relevant Holder.

### 4.  Forms of Non-Voting Status

Certain (i) Holders of Claims and Equity Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code, (ii) Holders of Claims or Equity Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, and (iii) Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their claims unless a Resolution Event occurs will receive the Combined Hearing Notice and a Notice of Non-Voting Status. Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots), as well as how they may opt out of the Third-Party Release using the opt out form provided therein.

In addition, the Notice of Non-Voting Status contains the full text of the release provision set forth in the Plan (the "Third-Party Release") and advises such holders in the Non-Voting Classes that they will be bound by the Third-Party Release unless they timely and properly opt out. The Notice of Non-Voting Status also includes a form to complete and return if the holder elects to opt out of such Third-Party Release (the "Third-Party Release Opt-Out Form"). A holder of Claims in a Non-Voting Class who properly and timely elects to opt out of the Third-Party Release will not be a Releasing Party or Released Party under the Plan. Holders of Claims in the Non-Voting Classes who choose to opt out of the Third-Party Release may do so (i) by first-class mail, (ii) by overnight courier, (iii) by hand delivery, or (iv) via the E-Ballot Portal so that (in each instance) it is actually received by the Solicitation Agent no later than the Voting and Opt-Out Deadline (as defined above), which the Debtors may extend, in their discretion, without further order of the Court. The Notice of Non-Voting Status includes information on how parties can opt out electronically via the E-Ballot Portal. An encrypted opt out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner. Additionally, the parties' electronic signature will be deemed to be legally valid and effective immediately.

### 5.  Notices With Respect to Executory Contracts and Unexpired Leases.

Counterparties to Executory Contracts or Unexpired Leases that receive an Assumption Notice substantially in the form attached as Exhibit 8 to the Disclosure Statement Order, may file an objection to the Debtors' proposed assumption, assumption and assignment and/or cure amount, each under the Plan, as applicable. Such objections **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received no later than fourteen (14) calendar days** after the date the Debtors file and serve the relevant assumption notice. If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by Final Order of the Bankruptcy Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Wind-Down Debtors, the Plan Administrator, the Liquidating Trustee, or any of their respective assets and properties unless a Proof of Claim is Filed with Kroll and served upon counsel to the Plan Administrator and Liquidating Trustee within thirty (30) days from the Effective Date.  The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order.

71306/0001-53758738v1

| **Counsel to the Debtors** | |
| --- | --- |
| **Cole Schotz P.C.** <br> Court Plaza North, 25 Main Street <br> Hackensack, New Jersey 07601 <br> Attn: Ryan T. Jareck and Matteo Percontino <br> Email: rjareck@coleschotz.com; mpercontino@coleschotz.com | |

| **United States Trustee** | |
| --- | --- |
| **Office of the United States Trustee for the District of New Jersey** <br> One Newark Center, Suite 2100 <br> Newark, New Jersey 07102 <br> Attn: Fran B. Steele and David Gerardi <br> Email: fran.b.steele@usdoj.gov; David.gerardi@usdoj.gov | |

| **Official Committee of Unsecured Creditors** | |
| --- | --- |
| **Fox Rothschild LLP** <br> 49 Market Street, <br> Morristown, New Jersey 07960 <br> Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris <br> Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com | |

| **Counsel to Birch Grove Investments LLC** | |
| --- | --- |
| **Herbert Smith Freehills Kramer (US) LLP** <br> 1177 Avenue of the Americas, New York, NY 10036, <br> Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga <br> Email: robert.schmidt@hsfkramer.com; richard.farley@hsfkramer.com; Andrew.citron@hsfkramer.com; marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.** <br> The Legal Center, One Riverfront Plaza, <br> Newark, NJ 07102, <br> Attn: Andrew Sherman and Boris Mankovetskiy <br> Email: asherman@sillscummis.com; bmankovetskiy@sillscummis.com |

| **Counsel to FaraNord (US) IV Pte Ltd** | |
| --- | --- |
| **Kirkland & Ellis LLP** <br> 601 Lexington Avenue, New York, NY 10022 <br> Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer <br> Email: cmarcus@kirkland.com; jordan.roberts@kirkland.com; jess.lepper@kirkland.com; Charles.martin@kirkland.com; kelly.meyer@kirkland.com | **McCarter & English, LLP** <br> Fourt Gateway Center <br> 100 Mulberry St. <br> Newark, NJ 07102 <br> Attn: Jeffrey T. Testa <br> Email: jtesta@mccarter.com |

### D. **Voting and Tabulation Procedures.**

#### 1. **Holders of Claims Entitled to Vote.**

Only the following Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

> (a) Unless otherwise provided, Holders of Claims who have timely filed a Proof of Claim (or an untimely Proof of Claim that has been Allowed as timely by the Bankruptcy

71306/0001-53758738v1

Court under applicable law) that: (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection filed with the Bankruptcy Court at least seven (7) days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Bankruptcy Court;

(b) Holders of Claims that are listed in the Schedules; provided that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be allowed to vote only in the amounts set forth in Section D.2 of these Solicitation Procedures;

(c) Holders whose Claims arise: (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Bankruptcy Court or conveyed to the Balloting Agent by e-mail with the Debtors and counterparty copied thereto; (ii) from an order entered by the Bankruptcy Court; or (iii) from a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim has been filed or the Claim was scheduled as contingent, unliquidated, or disputed;

(d) Holders of any Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

(e) with respect to any Entity described in subparagraphs (a) through (d) above, who, on or before the Voting Record Date, has filed a Claim and transferred such Entity's Claim to another Entity, the assignee of such Claim; provided that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.  Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code and (b) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that (x) a Ballot, (y) a group of Ballots within one Voting Class received from a single creditor, or (z) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion, and the Debtors' treatment of such Ballots will be set forth in the Voting Report.

(f) For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package on account of a Claim arising from the rejection of an Executory Contract or Unexpired Lease if the Claim is filed by the Voting Record Date.

**2. Establishing Claim Amounts for Voting Purposes.**

Class 4 First Lien Claims and Class 5 Second Lien Claims. Notwithstanding anything to the contrary set forth herein, the Claims amounts, for voting purposes only, of Class 4 Claims and Class 5 Claims will be established based on the amounts of the applicable positions held by such Class 4 Claim Holders and Class 5 Claim Holders, as applicable, as of the Voting Record Date, as evidenced by the

71306/0001-53758738v1

applicable records provided by the Prepetition Agent in electronic Microsoft Excel format to the Debtors or the Balloting Agent no later than two (2) business days following the Voting Record Date.

Filed and Scheduled Claims. The Claim amounts established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Debtors through the Balloting Agent, as applicable, are not binding for purposes of allowance and distribution. In tabulating votes, the amount of the Claim associated with each claimant's vote shall be determined as follows:

(a) the Claim amount: (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Bankruptcy Court or conveyed to the Balloting Agent with both the Debtors and counterparty copied thereon; (ii) set forth in an order of the Bankruptcy Court; or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

(b) the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event;

(c) the Claim amount contained in a Proof of Claim that has been timely filed by the applicable bar date (or deemed timely filed by the Bankruptcy Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided, however*, that any Ballot cast by a Holder of a Claim who timely files a Proof of Claim in respect of a (i) contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Balloting Agent) that is not the subject of a pending objection will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim, which Claim will be Allowed for voting purposes only in the liquidated amount; *provided, further*, *however*, that to the extent that any Claim amount contained in a Proof of Claim is different from the Claim amount set forth in a document filed with the Bankruptcy Court referenced in subparagraph (a) above, the Claim amount in the document filed with the Bankruptcy Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

(d) the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely Filed Proof of Claim); provided that such Claim is not scheduled as contingent, disputed, or unliquidated; if a Claim is listed in the Debtors' Schedules as contingent, unliquidated, or disputed and a proof of claim was not (i) filed by the applicable bar date for filing Proofs of Claim established by the Bankruptcy Court or (ii) deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline, such Claim shall be disallowed for voting purposes; *provided, however,* that, to the extent that such holder's deadline to file a Claim has not yet occurred, in which case the holder will be entitled to vote in the amount of $1.00 on account of their Claim that has been scheduled in an undetermined amount or as contingent, unliquidated, or disputed;

(e) Holders of Proofs of Claim filed for $0.00 are not entitled to vote;

(f) Claims that have been paid, scheduled to be paid in the ordinary course, or otherwise satisfied are disallowed for voting purposes;

(g) notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class shall, to the extent possible, be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

(h) in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

If a Proof of Claim is amended, the last filed Claim shall be subject to these rules and will supersede any earlier filed Claim, and any earlier filed Claim will be disallowed for voting purposes; *provided that* any amendment(s) to any Proof of Claim after the Voting Record Date shall not be considered for purposes of these voting procedures.

## 3. Voting and Ballot Tabulation Procedures.

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots, so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Local Rules:

(a) except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted and actually received by the Balloting Agent on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

(b) the Balloting Agent will date-stamp all Ballots when received;

(c) the Balloting Agent shall retain copies of Ballots and all solicitation-related correspondence for two (2) years following the closing of the Chapter 11 Cases, whereupon the Balloting Agent is authorized to destroy and/or otherwise dispose of: (a) all copies of Ballots; (b) printed solicitation materials including unused copies of the Solicitation Package; and (c) all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Bankruptcy Court in writing within such two (2) year period;

(d) the Debtors will file the Voting Report by no later than September 21, 2026. The Voting Report shall, among other things, delineate every Ballot that was excluded from the voting results (each an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or other necessary information, or damaged. The Voting Report shall indicate the Debtors' decision with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

(e) the method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each Holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Balloting Agent actually receives the executed Ballot;

71306/0001-53758738v1

(f) an executed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Balloting Agent by facsimile or any electronic means other than expressly provided in the applicable Ballot will not be valid;

(g) no Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

(h) if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly submitted, valid Ballot timely received by the Balloting Agent will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

(i) Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

(j) a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

(k) the Debtors, subject to a contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report or a supplemental voting report, as applicable;

(l) neither the Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

(m) unless waived or as ordered by the Bankruptcy Court, any defects or irregularities in connection with submissions of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted; provided that a valid opt-out election on an otherwise defective or irregular Ballot submitted prior to the Voting Deadline shall be honored as a valid opt-out election;

(n) in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

(o) subject to any order of the Bankruptcy Court, the Debtors reserve the right to reject any and all ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

(p)   if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Bankruptcy Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only, and not for purposes of allowance or distribution;

(q)   if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

(r)   the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the General Bar Date; (iv) any unsigned Ballot; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (vi) any Ballot sent to any of the Debtors, the Debtors' agents or representatives, or the Debtors' advisors (other than the Balloting Agent); and (vii) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

(s)   after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors or further order of the Bankruptcy Court; and

(t)   the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes, and for tabulation purposes, the Balloting Agent may rely on any e-mails sent to it by the Debtors conveying the terms of the stipulation as long as the Debtors copy the Holder of the affected Claim.

## E.  **Amendments to the Plan and Solicitation Procedures.**

The Debtors reserve the right to make changes to the Disclosure Statement, Plan, Solicitation Procedures, Combined Hearing Notice, Notice of Non-Voting Status, Ballots, Opt-Out Form, Publication Notice, Cover Letter, Plan Supplement Notice, Assumption Notice, and any related documents without further order of the Bankruptcy Court, including changes to correct typographical and grammatical errors, if any, and to make conforming changes to any materials in the Solicitation Packages before distribution.

\*        \*        \*        \*

## **EXHIBIT 3A**

(Class 4 Ballot)

71306/0001-53758738v1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br>           Debtors. | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING THE JOINT CHAPTER 11 PLAN OF**
**FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 4 — FIRST LIEN CLAIMS**

---

**PLEASE READ - YOUR RESPONSE IS REQUIRED BY SEPTEMBER 15, 2026**

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] FOR ~~STG LOGISTICS~~FRESHREALM, INC., ET AL. (THE "COMPANY") INCLUDED WITH THIS BALLOT BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE ~~IX~~VIII OF THE PLAN).

THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **ACTUALLY RECEIVED** BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") PRIOR TO **5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026** (THE "VOTING DEADLINE").

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

71306/0001-53758738v1

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Plan"), attached as Exhibit A to the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Disclosure Statement") from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Class, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in Exhibit A attached hereto. For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.

You have received this Ballot because the Company's books and records indicate that you are a Holder of a ~~Holder of a~~ Claim in Class 4 (First Lien Claims) as of August 6, 2026 (the "Voting Record Date") and as set forth in Item 1 of the Ballot. Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of those Claims.

This Ballot may not be used for any purpose other than for casting votes with respect to the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Balloting Agent immediately.

You should review the Plan before you vote. You may wish to seek legal advice concerning the proposals related to the Plan.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials (the "Solicitation Package") have been distributed under separate cover from this Ballot. This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto. Once completed and returned in accordance with the attached instructions, the votes on the Plan will be counted as set forth herein.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Equity Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Balloting Agent **actually receives** it on or before the Voting Deadline.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

**THE VOTING DEADLINE IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 15, 2026.**

71306/0001-53758738v1

**VOTING – COMPLETE THIS SECTION**

**Item 1. Principal Amount of Claims, Vote on Plan, Release Opt Out**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Claim in the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan in order to have your vote counted. Please note that you are voting all of your Claims either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted. If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted. The Holder of a Claim in the Voting Class set forth below votes and elects to:

| Voting Class | Description | Amount | Vote to Accept Plan | Vote to Reject Plan | Opt Out of Third-Party Release |
|---|---|---|---|---|---|
| Class 4 | First Lien Claim | $_____19,009,660.85 | ☐ | ☐ | ☐ |

**IF YOU VOTE TO ACCEPT THE PLAN, YOU ARE ALSO CONSENTING TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN AND COPIED IN ITEM 2 BELOW, AND YOU MAY NOT OPT OUT OF SUCH THIRD-PARTY RELEASE**

**PLEASE NOTE THAT YOUR VOTE ON ACCOUNT OF YOUR CLASS 4 – FIRST LIEN CLAIM WILL ALSO BE APPLIED TO YOUR CLASS 6 – GENERAL UNSECURED CLAIM ON ACCOUNT OF THE FIRST LIEN DEFICIENCY CLAIM, AS APPROPRIATE.**

**YOUR VOTE ON THE PLAN WILL BE APPLIED TO EACH APPLICABLE DEBTOR IN THE SAME MANNER AND IN THE SAME AMOUNT AS INDICATED IN THIS ITEM 1.**

**Important Information Regarding the Plan Releases**

**If the Plan is confirmed and consummated through the Chapter 11 Cases, the Third-Party Release and Debtor Release shall apply. You are deemed to provide the Third-Party Release and receive the Debtor Release and Third-Party Release, however, if you do not vote to accept the Plan, you may opt out of providing the Third-Party Release.**

**By opting out of providing the Third-Party Release, you will forego the benefit of becoming a "Released Party" and receiving the Debtor Release and Third-Party Release. You will receive the same treatment on account of your Claim(s) under the Plan regardless of whether or not you opt out of providing the Third-Party Release.**

**If you vote to accept the Plan, you cannot opt out of providing the Third-Party Release. If your ballot indicates that you have accepted the Plan but have also opted out of the Third-Party Release, such opt out election will be disregarded and you will be deemed to have accepted the Plan and consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you do not check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will be deemed to have consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will not grant the Third-Party Release.**

71306/0001-53758738v1

**Item 2. Release Information**

Article VIII.C of the Plan provides a release by the Debtors (the "**Debtor Release**"):

Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):

71306/0001-53758738v1

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

<u>Definitions Related to the Debtor Release and Third-Party Release</u>:

UNDER THE PLAN, "***RELEASED PARTY" or "RELEASED PARTIES"*** MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR

CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ISARE NOT A RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, THE RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

\* \* \* \* \*

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and to the Debtor:

a.   That as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims in the Voting Class as set forth in Item 1; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims in the Voting Class as set forth in Item 1;

71306/0001-53758738v1

b.  that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  that the undersigned has cast the same vote with respect to all Claims in each particular Voting Class; and

d.  that no other Ballots with respect to the Claims in the Voting Class identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots voting those Claims are hereby revoked.

| BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION |
| --- |

**Name of Holder:** _____

(Print or Type)

**Signature:** _____

**Name of Signatory:** _____

(If other than Holder)

**Title:** _____

**Address:** _____

**Email Address:** _____

**Date Completed:** _____

**RETURN INSTRUCTIONS**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY. THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON**

**SEPTEMBER 15, 2026.**

**To submit a paper Ballot by First Class Mail, Overnight Courier, or Hand Delivery (with a signature):**

FreshRealm, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Ballot, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

71306/0001-53758738v1

**To submit your Ballot via electronic, online submission:**

To submit your ballot via the Claims and Noticing Agent's online portal, visit
https://restructuring.ra.kroll.com/Freshrealm, click on the "E-Ballot" section of the website (the "E-Ballot
Portal"), and follow the instructions to submit your Ballot.

**IMPORTANT NOTE**: **You will need the following information to retrieve and submit your customized
unique Ballot:**

Unique E-Ballot ID#: _____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.
Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS,
OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL
AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION
INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND
CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

**<u>INSTRUCTIONS FOR COMPLETING THIS CLASS 4 BALLOT</u>**

1. This Ballot contains voting options with respect to the Plan.

2. To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered by (a) submitting it electronically through the E-Ballot Portal at https://restructuring.ra.kroll.com/Freshrealm or (b) first-class mail, overnight courier, or hand delivery to FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232, so that this Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline, **5:00 p.m. prevailing Eastern Time on September 15, 2026.**

3. To vote, you <u>MUST</u> deliver your completed Ballot (whether via first-class mail or hand delivery to the Balloting Agent) so that it is <u>ACTUALLY RECEIVED</u> by the Balloting Agent on or before the Voting Deadline by one of the methods described above. **The Voting Deadline is 5:00 p.m. prevailing Eastern Time on September 15, 2026**.

4. Any Ballot received by the Balloting Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Company determines otherwise. No Ballot may be withdrawn or modified after the Voting Deadline without the Company's prior written consent.

5. Additionally, the following Ballots will not be counted: (a) any Ballot that partially rejects and partially accepts the Plan; (b) Ballots sent to the Debtors, the Debtors' agents (other than Balloting Agent), the Debtors' financial or legal advisors or any other person (other than the Balloting Agent); (c) Ballots sent by facsimile or electronic mail; (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (e) any Ballot cast by an Entity that does not hold a Class 4—First Lien Claim (as of the Voting Record Date); (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan; (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or (i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

6. Delivery of a Ballot reflecting your vote to the Balloting Agent will be deemed to have occurred only when the Balloting Agent actually receives your paper Ballot or E-Ballot. In all cases, you should allow sufficient time to assure timely delivery.

7. If you deliver multiple Ballots to the Balloting Agent, <u>ONLY</u> the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Ballot(s).

8. You must vote all of your Claims in the Voting Class either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims in the Voting Class, the Company may direct the Balloting Agent to aggregate those Claims for the purpose of counting votes.

9. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Equity Interest, or an assertion or admission of a Claim, in the Company's Chapter 11 Cases.

10. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

71306/0001-53758738v1

11. <u>SIGN AND DATE</u> your Ballot.[1] In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot. Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

12. PLEASE RETURN YOUR BALLOT PROMPTLY.

13. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY**</u>

---

[1] If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Company, the Company's counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

## Exhibit A

Subject to the terms and conditions of the Plan, you will receive the following treatment if the Plan is consummated:

| | | |
|---|---|---|
| Class 4 | First Lien Claims | Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed First Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed First Lien Claim shall receive solely its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, after all Allowed DIP Claims have been satisfied in full in accordance with Article II of the Plan; *provided, however*, that in no event shall any Holder of a First Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |

**For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.**

# EXHIBIT 3B

(Class 5 Ballot)

71306/0001-53758738v1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING THE JOINT CHAPTER 11 PLAN OF**
**FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 5 — SECOND LIEN CLAIMS**

---

**PLEASE READ - YOUR RESPONSE IS REQUIRED BY SEPTEMBER 15, 2026**

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] FOR ~~STG LOGISTICS~~FRESHREALM, INC., ET AL. (THE "COMPANY") INCLUDED WITH THIS BALLOT BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE ~~IX~~VIII OF THE PLAN).

THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **ACTUALLY RECEIVED** BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") PRIOR TO **5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026** (THE "VOTING DEADLINE").

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

71306/0001-53758738v1

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Plan"), attached as Exhibit A to the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Disclosure Statement") from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Class, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in Exhibit A attached hereto. For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.

You have received this Ballot because the Company's books and records indicate that you are a Holder of a ~~Holder of a~~ Claim in Class 5 (Second Lien Claims) as of August 6, 2026 (the "Voting Record Date") and as set forth in Item 1 of the Ballot. Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of those Claims.

This Ballot may not be used for any purpose other than for casting votes with respect to the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Balloting Agent immediately.

You should review the Plan before you vote. You may wish to seek legal advice concerning the proposals related to the Plan.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials (the "Solicitation Package") have been distributed under separate cover from this Ballot. This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto. Once completed and returned in accordance with the attached instructions, the votes on the Plan will be counted as set forth herein.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Equity Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Balloting Agent **actually receives** it on or before the Voting Deadline.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

**THE VOTING DEADLINE IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 15, 2026.**

71306/0001-53758738v1

**VOTING – COMPLETE THIS SECTION**

**Item 1. Principal Amount of Claims, Vote on Plan, Release Opt Out**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Claim in the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan in order to have your vote counted. Please note that you are voting all of your Claims either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted. If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted. The Holder of a Claim in the Voting Class set forth below votes and elects to:

| Voting Class | Description | Amount | Vote to Accept Plan | Vote to Reject Plan | Opt Out of Third-Party Release |
|---|---|---|---|---|---|
| Class 5 | Second Lien Claim | $_____ | ☐ | ☐ | ☐ |

**IF YOU VOTE TO ACCEPT THE PLAN, YOU ARE ALSO CONSENTING TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN AND COPIED IN ITEM 2 BELOW, AND YOU MAY NOT OPT OUT OF SUCH THIRD-PARTY RELEASE**

**PLEASE NOTE THAT YOUR VOTE ON ACCOUNT OF YOUR CLASS 5 – SECOND LIEN CLAIM WILL ALSO BE APPLIED TO YOUR CLASS 6 – GENERAL UNSECURED CLAIM ON ACCOUNT OF THE SECOND LIEN DEFICIENCY CLAIM, AS APPROPRIATE.**

**YOUR VOTE ON THE PLAN WILL BE APPLIED TO EACH APPLICABLE DEBTOR IN THE SAME MANNER AND IN THE SAME AMOUNT AS INDICATED IN THIS ITEM 1.**

**Important Information Regarding the Plan Releases**

**If the Plan is confirmed and consummated through the Chapter 11 Cases, the Third-Party Release and Debtor Release shall apply. You are deemed to provide the Third-Party Release and receive the Debtor Release and Third-Party Release, however, if you do not vote to accept the Plan, you may opt out of providing the Third-Party Release.**

**By opting out of providing the Third-Party Release, you will forego the benefit of becoming a "Released Party" and receiving the Debtor Release and Third-Party Release. You will receive the same treatment on account of your Claim(s) under the Plan regardless of whether or not you opt out of providing the Third-Party Release.**

**If you vote to accept the Plan, you cannot opt out of providing the Third-Party Release. If your ballot indicates that you have accepted the Plan but have also opted out of the Third-Party Release, such opt out election will be disregarded and you will be deemed to have accepted the Plan and consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you do not check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will be deemed to have consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will not grant the Third-Party Release.**

71306/0001-53758738v1

**Item 2. Release Information**

Article VIII.C of the Plan provides a release by the Debtors (the "**Debtor Release**"):

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "***RELEASED PARTY" or "RELEASED PARTIES"*** MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER

AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ISARE NOT A RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, THE RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

\* \* \* \* \*

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and to the Debtor:

e.  That as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims in the Voting Class as set forth in Item 1; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims in the Voting Class as set forth in Item 1;

71306/0001-53758738v1

f.   that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

g.   that the undersigned has cast the same vote with respect to all Claims in each particular Voting Class; and

h.   that no other Ballots with respect to the Claims in the Voting Class identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots voting those Claims are hereby revoked.

| BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION |
| --- |

**Name of Holder:** _____
(Print or Type)

**Signature:** _____

**Name of Signatory:** _____
(If other than Holder)

**Title:** _____

**Address:** _____

**Email Address:** _____

**Date Completed:** _____

<u>**RETURN INSTRUCTIONS**</u>

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY. THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON**

**SEPTEMBER 15, 2026.**

**To submit a paper Ballot by First Class Mail, Overnight Courier, or Hand Delivery (with a signature):**

FreshRealm, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Ballot, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

71306/0001-53758738v1

**To submit your Ballot via electronic, online submission:**

To submit your ballot via the Claims and Noticing Agent's online portal, visit
https://restructuring.ra.kroll.com/Freshrealm, click on the "E-Ballot" section of the website (the "E-Ballot
Portal"), and follow the instructions to submit your Ballot.

**IMPORTANT NOTE**: **You will need the following information to retrieve and submit your customized
unique Ballot:**

Unique E-Ballot ID#: _____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.
Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS,
OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL
AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION
INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND
CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

**<u>INSTRUCTIONS FOR COMPLETING THIS CLASS 5 BALLOT</u>**

1. This Ballot contains voting options with respect to the Plan.

2. To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered by (a) submitting it electronically through the E-Ballot Portal at https://restructuring.ra.kroll.com/Freshrealm or (b) first-class mail, overnight courier, or hand delivery to FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232, so that this Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline, **5:00 p.m. prevailing Eastern Time on September 15, 2026.**

3. To vote, you <u>MUST</u> deliver your completed Ballot (whether via first-class mail or hand delivery to the Balloting Agent) so that it is <u>ACTUALLY RECEIVED</u> by the Balloting Agent on or before the Voting Deadline by one of the methods described above. **The Voting Deadline is 5:00 p.m. prevailing Eastern Time on September 15, 2026**.

4. Any Ballot received by the Balloting Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Company determines otherwise. No Ballot may be withdrawn or modified after the Voting Deadline without the Company's prior written consent.

5. Additionally, the following Ballots will not be counted: (a) any Ballot that partially rejects and partially accepts the Plan; (b) Ballots sent to the Debtors, the Debtors' agents (other than Balloting Agent), the Debtors' financial or legal advisors or any other person (other than the Balloting Agent); (c) Ballots sent by facsimile or electronic mail; (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (e) any Ballot cast by an Entity that does not hold a Class 5—Second Lien Claim (as of the Voting Record Date); (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan; (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or (i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

6. Delivery of a Ballot reflecting your vote to the Balloting Agent will be deemed to have occurred only when the Balloting Agent actually receives your paper Ballot or E-Ballot. In all cases, you should allow sufficient time to assure timely delivery.

7. If you deliver multiple Ballots to the Balloting Agent, <u>ONLY</u> the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Ballot(s).

8. You must vote all of your Claims in the Voting Class either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims in the Voting Class, the Company may direct the Balloting Agent to aggregate those Claims for the purpose of counting votes.

9. This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Equity Interest, or an assertion or admission of a Claim, in the Company's Chapter 11 Cases.

10. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

11. <u>SIGN AND DATE</u> your Ballot.[1] In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot. Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

12. PLEASE RETURN YOUR BALLOT PROMPTLY.

13. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

**<u>PLEASE SUBMIT YOUR BALLOT PROMPTLY</u>**

---

[1] If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Company, the Company's counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

71306/0001-53758738v1

**Exhibit A**

Subject to the terms and conditions of the Plan, you will receive the following treatment if the Plan is consummated:

| Class 5 | Second Lien Claims | Except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Claim, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Second Lien Claim shall receive solely its pro rata share of Distributable Value pursuant to the Distributable Waterfall, if any, after all Allowed DIP Claims and all Allowed Claims in Class 4 have been satisfied in full in accordance with Articles II and III of the Plan; provided, however, that in no event shall any Holder of Second Lien Claim receive, on account of such Claim, a recovery greater than 100% of the Allowed amount of such Claim. |
|---|---|---|

**For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.**

71306/0001-53758738v1

**EXHIBIT 3C**

(Class 6 Ballot)

71306/0001-53758738v1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING THE JOINT CHAPTER 11 PLAN OF**
**FRESHREALM, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 6 — GENERAL UNSECURED CLAIMS**

---

**PLEASE READ - YOUR RESPONSE IS REQUIRED BY SEPTEMBER 15, 2026**

PLEASE CAREFULLY READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS BALLOT RELATING TO THE *JOINT CHAPTER 11 PLAN OF FRESHREALM, INC. AND ITS DEBTOR AFFILIATES* (AS MAY BE MODIFIED, AMENDED, OR SUPPLEMENTED FROM TIME TO TIME, THE "PLAN")[2] FOR ~~STG LOGISTICS~~FRESHREALM, INC., ET AL. (THE "COMPANY") INCLUDED WITH THIS BALLOT BEFORE COMPLETING THIS BALLOT. THIS BALLOT PERMITS YOU TO VOTE ON THE PLAN (INCLUDING THE RELEASES CONTAINED IN ARTICLE ~~IX~~VIII OF THE PLAN).

THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS **ACTUALLY RECEIVED** BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") PRIOR TO **5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026** (THE "VOTING DEADLINE").

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, IT WILL BIND YOU REGARDLESS OF WHETHER YOU HAVE VOTED.

CONFIRMATION OF THE PLAN IS EXPRESSLY CONDITIONED UPON BANKRUPTCY COURT APPROVAL OF THE RELEASES BY RELEASING PARTIES (AS DESCRIBED BELOW AND LOCATED IN ARTICLE VIII OF THE PLAN), WHICH, IF APPROVED BY THE BANKRUPTCY COURT, WOULD PERMANENTLY ENJOIN HOLDERS OF CERTAIN CLAIMS AGAINST THIRD PARTIES FROM ASSERTING SUCH CLAIMS AGAINST SUCH NON-DEBTOR THIRD PARTIES. THE RELEASES BY

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

> RELEASING PARTIES, IF APPROVED, WILL BIND AFFECTED HOLDERS OF CLAIMS AND EQUITY INTERESTS IN THE MANNER DESCRIBED IN ITEM 2 OF THIS BALLOT.

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), to accept or reject the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Plan"), attached as Exhibit A to the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* and all exhibits related thereto (collectively, and as each may be modified, amended, or supplemented from time to time, the "Disclosure Statement") from Holders of Claims in Class 4, Class 5, and Class 6 (the "Voting Classes").

Once completed and returned in accordance with the attached instructions, your vote on the Plan will be counted as set forth herein. A Voting Class will accept the Plan if Holders of at least two-thirds in amount and more than one-half in number of Claims in that Voting Class votes to accept the Plan. The Bankruptcy Court may confirm the Plan if the Plan otherwise satisfies the requirements of section 1129 of the Bankruptcy Code, and the Plan then would be binding on all Holders of Allowed Claims in the Voting Class, among others. Subject to the terms and conditions of the Plan, you will receive the treatment identified in Exhibit A attached hereto. For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.

You have received this Ballot because the Company's books and records indicate that you are a Holder of a ~~Holder of a~~ Claim in Class 6 (General Unsecured Claims) as of August 6, 2026 (the "Voting Record Date") and as set forth in Item 1 of the Ballot. Accordingly, you have the right to execute this Ballot and to vote to accept or reject the Plan on account of those Claims.

This Ballot may not be used for any purpose other than for casting votes with respect to the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong Ballot, please contact the Balloting Agent immediately.

You should review the Plan before you vote. You may wish to seek legal advice concerning the proposals related to the Plan.

The Disclosure Statement describes the rights and treatment for each Class. The Disclosure Statement, the Plan, and certain other materials (the "Solicitation Package") have been distributed under separate cover from this Ballot. This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect thereto. Once completed and returned in accordance with the attached instructions, the votes on the Plan will be counted as set forth herein.

The Bankruptcy Court may confirm the Plan and thereby bind all Holders of Claims and Equity Interests. To have your vote count as either an acceptance or rejection of the Plan, you must complete and return this Ballot so that the Balloting Agent **actually receives** it on or before the Voting Deadline.

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHICH YOU HAVE SUCH A CLAIM.**

**THE VOTING DEADLINE IS 5:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 15, 2026.**

**VOTING – COMPLETE THIS SECTION**

**Item 1. Amount of Claims, Vote on Plan, Release Opt Out**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Claim in the Voting Class as set forth below (your "Claim"). You may vote to accept or reject the Plan. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan in order to have your vote counted. Please note that you are voting all of your Claims either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote will not be counted. If you indicate that you both accept and reject the Plan by checking both boxes below, your vote will not be counted. The Holder of a Claim in the Voting Class set forth below votes and elects to:

| Voting Class | Description | Amount | Debtor | Vote to Accept Plan | Vote to Reject Plan | Opt Out of Third-Party Release |
|---|---|---|---|---|---|---|
| Class 6 | General Unsecured Claim | $_____ | _____ | ☐ | ☐ | ☐ |

**<u>IF YOU VOTE TO ACCEPT THE PLAN, YOU ARE ALSO CONSENTING TO THE THIRD-PARTY RELEASE SET FORTH IN ARTICLE VIII.D OF THE PLAN AND COPIED IN ITEM 2 BELOW, AND YOU MAY NOT OPT OUT OF SUCH THIRD-PARTY RELEASE</u>**

**<u>Important Information Regarding the Plan Releases</u>**

**If the Plan is confirmed and consummated through the Chapter 11 Cases, the Third-Party Release and Debtor Release shall apply. You are deemed to provide the Third-Party Release and receive the Debtor Release and Third-Party Release, however, if you do not vote to accept the Plan, you may opt out of providing the Third-Party Release.**

**By opting out of providing the Third-Party Release, you will forego the benefit of becoming a "Released Party" and receiving the Debtor Release and Third-Party Release. You will receive the same treatment on account of your Claim(s) under the Plan regardless of whether or not you opt out of providing the Third-Party Release.**

**If you vote to accept the Plan, you cannot opt out of providing the Third-Party Release. If your ballot indicates that you have accepted the Plan but have also opted out of the Third-Party Release, such opt out election will be disregarded and you will be deemed to have accepted the Plan and consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you do not check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will be deemed to have consented to granting the Third-Party Release. If you vote to reject the Plan, or if you do not vote on the Plan, and you check the opt-out box in Item 1 of this Ballot and properly complete and timely submit this Ballot in accordance with the instructions set forth herein, you will not grant the Third-Party Release.**

**Item 2. Release Information**

Article VIII.C of the Plan provides a release by the Debtors (the "**Debtor Release**"):

**Except as otherwise specifically provided herein or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Released Party is, and is deemed, hereby fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, the Wind-Down Debtors and their Estates, and the Liquidating Trustee, in each case on behalf of themselves and their respective successors, assigns, and representatives from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates, that the Liquidating Trustee, the Debtors, the Wind-Down Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, or any other definitive document, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, the Liquidating Trustee, or the Debtors' or Wind-Down Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

<u>Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):</u>

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

<u>Definitions Related to the Debtor Release and Third-Party Release</u>:

UNDER THE PLAN, "***RELEASED PARTY" or "RELEASED PARTIES"*** MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER

AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, IS ARE NOT A RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, THE RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

\* \* \* \* \*

**Item 3. Certification, Ballot Completion, and Delivery Instructions**

By signing this Ballot, the undersigned certifies to the Bankruptcy Court and to the Debtor:

i.   That as of the Voting Record Date, either: (i) the undersigned is the Holder of the Claims in the Voting Class as set forth in Item 1; or (ii) the undersigned is an authorized signatory for an Entity that is the Holder of the Claims in the Voting Class as set forth in Item 1;

71306/0001-53758738v1

j.   that the undersigned (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

k.   that the undersigned has cast the same vote with respect to all Claims in each particular Voting Class; and

l.   that no other Ballots with respect to the Claims in the Voting Class identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Claims, then any such earlier Ballots voting those Claims are hereby revoked.

| BALLOT COMPLETION INFORMATION — COMPLETE THIS SECTION |
|---|

**Name of Holder:** _____
(Print or Type)

**Signature:** _____

**Name of Signatory:** _____
(If other than Holder)

**Title:** _____

**Address:** _____

**Email Address:** _____

**Date Completed:** _____

---

**RETURN INSTRUCTIONS**

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT PROMPTLY. THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT PRIOR TO THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON**

**SEPTEMBER 15, 2026.**

**To submit a paper Ballot by First Class Mail, Overnight Courier, or Hand Delivery (with a signature):**

FreshRealm, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Ballot, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

71306/0001-53758738v1

**To submit your Ballot via electronic, online submission:**

To submit your ballot via the Claims and Noticing Agent's online portal, visit https://restructuring.ra.kroll.com/Freshrealm, click on the "E-Ballot" section of the website (the "E-Ballot Portal"), and follow the instructions to submit your Ballot.

**IMPORTANT NOTE**: **You will need the following information to retrieve and submit your customized unique Ballot:**

Unique E-Ballot ID#: _____

The E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Holders who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

71306/0001-53758738v1

**INSTRUCTIONS FOR COMPLETING THIS CLASS 6 BALLOT**

1.  This Ballot contains voting options with respect to the Plan.

2.  To ensure that your vote is counted, this Ballot must be properly completed, executed, and delivered by (a) submitting it electronically through the E-Ballot Portal at https://restructuring.ra.kroll.com/Freshrealm or (b) first-class mail, overnight courier, or hand delivery to FreshRealm Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232, so that this Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline, **5:00 p.m. prevailing Eastern Time on September 15, 2026.**

3.  To vote, you MUST deliver your completed Ballot (whether via first-class mail or hand delivery to the Balloting Agent) so that it is ACTUALLY RECEIVED by the Balloting Agent on or before the Voting Deadline by one of the methods described above. **The Voting Deadline is 5:00 p.m. prevailing Eastern Time on September 15, 2026**.

4.  Any Ballot received by the Balloting Agent after the Voting Deadline will not be counted with respect to acceptance or rejection of the Plan, as applicable, unless the Company determines otherwise. No Ballot may be withdrawn or modified after the Voting Deadline without the Company's prior written consent.

5.  Additionally, the following Ballots will not be counted: (a) any Ballot that partially rejects and partially accepts the Plan; (b) Ballots sent to the Debtors, the Debtors' agents (other than Balloting Agent), the Debtors' financial or legal advisors or any other person (other than the Balloting Agent); (c) Ballots sent by facsimile or electronic mail; (d) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (e) any Ballot cast by an Entity that does not hold a Class 6—General Unsecured Claim (as of the Voting Record Date); (f) any Ballot submitted by a Holder not entitled to vote pursuant to the Plan; (g) any unsigned Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or (i) any Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan.

6.  Delivery of a Ballot reflecting your vote to the Balloting Agent will be deemed to have occurred only when the Balloting Agent actually receives your paper Ballot or E-Ballot. In all cases, you should allow sufficient time to assure timely delivery.

7.  If you deliver multiple Ballots to the Balloting Agent, ONLY the last properly executed Ballot timely received will be deemed to reflect your intent and will supersede and revoke any prior Ballot(s).

8.  You must vote all of your Claims in the Voting Class either to accept or reject the Plan and may not split your vote. Further, if a Holder has multiple Claims in the Voting Class, the Company may direct the Balloting Agent to aggregate those Claims for the purpose of counting votes.

9.  This Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or Equity Interest, or an assertion or admission of a Claim, in the Company's Chapter 11 Cases.

10. You should not rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in the Disclosure Statement, the documents attached to or incorporated in the Disclosure Statement, and the Plan.

71306/0001-53758738v1

11. <u>SIGN AND DATE</u> your Ballot.[1] In addition, please provide your name and mailing address if it is different from that set forth on the Ballot or if no address is preprinted on the Ballot. Any unsigned Ballot will not be valid; however, for the avoidance of doubt, the scanned signature or e-signature included on an E-Ballot will be deemed immediately legally valid and effective.

12. PLEASE RETURN YOUR BALLOT PROMPTLY.

13. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CONTACT THE BALLOTING AGENT BY EMAIL AT FRESHREALMINFO@RA.KROLL.COM, REFERENCING "FRESHREALM SOLICITATION INQUIRY" IN THE SUBJECT LINE, OR BY PHONE AT (888) 454-0938 (TOLL FREE, U.S. AND CANADA) OR +1 (646) 452-8302 (INTERNATIONAL).**

<u>**PLEASE SUBMIT YOUR BALLOT PROMPTLY**</u>

---

[1] If you are signing a Ballot in your capacity as a trustee, executor, administrator, guardian, attorney-in-fact, or officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Company, the Company's counsel, or the Bankruptcy Court, must submit proper evidence to the requesting party of authority to so act on behalf of such Holder.

71306/0001-53758738v1

## Exhibit A

Subject to the terms and conditions of the Plan, you will receive the following treatment if the Plan is consummated:

| | | |
|---|---|---|
| Class 6 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Liquidating Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed General Unsecured Claim, each Holder thereof will receive its pro rata share of the Liquidating Trust Distributable Proceeds. |

**For additional discussion of your treatment and rights under the Plan, please read the Disclosure Statement and the Plan.**

71306/0001-53758738v1

## <u>EXHIBIT 4</u>

(Notice of Non-Voting Status and Opt-Out Form)

71306/0001-53758738v1

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

**NOTICE OF NON-VOTING STATUS AND OPT-OUT FORM TO HOLDERS OR POTENTIAL
HOLDERS OF UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE
PLAN, HOLDERS OR POTENTIAL HOLDERS OF IMPAIRED CLAIMS OR INTERESTS
CONCLUSIVELY PRESUMED TO REJECT THE PLAN, AND HOLDERS OR POTENTIAL
<u>HOLDERS OF DISPUTED CLAIMS</u>**

      **PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "<u>Bankruptcy Court</u>") entered an order [Docket No.__] (the "<u>Disclosure Statement Order</u>"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "<u>Plan</u>");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "<u>Solicitation Packages</u>"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

      **PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kroll Restructuring Administration LLC, the Debtors' balloting agent in the Chapter 11 Cases (the "<u>Balloting Agent</u>"), by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm, Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International). You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]    Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

71306/0001-53758738v1

the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

**PLEASE TAKE FURTHER NOTICE THAT** you are a Holder or potential Holder of a Claim against or Equity Interest in the Debtors that, due to the nature and treatment of such Claim or Equity Interest under the Plan, is not entitled to vote on the Plan. Specifically, under the terms of the Plan, (i) a Holder of a Claim in a Class that is not Impaired under the Plan and, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, (ii) a Holder of a Claim or Equity Interest in a Class that is Impaired under the Plan and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, or (iii) a Holder of a Claim that is subject to a pending objection by the Debtors, is not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m., (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

---

**PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE

---

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 15, 2026, at 5:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline"). Any objection to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| **Counsel to the Debtors** |
|---|
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |
| **United States Trustee** |
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Fran B. Steele and David Gerardi<br>Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |
| **Official Committee of Unsecured Creditors** |
| **Fox Rothschild LLP**<br>49 Market Street,<br>Morristown, New Jersey 07960<br>Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris |

71306/0001-53758738v1

| Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com | |
|---|---|
| **Counsel to Birch Grove Investments LLC** | |
| **Herbert Smith Freehills Kramer (US) LLP**<br>1177 Avenue of the Americas, New York, NY 10036,<br>Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga<br>Email: robert.schmidt@hsfkramer.com;<br>richard.farley@hsfkramer.com;<br>Andrew.citron@hsfkramer.com;<br>marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.**<br>The Legal Center, One Riverfront Plaza,<br>Newark, NJ 07102,<br>Attn: Andrew Sherman and Boris Mankovetskiy<br>Email: asherman@sillscummis.com;<br>bmankovetskiy@sillscummis.com |
| **Counsel to FaraNord (US) IV Pte Ltd** | |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue, New York, NY 10022<br>Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer<br>Email: cmarcus@kirkland.com;<br>jordan.roberts@kirkland.com;<br>jess.lepper@kirkland.com;<br>Charles.martin@kirkland.com;<br>kelly.meyer@kirkland.com | **McCarter & English, LLP**<br>Fourt Gateway Center<br>100 Mulberry St.<br>Newark, NJ 07102<br>Attn: Jeffrey T. Testa<br>Email: jtesta@mccarter.com |

**PLEASE TAKE FURTHER NOTICE THAT** if you are a Holder of a Claim that is subject to a pending objection by the Debtors, **you are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place before a date that is two (2) business days before the Voting Deadline** (each, a "Resolution Event"):

i.  an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code;

ii.  an order of the Bankruptcy Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a);

iii.  a stipulation or other agreement is executed between the Holder of such Claim and the Debtors temporarily allowing the Holder of such Claim to vote its Claim in an agreed upon amount; or

iv.  the pending objection is voluntarily withdrawn by the objecting party.

**PLEASE TAKE FURTHER NOTICE THAT** the following provisions are included in the Plan:

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IXVIII.D OF THE PLAN PROVIDES FOR THE FOLLOWING THIRD-PARTY RELEASE (THE "THIRD-PARTY RELEASE"):**

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their**

**Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.**

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "*RELEASED PARTY" or "RELEASED PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER

71306/0001-53758738v1

AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"RELEASING PARTY"* or *"RELEASING PARTIES"* MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH: (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, *"RELEASED OFFICERS"* MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ISARE NOT A RELEASED OFFICERS.

UNDER THE PLAN, *"RELATED PARTY"* MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER DIRECTORS, MANAGERS, THE RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS. FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY AND TO PROVIDE YOU WITH THE ATTACHED OPT-OUT FORM WITH RESPECT TO THE EXCULPATION, INJUNCTION, AND THIRD-PARTY RELEASE PROVIDED IN THE PLAN. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE CLAIMS AND NOTICING AGENT.**

71306/0001-53758738v1

*[Reminder of the Page Left Intentionally Blank]*

*[Reminder of the Page Left Intentionally Blank]*

Dated: August __, 2026

/s/ *DRAFT*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
                 wusatine@coleschotz.com
                 rjareck@coleschotz.com
                 dharris@coleschotz.com
                 mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

71306/0001-53758738v1

## OPTIONAL: THIRD-PARTY RELEASE OPT-OUT FORM

You are receiving this opt out form (the "Opt-Out Form") because you are or may be a Holder of a Claim or Interest that is not entitled to vote on the *Joint Chapter 11 Plan of FreshRealm, Inc. and its Debtor Affiliates* [Docket No. [●]] (as amended, supplemented, or otherwise modified from time to time, the "Plan"). Except as otherwise set forth in the definition of Releasing Party in the Plan, Holders of Claims and Interests are deemed to grant the Third-Party Release set forth in Article VIII.D (the "Third-Party Release"), set forth in the Notice unless a Holder affirmatively opts out of the Third-Party Release or timely objects to the Third-Party Release on or before **September 15, 2026, at 5:00 p.m., prevailing Eastern Time**, and such objection is not resolved before confirmation.

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM CAREFULLY BEFORE COMPLETING THIS OPT-OUT FORM.

**UNLESS YOU CHECK THE BOX ON THIS OPT-OUT FORM BELOW AND FOLLOW ALL INSTRUCTIONS, YOU WILL BE HELD TO FOREVER RELEASE THE RELEASED PARTIES (AS DEFINED HEREIN) IN ACCORDANCE WITH THE PLAN.**

**THIS OPT-OUT FORM MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE ACTUALLY RECEIVED BY KROLL RESTRUCTURING ADMINISTRATION LLC (THE "BALLOTING AGENT") ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026 (THE "OPT-OUT DEADLINE").**

All questions as to the validity, form, eligibility (including time of receipt), and acceptance and revocation of an opt-out election will be resolved by the Debtors or Reorganized Debtors (as applicable), in their sole discretion, which resolution will be final and binding.

This Opt-Out Form may not be used for any purpose other than opting out of the Third-Party Release contained in the Plan. If you believe you have received this Opt-Out Form in error, or if you believe that you have received the wrong opt-out form, please contact the Balloting Agent immediately by email at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm, Inc. – Solicitation Inquiry" in the subject line, or by phone at (888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International).

**Item 1**. **Optional Third-Party Release.**

AS A HOLDER OF A CLAIM OR INTEREST, YOU ARE A "RELEASING PARTY" UNDER THE PLAN AND ARE DEEMED TO PROVIDE THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN, AS SET FORTH BELOW. YOU MAY CHECK THE BOX BELOW TO ELECT NOT TO GRANT THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN. YOU WILL NOT BE CONSIDERED A "RELEASING PARTY" UNDER THE PLAN ONLY IF (I) THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE THE RIGHT TO OPT OUT OF THE RELEASES AND (II) YOU (A) CHECK THE BOX BELOW AND SUBMIT THE OPT OUT FORM BY THE OPT-OUT DEADLINE OR (B) TIMELY OBJECT TO THE RELEASES CONTAINED IN ARTICLE VIII.D OF THE PLAN AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION. THE ELECTION TO WITHHOLD CONSENT TO GRANT THE THIRD-PARTY RELEASE IS AT YOUR OPTION.

☐ **By checking this box, you elect to opt out of the Third-Party Release set forth below.**

Article VIII.D of the Plan provides for the following release (the "**Third-Party Release**"):

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order, as of the Effective Date, each Releasing Party is, and is deemed to have, hereby fully, conclusively, absolutely, unconditionally, irrevocably and forever released each Debtor, Wind-Down Debtor, the Liquidating Trustee, and Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims asserted or assertable on behalf of the Liquidating Trustee, the Debtors, the Wind-Down Debtors, and their Estates (as applicable) that such Entity would have been legally entitled to assert in their own right (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof or otherwise), the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtors and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Facility, the DIP Facility Documents, the Disclosure Statement Order, the Confirmation Order, the Sale Order(s), the Sale Transactions, the TSA, the Sale and Settlement Order, the First Day Pleadings, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Prepetition Loan Documents, any other definitive document, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Sale Transactions, any other definitive document, any of the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, or any document,**

71306/0001-53758738v1

instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action to be attached as an exhibit to the Plan Supplement, or (iii) any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct).

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases are: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the releases provided in this Article VIII.D; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases provided in this Article VIII.D.

Definitions Related to the Debtor Release and Third-Party Release:

UNDER THE PLAN, "**RELEASED PARTY**" *or* "**RELEASED PARTIES**" MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) EACH RELEASING PARTY; (G) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (F); EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), EACH IN THEIR CAPACITY AS SUCH; (H) THE CURRENT MEMBERS OF THE BOARD OR BOARDS OF THE DEBTORS, JILL FRIZZLEY AND CHARLIE PIPER; AND (I) THE RELEASED OFFICERS; *PROVIDED, HOWEVER,* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASED PARTY IF IT: (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED. FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO FORMER DIRECTOR (IN THEIR CAPACITY AS SUCH) OR NON-RELEASING PARTY SHALL BE A RELEASED PARTY UNDER THIS PLAN.

UNDER THE PLAN, *"**RELEASING PARTY"** or "**RELEASING PARTIES"*** MEANS, EACH OF, AND IN EACH CASE, IN THEIR RESPECTIVE CAPACITIES AS SUCH:  (A) THE DEBTORS; (B) THE COMMITTEE AND ITS MEMBERS; (C) THE DIP SECURED PARTIES; (D) THE FIRST LIEN SECURED PARTIES; (E) THE SECOND LIEN SECURED PARTIES; (F) ALL HOLDERS OF CLAIMS; (G) ALL HOLDERS OF INTERESTS; (H) EACH CURRENT AND FORMER AFFILIATE OF EACH ENTITY IN CLAUSE (A) THROUGH THE FOLLOWING CLAUSE (G); (I) EACH RELATED PARTY OF EACH ENTITY IN CLAUSE (A) THROUGH THIS CLAUSE (G), FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH RELATED PARTY TO THE RELEASES CONTAINED IN THE PLAN UNDER APPLICABLE LAW; *PROVIDED, HOWEVER,* THAT EACH ENTITY IN THE FOREGOING CLAUSE (F) OR (G) THAT (X) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (Y) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT WITHDRAWN OR OTHERWISE RESOLVED BEFORE THE CONFIRMATION ORDER IS ENTERED SHALL NOT BE A RELEASING PARTY.

UNDER THE PLAN, "**RELEASED OFFICERS**" MEANS, CURRENT AND FORMER OFFICERS OF THE DEBTORS WHO SERVED IN SUCH CAPACITY ON OR AFTER OCTOBER 16, 2025, OTHER THAN MR. CARLOS INIGUEZ AND MS. SNOW LE, WHO, FOR THE AVOIDANCE OF DOUBT, ~~IS~~ARE NOT ~~A~~ RELEASED OFFICERS.

UNDER THE PLAN, "*RELATED PARTY*" MEANS, EACH OF, AND IN EACH CASE IN ITS CAPACITY AS SUCH, CURRENT AND FORMER ~~DIRECTORS,~~ MANAGERS, ~~THE~~ RELEASED OFFICERS, SPECIAL COMMITTEE MEMBERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), AFFILIATED INVESTMENT FUNDS OR INVESTMENT VEHICLES, PREDECESSORS, PARTICIPANTS, SUCCESSORS, ASSIGNS (WHETHER BY OPERATION OF LAW OR OTHERWISE), SUBSIDIARIES, CURRENT, FORMER, AND FUTURE ASSOCIATED ENTITIES, MANAGED OR ADVISED ENTITIES, ACCOUNTS OR FUNDS, PARTNERS, LIMITED PARTNERS, GENERAL PARTNERS, PRINCIPALS, MEMBERS, MANAGEMENT COMPANIES, FUND ADVISORS, MANAGERS, FIDUCIARIES, TRUSTEES, EMPLOYEES, AGENTS (INCLUDING ANY DISBURSING AGENT), ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS (INCLUDING ANY ATTORNEYS OR PROFESSIONALS RETAINED BY ANY CURRENT OR FORMER DIRECTOR OR MANAGER OF A DEBTOR IN HIS OR HER CAPACITY AS DIRECTOR OR MANAGER AS A DEBTOR), ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS AND ADVISORS, AND ANY SUCH PERSON'S OR ENTITY'S RESPECTIVE PREDECESSORS, SUCCESSORS, AND ASSIGNS.  FOR THE AVOIDANCE OF DOUBT, THE MEMBERS OF EACH GOVERNING BODY ARE RELATED PARTIES OF THE DEBTORS.

## Item 2. Certifications.

By signing this Opt-Out Form, the undersigned certifies to the Bankruptcy Court and the Debtors:

- that, as of July 27, 2026, either: (i) the undersigned is the Holder of Claims or Interests; or (ii) the undersigned is an authorized signatory for an Entity or Person that is the Holder of Claims or Interests;

- that the Holder has received a copy of the Notice of Non-Voting Status and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

- that the undersigned has made the same election with respect to all Claims or Interests; and

- that no other Opt-Out Form has been cast with respect to the Holder's Claims or Equity Interests, or, if any other Opt-Out Forms have been cast with respect to such Claims or Interests, such Opt-Out Forms are hereby revoked.

YOUR RECEIPT OF THIS OPT-OUT FORM DOES NOT SIGNIFY THAT YOUR CLAIM OR EQUITY INTEREST HAS BEEN OR WILL BE ALLOWED.

**Name of Holder:**  _____
                          (Print or Type)

**Signature:**  _____

**Name of Signatory:**  _____

71306/0001-53758738v1

| | |
|---|---|
| | (If other than Holder) |
| **Title:** | |
| **Address:** | |
| **Date Completed:** | |

If your address or contact information has changed, please note the new information here.

**TO OPT OUT, PLEASE SUBMIT YOUR OPT-OUT FORM BY ONE OF THE FOLLOWING TWO METHODS:**

<u>Via Opt-Out Portal</u>**. To submit your Opt-Out Form via the Balloting Agent's online portal, visit https://restructuring.ra.kroll.com/Freshrealm, click on the "Submit E-Ballot" section of the website (the "<u>E-Ballot Portal</u>"), and follow the instructions to submit your Opt-Out Form.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Opt-Out Form:**

**Unique E-Opt-Out ID#:** _____

**Kroll's Opt-Out Portal is the sole manner in which forms will be accepted via electronic or online transmission.  Forms submitted by facsimile, email, or other means of electronic transmission will not be counted.**

**Please complete and submit an electronic Opt-Out Form for each E-Opt-Out ID# you receive, as applicable.**

<u>Via Paper Form</u>**. Complete, sign, and date this Opt-Out Form and return it promptly by first-class mail, overnight courier, or hand delivery to the address below.**

> FreshRealm, Inc. Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11232

**<u>To arrange hand delivery of your Opt-Out Form, please contact the Balloting Agent via email at FreshRealmballots@ra.kroll.com (with "FreshRealm Opt-Out Form Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.</u>**

Parties that submit their Opt-Out Form using the Opt-Out Portal should NOT also submit a paper Opt-Out Form.

71306/0001-53758738v1

---

IF THE BALLOTING AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THIS OPT-OUT FORM ON OR BEFORE 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026, THEN YOUR ELECTION TRANSMITTED HEREBY WILL NOT BE EFFECTIVE.

OPT-OUT FORMS SENT BY FACSIMILE OR EMAIL WILL <u>NOT</u> BE ACCEPTED.

---

71306/0001-53758738v1

## INSTRUCTIONS FOR COMPLETING THIS OPT-OUT FORM

1. Capitalized terms used in the Opt-Out Form or in these instructions (the "Instructions") but not otherwise defined therein or herein shall have the meaning set forth in the Plan.

2. To ensure that your election is counted, you must complete the Opt-Out Form and take the following steps: (a) clearly indicate your decision to "opt out" of the Third-Party Release set forth in the Plan in Item 1 above; (b) make sure that the information required by Item 2 above has been correctly inserted; and (c) sign, date and return your Opt-Out Form in accordance with paragraph 3 directly below.

3. **Return of Opt-Out Form**: Your Opt-Out Form MUST be returned to the Balloting Agent so as to be **actually received** by the Balloting Agent on or before the Opt-Out Deadline, which is **5:00 p.m. (prevailing Eastern Time) on September 15, 2026.**

4. If an Opt-Out Form is received by the Balloting Agent after the Opt-Out Deadline, it will not be effective. Additionally, the following Opt-Out Forms will NOT be counted:

   - ANY OPT-OUT FORM THAT IS ILLEGIBLE OR CONTAINS INSUFFICIENT INFORMATION TO PERMIT THE IDENTIFICATION OF THE HOLDER OF THE CLAIM OR EQUITY INTEREST;

   - ANY OPT-OUT FORM CAST BY OR ON BEHALF OF AN ENTITY THAT IS NOT ENTITLED TO OPT OUT OF THE RELEASE;

   - ANY OPT-OUT FORM SENT TO THE DEBTORS, THE DEBTORS' AGENTS/REPRESENTATIVES (OTHER THAN THE BALLOTING AGENT), OR THE DEBTORS' FINANCIAL OR LEGAL ADVISORS;

   - ANY OPT-OUT FORM TRANSMITTED BY FACSIMILE OR EMAIL;

   - ANY UNSIGNED OPT-OUT FORM; OR

   - ANY OPT-OUT FORM NOT COMPLETED IN ACCORDANCE WITH THE PROCEDURES APPROVED IN THE SOLICITATION ORDER.

5. The method of delivery of Opt-Out Forms to the Balloting Agent is at the election and risk of each Holder of a Claim or Interest. Except as otherwise provided herein, such delivery will be deemed made to the Balloting Agent only when the Balloting Agent **actually receives** the executed Opt-Out Form. Holders should allow sufficient time to assure timely delivery.

6. If multiple Opt-Out Forms are received from the same Holder with respect to the same Claim or Interest prior to the Opt-Out Deadline, the last Opt-Out Form timely received will supersede and revoke any earlier received Opt-Out Forms.

7. The Opt-Out Form is not a letter of transmittal and may not be used for any purpose other than to Opt-Out of the Third-Party Release. Accordingly, at this time, Holders of Interests should not surrender certificates or instruments representing or evidencing their Interests, and neither the Debtors nor the Balloting Agent will accept delivery of any such certificates or instruments surrendered together with an Opt-Out Form.

71306/0001-53758738v1

8. The Opt-Out Form does not constitute, and shall not be deemed to be, (a) a proof of claim, (b) proof of interest, or (c) an assertion or admission of a Claim or Interest.

9. <u>Please be sure to sign and date your Opt-Out Form</u>. If you are signing an Opt-Out Form in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Opt-Out Form

10. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**<u>PLEASE RETURN YOUR OPT-OUT FORM PROMPTLY!</u>**

**IF YOU HAVE RECEIVED A DAMAGED OPT-OUT FORM OR HAVE LOST YOUR OPT-OUT FORM, OR IF YOU HAVE ANY QUESTIONS REGARDING THIS OPT-OUT FORM OR THE INSTRUCTIONS OR PROCEDURES, PLEASE CONTACT THE BALLOTING AGENT AT:**

**(888) 454-0938 (Toll Free, U.S. and Canada) or +1 (646) 452-8302 (International)**

**Or via email at FreshRealmInfo@ra.kroll.com**

> **IF THE BALLOTING AGENT DOES NOT <u>ACTUALLY RECEIVE</u> THE OPT-OUT FORM ON OR BEFORE THE OPT-OUT DEADLINE, WHICH IS 5:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2026, THEN YOUR OPT-OUT ELECTION TRANSMITTED THEREBY WILL NOT BE EFFECTIVE.**

**EXHIBIT 5**

(Cover Letter)

71306/0001-53758738v1

<div align="center">**COMPANY LETTERHEAD**</div>

Via First-Class Mail

**RE: FreshRealm, Inc.,** *et al.*
**Chapter 11 Case No. 26-~~10258~~14656 (MEH) (Jointly Administered)**

Dear Holders of Claims entitled to vote on the Plan,

You have received this letter and the enclosed materials because you are entitled to vote on the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[1]

FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") on April 27, 2026.

On [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing the Debtors, to solicit acceptances for the Plan; (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and (e) for filing objections to the Plan.

Additionally, Article VIII of the Plan contains release, exculpation, and injunction provisions, and Article VIII.D of the Plan includes a third-party release. Thus, you are advised to review and consider the Plan carefully because your rights may be affected thereunder. You may elect not to grant the third-party release contained in Article VIII.D of the Plan only if you (a) do not vote to accept the Plan or are deemed to accept the Plan, and (b) return a Ballot or Opt-Out Form, as applicable, checking the box to "opt-out" from the third-party release.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN. THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY. IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Bankruptcy Court for distribution to Holders of Claims in connection with the solicitation of votes to accept the Plan. The Solicitation Package consists of the following, as applicable:

1. a copy of the Solicitation Procedures;

2. Ballot, together with detailed voting instructions and instructions on how to submit the Ballots, and a pre-addressed, postage prepaid return envelope;

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

3.  this letter;

4.  the Combined Hearing Notice;

5.  the Disclosure Statement (and exhibits thereto, including the Plan) as conditionally approved by the Bankruptcy Court;

6.  the Disclosure Statement Order (without exhibits, except for the Solicitation Procedures);

7.  a pre-addressed, postage prepaid reply envelope (if applicable); and

8.  any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Classes.

The Debtors have approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their estates, Holders of Claims, and all other parties in interest. Moreover, the Debtors believe that any alternative to Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the Chapter 11 Cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN IN ACCORDANCE WITH THE INSTRUCTIONS IN YOUR BALLOT. THE VOTING DEADLINE IS SEPTEMBER 15, 2026, AT 5:00 P.M. (PREVAILING EASTERN TIME).**

The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm. You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER on the Bankruptcy Court's website at: https://www.njb.uscourts.gov/.  Please be advised that Kroll/the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may not advise you as to whether you should vote to accept or reject the Plan or provide legal advice.

Sincerely,

_____
John Hanson, CFO

71306/0001-53758738v1

**Exhibit 6**

(Combined Hearing Notice)

71306/0001-53758738v1

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>FRESHREALM, INC., *et al*.,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

**NOTICE OF HEARING TO CONSIDER CONFIRMATION OF THE CHAPTER 11 PLAN**
**FILED BY THE DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

   **PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

71306/0001-53758738v1

solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m. (prevailing Eastern Time),** or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

> **PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

## CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **August 6, 2026** (the "Voting Record Date"), which is the date for determining which certain Holders of Claims are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is **September 15, 2026. At 5:00 p.m. (prevailing Eastern Time)** (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete all of the required information on the ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' balloting agent, Kroll Restructuring Administration LLC (the "Balloting Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

**Objection Deadline.** The deadline for filing objections to the Plan is **September 15, 2026, at 5:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline"). Any objection to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| Counsel to the Debtors |
|---|
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |

| United States Trustee |
|---|
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102<br>Attn: Fran B. Steele and David Gerardi |

71306/0001-53758738v1

| Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |
|---|
| **Official Committee of Unsecured Creditors** |
| **Fox Rothschild LLP**<br>49 Market Street,<br>Morristown, New Jersey 07960<br>Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris<br>Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com |

| **Counsel to Birch Grove Investments LLC** | |
|---|---|
| **Herbert Smith Freehills Kramer (US) LLP**<br>1177 Avenue of the Americas, New York, NY 10036,<br>Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga<br>Email: robert.schmidt@hsfkramer.com;<br>richard.farley@hsfkramer.com;<br>Andrew.citron@hsfkramer.com;<br>marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.**<br>The Legal Center, One Riverfront Plaza,<br>Newark, NJ 07102,<br>Attn: Andrew Sherman and Boris Mankovetskiy<br>Email: asherman@sillscummis.com;<br>bmankovetskiy@sillscummis.com |

| **Counsel to FaraNord (US) IV Pte Ltd** | |
|---|---|
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue, New York, NY 10022<br>Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer<br>Email: cmarcus@kirkland.com;<br>jordan.roberts@kirkland.com;<br>jess.lepper@kirkland.com;<br>Charles.martin@kirkland.com;<br>kelly.meyer@kirkland.com | **McCarter & English, LLP**<br>Fourt Gateway Center<br>100 Mulberry St.<br>Newark, NJ 07102<br>Attn: Jeffrey T. Testa<br>Email: jtesta@mccarter.com |

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE.** THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

YOU MAY ELECT NOT TO GRANT THE THIRD-PARTY RELEASE CONTAINED IN ARTICLE VIII.D OF THE PLAN ONLY IF YOU (A) DO NOT VOTE TO ACCEPT THE PLAN OR ARE DEEMED TO ACCEPT THE PLAN AND (B) RETURN A BALLOT OR OPT-OUT FORM, AS APPLICABLE, CHECKING THE BOX TO "OPT-OUT" FROM THE THIRD-PARTY RELEASE. SUBJECT TO ANY FINAL ORDER OF THE BANKRUPTCY COURT TO THE CONTRARY, REGARDLESS OF WHETHER THE BANKRUPTCY COURT DETERMINES THAT YOU HAVE A RIGHT TO OPT-OUT OF THE RELEASE, IF YOU (A) VOTE TO ACCEPT THE PLAN, OR (B) (I) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (II) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (III) VOTE TO REJECT OR ARE DEEMED TO REJECT THE PLAN AND, IN EACH CASE OF (B)(I)-(III), FAIL TO CHECK THE BOX TO "OPT-OUT" FROM THE THIRD-PARTY RELEASE ON THE APPLICABLE BALLOT OR OPT-OUT FORM, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE IXVIII.D OF THE PLAN. IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL BE DEEMED TO GRANT THE THIRD-PARTY RELEASE IN ARTICLE VIII.D OF THE PLAN.

71306/0001-53758738v1

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received the materials in electronic format), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein. Please be advised that the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may not advise you as to whether you should vote to accept or reject the Plan.

**Filing the Initial Plan Supplement**. The Debtors will file the Initial Plan Supplement (as defined in the Plan) by **September 8, 2026** and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

### BINDING NATURE OF THE PLAN

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

Dated: August __, 2026

*/s/ DRAFT*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
               wusatine@coleschotz.com
               rjareck@coleschotz.com
               dharris@coleschotz.com
               mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

**Exhibit 7**

(Plan Supplement Notice)

71306/0001-53758738v1

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| In re: | Chapter 11 |
| FRESHREALM, INC., *et al.*,[1] | Case No. 26-14656 (MEH) |
| Debtors. | (Jointly Administered) |

<div align="center">

**NOTICE OF FILING OF PLAN SUPPLEMENT**

</div>

**PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

---

[1]   The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement with the Bankruptcy Court on or before August 24, 2026 [Docket No. [●]]. The Plan Supplement contains the following documents, each as defined in the Plan: ((a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, (c) the Plan Administrator Agreement, (d) the Liquidating Trust Agreement, (e) the Wind-Down Budget, (f) any other necessary documentation in accordance with the Plan and (g) additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

> **PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **September 15, 2026, at 5:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline"). Any objection to the relief sought at the Confirmation Hearing **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline:

| **Counsel to the Debtors** |
|:---:|
| **Cole Schotz P.C.** <br> Court Plaza North, 25 Main Street <br> Hackensack, New Jersey 07601 <br> Attn: Ryan T. Jareck and Matteo Percontino <br> Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |
| **United States Trustee** |
| **Office of the United States Trustee for the District of New Jersey** <br> One Newark Center, Suite 2100 <br> Newark, New Jersey 07102 <br> Attn: Fran B. Steele and David Gerardi <br> Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |
| **Official Committee of Unsecured Creditors** |
| **Fox Rothschild LLP** <br> 49 Market Street, <br> Morristown, New Jersey 07960 <br> Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris <br> Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com |

71306/0001-53758738v1

| Counsel to Birch Grove Investments LLC | |
|---|---|
| **Herbert Smith Freehills Kramer (US) LLP** | **Sills Cummis & Gross P.C.** |
| 1177 Avenue of the Americas, New York, NY 10036, Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga Email: robert.schmidt@hsfkramer.com; richard.farley@hsfkramer.com; Andrew.citron@hsfkramer.com; marie.soga@hsfkramer.com | The Legal Center, One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew Sherman and Boris Mankovetskiy Email: asherman@sillscummis.com; bmankovetskiy@sillscummis.com |

| Counsel to FaraNord (US) IV Pte Ltd | |
|---|---|
| **Kirkland & Ellis LLP** | **McCarter & English, LLP** |
| 601 Lexington Avenue, New York, NY 10022 Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer Email: cmarcus@kirkland.com; jordan.roberts@kirkland.com; jess.lepper@kirkland.com; Charles.martin@kirkland.com; kelly.meyer@kirkland.com | Four Gateway Center 100 Mulberry St. Newark, NJ 07102 Attn: Jeffrey T. Testa Email: jtesta@mccarter.com |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact Kroll Restructuring Administration LLC (the "Balloting Agent") by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.**

Dated: August __, 2026

/s/ DRAFT

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:      msirota@coleschotz.com
            wusatine@coleschotz.com
            rjareck@coleschotz.com
            dharris@coleschotz.com
            mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

71306/0001-53758738v1

## **Exhibit 8**

(Assumption Notice)

71306/0001-53758738v1

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
rjareck@coleschotz.com
dharris@coleschotz.com
mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>FRESHREALM, INC., *et al.*,[1]<br><br>                  Debtors. | Chapter 11<br><br>Case No. 26-14656 (MEH)<br><br>(Jointly Administered) |

### NOTICE OF REGARDING EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED PURSUANT TO THE PLAN

**PLEASE TAKE NOTICE THAT** on [_____], 2026, the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court") entered an order [Docket No.__] (the "Disclosure Statement Order"): (a) authorizing FreshRealm, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. __] (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of FreshRealm, Inc. and Its Debtor Affiliates* [Docket No. ___] (as modified, amended, or supplemented from time to time, the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FreshRealm, Inc. (8505); FreshRealm Holdings, Inc. (1563); IHEC, LLC (8728); FreshRealm HR, LLC (7221); and FreshRealm Texas, LLC (8263). The location of FreshRealm, Inc.'s principal place of business and service address is: 901 W Linden Ave, Linden, NJ 07036.

[2] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

1

solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, noticing, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

> **PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE ASSUMED PURSUANT TO THE PLAN. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

**PLEASE TAKE FURTHER NOTICE THAT** on [●], the Debtors filed the Schedule of Assumed Executory Contracts and Unexpired Leases [Docket No. [●]] (the "Assumed Executory Contracts and Unexpired Leases List") with the Bankruptcy Court as part of the Plan Supplement as contemplated under the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to a contract that is listed on the Assumed Executory Contracts and Unexpired Leases List. Therefore, you are advised to carefully review the information contained in this notice and the related provisions of the Plan, including the Assumed Executory Contracts and Unexpired Leases List.

**PLEASE TAKE FURTHER NOTICE THAT** counterparties to Executory Contracts and Unexpired Leases that receive a Notice of Assumption of Executory Contracts and Unexpired Leases may file an objection to the Debtors' proposed assumption. Such objections **must**: (a) be in writing; (b) state with particularity the basis of the objection; (c) comply with the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of New Jersey; and (d) be filed with the Clerk of the Bankruptcy Court, and shall be served upon the following parties so as to be **actually received no later than fourteen (14) calendar days** after the date the Debtors file and serve the relevant assumption notice.

| Counsel to the Debtors |
|---|
| **Cole Schotz P.C.**<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attn: Ryan T. Jareck and Matteo Percontino<br>Email: rjareck@coleschotz.com; mpercontino@coleschotz.com |
| **United States Trustee** |
| **Office of the United States Trustee for the District of New Jersey**<br>One Newark Center, Suite 2100<br>Newark, New Jersey 07102 |

---

[3]  Neither the inclusion nor exclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Leases List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. Further, the Debtors expressly reserve all rights with respect to the Assumed Contracts, including the right to add or remove any Executory Contract or Unexpired Lease to or from the Assumed Executory Contracts and Unexpired Leases List pursuant to the terms of the Plan, at any time prior to the Effective Date.

71306/0001-53758738v1

| Attn: Fran B. Steele and David Gerardi<br>Email: fran.b.steele@usdoj.gov; david.gerardi@usdoj.gov |
|---|
| **Official Committee of Unsecured Creditors** |
| **Fox Rothschild LLP**<br>49 Market Street,<br>Morristown, New Jersey 07960<br>Attn: Joseph J. DiPasquale, Michael R. Herz, and Jesse M. Harris<br>Email: jdipasquale@foxrothschild.com; mherz@foxrothschild.com; jesseharris@foxrothschild.com |
| **Counsel to Birch Grove Investments LLC** |

| **Herbert Smith Freehills Kramer (US) LLP**<br>1177 Avenue of the Americas, New York, NY 10036,<br>Attn: Robert T. Schmidt, Richard E. Farley, Andrew Citron, and Marie Soga<br>Email: robert.schmidt@hsfkramer.com;<br>richard.farley@hsfkramer.com;<br>Andrew.citron@hsfkramer.com;<br>marie.soga@hsfkramer.com | **Sills Cummis & Gross P.C.**<br>The Legal Center, One Riverfront Plaza,<br>Newark, NJ 07102,<br>Attn: Andrew Sherman and Boris Mankovetskiy<br>Email: asherman@sillscummis.com;<br>bmankovetskiy@sillscummis.com |
|---|---|
| **Counsel to FaraNord (US) IV Pte Ltd** | |
| **Kirkland & Ellis LLP**<br>601 Lexington Avenue, New York, NY 10022<br>Attn: Christopher Marcus, Jordan D. Roberts, Jess Lepper, Charles H. Martin, and Kelly Meyer<br>Email: cmarcus@kirkland.com;<br>jordan.roberts@kirkland.com;<br>jess.lepper@kirkland.com;<br>Charles.martin@kirkland.com;<br>kelly.meyer@kirkland.com | **McCarter & English, LLP**<br>Four Gateway Center<br>100 Mulberry St.<br>Newark, NJ 07102<br>Attn: Jeffrey T. Testa<br>Email: jtesta@mccarter.com |

**PLEASE TAKE FURTHER NOTICE THAT**, on the Effective Date, the applicable Wind-Down Debtor, Liquidating Trustee or the Plan Administrator, as applicable, will assume the contracts (the "Assumed Contracts") listed on the Assumed Executory Contracts and Unexpired Leases List, attached hereto as Exhibit A, one or more of which you are a counterparty. The Assumed Executory Contracts and Unexpired Leases List can also be viewed on the Debtors case website, https://restructuring.ra.kroll.com/Freshrealm.

**PLEASE TAKE FURTHER NOTICE THAT**, on the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease is: (1) the TSA; (2) the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) an Insurance Policy; (5) an Asset Purchase Agreement; or (6) to be assumed by the Debtors and assigned to any Purchaser in connection with any Sale Transactions and pursuant to any Sale Transactions Documentation or the TSA.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Bankruptcy Court will consider Confirmation of the Plan will commence on **September 24, 2026, at 10:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard (the "Confirmation Hearing") before the Honorable Judge Mark Edward Hall, United States Bankruptcy Judge, Martin Luther King, Jr. Federal Building, 50 Walnut Street, Courtroom 3E, Newark, NJ 07102.

---

**PLEASE BE ADVISED:** THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE BANKRUPTCY COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

---

**PLEASE TAKE FURTHER NOTICE** that section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to Cure, or provide adequate assurance that it will promptly Cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to Cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in Exhibit A hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no Cure amount outstanding for such Executory Contract or Unexpired Lease.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with proposed Cure amounts, your objection (a "Cure Objection") **must**: (i) be in writing; (ii) state with particularity the basis of the objection and, if the objection pertains to the proposed Cure amounts, state the correct Cure amount alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (iii) be Filed with the Clerk of the United States Bankruptcy Court for the district of New Jersey, Martin Luther King Jr. Building, 50 Walnut Street, Newark, NJ 07102, or electronically by attorneys who regularly practice before the Bankruptcy Court in accordance with the General Order Regarding Electronic Means for Filing, Signing, and Verification of Documents dated March 27, 2002 (the "General Order") and the Commentary Supplementing Administrative Procedures dated as of March 2004 (the "Supplemental Commentary") (the General Order, the Supplemental Commentary and the User's Manual for the Electronic Case Filing System can be found at www.njb.uscourts.gov, the official website for the Bankruptcy Court) and, by all other parties-in-interest and shall be served in accordance with the General Order and the Supplemental Commentary no later than fourteen (14) days after the Effective Date or any other deadline that may be set by the Bankruptcy Court (the "Cure Objection Deadline").

**PLEASE TAKE FURTHER NOTICE THAT** if no objection is filed by the Cure Objection Deadline, then: **(i) you will be deemed to have stipulated that the Cure amounts as determined by the Debtors are correct; (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure amount under the proposed Assumed Contract; and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assumption**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption or assumption and assignment of the Executory Contract(s) and Unexpired Lease(s) and/or proposed Cure amounts in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing or a later date as fixed by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** nothing herein: (i) alters in any way the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract; (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Assumed Contract against the Debtors that may arise under such Assumed Contract.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to **obtain a copy of the Disclosure Statement, the Plan, or related documents at no additional cost**, you should contact Kroll Restructuring Administration LLC (the "Balloting Agent") by: (a) visiting the Debtors' restructuring website at: https://restructuring.ra.kroll.com/Freshrealm; (b) writing to FreshRealm, Inc. Ballot Processing

71306/0001-53758738v1

Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing the Balloting Agent at FreshRealmInfo@ra.kroll.com, referencing "FreshRealm Inc. – Solicitation Inquiry" in the subject line; or (d) calling the Balloting Agent at (888) 454-0938 (toll free, U.S. and Canada) or +1 (646) 452-8302 (international). You may obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://restructuring.ra.kroll.com/Freshrealm, or the Bankruptcy Court's website at https://www.njb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

**ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND <u>ARTICLE VIII.D OF THE PLAN CONTAINS A THIRD-PARTY RELEASE</u>. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE BALLOTING AGENT.**

---

[*Remainder of Page Intentionally Left Blank*]

Dated: August __, 2026

*/s/ DRAFT*

**COLE SCHOTZ P.C.**
Michael D. Sirota
Warren A. Usatine
Ryan T. Jareck
Daniel J. Harris
Matteo Percontino
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
            wusatine@coleschotz.com
            rjareck@coleschotz.com
            dharris@coleschotz.com
            mpercontino@coleschotz.com

*Counsel to the Debtors and Debtors-in-Possession*

71306/0001-53758738v1

## SCHEDULE A

## SCHEDULE OF CONTRACTS AND LEASES AND PROPOSED CURE AMOUNTS

## [OMITTED]

71306/0001-53758738v1